Deposition of William Quick　　　　　　　　　　　　　　　　　　　　Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 1 of 16

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3   MARYLAND SHALL ISSUE, INC.,

 4   et al.,

 5              Plaintiffs,

 6   vs.                                Civil Action No.:

 7   ANNE ARUNDEL COUNTY, MD,           1:22-cv-00865-SAG

 8              Defendant.

 9   _____/

10

11              The 30(b)(6) deposition of WILLIAM QUICK

12   was held on Thursday, September 8, 2022, commencing at

13   9:10 a.m., at the Law Offices of Anne Arundel County

14   Office of Law, 2660 Riva Road, 4th Floor, Annapolis,

15   Maryland, before Steven Poulakos, Notary Public.

16

17

18

19

20                     EXHIBIT I

21   REPORTED BY:  Steven Poulakos, RPR
```

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 2 of 16

Deposition of William Quick                                      Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 2

1  APPEARANCES:
2     ON BEHALF OF THE PLAINTIFFS:
3     MARK PENNAK, ESQUIRE
4        Maryland Shall Issue, Inc.
5        9613 Harford Road
6        Suite C#1015
7        Baltimore, Maryland  21234
8        Telephone: 301.873.3671
9        Email: mpennak@mraylandshallissue.org
10
11    ON BEHALF OF THE DEFENDANT:
12    JAMES E. MILLER, ESQUIRE
13    NINA SUDARSAN, ESQUIRE
14       Everytown Law
15       450 Lexington Avenue
16       New York, New York  10017
17       Telephone: 646.324.8220
18       Email: jedmiller@everytown.org
19
20 (Appearances continued on next page.)
21

Page 3

1  APPEARANCES (Continued):
2     ON BEHALF OF THE DEFENDANT:
3     HAMILTON F. TYLER, ESQUIRE
4        Anne Arundel County Office of Law
5        Deputy County Attorney
6        2660 Riva Road
7        4th Floor
8        Annapolis, Maryland  21401
9        Telephone: 410.222.4208
10       Email: htyler@aacounty.org
11 And
12    ON BEHALF OF THE DEFENDANTS:
13    TAMAL A. BANTON, ESQUIRE
14       Anne Arundel County Office of Law
15       Senior Assistant County Attorney
16       2660 Riva Road
17       4th Floor
18       Annapolis, Maryland  21401
19       Telephone: 410.222.7888
20       Email: tbanton@aacounty.org
21

Page 4

1                 INDEX
2          Deposition of WILLIAM QUICK
3             September 8, 2022
4  Examination by:                          Page
5  Ms. Sudarsan                               5
6
7                EXHIBITS
8  Exhibit No.  Description              Marked
9  Exhibit 9    Notice of Rule 30(b)(6) Deposition   9
10
11         PREVIOUSLY MARKED EXHIBITS
12 Exhibit 4    Youth Handgun Safety Act Notice   103
13             pamphlet notice
14
15
16
17
18
19
20
21

Page 5

1                  - - -
2             P R O C E E D I N G S
3                  - - -
4  Whereupon,
5          WILLIAM QUICK,
6  called as a witness, having been first duly sworn to
7  tell the truth, the whole truth, and nothing but the
8  truth, was examined and testified as follows:
9          EXAMINATION BY MS. SUDARSAN
10   Q   Good morning.
11   **A   Good morning.**
12   Q   I am Nina Sudarsan and I am with Everytown
13 Law.  And I represent Anne Arundel County, the
14 defendant in this litigation.  I'm joined by a couple
15 of my colleagues who I will let introduce themselves.
16       MR. MILLER:  Good Morning, Mr. Quick.  My
17 name is James Miller.  I'm also a lawer with Everytown
18 Law representing Anne Arundel County.
19       MR. BANTON:  Good morning.  Tamal Banton
20 from Anne Arundel County Office of Law.
21       THE WITNESS:  Good morning.

Deposition of William Quick — Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 3 of 16

Page 22

1  Q   What products does Cindy's Hot Shots sell?
2  A   **Firearms, ammunition and firearms**
3  **accessories.**
4  Q   Anything else?  Any other products?
5  A   **Not for the most part.**
6  Q   Do you sell gun safes?
7  A   **Yes.**
8  Q   Do you sell gun locks?
9  A   **Yes.**
10 Q   Do you sell lock boxes?
11 A   **Yes.**
12 Q   And any other products?
13 A   **Yes.**
14 Q   Besides the ones you've already listed,
15 firearms, ammunition, accessories, gun safes?
16 A   **Anything having to do with firearms.**
17 Q   Do you sell sporting goods?
18 A   **Define sporting goods.**
19 Q   Do you sell fishing poles?
20 A   **We do not.**
21 Q   What sporting goods do you sell?

Page 23

1  A   **For the most part, nothing.**
2  Q   How many firearms per month do you sell at
3  Cindy's Hot Shots on average?
4  A   **It's hard to quantify.**
5      MR. PENNAK:  Is the question directed at
6  how many firearms he personally sells or how many
7  firearms his shop sells?
8  BY MS. SUDARSAN:
9  Q   All of my questions today -- as you've
10 already agreed to, you are here representing Cindy's
11 Hot Shots.  So as you already agreed, your testimony is
12 the testimony of Cindy's Hot Shots.
13 A   **Right.**
14 Q   When I say you, I'm referring to Cindy's
15 Hot Shots.
16 A   **Of course.**
17 Q   If you are confused as to whether or not
18 I'm asking you a question in your individual capacity
19 or in the capacity of Cindy's Hot Shots, please let me
20 know.
21 A   **Of course.**

Page 24

1  Q   How many firearms per month does Cindy's
2  Hot Shots sell?
3  A   **I'm not sure.  I would have to look in the**
4  **system.**
5  Q   More than 10 firearms a month?
6  A   **For sure.**
7  Q   More than 100?
8  A   **Between 10 and a hundred for sure.**
9  Q   Between 10 and a hundred.  Let's get a
10 little closer.  Do you think more than 50?
11 A   **I don't know.  I don't look at those**
12 **numbers often.**
13 Q   Do you have a sense for your annual sales?
14 A   **Yes.  Annually I'd say about 2,000.**
15 Q   How many transactions per month involve the
16 sale of ammunition but not a firearm?
17 A   **Thousands.**
18 Q   Per month?
19 A   **Yes.**
20     MR. PENNAK:  Thousands of transactions?
21     THE WITNESS:  Yes.

Page 25

1  BY MS. SUDARSAN:
2  Q   Thousands.  Are we closer to 1,000 or
3  closer to 10,000?
4  A   **Closer to a thousand.**
5  Q   One thousand?
6  A   **Yes.**
7  Q   Do you do any other type of business at
8  Cindy's Hot Shots?
9  A   **We do not.**
10 Q   You don't offer training classes?
11 A   **We do not.  So we employ an outside company**
12 **to do the training.**
13 Q   So nobody -- no employees of Cindy's Hot
14 Shots conduct the training classes offered at Cindy's
15 Hot Shots?
16 A   **No, not under Cindy's Hot Shots' license.**
17 Q   Are they offered in your facilities in your
18 building?
19 A   **Not in the firing range, but in the**
20 **training facility, yes.**
21 Q   But you advertise training on your website?

**Office (410) 821-4888**
**CRC Salomon, Inc.**
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
**Facsimile (410) 821-4889**
**Page: 7 (22 - 25)**

Page 30

 1  during this first time gun owner assistance?
 2    A    We do not.
 3    Q    Do you offer gun rentals at Cindy's Hot
 4  Shots?
 5    A    We do.
 6    Q    And that's under Cindy's Hot Shots, not --
 7    A    Yes.
 8    Q    Do you offer any other public education at
 9  Cindy's Hot Shots?
10    A    We do not.
11    Q    And do you do any public advocacy?
12    A    I don't think so.
13    Q    Do you do any lobbying?
14    A    No.
15    Q    And does the ordinance affect your ability
16  to offer this first time gun owner training in any way?
17    A    It could.
18    Q    How?
19    A    By violating everybody's First Amendment
20  right.
21    Q    What does that mean?

Page 31

 1    A    So a customer coming in is going to have to
 2  look at the pamphlet.  If they don't agree with the
 3  pamphlet and it's being forced on every single range in
 4  Maryland or Anne Arundel County at least, they have no
 5  choice but to be exposed to it.
 6    Q    How does that exposure affect your ability
 7  to talk them through the first time gun owner
 8  assistance that you described earlier?
 9    A    It could be distracting.
10    Q    How so?
11    A    If it's something that somebody doesn't
12  want to partake in and they're being forced to partake
13  in it, that could be distracting.
14    Q    Has the ordinance affected your ability to
15  offer this first time gun owner assistance?
16         MR. PENNAK:  Asked and answered.
17  BY MS. SUDARSAN:
18    Q    You can answer.
19    A    I believe I did.
20    Q    How many times has the ordinance affected
21  your ability to offer this first time gun owner

Page 32

 1  assistance?
 2    A    I don't know.
 3    Q    More than once?
 4    A    I'm not sure.
 5    Q    Can you walk me through a specific instance
 6  with a customer where the ordinance affected your
 7  ability to talk them through or show them the first
 8  time gun owner assistance that you provide?
 9         MR. PENNAK:  Are you talking about the
10  short period of time in which the pamphlets were
11  available and prior to being distributed under the
12  county's ordinance until they were removed?  I'm not
13  sure about the timeframe here.  Is it a hypothetical
14  question or is it -- relates to a particular time?
15         MS. SUDARSAN:  I asked for specific
16  instances.  So that's not a hypothetical.
17         MR. PENNAK:  Okay.
18         MS. SUDARSAN:  And I'm asking for any time
19  since the ordinance has been in effect.
20         THE WITNESS:  Being that it isn't in effect
21  right now and it was only in effect for a short period

Page 33

 1  of time, it has not.
 2  BY MS. SUDARSAN:
 3    Q    So you cannot identify any instances
 4  specifically where you were unable to provide the first
 5  time gun owner assistance to a customer because of the
 6  ordinance?
 7         MR. PENNAK:  Asked and answered.
 8         THE WITNESS:  I cannot.
 9  BY MS. SUDARSAN:
10    Q    I couldn't hear your answer.
11    A    I did answer that.
12    Q    What was your answer?
13    A    That -- can you repeat the question?
14    Q    So you cannot identify a single instance
15  where the ordinance affected your ability to offer the
16  first time gun owner assistance to a customer?
17    A    I cannot.
18    Q    And you testified that it would be
19  distracting to a customer.  What did you mean by that?
20         MR. PENNAK:  Asked and answered.
21

Page 34

1  BY MS. SUDARSAN:
2      Q    You can answer.
3      A    I believe I did.
4           MR. BANTON: You have to answer the
5  question.
6           MR. PENNAK: Mr. Banton, she's conducting
7  this deposition. You don't get to tag team. You
8  cannot answer this question. You cannot participate on
9  this when she's conducting the deposition. That tag
10 teaming, it's improper and I'm going to object to it.
11          MR. BANTON: Can we go off the record?
12          MR. PENNAK: No, I'm not going off the
13 record.
14          MR. BANTON: I'll stay on the record then.
15 He's been instructed to answer the question. You're
16 coaching him and then saying he's already answered the
17 question. He still has to answer the question.
18          MR. PENNAK: You're not conducting the
19 deposition. You don't get to participate unless you --
20          MR. BANTON: I'll go talk to her after
21 every question.

Page 35

1           MR. PENNAK: You can talk to your counsel
2  if you want.
3           MR. BANTON: We'll do that.
4           MR. PENNAK: But you can't direct my
5  witness to answer the questions. That's tag teaming.
6           MR. BANTON: We're good. I'll take care of
7  it. I've done a thousand depositions. However you
8  want to handle it, you can handle it.
9           MR. PENNAK: Talk to your counsel. She's
10 conducting the deposition. She is the only one
11 conducting it. Otherwise it's completely improper for
12 you to address.
13          MR. BANTON: You're coaching the witness.
14          MR. PENNAK: I'm not coaching the witness.
15          MR. BANTON: Yes, you are.
16 BY MS. SUDARSAN:
17     Q    I believe your testimony was the pamphlets
18 could be distracting because a customer I believe you
19 said would disagree with them?
20     A    Yes.
21     Q    And did you say they would be

Page 36

1  uncomfortable?
2      A    They could be.
3      Q    How so?
4      A    Being forced to view something that they
5  don't want to view.
6      Q    How do you know that your customers might
7  be distracted or could be distracted by the pamphlets?
8      A    I don't know. They could be, though. I
9  just -- I don't want to expose my customers to that.
10     Q    Have you spoken to any customers about the
11 ordinance?
12     A    I have not.
13     Q    Have you spoken to any customers about the
14 pamphlets?
15     A    I have not.
16     Q    So when you say they could be distracted,
17 you are guessing?
18          MR. PENNAK: Argumentative.
19          THE WITNESS: I might -- it's an educated
20 guess.
21 BY MS. SUDARSAN:

Page 37

1      Q    Educated based on what?
2      A    I deal with customers constantly. I know
3  what ticks customers off and that more than likely
4  would.
5      Q    What kinds of things tick off your
6  customers?
7      A    There's a lot of things. Anything having
8  to do with stripping the constitutional freedoms for
9  sure.
10     Q    What constitutional freedoms are you
11 referring to?
12     A    Any, any and all.
13     Q    Which constitutional freedoms have you
14 discussed with your customers?
15     A    Most constitutional freedoms.
16     Q    Have you discussed the First Amendment with
17 your customers?
18     A    I have.
19     Q    In what capacity?
20     A    That's a hard one. I can't remember back
21 to specific conversations, but I know I have.

Page 42

1  A    So in the pamphlet --
2      (Reviewing document.)
3      More than likely just the fact that this is
4  being forced on the firearms retailers and no one else.
5  It infers that firearms -- firearms are an issue in
6  relation to suicide.
7  Q    When you say more than likely, do you mean
8  more than likely the reason your customers will be
9  ticked off?
10 A    Yes.
11 Q    How do you know that?
12 A    I know my customers.
13 Q    Is it possible that some of your customers
14 who see the pamphlets will agree with the content?
15     MR. PENNAK:  Objection, calls for
16 speculation.
17     THE WITNESS:  I don't know.
18 BY MS. SUDARSAN:
19 Q    But it's possible that some of your
20 customers will agree with the pamphlet?
21 A    It could be.

Page 43

1      MR. PENNAK:  Same objection.
2  BY MS. SUDARSAN:
3  Q    You are guessing that none of your
4  customers will agree with anything in this pamphlet?
5  A    Yes.
6  Q    And you see on the cover on this pamphlet
7  that one of the authors of the pamphlet marked as
8  Exhibit 5 is the National Shooting Sports Foundation?
9  A    Yes.
10 Q    Is it possible that some of your customers
11 agree with the National Shooting Sports Foundation?
12     MR. PENNAK:  Objection, calls for
13 speculation.
14     MS. SUDARSAN:  Counsel, can you please let
15 me finish my questions before you lodge your objection?
16     MR. PENNAK:  I apologize.  I thought you
17 were finished.
18     MS. SUDARSAN:  I was mid sentence.
19     THE WITNESS:  Can you repeat the question?
20 BY MS. SUDARSAN:
21 Q    Is it possible that some of your customers

Page 44

1  will agree with the pamphlet that was authored by the
2  National Shooting Sports Foundation?
3      MR. PENNAK:  Same objection.
4      THE WITNESS:  I don't know.
5  BY MS. SUDARSAN:
6  Q    You don't know because you haven't spoken
7  to any of your customers about the ordinance or the
8  pamphlets?
9  A    Yes.
10 Q    So everything you are saying here today
11 about what your customers think and feel is a guess?
12 A    An educated guess, yes.
13 Q    Is Cindy's Hot Shots a member of MSI?
14 A    Yes.
15 Q    Is Cindy's Hot Shots a corporate member of
16 MSI?
17 A    Yes.
18 Q    How long has Cindy's Hot Shots been a
19 member of MSI?
20 A    I want to say at least a year.
21 Q    And why did Cindy's Hot Shots become a

Page 45

1  corporate member of MSI?
2  A    Because we believe in their mission.
3  Q    What is the mission of MSI?
4  A    To fight for everyone's Second Amendment
5  rights in Maryland.
6  Q    And what does being a corporate member of
7  MSI entail for Cindy's Hot Shots?
8  A    I don't know.  There is a fee.
9  Q    Do you remember what the fee was?
10 A    I do not.
11 Q    Do you attend meetings?
12 A    I have not.
13 Q    Are there meetings?  Does MSI have meetings
14 for its members?
15 A    I believe so.
16 Q    Has anyone from Cindy's Hot Shots attended
17 any of those MSI meetings?
18 A    No.
19 Q    Were you a member of MSI before this
20 litigation started?
21 A    I was.

Deposition of William Quick — Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 7 of 16

Page 46

1  Q    Do you receive information from MSI?
2  A    Yes.
3  Q    What kind of information?
4  A    **Updates on suits going on in Maryland,**
5  **updates on laws in Maryland.**
6  Q    Anything else?
7  A    **That's it for the most part.**
8  Q    Do they send this by email?
9  A    **Email, mail, both.**
10 Q    As a corporate member, did you have any say
11 in whether or not MSI pursued this litigation?
12 A    **I don't believe so.**
13 Q    Are you an individual member of MSI?
14 A    **I am.**
15 Q    How long have you been an individual
16 member?
17 A    **At least three years.**
18 Q    Why did you become an individual member of
19 MSI?
20 A    **Because I believe in their mission.**
21 Q    And that mission is to protect the Second

Page 47

1  Amendment rights of everyone in Maryland?
2  A    **Yes.**
3  Q    As an individual member, do you attend MSI
4  meetings?
5  A    **I do not.**
6  Q    Do you receive information from MSI in your
7  capacity as an individual member?
8  A    **I do.**
9  Q    Is that information about bills?
10 A    **Yes.**
11 Q    And about other lawsuits?
12 A    **Yes.**
13 Q    We've discussed the ordinance at issue in
14 this litigation and you are familiar with Bill 108-21,
15 right?
16 A    **I am.**
17 Q    And you've read it before?
18 A    **I have.**
19 Q    You I believe testified you learned about
20 the bill from your dad?
21 A    **I believe so, yes.**

Page 48

1  Q    What was your reaction to the ordinance
2  when you first heard about -- when you first read it?
3  A    **I was in disagreeance with it.**
4  Q    What do you disagree with in the ordinance?
5  A    **Being forced to do it, being forced to**
6  **distribute.**
7  Q    Being forced to distribute what?
8  A    **The pamphlets.**
9  Q    Why do you disagree with the distribution
10 of the pamphlets?
11 A    **Because it violates my First Amendment**
12 **rights.**
13 Q    How so?
14      MR. PENNAK:  Calls for a legal conclusion
15 by the witness.  Objection.
16      THE WITNESS:  I'm being forced to
17 distribute it and I may not agree with it -- I don't
18 agree with it and I'm being forced to.
19 BY MS. SUDARSAN:
20 Q    When you first heard about the bill, was
21 this before it went into effect?

Page 49

1  A    **Yes.**
2  Q    And did anyone from Cindy's Hot Shots
3  attend a public hearing on the bill?
4  A    **No -- yes.**
5  Q    Yes?
6  A    **Yes.**
7  Q    Who attended a public hearing?
8  A    **Tom.**
9  Q    Tom is Tom Quick, your dad?
10 A    **Yes.**
11 Q    How many hearings did your dad, Tom Quick
12 attend?
13 A    **Just one.**
14 Q    Do you know when that was?
15 A    **I don't.**
16 Q    Did Tom Quick speak at the public hearing?
17 A    **I don't know.**
18 Q    Did you talk to Tom Quick about the hearing
19 before he attended?
20 A    **No.**
21 Q    Did you talk to him after?

**Office (410) 821-4888**
**CRC Salomon, Inc.**
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
**Facsimile (410) 821-4889**
**Page: 13 (46 - 49)**

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 8 of 16

Deposition of William Quick                                    Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 54

1  Q    Do you know if the pamphlets had already
2  been developed when the bill was voted on?
3  A    I have no idea.
4  Q    And you thought the ordinance wouldn't pass
5  and that's why you didn't attend the public hearing or
6  reach out to the county?
7       MR. PENNAK:  Asked and answered.
8       THE WITNESS:  Yes.
9  BY MS. SUDARSAN:
10 Q    Once you found out the ordinance had
11 passed, why didn't you reach out about giving Cindy's
12 Hot Shots input on the literature?
13 A    Because I didn't agree with the bill.
14 Q    Did you not think it was important to give
15 Cindy's Hot Shots' input on the literature that you
16 would be displaying and distributing at your store?
17 A    No, because I wasn't going to agree with it
18 anyway.
19 Q    There would have been no content that you
20 would have agreed to post and distribute in your store
21 under this ordinance?

Page 55

1  A    More than likely not.
2  Q    We were previously looking at the document
3  marked Exhibit 5.  Do you have that in front of you?
4  A    Yes.
5  Q    If you can just look at that and you
6  previously said you have read this pamphlet before?
7  A    I have.
8  Q    We started to talk about this earlier,
9  but -- and if you need to read the pamphlet again
10 today, that's fine, but what do you disagree with --
11 what do you disagree with that is written in this
12 pamphlet?
13 A    The pamphlet infers that there's a higher
14 risk of suicide with firearms ownership.
15 Q    Where in the pamphlet --
16 A    In its entirety.
17 Q    Every word of this pamphlet infers that the
18 rate of suicide is higher with a firearm?
19 A    Specifically in this section.
20 Q    For the record, you are showing me I think
21 page 2 of this pamphlet that is titled some people are

Page 56

1  more at risk for suicide than others?
2  A    Environmental factors down at the bottom,
3  access to lethal means including firearms.
4  Q    You are pointing to the second column?
5  A    Yes.
6  Q    Titled environmental factors?
7  A    Yes.
8  Q    And the last line that -- and you read
9  access to lethal means including firearms?
10 A    Yes.
11 Q    What do you disagree with in that
12 statement?
13 A    I don't agree with that statement.
14 Q    What don't you agree with?
15      MR. PENNAK:  Asked and answered.
16      THE WITNESS:  I don't agree with the
17 statement as a whole.
18 BY MS. SUDARSAN:
19 Q    What is the basis for your disagreement
20 with the statement access to lethal means including
21 firearms and drugs?

Page 57

1  A    I don't -- I don't believe that that leads
2  to a higher risk of suicide.
3  Q    On this same page -- and maybe you read
4  this before and I missed it.  I apologize.  The
5  document says, risk factors are characteristics or
6  conditions that increase the chance that a person may
7  try to take their life.
8  A    Yes.
9  Q    And you disagree that access to lethal
10 means including firearms and drugs may increase the
11 chance that a person tries to take their life?
12 A    Yes.
13 Q    What is your basis for disagreeing with
14 that?
15 A    I don't believe it.  I've been around
16 firearms my whole life.  I know tons of people that
17 have.  I believe if you're going to do something as
18 horrible as suicide, you're planning on doing it,
19 you're going to do it anyway whether or not you have
20 access to a firearm.
21 Q    Does this document say that firearms are

Page 58

1 the only way that someone may try to take their life?
2         MR. PENNAK: Objection. The document
3 speaks for itself.
4         THE WITNESS: It does not.
5 BY MS. SUDARSAN:
6    Q    So your disagreement that if someone is
7 suicidal, they will find a way to take their life isn't
8 disputed by this document?
9         MR. PENNAK: Objection, mischaracterizes
10 the document.
11        THE WITNESS: I don't know. I'm not sure.
12 BY MS. SUDARSAN:
13   Q    So you just said your disagreement with the
14 statement that access to lethal means including
15 firearms and drugs increases the chance that a person
16 may try to take their life is that if someone wanted to
17 take their life, they would find a different way. I am
18 asking is that statement -- is your understanding that
19 that statement is disputed by this pamphlet?
20   A    **No. I think it demonizes firearms.**
21   Q    How so?

Page 59

1    A    **I don't know. It's says access to lethal**
2 **means including firearms and drugs increase risk**
3 **factors or a chance the person may commit suicide.**
4    Q    Do you think that is a factually inaccurate
5 statement that access to lethal means including
6 firearms and drugs increase the chance that a person
7 may try to take their life?
8    A    **I do.**
9    Q    What is your basis for disagreeing with
10 that as a factual matter?
11   A    **I just don't agree with it.**
12   Q    You said earlier you've been around
13 firearms all your life. Is your disagreement based on
14 your relationship with firearms?
15   A    **Yes.**
16   Q    Is it based on anything else?
17   A    **My experiences throughout life.**
18   Q    Have you studied the rate of firearm
19 suicide in Anne Arundel County?
20   A    **I have not.**
21   Q    Have you studied the rate of firearm

Page 60

1 suicide in Maryland?
2    A    **I have not.**
3    Q    Have you studied the rate of firearm
4 suicide in the United States?
5    A    **No.**
6    Q    Have you studied the global rate of firearm
7 suicide?
8    A    **No.**
9    Q    Do you agree that firearms can be lethal?
10   A    **Of course.**
11   Q    Do you agree that sometimes people use
12 firearms to try to kill themselves?
13   A    **Yes.**
14   Q    And you agree that sometimes people use
15 firearms to kill themselves?
16   A    **Yes.**
17   Q    Why do you think someone would use a
18 firearm to try to kill themselves?
19   A    **I don't know.**
20   Q    Do you think it's because firearms are
21 lethal?

Page 61

1         MR. PENNAK: Asked and answered.
2         THE WITNESS: I don't know.
3 BY MS. SUDARSAN:
4    Q    Do you think that if someone wanted to try
5 to take their own life, they may use an unlocked
6 firearm that they found?
7         MR. PENNAK: Calls for speculation on the
8 part of the witness.
9         THE WITNESS: Possibly.
10 BY MS. SUDARSAN:
11   Q    If someone wanted to take their life, do
12 you think they would be more likely to try if there
13 were an unlocked firearm nearby?
14        MR. PENNAK: Calls for speculation on the
15 part of the witness.
16        THE WITNESS: I don't think so.
17 BY MS. SUDARSAN:
18   Q    You don't think so?
19   A    **I don't think so.**
20   Q    Do you agree that one way to prevent
21 suicide would be to safely secure a firearm from

**Office (410) 821-4888**
**CRC Salomon, Inc.**
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
**Facsimile (410) 821-4889**
**Page: 16 (58 - 61)**

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 10 of 16

Deposition of William Quick                                   Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 66

1  A   Can you repeat the question?
2  Q   So you agree that the information in this
3  pamphlet regarding securing firearms could be helpful
4  information to provide to a firearm owner who is
5  worried that someone in their family or household may
6  be suicidal?
7       MR. PENNAK: Same objection.
8       THE WITNESS: I feel like there's many
9  other ways to get that information.
10 BY MS. SUDARSAN:
11 Q   But is this one way of getting that
12 information to firearm owners?
13 A   I guess.
14 Q   Would you be happy to learn that one of
15 your customers was helped by the information in this
16 pamphlet?
17      MR. PENNAK: Calls for a hypothetical.
18 Never mind.
19      THE WITNESS: Yes.
20 BY MS. SUDARSAN:
21 Q   So you agree that firearms are lethal and

Page 67

1  you agree that a gun owner who is worried that someone
2  who is suicidal may try to access their firearm should
3  ensure that the firearm is locked and secured, right?
4  A   Yes.
5  Q   Now I'm going to show you what -- now I'm
6  going to show you this one pager that says at the top
7  do you have unresolved conflicts. It's included in the
8  document marked Exhibit 5.
9  A   Yes.
10 Q   Do you see that?
11 A   Yes.
12 Q   Have you seen this pamphlet before?
13 A   I have.
14 Q   Was this one of the two pamphlets required
15 under the ordinance?
16 A   Yes.
17 Q   And you've read this before you said?
18 A   Yes.
19 Q   Do you agree with the content of this
20 pamphlet?
21 A   I do not.

Page 68

1  Q   What don't you agree with in this pamphlet?
2  A   I don't agree with the whole thing. I
3  don't agree with it.
4  Q   Okay. Maybe we can go through it
5  line-by-line and you can tell me what you disagree
6  with. The first line, do you have unresolved
7  conflicts.
8  A   Um-hmm.
9  Q   What do you disagree with?
10 A   I disagree that -- essentially this is
11 saying are you trying to -- I just don't agree with it.
12 I just don't.
13 Q   So you cannot articulate --
14 A   No.
15 Q   -- anything written on this pamphlet that
16 you find objectionable?
17 A   No.
18 Q   So what is the basis for your disagreement?
19 A   I just don't agree with it.
20 Q   You don't disagree with anything that is
21 written here is what you just testified, but you --

Page 69

1       MR. PENNAK: Mischaracterizes the witness's
2  testimony. Object.
3       THE WITNESS: I don't agree with it.
4  BY MS. SUDARSAN:
5  Q   I just asked you cannot articulate anything
6  on this pamphlet that you disagree with and you said,
7  and we can have the court reporter read it back, I
8  think you said I do not?
9  A   I can't articulate it. I don't agree with
10 it, though.
11 Q   Why don't you talk me through what you
12 don't agree with?
13      MR. PENNAK: Is there a question pending?
14 I mean, you have to ask a question. Talk it out is not
15 a question.
16 BY MS. SUDARSAN:
17 Q   The statement conflict resolution is a
18 process to help you find the best way to resolve
19 conflicts and disagreements peacefully. Do you agree
20 or disagree with that statement?
21      MR. PENNAK: Asked and answered.

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 18 (66 - 69)

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 11 of 16

Deposition of William Quick                                    Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 78

BY MS. SUDARSAN:

Q   You have no reason to think that the veterans crisis line wouldn't be a good resource for someone who is experiencing conflict to call?

A   **I don't know.  I'm not familiar with it.**

Q   So you have no basis to disagree with the veterans crisis line as a resource for people who are in conflict?

A   **Correct.**

Q   So you have not identified anything listed or said or stated on this pamphlet that you disagree with?

MR. PENNAK:  Argumentative.

THE WITNESS:  No.

BY MS. SUDARSAN:

Q   Are firearms mentioned in this pamphlet?

A   **They are not.**

Q   Do you agree that firearms are sometimes used in conflict?

A   **Yes.**

Q   People sometimes use guns to intimidate

Page 79

others?

A   **Among other things, yes.**

Q   People sometimes use guns to injure others?

A   **Yes.**

Q   People sometimes use guns to kill others?

A   **Yes.**

Q   In your Interrogatory responses which you referenced earlier, you objected that this document sends the message that possession of firearms and ammunition is causally related to the illegal use of firearms and ammunition in conflict resolution.  In our previous discussion of this pamphlet, you did not mention that objection.  Would you like to correct your testimony?

A   **Yes.**

Q   And where in the document is that message communicated?

A   **The fact that it's present with the firearms and suicide prevention packet.**

Q   But that is not communicated in this document, right?

Page 80

MR. PENNAK:  Objection.  Document speaks for itself.

THE WITNESS:  It does.

BY MS. SUDARSAN:

Q   Where?

A   **It's a part of the firearm suicide prevention packet.**

Q   And these two pamphlets together, how do you read them?

A   **Can you elaborate?**

Q   You said it's included with this pamphlet?

A   **Right.**

Q   And so the message that firearms and ammunition are causally related to the illegal use of firearms and ammunition and conflict resolution is something you derive from these two pamphlets being together?

A   **Yes.**

Q   Can you describe that?  Can you explain that relationship?

A   **No.  It speaks for itself.**

Page 81

Q   Do either of these pamphlets say anything about gun owners using their guns in conflict?

A   **I don't believe so.**

Q   Do you think that trying to prevent someone from taking their own life is important?

A   **Yes.**

Q   And the purpose of the pamphlet titled firearms and suicide prevention is to prevent suicide, right?

MR. PENNAK:  Objection, calls for speculation on the part of the witness.

THE WITNESS:  I don't know.

BY MS. SUDARSAN:

Q   Does this pamphlet provide resources to individuals who know someone who is feeling suicidal?

MR. PENNAK:  The document speaks for itself.

THE WITNESS:  I guess.

BY MS. SUDARSAN:

Q   It provides information on suicide warnings to look for?

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 12 of 16

Deposition of William Quick                                          Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 86

1  Q People don't talk about that, but do some
2  people go to gun stores to buy guns that they plan to
3  use to intimidate or to injure someone else?
4       MR. PENNAK: Calls for speculation.
5       THE WITNESS: I don't know. I don't know.
6  BY MS. SUDARSAN:
7  Q Have any guns sold by Cindy's Hot Shots
8  been recovered in crime?
9  A Yes.
10 Q And you don't want people to commit crimes
11 with the firearms you sell, right?
12 A Absolutely not.
13      MS. SUDARSAN: We can take a little break.
14 We can go off the record.
15      (There was a brief recess taken.)
16      MR. PENNAK: Before we resume, I would like
17 to put on the record that my client has received
18 repeated inquiries about work. He needs to return to
19 work as soon as possible. How much longer do you
20 intend to take this deposition?
21      MS. SUDARSAN: I would say at least an

Page 87

1  hour.
2       MR. PENNAK: Okay with it?
3       THE WITNESS: Yes.
4       MR. PENNAK: Okay.
5  BY MS. SUDARSAN:
6  Q Mr. Quick, we are back on the record. You
7  understand that the rules we went over this morning
8  still apply?
9  A Yes.
10 Q And you understand that you are still under
11 oath, correct?
12 A Yes.
13 Q Thank you.
14      So I think earlier you -- strike that.
15      Your understanding is that ordinance
16 requires you to give the pamphlets only to purchasers
17 of firearms and ammunition under the ordinance, right?
18 A Yes.
19 Q And your understanding is that the
20 ordinance requires you to make the pamphlets visible
21 and available in your store, right?

Page 88

1  A Yes.
2  Q Do you understand the ordinance to require
3  you to do anything else?
4  A No.
5  Q You don't have to say anything to your
6  customers about the pamphlets, right, under the
7  ordinance?
8  A No.
9  Q You don't understand the ordinance to
10 require you to say anything at all?
11 A Yes.
12      MR. PENNAK: Objection.
13 BY MS. SUDARSAN:
14 Q You can answer.
15 A Yes.
16 Q You don't have to endorse the pamphlets,
17 right?
18 A Correct.
19 Q And your customers don't have to read the
20 pamphlets, right?
21 A Correct.

Page 89

1  Q Your customers can throw them in the trash,
2  right?
3  A Yes.
4  Q So the ordinance doesn't require you to say
5  anything?
6       MR. PENNAK: Calls for a legal conclusion.
7       THE WITNESS: It could be seen that we
8  endorse them because we have to hand them out.
9  BY MS. SUDARSAN:
10 Q But you don't understand the ordinance to
11 require you to say that you endorse the pamphlets,
12 right?
13 A It does not.
14 Q Is there a speech that you make to a
15 customer when you are giving them firearms or
16 ammunition that they have purchased that you will be
17 unable to say when the pamphlets are on display in your
18 store?
19 A No.
20 Q Are there, you know, things that you say to
21 a customer when you are giving them the firearms or

Page 90

1 ammunition they purchased that you will be unable to
2 say because you've distributed the two pamphlets?
3  A   No.
4  Q   So you will be able to continue to say what
5 you want about any topic that you wish to speak about
6 with your customers once the pamphlets are on display
7 in your store, right?
8  A   Yes.
9  Q   And you will continue to be able to say
10 what you want about any topic that you wish to speak
11 about with your customers before or during or after you
12 distribute the pamphlets to them?
13  A   Yes.
14  Q   So there's nothing you will not be able to
15 say to your customers at the point of sale in your
16 store or at any other location in your store because of
17 the display or distribution of the pamphlets, right?
18  A   Correct.
19  Q   Let's look again at the document marked
20 Exhibit 5. I see you have it in front of you. This is
21 the firearms and suicide prevention pamphlet and the

Page 91

1 pamphlet identifies its authors on the front cover, the
2 National Shooting Sports Foundation and the American
3 Foundation for Suicide Prevention, right?
4  A   Yes.
5  Q   And it does so on its back cover as well,
6 right, the page that says resources?
7  A   Yes.
8  Q   Your customers will know that you did not
9 write this pamphlet, right?
10     MR. PENNAK: Calls for speculation on the
11 part of the witness.
12     THE WITNESS: Possibly.
13 BY MS. SUDARSAN:
14  Q   This pamphlet doesn't say Cindy's Hot Shots
15 on the cover, does it?
16  A   It does not.
17  Q   Does it say Cindy's Hot Shots on the back
18 cover?
19  A   It does not.
20  Q   Does it say it on any of the pages of the
21 pamphlet?

Page 92

1  A   It does not.
2  Q   Is it your understanding that you are
3 required by the ordinance to put your name on this
4 pamphlet?
5  A   No.
6  Q   So there's no risk that your customers will
7 think this pamphlet was written by you, right?
8     MR. PENNAK: Calls for speculation on the
9 part of the witness.
10     THE WITNESS: It could.
11 BY MS. SUDARSAN:
12  Q   How could they?
13  A   **Just because it doesn't have Cindy's Hot**
14 **Shots on it doesn't mean we didn't write it.**
15  Q   You could say to your customers I didn't
16 write this, right?
17  A   We could.
18  Q   Let's look at the other pamphlet that was
19 included in the document marked Exhibit 5 that says do
20 you have unresolved conflicts at the top.
21  A   Yes.

Page 93

1  Q   And this pamphlet includes the logo of the
2 Anne Arundel County Department of Health, right?
3  A   Yes.
4  Q   So your customers will know you did not
5 write this pamphlet, right?
6     MR. PENNAK: Calls for speculation on the
7 part of the witness.
8     THE WITNESS: It could.
9 BY MS. SUDARSAN:
10  Q   And you could tell your customers I did not
11 write this pamphlet, right?
12  A   I could.
13  Q   And then your customers would know that you
14 didn't write this pamphlet?
15     MR. PENNAK: Calls for speculation on the
16 part of the witness.
17     THE WITNESS: Yes.
18 BY MS. SUDARSAN:
19  Q   You can also tell your customers that you
20 don't endorse the pamphlets, right?
21  A   I could.

Deposition of William Quick — Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 14 of 16

Page 94

Q You could say to your customers I'm required by county ordinance to give you this even though I don't think I should have to, right?

A I could.

Q When customers buy firearms, how do you give those firearms to them, in what container?

A It's going to depend on the situation. If it's brand new gun, typically it's going to come with a box or a case or something like that. If it's used, they may not.

Q And how do you package ammunition when your customers buy it?

A In a box.

Q So you could just slip these two pamphlets into the box containing the firearms or ammunition that your customers have purchased, right?

A We could.

Q Is there something you think you will be forced to say once the pamphlets are visible and available to your customers even though as you said, you could tell them you did not prepare either of the

Page 95

pamphlets?

A Verbally, no.

Q What would you say to them nonverbally?

A To be forced to say everything in the back nonverbally.

Q But that is not something you need to read aloud to your customers, right?

A No.

Q And you can say I didn't write this. I don't think I should have to give it to you and that could be the end of the conversation with your customers, right?

MR. PENNAK: Objection, asked and answered.

THE WITNESS: I prefer to not even have to do that.

BY MS. SUDARSAN:

Q But you could say that?

A I could.

Q How big is Cindy's Hot Shots, the retail portion of the store?

A Physically?

Page 96

Q Yes.

A Retail is 1,500 square feet.

Q And is the store all in one room or are there multiple rooms?

A There's multiple sections to the room, but they're not blocked off by anything.

Q So it is one room with four walls?

A Yes.

Q What are the sections blocked off with?

A Displays.

Q These displays are not floor to ceiling?

A Correct.

Q How many counters are in this room?

A Three sides about 15 different cases.

Q On each side or total?

A Total.

Q Total there are 15 cases?

A Yes.

Q And where do transactions involving firearms and ammunitions occur in the room?

A Both on the retail and the range side. So

Page 97

on both sides.

Q Is the range side in this one room or is that a separate room?

A It is the same room.

Q Is the -- when you say the range side, what do you mean?

A The range counter.

Q This is a counter where you sign in people who want to use your firing range?

A Yes.

Q And you also do sales involving firearms and ammunition at that same counter?

A Occasionally, yes.

Q How many different points of sale do you have? This might be denoted with a cash register.

A Six different cash registers.

Q In this one room?

A Yes.

Q And you said you have 15 cases that comprise the three --

A Yes.

Office (410) 821-4888  
CRC Salomon, Inc.  
2201 Old Court Road, Baltimore, MD 21208  
www.crcsalomon.com - info@crcsalomon.com  
Facsimile (410) 821-4889  
Page: 25 (94 - 97)

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 15 of 16

Deposition of William Quick                                    Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 114

1  views on gun safety and all of the customers who you've
2  spoken with about gun safety think it is beneficial and
3  your testimony is that you don't know what any of your
4  customers think about suicide prevention, mental health
5  and conflict resolution?
6        MR. PENNAK:  Mischaracterizes his
7  testimony.
8        MS. SUDARSAN:  Mr. Pennak, if you could
9  please wait for me to finish my question before you
10 lodge your objection.
11       MR. PENNAK:  I thought you were finished.
12       MS. SUDARSAN:  You just interrupted me
13 again.  I'm going to please ask that you stop
14 interrupting me.
15       MR. PENNAK:  I apologize for interrupting
16 you.  I thought you were the finished.
17 BY MS. SUDARSAN:
18    Q    You can answer.
19       MR. PENNAK:  Same objection.
20       THE WITNESS:  What was the question?
21       MS. SUDARSAN:  Do you mind please reading

Page 115

1  the question?
2    (Reporter read back the record as requested.)
3        THE WITNESS:  Yes.
4  BY MS. SUDARSAN:
5    Q    You don't know your customers' views on
6  suicide prevention, mental health and conflict
7  resolution because your customers don't talk to you
8  about these issues?
9    A    Yes.
10   Q    So you can only speculate as to what views
11 your customers have on these topics?
12       MR. PENNAK:  Argumentative.
13       THE WITNESS:  Yes.
14 BY MS. SUDARSAN:
15   Q    What speech will your customers be
16 unwilling to engage in when the pamphlets are visible
17 and available in your store?
18   A    I'm not sure.
19   Q    What speech will your customers be less
20 willing to engage in when the pamphlets are visible and
21 available in your store?

Page 116

1    A    I'm not sure.
2    Q    What specific things will your customers
3  not be able to say?
4        MR. PENNAK:  Calls for speculation.
5        THE WITNESS:  I'm not sure.
6  BY MS. SUDARSAN:
7    Q    Have any customers told you that they would
8  be less willing to share their views with you because
9  of the pamphlets?
10   A    No one has said that, no.
11   Q    Sitting here today, you cannot identify any
12 speech your customers will be unable to make because of
13 the display or distribution of the pamphlets?
14   A    No.
15   Q    In your complaint, you allege that
16 customers who will be the recipients of such official
17 communications from the county will objectively be less
18 willing to articulate their own views relating to gun
19 safety, gun training, suicide prevention, mental health
20 and conflict resolution.  What was the basis of that
21 allegation in your complaint?

Page 117

1    A    What do you mean?
2    Q    You've testified that you don't know what
3  your customers think about any of these topics and that
4  they previously have never spoken to you about these
5  topics.
6        In your complaint, you allege that your
7  customers who will receive the pamphlets will
8  objectively be less willing to articulate their views
9  on these topics.  I'm asking what was the basis of that
10 allegation.  It sounds like you don't know what your
11 customers think or are willing to talk about?
12       MR. PENNAK:  It's compound now.  What's the
13 question?
14 BY MS. SUDARSAN:
15   Q    You can answer.
16   A    I know my customers and I know what they do
17 and don't like.  Just because I haven't spoken to them
18 about very, very specific things, I do know what my
19 customers do and don't like.
20   Q    How do you know what your customers do and
21 don't like?

Case 1:22-cv-00865-SAG   Document 39-9   Filed 09/30/22   Page 16 of 16

Deposition of William Quick                                    Maryland Shall Issue, Inc., et al. vs. Anne Arundel County, MD

Page 118

1  A  I spend a lot of time with them.
2  Q  Despite never talking to them about their
3 views on any of the subjects that you raise in your
4 complaint, you know what they would be less willing to
5 articulate?
6  A  Yes.
7  Q  How do you know that?
8  A  I just do.
9  Q  Is that a guess?
10  A  Educated guess.
11  Q  What -- describe to me your education in
12 this area.
13  A  Having dealt with my customers for the past
14 three years, I can -- I can tell you based on other --
15 I know what my customers like.
16  Q  But you didn't talk to any of your
17 customers before you made this allegation in your
18 complaint?
19  A  No.
20  Q  And all of your customers have the same
21 views on gun safety, gun training, suicide prevention,

Page 119

1 mental health and conflict resolution?
2  A  Absolutely not.
3  Q  So some of your customers might agree with
4 the pamphlets, right?
5  A  It's possible.
6  Q  And those customers might be more willing
7 to articulate their views relating to gun safety, gun
8 training, suicide prevention, mental health and
9 conflict resolution when they are the recipients of
10 such official communications from the county, right?
11      MR. PENNAK:  Calls for speculation on the
12 part of the witness.
13      THE WITNESS:  I'm not sure.
14 BY MS. SUDARSAN:
15  Q  But it's possible, right?
16  A  I'm not sure.
17  Q  Have any customers told you that they will
18 not be able to purchase firearms or ammunition from you
19 because of the display and distribution of the
20 pamphlets?
21  A  Not directly, no.

Page 120

1  Q  Have they indirectly told you that?
2  A  No.
3  Q  So no customers have told you that they
4 will not be able to purchase firearms or ammunition
5 from you because of the pamphlets?
6  A  No.
7  Q  Have any customers or did any customers
8 when you had the pamphlets displayed refuse to purchase
9 firearms or ammunition from you?
10  A  None that were in the store that day, no.
11  Q  Did some customers who were not in the
12 store that day refuse to buy firearms and ammunition
13 from you?
14  A  No.  Not to my knowledge, no.
15  Q  Do your customers know that you are
16 participating in this lawsuit?
17  A  Some may.
18  Q  Have you talked to your customers about the
19 lawsuit?
20  A  I don't believe so, no.
21  Q  Some may know about it from other employees

Page 121

1 at Cindy's Hot Shots?
2  A  Possibly.
3  Q  Do you know what your customers' reaction
4 has been to Cindy's Hot Shots' participation in this
5 lawsuit?
6  A  I'm not sure.
7  Q  Did you ask any customers to join this
8 lawsuit?
9  A  No.
10      MS. SUDARSAN:  I think we'll take a short
11 break, but then we might be done or close to.
12      (There was a brief recess taken.)
13 BY MS. SUDARSAN:
14  Q  Mr. Quick, we're back on the record.
15  A  Yes.
16  Q  You understand that you are still under
17 oath?
18  A  Yes.
19      MS. SUDARSAN:  Let the record reflect that
20 counsel for the witness during the break informed
21 counsel for defendant that there was a conversation