## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150,**

                 *Plaintiffs,*             No.:   1:22-cv-00865-SAG

                 **v.**

**ANNE ARUNDEL COUNTY,**
**MARYLAND**
**44 Calvert Street**
**Annapolis, MD 21401,**

                 *Defendant.*


## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT


**MARK W. PENNAK**
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
District Court Bar No. 21033

.

# TABLE OF CONTENTS

STATEMENT OF THE CASE  ............................................................  1

  A.  Bill 108-21  ...................................................................  1

  B.  The Parties  ..................................................................  2

  C.   Statement of Facts  ........................................................  4

SUMMARY OF ARGUMENT  ........................................................  7

ARGUMENT  .........................................................................  7

 I.  STANDARD OF REVIEW  .......................................................  7

II.  BILL 108-21 VIOLATES THE FIRST AMENDMENT
   RIGHTS OF PLAINTIFFS  .............................................  8

  A.  First Principles  .............................................................  8

  B.  Bill 108-21 Is Content-Based and Thus Presumptively Unconstitutional...  10

  C.  Bill 108-21 Is Subject to Strict Scrutiny  .....................................  14

  D.  Bill 108-21 Does Not Survive Strict Scrutiny  ...........................  18

  E.   The First Amendment and Second Rights of MSI Members Are
    Adversely Affected By Bill 108-21...............................  24

III.  EACH OF THE PLAINTIFFS HAS STANDING TO SUE  .......................  28

  A.  Plaintiff Dealers Have Standing  .................................................  28

  B.  MSI Has Representational Standing  ...........................................  29

IV.  RELIEF REQUESTED..............................................................  33

CONCLUSION ......................................................................  35

# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150,**

                  *Plaintiffs,*               **No.:   1:22-cv-00865-SAG**

                      **v.**

**ANNE ARUNDEL COUNTY,**
**MARYLAND**
**44 Calvert Street**
**Annapolis, MD 21401,**

                  *Defendant.*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

**A.     Bill 108-21**

    In their Complaint filed April 11, 2022, plaintiffs challenge the constitutionality of Bill 108-21 ("the Bill"), which was enacted into law by defendant, Anne Arundel County, MD ("the County), on January 10, 2022, with an effective date of April 10, 2022. Complaint ¶ 1. A copy of Bill 108-21 is attached to the Complaint as Exhibit A. Bill 108-21 amends the Anne Arundel County Code, Article 12, Title 6, Section 12-6-108, to provide:

> (A) **Duties of Health Department**. The Anne Arundel County health department shall prepare literature relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution and distribute the literature to all establishments that sell guns or ammunition.
> (B) **Requirements.** Establishments that sell guns or ammunition shall make the literature distributed by the health department visible and available at the point of sale. These establishments shall also distribute the literature to all purchasers of guns or ammunition.

C) **Enforcement.** An authorized representative of the Anne Arundel County Health Department may issue a citation to an owner of an establishment that sells guns or ammunition for a violation of subsection 8(b).

Bill 108-21 also provides that "a violation of this section is a Class C civil offense pursuant to § 9-2-101 of this code." A Class C civil offense under Section 9-2-101 of the County Code is punishable by a fine of "$500 for the first violation and $1,000 for the second or any subsequent violation." Complaint ¶¶ 6, 7.

The County implemented Bill 108-21 by requiring County firearms dealers to distribute two pieces of literature. The first is a pamphlet entitled "Firearms and Suicide Prevention" published jointly by the National Shooting Sports Foundation ("NSSF") and the American Foundation for Suicide Prevention. A copy of that pamphlet is attached as Exhibit B to the Complaint. The text and layout of this downloaded copy is identical to the printed, folded copy distributed by the County to the dealers. The second piece of literature is a 6-inch square page setting forth information concerning County "resources" for "conflict resolution," including suicide. A copy of that piece of literature is attached as Exhibit C to the Complaint. Complaint ¶¶ 1, 2.

## B.   The Parties

Plaintiff MSI is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234-2150. As alleged in Complaint (¶8), MSI is an Internal Revenue Service certified, Section 501(c)(4), non-profit, non-partisan membership organization with currently over 2468 members, including 374 members who reside in Anne Arundel County. Supplemental Decl. of Daniel Carlin-Weber ¶ 3 (Exh. F). MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the Second Amendment right to purchase arms.

MSI engages in education, research, and legal action focusing on the constitutional right to privately own, possess and carry firearms. MSI has members who live in Anne Arundel County and purchase firearms and/or ammunition from firearms dealers in Anne Arundel County. Each of the other plaintiffs in this matter is a corporate member of MSI.

MSI brings this suit on behalf of its members who are firearms dealers in Anne Arundel County, and who are required to display and distribute County literature by Bill 108-21, and who are thus directly regulated by Bill 108-21. Complaint ¶ 9. MSI also brings this suit in its representational capacity on behalf of its individual members who visit or who may do business with County dealers and who are thus subject to the forced receipt or display of literature required by Bill 108-21. (Id.). MSI has one or more individual members who live in Anne Arundel County and/or have purchased or intend to purchase firearms and/or ammunition from dealers in the County. (Id. ¶ 8).

As alleged in the Complaint (¶¶ 10-14), the remaining plaintiffs, Field Traders, LLC, Cindy's Hot Shots, Inc., Pasadena Arms, LLC, And Worth-A-Shot, Inc., ("plaintiff dealers") are privately owned, federally and Maryland State licensed firearms dealers located in Anne Arundel County. Each of these plaintiff dealers regularly sells firearms, including regulated firearms, as well as ammunition. Each of the plaintiff dealers objects to Bill 108-21 because the Bill commandeers it to act as a mouthpiece and conduit for County communications mandated by Bill 108-21. Each of the plaintiff dealers alleges that Bill 108-21 requires it to involuntarily display and distribute County literature with which the plaintiff disagrees and each alleges that it does not wish to be a party to these communications or to be seen by its customers and potential customers as endorsing implicitly or otherwise the County's messages and opinions set out in the literature required by Bill 108-21. Each of the plaintiff dealers is a corporate member of MSI. Complaint ¶¶ 10-13. Each of the plaintiff

dealers alleges that it has standing to sue on its own behalf and on behalf of its customers. Id. at ¶ 14.

The Defendant is Anne Arundel County, Maryland and it is a chartered home rule county within the meaning of Article XI-A of the Maryland Constitution. Bill 108-21, challenged herein, is a County ordinance and thus an official policy of the County. The County is named and sued *eo nomine* under 42 U.S.C. § 1983. Verified Complaint ¶ 15.

**C.    Statement Of Facts**

The factual allegations of the Complaint were verified by each of the plaintiffs in sworn declarations filed with plaintiffs' motion for a preliminary injunction and alternative motion for summary judgment (filed April 20, 2022). Those declarations are incorporated herein by reference. The material facts are simple. First, the County has enacted Bill 108-21. Complaint Exhibit A. Second, pursuant to Bill 108-21, the County has prepared or adopted the literature required by Bill 108-21 and distributed that literature to dealers County-wide, including the plaintiff dealers. Complaint, Exh. B & C. Third, each of the plaintiff dealers are Anne Arundel County dealers who are subject to Bill 108-21, and thus each must make "visible and available" and "distribute" this literature, as required by Bill 108-21. Complaint ¶ 6. Fourth, each of the plaintiffs object to this forced display and distribution of the County's literature. Id. at ¶¶ 9-13. Fifth, each of the plaintiff-dealers has received this literature and each such dealer complied with Bill 108-21 only in order to avoid the fines that would be imposed under Bill 108-21 for non-compliance. See Declarations of plaintiff dealers at ¶ 3. But for Bill 108-21, the plaintiff dealers would not display or distribute the literature distributed to the dealers by the County. (Id.). A violation of these obligations to display and distribute is punishable by a civil fine of $500 for the first offense and $1,000 for a second and subsequent offenses. Complaint ¶ 6.

In their individual interrogatory responses, each of the plaintiff dealers detail their objections to the literature that Bill 108-21 requires them to display and distribute. Each of the plaintiff dealers state:

> Requiring firearms dealers, including [plaintiff dealer], to display the County's publications on suicide and conflict resolution, as mandated by Bill 108-21, sends the message that the purchase and possession of firearms and ammunition is causally related to an increased risk of suicide and/or the illegitimate or illegal use of firearms and ammunition in conflict resolution. [Plaintiff dealer] strongly disagrees with that message and that message is, at minimum, highly controversial. The display and distribution of the County's message at dealer stores sends the message to customers and visitors that the dealer agrees with the County's message. That message is factually wrong as [plaintiff dealer] strongly objects to the County's message. It further sends the message that the customers of such firearms dealers are uniquely in need of the County's message in order to prevent suicide and/or the illegitimate use of firearms in conflict resolution. That message is offensive and is, at a minimum, highly controversial. Response to Interr. 1. (Exhs. A-D).

The plaintiff dealers further state:

> The County's message foisted on the dealers by Bill 108-21 will be reasonably seen by its customers as being adopted or endorsed by the [plaintiff dealer] by virtue of [plaintiff dealer]'s compelled display and distribution of the County's message. [Plaintiff dealer's] customers reasonably will be inhibited or will refrain from arguing or contesting that County message in the store where the [plaintiff dealer] is forced to display and distribute the County's literature. Customers are largely dependent on firearms dealers for the acquisition of firearms and ammunition and thus held captive to the County's messages if they wish to exercise their Second Amendment rights to purchase firearms and ammunition at [plaintiff dealer]. [Plaintiff dealer] likewise highly values mutual good relations with its customers as doing so builds good will with its customers. [Plaintiff dealer] strongly disagrees with the County's messages, but will self-censor it views with its customers in order to avoid fruitless discussions and distractions with respect to the County's messages. [Plaintiff dealer] would prefer to stay silent with respect to suicide prevention and conflict resolution. Yet, because [plaintiff dealer] and its employees are compelled to display and distribute the County's literature, [plaintiff dealer] customers will likely believe that [plaintiff dealer] endorses the County's messages. [Plaintiff dealer's] risks being drawn into discussions with its customers concerning the County's messages that [plaintiff dealer] would prefer to avoid altogether. Response to Interr. 4 (Exhs. A-D).

Each of the plaintiff dealers detail in their Interrogatory responses the harm that Bill 108-21 causes them and their customers, stating:

> Bill 108-21 infringes the right of [plaintiff dealer] to be free of compelled speech under the First Amendment. Bill 108-21 burdens the ancillary Second Amendment right of [plaintiff

dealer] to sell firearms and/or ammunition to customers who wish to exercise their Second Amendment right to purchase firearms and ammunition at [plaintiff dealer]. Bill 108-21 infringes the First Amendment rights of [plaintiff dealer's] customers to exercise their Second Amendment rights to acquire firearms and ammunition without being held captive to the County's offensive messages when they enter [plaintiff dealer's] store or make purchase of firearms or ammunition at [plaintiff dealer]. The County may not burden or chill the exercise of First Amendment rights by burdening or conditioning the exercise of Second Amendment rights or vice versa. The County may not condition a customer's access to [plaintiff dealer's] store or condition [plaintiff dealer's] operation upon [plaintiff dealer's] and the customer's acquiescence to the County's forced display and distribution of its messages. Response to Interr. 5 (Exhs. A-D).

The NSSF pamphlet the County forces the plaintiff dealers to display and distribute states that "people are more at risk" of suicide if they have "access to lethal means," including specifically "firearms." Complaint, Exh. A at 4. Plaintiffs' expert, Professor Emeritus Gary Kleck, who is a much-published, renowned expert in this area, states "[t]here is at present no reliable body of scientific evidence to support the County's claim, via its mandated 'Firearms and Suicide Prevention' pamphlet, that access to firearms causes an increase in the risk that a person will kill themselves. The claim is at best highly questionable; at worst, it is false." Prof. Kleck Rept. at 20 (Exh. G).

Professor Kleck also examines the "expert" reports of the County's experts, stating that one "expert," Nilesh Kalyanaraman, is not an expert in this subject matter at all in that he "has never published a single scholarly article on this issue, and does not claim to have ever conducted any relevant research." Id. at 14. Prof. Kleck states that the report of the County's other "expert," Alexander McCourt, "is compromised by his complete failure to apply any critical standards to the studies on which he relies," noting that this expert report fails to "control for confounding variables" and instead uses "irrelevant controls for variables that either had no significant effect on suicide or had no known correlation with gun ownership." Id. at 15. The multitude of methodological errors and unsupported conclusions of many so-called experts in this area are further detailed throughout

Prof. Kleck's video deposition, which was taken by the County on September 29, 2022. The video is very large (approximately 6.7 gigabytes in zip file format) but is downloadable and accessible from  https://www.dropbox.com/sh/togfntsop72ittq/AAAGe6E4YfjoCmdkIk9bxZcBa?dl=0   The final, signed transcript will be lodged with the Court once it becomes available.

SUMMARY OF ARGUMENT

Here, there is certainly a dispute between the County and plaintiffs concerning whether access to firearms increases the risk of suicide and illegal conflict resolution. That issue is, at a minimum, highly controversial. As Professor Kleck's Rept. (Exh. G) explains, scientifically sound research makes clear that plaintiffs actually have the better of the argument. However, that dispute is not material to the proper resolution of this case, and the Court need not resolve it, because Bill 108-21 imposes content-based, compelled speech, and thus is presumptively unconstitutional regardless of whether the County's message is accurate. Under controlling precedent, the Bill is subject to strict scrutiny under which the County bears the burden of justifying the Bill. The Bill is not justified by any "compelling" interest and, even if it were, the Bill is not "narrowly tailored" or the "least restrictive alternative" for advancing that interest. The plaintiff dealers cannot be compelled to display and distribute the County's literature because plaintiffs have a right, protected by the First Amendment, to remain silent on such matters without being commandeered by the County. Declaratory and injunctive relief is thus appropriate. Plaintiffs, including members of MSI, are also entitled to nominal damages for each day that Bill 108-21 was enforced by the County.

ARGUMENT

## I.   STANDARD OF REVIEW

Rule 56, FRCP, requires that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

7

of law." The party seeking summary judgment has the burden of establishing the genuine absence of disputed issues of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat a motion for summary judgment, the defendant must do more than create "some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Rather, the defendant must demonstrate a genuine issue to a material fact through admissible evidence. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Thus, the "non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable [finder of fact] to find the facts in his [or her] favor." *Sylvia Dev. Corp. v. Calvert Cnty*., 48 F.3d 810, 818 (4th Cir. 1995). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), quoting *Matsushita v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## II.     BILL 108-21 VIOLATES THE FIRST AMENDMENT RIGHTS OF PLAINTIFFS

### A.     First Principles

"The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc*., 425 U.S. 748, 749 n.1 (1976); *Lovell v. Griffin*, 303 U.S. 444, 450 (1938). The Supreme Court's "leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, 61 (2006). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens

8

to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. American Fed. of State, Co. and Mun. Employees, Council 31*, 138 S.Ct. 2448, 2463 (2018). Such compulsion is "universally condemned." *Janus*, 138 S.Ct. at 2463–64.

Compelled speech is content-based where it "[m]andat[es] speech that a speaker would not otherwise make." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 795 (1988). Any state action "which forces an individual ... to be an instrument for fostering public adherence to an ideological point of view" is unacceptable under the First Amendment. *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). The State may not use a vendor's services or its "private property as a 'mobile billboard' for the State's ideological message." *Wooley*, 430 U.S. at 715, 717.

The government may not command a person to serve as a "conduit" for government speech, and may not be "'forced either to appear to agree with [the intruding leaflet] or to respond.'" *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co. v. Public Utilities Com'n,,* 475 U.S. 1, 15 (1986). See also *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."). There "is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley*, 487 U.S. at 796-97.

The Fourth Circuit is in accord. In *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council Of Baltimore,* 879 F.3d 101, 111 (4th Cir.), *cert. denied,* 138 S.Ct. 2710 (2018), the court applied the First Amendment to strike down a Baltimore ordinance which required any "limited-service" pregnancy center in the City to provide a disclaimer to its patrons, stating that the center did not provide or make any referral for abortion or birth-control services. In so holding, the court ruled that the disclaimer was unconstitutional compelled speech and that the centers had a First Amendment "right not to utter political and philosophical beliefs that the state wishes to have said." There is a First Amendment right "not to speak" because "the right to refrain from speaking is concerned with preventing the government from "'[c]ompelling individuals to mouth support for views they find objectionable.'" *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 222 (4th Cir. 2019), quoting *Janus*, 138 S.Ct. at 2463. And "[t]he Supreme Court has emphasized that there is no constitutional difference between 'compelled statements of opinion' and 'compelled statements of fact' because 'either form of compulsion burdens protected speech.'" *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019), quoting *Riley*, 487 U.S. at 797-98.

## B. Bill 108-21 Is Content-Based and Thus Presumptively Unconstitutional

By its terms, Bill 108-21 compels a dealer to make "visible and available" and "distribute" County-sponsored literature directed at "gun safety, gun training, suicide prevention, mental health, and conflict resolution." This requirement is obviously "content-based" as the ordinance is confined to specific subject matter topics and is intended by the County to communicate. See *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022) ("A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"), quoting *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). Any regulation

that has "a content-based purpose or justification" is content-based under this principle. *City of Austin,* 142 S.Ct. at 1471. A regulation is content-based if it cannot be "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The literature at issue in this case is either County-created or County-adopted and is self-evidently designed to communicate, explicitly and by implication, that mere "access" to firearms increases the risk for suicide and the risk of illegal use of firearms in "conflict resolution." By applying only to dealers, Bill 108-21is calculated to further the County government's anti-gun ideology. The literature suggests to customers of dealers that they may need County "conflict resolution" resources should customers persist in exercising their Second Amendment rights by purchasing a firearm or ammunition. The Bill requires County employees to "prepare" the literature and then "distribute the literature to all establishments that sell guns or ammunition" who are then commanded, upon pain of a "fine of $500 for the first violation and $1,000 for the second or any subsequent violation," to make the County's literature "visible and available" and to "distribute" this literature to a purchaser of firearm or ammunition. Complaint ¶ 7.

These "display and distribute" requirements self-evidently compel the dealers to "speak" the County's message on suicide and conflict resolution. "In general, '[l]aws that compel speakers to utter *or distribute speech* bearing a particular message are subject to ... rigorous scrutiny.'" *Greater Baltimore Center*, 879 F.3d at 107, quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (emphasis added). Bill 108-21 has a "content-based purpose or justification," *City of Austin*, 142 S.Ct. at 1471, as the *whole point* of the ordinance is to communicate County-sponsored or prepared content to the customers of the dealers through the compelled actions of the dealers. *Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 48 (1986) (explaining that "'content-neutral' speech regulations" are "those that are justified without reference to the content of the regulated speech"

11

(internal quotation marks omitted)). The pamphlets are, in short, County ideology-based speech. The plaintiff dealers would not distribute or display this material but for the compulsion imposed by the ordinance. See plaintiff-dealers' verification declarations at ¶ 3.

Compelling dealers to display and distribute such County material necessarily "alte[r] the content of [their] speech." *National Institute of Family and Life Advocates v. Becerra,* 138 S.Ct. 2361, 2371 (2018) ("*NIFLA*"), quoting *Riley,* 487 U.S. at 795. Such content-based regulations "*are presumptively unconstitutional* and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 138 S.Ct. 2371 (emphasis added). This is a "stringent standard" because of "the fundamental principle that governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" (Id.) See also *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004) (the Constitution "demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality").

Under this test, the County's actual motives are irrelevant. "A law that is content based on its face is subject to strict scrutiny regardless of the government's motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech.*" Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). "'Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment,'" and a party opposing the government "need adduce 'no evidence of an improper censorial motive.'" Id., quoting *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd*., 502 U.S. 105, 117 (1991). In every sense, Bill 108-21 violates these principles by compelling the dealers to be unwilling agents for the County speech.

Indeed, Bill 108-21 goes beyond being content-based to being viewpoint discrimination, as it promotes a particular point of view concerning firearms and suicide and "conflict resolution." Bill

12

108-21 is, by its express terms, applicable solely to firearms dealers and sellers of ammunition. The NSSF pamphlet distributed by the County specifically states that "[a]ccess to lethal means," including specifically access to "firearms," makes people "More at Risk of Suicide than Others." Complaint Exh. B. The pamphlet on conflict resolution that dealers must display and distribute picks up this point by providing information on County's "Suicide Prevention Toolkit." Id. Exh. C.

By forcing dealers *and only dealers* to distribute the County's literature on suicide and "conflict resolution," the County is forcing dealers to be distributors of the County's view that firearms are associated with suicide and the illegal use of firearms in conflict resolution. Each of the plaintiffs hotly dispute that view. Indeed, as the accompanying expert report of Professor Kleck points out, properly conducted scientific studies actually support plaintiffs' views on this point. Professor Kleck states unequivocally that the County's premise, *viz.,* that "access to firearms causes an increased chance of a person committing suicide," "is not supported by the most credible available scientific evidence and is probably false." Report at 3 (Exh. G). As he further states, "[t]he suicide claim is contradicted by much of the available scientific evidence, and is indisputably not purely factual and uncontroversial information." (Id. at 3-4). While the County will undoubtedly dispute Prof. Kleck's conclusion, such a dispute just confirms that the issue is not "uncontroversial."

Bill 108-21 violates the First Amendment's prohibition on compelled speech by forcing the plaintiff dealers to display and distribute the County literature and thus act as involuntary conduits for the County's message. Bill 108-21 also violates plaintiff dealers' First Amendment right "not to speak" on such subjects, as the plaintiff dealers are compelled by Bill 108-21 to display and distribute the County's literature. Pasadena Dep. Tr. at 25 (Exh. J). By compelling the plaintiff dealers to display and distribute the County's literature, Bill 108-21 violates the First Amendment by forcing the plaintiff dealers either to appear to agree with the County's literature or respond to

the County's literature by affirmatively speaking where the plaintiff dealers prefer to remain silent. Worth-A-Shot Dep. Tr. at 24, 39, 41, 44, 58 (Exh. G); Field Traders Dep. Tr. at 38-39, 41, 44-45, 47-48 (Exh. H); Cindy's Hot Shots Dep. Tr. at 95, 116-18 (Exh. I); Pasadena Dep. Tr. at 29, 82-83 (Exh. J);

### C.    Bill 108-21 Is Subject To Strict Scrutiny

The County will no doubt contend that Bill 108-21 merely regulates commercial speech by the plaintiff dealers and is thus subject only to intermediate scrutiny under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651 (1985). *Zauderer* assessed the constitutionality of restraints on advertising and solicitation by attorneys. The Court first held that "'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech,'" finding that the "speech at issue" in *Zauderer*, was commercial speech because it restricted "advertising pure and simple." (471 U.S. at 637). The Court stated that "[t]he States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, * * * or that proposes an illegal transaction." Id. at 638. The Court also opined that "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest."

*NIFLA* sharply distinguished and limited the scope of *Zauderer*. The Court first rejected the holdings of several lower courts (including the Fourth Circuit) which had applied *Zauderer* broadly to hold that strict scrutiny did not apply to the speech of professionals, holding that "this Court has not recognized 'professional speech' as a separate category of speech." *NIFLA*, 138 S.Ct. at 2371. Rather, the Court held that the more deferential view permitted by *Zauderer* was limited (1) "to some laws that require professionals to disclose factual, noncontroversial information in their

14

"commercial speech," citing *Zauderer*, and (2) the regulation of "professional conduct, even though the conduct incidentally involves speech." *NIFLA*, 128 F.3d at 2172. Focusing on *Zauderer* in particular, the Court held that the State law at issue in *NIFLA* (requiring licensed abortion providers to provide a government-drafted notice on publicly provided family planning services), was "not limited to 'purely factual and uncontroversial information about the terms under which … services will be available." Id. As the Court explained, its decision in *Hurley* had held that "*Zauderer* does not apply outside of these circumstances." Id., citing *Hurley*, 515 U.S. at 573. Applying that principle in *NIFLA*, the Court held that *Zauderer* had "no application" because the State-mandated notice "in no way relates to the services that licensed clinics provide," and because requiring the licensed providers "to disclose information about *state*-sponsored services" was "anything but an 'uncontroversial topic." (Id.) (emphasis the Court's).

Application of *NIFLA* to this case is straightforward. Here, as in *NIFLA*, the government is compelling private entities to display County generated or adopted information about "*state*-sponsored services," *viz.*, information about County services on suicide prevention and conflict resolution. Here, as in *NIFLA*, Bill 108-21 "no way relates" to the services provided by the plaintiff dealers and the County's literature "is not limited to 'purely factual and uncontroversial information about the terms under which ... services will be available.'" *NIFLA*, 138 S.Ct. at 2372, quoting and distinguishing, *Zauderer* 471 U.S. at 651.

Moreover, it is well established that "commercial speech" is only such speech that *proposes* a commercial transaction. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). See also *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 473-74 (1989) (stating that the proposal of a commercial transaction is "the test for identifying commercial speech"); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 762 (1976) (same); *Greater Baltimore*

15

*Center*, 879 F.3d at 108 ("Courts rely on three factors to identify such commercial speech: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." (Citation omitted); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.,* 191 F.3d 429, 440 (4th Cir. 1999) ("In the abstract, the definition of commercial speech appears to be fairly straightforward, if somewhat circular: it is speech that proposes a commercial transaction."

These principles make clear that Bill 108-21 does not regulate "commercial speech." First, as in *Greater Baltimore Center*, "[t]he ordinance, as applied to the [the plaintiffs], does not regulate speech that "propose[s] a commercial transaction;" it applies to the plaintiff dealers "regardless of whether they advertise at all." *Greater Baltimore Center,* 879 F.3d at 108-09. Similarly, the Bill requires that the dealer distribute the County's material with each sale of a firearm or ammunition, *viz., after* the commercial transaction has been consummated and thus cannot possibly regulate any "proposed" sale. Nothing in the Bill's mandates relates to "the terms under which ... services will be available." As in *NIFLA*, the County's compelled display and distribution requirement "regulates speech as speech." Id. at 2374.

The second inquiry required under *NIFLA* is whether the County's literature is "purely factual and uncontroversial information." As explained above, there is nothing "purely factual" and "uncontroversial" about the County's messages conveyed in its literature. The pack of materials unmistakably links the possession of firearms with an increased risk of suicide and unlawful conflict resolution using firearms. Stated differently, by expressly linking the "access" to firearms as posing an increased risk of suicide and by being applicable only to firearms dealers, Bill 108-21 necessarily is suggesting that suicide is associated with the mere possession of firearms and/or ammunition. The plaintiffs dispute that message and would prefer to remain silent on such matters. The County's

16

attempt to link firearms to suicide is, as Professor Kleck explains, "is not supported by the most credible available scientific evidence and is probably false." Report at 3 (Exh. G).

Similarly, the literature about County-provided services for "conflict resolution" (including suicide prevention) is obviously directed at gun owners on the highly dubious premise that the firearms and ammunition purchased at the plaintiff dealers are used for illegal "conflict resolution" and suicide. There is no other reason for the Bill's application only to dealers. That suggestion fails to account for the obvious reality that the firearms and ammunition are overwhelmingly used for other perfectly legal purposes, such as target shooting, competitions, hunting and for armed self-defense, all lawful activities protected by the Second Amendment. Pasadena Dep. Tr. at 63 (Exh. J). See *District of Columbia v. Heller*, 554 U.S. 570 (2008); *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022). The idea that persons who purchase ammunition or firearms are at risk of illegally using such items for "conflict resolution" is offensive. The exercise of Second Amendment rights, without more, cannot be legitimately made the basis for the forced receipt of government-compelled speech.

But even assuming *arguendo* that the County's messages are merely factual, strict scrutiny would still apply. *Rumsfeld*, 547 U.S. at 61 ("[C]ompelled statements of fact ..., like compelled statements of opinion, are subject to First Amendment scrutiny."). As stated in *Greater Baltimore Center*, a "statement's factuality" ""does not divorce the speech from its moral or ideological implications."" (879 F.3d at 110), quoting *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014). Similarly, as also stressed in *Greater Baltimore Center*, "a person's right to refrain from speaking 'applies ... equally to statements of fact the speaker would rather avoid.'" Id., quoting *Hurley*, 515 U.S. at 573. See also *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 222 (4th Cir. 2019) ("the Supreme Court has 'held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'"), quoting *Janus,* 138 S. Ct. at 2463.

The County is of the view that mere "access" to guns and ammunition creates a higher risk of suicide and use in illegal "conflict resolution." As in *Greater Baltimore Center*, the "ideological implications" of the County's message are not lost on plaintiffs. The Bill basically embodies a "guns are bad" ideological message. That "may be the [County's] view, it is not the [plaintiff dealers's]." *Greater Baltimore Center*, 879 F.3d at 110. See, e.g, Cindy's Hot Shots Dep. Tr. at 48, 57-58, 67-68, 79-80 (Exh. I); Pasadena Dep. Tr. at 35-38, 71 (Exh. J). Here, as in *Greater Baltimore Center*, the County's view "is antithetical" to plaintiffs' belief that the exercise of Second Amendment rights by law-abiding, responsible adults is a positive social good. While plaintiffs are under no obligation to support their opinion, that view is objectively reasonable and "the central component" of the Second Amendment. *Heller*, 554 US. at 599. See *Bruen*, 142 S.Ct, at 2158-59 (Alito, J., concurring) ("Ordinary citizens frequently use firearms to protect themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year."). Another recent study put the use of firearms for self-defense at 1.67 million times a year. William English, *2021 National Firearms Survey: updated Analysis Include Types of Firearms Owned* (May 13, 2022) (available at https://bit.ly/3M3msVP).

### D.      Bill 108-21 Does Not Survive Strict Scrutiny

Under strict scrutiny, the County's requirements are constitutional only if "they are narrowly tailored to serve compelling state interests." *NIFLA*, 138 S.Ct. at 2371. See also *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1881 (2021) ("A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests."). State interests or objectives stated at "a high level of generality" are insufficient as a matter of law because "the First Amendment demands a more precise analysis." Id. Strict scrutiny requires that "the Government … demonstrate that the compelling interest test is satisfied through application of

18

the challenged law 'to the person'—the particular claimant." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegtal*, 546 U.S. 418, 430-31 (2006). Here, while the County's avowed interest in suicide and "conflict resolution" may be legitimate, these interests are not "satisfied through application of the challenged law" to the plaintiff dealers. "Suicide prevention" and "conflict resolution" are far too "generalized" to justify the imposition of compelled speech on **dealers**. Not even the County seriously thinks dealers are at risk of suicide or the illegal use of firearms in conflict resolution. Rather, dealers are just being used by the County as tools for conveying the County's offensive speech to others.

The County's asserted interest in suicide prevention and "conflict resolution" cannot be rationally limited to firearms and ammunition vendors if only because these problems go far beyond the use of firearms. As Professor Kleck notes, "[t]he ordinance . . . does not require hardware stores and other suppliers of rope to distribute the pamphlet, even though rope can be used to fashion a noose for use in a suicide [and] hanging is the second-most common method of suicide in the United States." Report at 4 (Exh. G). Indeed, "[t]he best available national data indicates that there is no significant difference in the percent of suicide attempters who die between those who attempt suicide by hanging (the second-most common suicide method) and those who do so by shooting." Id. In short, "there is no justification for the County's ordinance to require only firearms dealers to distribute suicide prevention materials." Id. Such governmental action cannot survive strict scrutiny. See *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546-47 (1993) ("Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling."). See also *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104–105 (1979) (same).

If the County was truly serious about these matters, then Bill 108-21 would be applicable to other vendors who sell other types of items that could be used in suicide or conflicts. For example, the NSSF pamphlet (Complaint Exh. B) assigns a higher risk of suicide to persons who have access to "lethal means" including "drugs." If the County truly thought suicide prevention was compelling, it would be requiring pharmacies, hospitals, physicians and other sources of "drugs" to distribute the County's message regarding suicide. Kleck Rept. at 4 (Exh. G). Notices would also be required to be posted on high buildings, bridges, cutlery shops and at hardware stores and railway crossings. Id. In short, the Bill discriminates against and uniquely burdens only dealers. Any ordinance thus limited cannot be said to serve a "compelling interest."

Strict scrutiny also requires that the "regulation is the least-restrictive manner in which that interest could have been achieved." *Reform America v. City of Detroit*, 37 F.4th 1138, 1156 (6th Cir. 2022), citing *Reed*, 576 U.S. at 163-64. See also *American Life League, Inc. v. Reno*, 547 F.3d 642, 648 (4th Cir. 1995) ("a law must be necessary to serve compelling governmental interests by the least restrictive means available"). As in *Greater Baltimore Center*, here the County cannot show that it "could not pursue its goals through less restrictive means." (879 F.3d at 112). Specifically, as in *Greater Baltimore Center*, the County "itself may 'communicate the desired information to the public without burdening a speaker with unwanted speech.'" (Id., quoting *Riley*, 487 U.S. at 800). The County could communicate "through a public advertising campaign," (id.), or through literature posted in schools, libraries, government buildings and wherever the County operates or has County-controlled property. See also *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 190 (4th Cir. 2013) (en banc) (stating that the government had "several options less restrictive than compelled speech," such as "launch[ing] a public awareness campaign").

20

As noted, suicides are hardly limited to the use of firearms and firearms are not even a uniquely lethal method of suicide. Kleck Rept. at 4 (Exh. G). The County may have concerns over suicide and illegal conflict resolution, "but when [such concerns] affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown v. Entertainment Merchants Ass'n.*, 564 U.S. 786, 805 (2011). See *Greater Baltimore Center*, 879 F.3d at 112 ("'[W]hen [laws] affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive.'"), quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 805 (2011).

Bill 108-21 is seriously underinclusive in that applies solely to firearms dealers. As Professor Kleck points out in his report, suicide by hanging is "equally effective and the second-most common means of suicide and there are multiple, very effective ways of committing suicide." Kleck Rept. at 4-5 (Exh. G). If suicide is truly the concern (instead of an ideological bias against firearms) then the focus would be on suicide by any means, not merely suicide by firearms. "There is no public health benefit to merely getting people to kill themselves with non-firearms methods but without reducing the total number of people who kill themselves." Kleck Rept. at 13-14 (Exh. G). The implication is unmistakable that the County is more interested in demonizing the exercise of Second Amendment rights than in preventing suicide. *March v. Mills*, 867 F.3d 46, 65-6 (1st Cir. 2017) ("when a restriction on speech is underinclusive, there may be reason to doubt 'whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"), quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015). See Cindy's Hot Shots Dep. Tr. at 58-59 (Exh. I) ("I think it demonizes firearms"); Pasadena Dep. Tr. at 42 (Exh. J) ("this message is against firearms").

But even if the County's interest is narrowly defined (improperly) as preventing suicide by firearm, the County could have advanced that interest less restrictively by distributing its literature directly to gun-owners through advertising, direct mailings, or by manning booths at gun shows or trade shows. It could even task its employees or contractors to hand out its literature on the public sidewalk outside of every gun store to every customer, every day. The County never even attempted such alternatives. Again, it is the County's burden to show that these alternatives could not have advanced its purpose. See *Greater Baltimore Center*, 879 F.3d at 112 ("we are unpersuaded that the City could not pursue its goals through less restrictive means"), citing *Riley*, 487 U.S. at 800 (government may itself publish "without burdening a speaker with unwanted speech").

The same underinclusive nature is also true of the County's literature concerning "conflict resolution." **Any** weapon (or even hands and feet) could be used for unlawful conflict resolution. Physical alternations are undoubtedly far more common than the use of firearms for illegal conflict resolution. See, e.g., https://pubmed.ncbi.nlm.nih.gov/23248355/ (finding that "firearm use in domestic violence is uncommon even among offenders with known firearm access."). Yet, the County's literature addresses none of these subjects, preferring to single out firearms dealers for its offensive speech, all in pursuit of an obvious anti-gun ideological agenda. See *Greater Baltimore Center*, 879 F.3d at 111 (noting that "states can bend individuals to their own beliefs and use compelled speech as a weapon to run its ideological foes into the ground").

Bill 108-21 is also seriously overinclusive as it requires the distribution of this literature on every single sale of ammunition or of a firearm to every single customer. *Great Baltimore Center*, 879 F.3d at 112 (laws must be "neither seriously underinclusive nor seriously overinclusive"). Yet, it should be obvious that the vast majority of these purchasers keep and use firearms lawfully and pose no risk of suicide or unlawful conflict resolution. This overinclusive nature of Bill 108-21 is

22

fatal to the Bill. See *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 122 n.* (1991) ("[a] regulation is not 'narrowly tailored' … where, as here, 'a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals.'"). *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015), quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002).

The display and distribution requirements also impose significant risks and burdens. The dual requirements that dealers make the literature "visible and available" effectively mandates the use valuable counter space, as literature posted on a wall is hardly "available" to the customer to pick up and take home. See Worth-A-Shot Dep. Tr. at 69-70 (Exh. K); Field Traders Dep. Tr. at 81-82 (Exh. I); Pasadena Dep. Tr. at 52-53 (Exh. J). More seriously, a dealer would face a $500 fine for the first violation and a $1000 fine for each subsequent violation for an employee's failure to distribute the literature with each sale. The ordinance has no *mens rea* requirement so fines could be imposed for simple mistakes or inadvertence. That risk of crippling fines is particularly significant for bigger stores, such as plaintiffs Worth-A-Shot and Cindy's Hot Shots, which sell hundreds or thousands of firearms a year and have thousands of ammunition sales. Worth-A-Shot Dep. Tr. at 18 (Exh. K) (monthly sales of firearms alone "probably over a hundred"); Cindy's Hot Shots Dep. Tr. at 24 (Exh. I) (annual sales of firearms is "about 2,000" with "thousands" of "transactions" of ammunition per month). Given such volumes, a dealer could easily run out of the literature, in which case it would be unable to make **any** sales until resupplied by the County.

Finally, "[t]he First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (plurality), quoting *Brown v. Entertainment Merchants Ass'n*., 564 U.S. 786, 799 (2011). Specifically, the "State must specifically identify an 'actual problem' in need of solving, *

* * and the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. "'It is rare that a regulation restricting speech because of its content will ever be permissible.'" Id., quoting *United States v. Playboy Entertainment Group, Inc.* 529 U.S. 803, 818 (2000). The County cannot come even close to meeting this test. As Prof. Kleck points out, there is no established causal effect between firearms and ammunition possession and suicide. The same is true with respect to "conflict resolution." And because the County "bears the risk of uncertainty * * * ambiguous proof will not suffice." *Brown*, 564 U.S. at 799-800. Again, even assuming *arguendo* that coercing the participation of dealers would be helpful in addressing these problems, the County has a multitude of alternative ways to approach the subject of suicide prevention or conflict resolution without compelling the speech of the plaintiff dealers. The compelled speech is thus hardly "necessary."

### E. The First Amendment and Second Amendment Rights of MSI Members Are Adversely Affected By Bill 108-21

The Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The Supreme Court just held in *Bruen* that this right of self-defense fully extends outside the home as well. See *Bruen*, 142 S.Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."). These rights are fundamental and thus fully incorporated as against the States under the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding that "the right to keep and bear arms is fundamental to our scheme of ordered liberty").

Law-abiding, responsible citizens have a Second Amendment right to purchase firearms. *Teixeira v. City of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*en banc*), *cert. denied*, 138 S.Ct. 1988 (2018) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't

mean much' without the ability to acquire arms"). Thus, "aside from a few exceptions, the government may not prevent citizens from buying and owning guns." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022). Law-abiding responsible citizens likewise have a Second Amendment right to purchase ammunition. *United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *cert. denied*, 576 U.S. 1013 (2015) ("without bullets, the right to bear arms would be meaningless").

Restraints on dealers necessarily affect customers of dealers. As a matter of law, the acquisition of firearms generally takes place through federally and State licensed dealers. See, e.g., 18 U.S.C. § 922(a)(3),(5), § 922(b)(3); MD Code, Public Safety, §§ 5-117, 5-118, 5-117.1. Maryland law even requires that a *private* sale of a long gun to non-family members be facilitated by a federally licensed dealer. MD Code, Public Safety, § 5-204.1. A private sale of a handgun is likewise facilitated by a State licensed dealer. MD Code, Public Safety, § 5-124(a)(1). While ammunition need not be sold through dealers, it is common knowledge and a matter of common sense that such sales often take place through dealers, either in stand-alone sales, or in connection with the sale of a firearm. Each of the plaintiff dealers in this case thus stocks and sells ammunition. Complaint ¶¶ 10-13. See *Celotex Corp.*, 477 U.S. at 326 (employing "common sense" in a summary judgment context).

Because Bill 108-21 applies to all sellers of firearms and ammunition in the County, and because, as a legal and practical matter, customers must use licensed dealers to purchase firearms, such purchasers are effectively held captive to the County's distribution of its literature if they wish to exercise their Second Amendment right to purchase firearms and ammunition. See *Hill v.*

25

*Colorado*, 530 U.S. 703, 717-18 (2000) ("The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases" and this interest is especially placed at risk where "'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure'"). Purchasers, as a practical matter, are thus unable to avoid exposure to unwanted speech by the County if they wish to exercise this fundamental constitutional right to acquire firearms or ammunition in the County.

This situation creates multiple harms. First, customers are chilled in the exercise of their own speech because they will objectively be less willing to articulate their own views where the dealer is the distributor and thus may be reasonably understood to endorse the views of the literature required by Bill 108-21. Second, customers may object and feel compelled to voice their objections to County's message. See Plaintiff Dealers' Responses to Interr. No. 4 (Exh. A-D); MSI Response to Interr. Nos. 14, 15 (Exh. E); Field Traders Dep. Tr. at 89-90, 93, 95 (Exh. H), Cindy's Hot Shots Dep. Tr. at 89, 91-93 (Exh. I); Pasadena Dep. Tr. at 71-75, 78-79 (Exh. J).

Third, customers are chilled in the exercise of their Second Amendment rights because such exercise is conditioned on the forced receipt of the County's offensive literature. Customers are effectively held "captive," *Hill*, 530 U.S. 717-18, if they want to exercise Second Amendment rights. (Id.). See Cindy's Hot Shots Dep. Tr. at 30-31, 35-37, 40-42 (Exh. I). Such burdens on speech are cognizable under the First Amendment. See, e.g., *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) ("'[i]n First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'"), quoting *Cooksey*, 721 F.3d at 235 (internal quotes omitted).

Fundamentally, under the First Amendment, the County may no more compel the *receipt* of the County's speech than it may compel a dealer to *deliver* the County's speech. The forced receipt

imposed on the captive customer is simply the flip side of the forced distribution imposed on the dealer and is thus part and parcel of the *same* First Amendment violation. The customer and the dealer are both harmed by this scheme. The County may not chill the exercise of Second Amendment rights by burdening First Amendment rights or *vice versa*. See, e.g., *Simmons v. United States*, 390 U.S. 377, 393-394 (1968) (it is "intolerable that one constitutional right should have to be surrendered in order to assert another"); *Antonyuk v. Bruen*, 2022 WL 3999791 at *31 (N.D.N.Y. 2022) (applying *Simmons* to a Second Amendment claim). Cf. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (a government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests especially, his interest in freedom of speech"); *Elrod v. Burns*, 427 U.S. 347, 359 (1976) (same). The County may not condition a customer's Second Amendment right to purchase a firearm or ammunition on acquiescence to the County's offensive speech.

There can be little doubt that the customers of the dealers object to the messages dealers are compelled to convey. By singling out purchasers at dealers and expressly asserting that the mere access to a firearm results in an increased risk of suicide, the forced display and distribution of the County's literature "sends the message that the customers of such firearms dealers are uniquely in need of the County's message in order to prevent suicide and/or the illegitimate use of firearms in conflict resolution." Plaintiff dealers' Response to Interr. 2 (Exhs. A-D). Plaintiff dealers believe this "message is offensive and is, at a minimum, highly controversial." (Id.). For example, during the relatively short period in which this literature was being distributed, "feedback" from customers of plaintiff Field Traders "showed repulsion that the County claims via its literature that they are more likely to use their purchases for nefarious and ill-intended manners than good." Field Traders Response to Interr. 8 (Exh. A); Field Traders Dep. Tr. at 60-68, 72-75 (Exh. H). Response to Interr. 2 (Exhs. A-D).

**III.    EACH OF THE PLAINTIFFS HAS STANDING TO SUE**

**A.    Plaintiff Dealers Have Standing**

Each of the plaintiff dealers has Article III standing to sue as each dealer is directly regulated by Bill 108-21. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"). See also *Maryland Shall Issue, Inc. v. Hogan,* 971 F.3d 199, 212-13 (4th Cir. 2020) (applying *Lujan* to sustain standing of a firearms dealer). Each plaintiff dealer also has standing to sue on behalf of its customers and "other similarly situated persons" for injuries inflicted by Bill 108-21. *MSI*, 971 F.3d at 216. If one plaintiff has standing, it is unnecessary to determine the standing of other plaintiffs. (Id., 971 F.3d at 214 & n.5).   Compelling the speech of dealers obviously injures the dealers.

Bill 108-21 went into effect on April 10, 2022, and was immediately implemented as of that date. While the County subsequently agreed to withhold enforcement of Bill 108-21 pending these proceedings (Dkt. Entry # 18), the County has not disavowed future enforcement. See *Virginia v. American Booksellers Ass'n, Inc*., 484 U.S. 383, 393 (1988) (the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"). In short, the County has enforced the Bill in the past, has vigorously defended the Bill in this Court and will undoubtedly enforce its provisions unless enjoined. The plaintiffs have already been harmed and, unless the Bill is enjoined, will suffer more irreparable harm should the County's resume enforcement of the Bill. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a

'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). See also *Davidson v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019).

### B.        MSI Has Representational Standing

This Court need not reach the standing of Maryland Shall Issue, as each of the plaintiff dealers has standing to sue on its own behalf and on the behalf of its customers. *MSI*, 971 F.3d at 214 n.5, & 216. That said, MSI likewise has standing to sue on behalf of its members who visit or who may do business with County dealers and sellers of ammunition and who will be thus subject to the forced receipt or display of literature required by Bill 108-21. *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 342 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."). See *Retail Industry Leaders Ass' v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) ("[a]ssociational standing may exist even when just one of the association's members would have standing"). The interests MSI seeks to protect are germane to MSI's purpose and, because MSI does not seek compensatory damages for its members, neither the claims asserted herein nor the relief requested require the participation of MSI's individual members. *United Food and Commercial Workers Union v. Brown Group, Inc*., 517 U.S. 544, 546 (1996).

MSI does seek injunctive and declaratory relief and nominal damages on behalf of its members. MSI has one or more individual members who live in Anne Arundel County and/or have purchased and/or intend to purchase firearms and/or ammunition from dealers in Anne Arundel County. See MSI Confidential Response to Interr. No. 13 (Exh. M) (filed under seal). During the time period Bill 108-21 was being enforced, MSI had 239 active members who resided in the County

and 1,610 active members in total. Supp. Decl. of Daniel Carlin-Weber (Exh. F). MSI currently has 2,468 active members, of whom 374 reside in the County. Id. Each of MSI's individual members who does business or may do business with Anne Arundel County firearms dealers have been or will be injured by the forced display and receipt of County literature while exercising their Second Amendment right to purchase firearms or ammunition from County dealers.

Under the "relaxed" standards applicable to First Amendment claims, these harms are sufficient to confer standing on MSI members. "[I]in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech." *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940). See also *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("standing requirements are somewhat relaxed in First Amendment cases."). Customers and persons who have purchased or who may potentially purchase firearms and/or ammunition in the County, including MSI members, have standing under these principles. See also *Secretary of State of Md. v. Joseph H. Munson Co., Inc.* 467 U.S. 947, 956-57 (1984) ("'Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

As explained in MSI's interrogatory answers (Exh. E):

> The County's message foisted on the dealers will be reasonably seen by MSI members as being adopted or endorsed by the dealer by virtue of the dealer's display and distribution of the County's message. MSI members reasonably will be inhibited or will refrain from arguing or contesting that County message in the dealer's store where the dealer is displaying and distributing the County's literature as compelled by Bill 108-21. MSI members are largely dependent on firearms dealers for the acquisition of firearms and ammunition and thus held captive to the County's messages if they wish to exercise their Second Amendment rights to purchase firearms and ammunition. MSI members highly value good relations with

firearms dealers and reasonably can be expected to avoid expressing their own opinions regarding the County' messages and will reasonably seek to avoid potential disagreements with dealers and their employees over the County's messages while on the dealers' premises.

MSI Resp. to Interr. 10. As further explained in MSI Resp. to Interr. 13:

> Bill 108-21 infringes the First Amendment rights of MSI members to exercise their Second Amendment rights to acquire firearms and ammunition without being held captive to the forced distribution of the County's offensive message. See Response to Interrogatory 15, infra. The County may not burden or chill the exercise of First Amendment rights by burdening or conditioning the exercise of Second Amendment rights or *vice versa*. The County may not condition a customer's access to a dealer's store or condition the dealer's operation upon the dealer's and the customer's acquiescence to the County's forced display and distribution of its message.

In its response to Interrogatory 15, MSI explained:

> MSI and its members are burdened by the display and distribution of the County's literature because, under Bill 108-21, every time they enter the premises of a firearms dealer in Anne Arundel County they will be assaulted and insulted by the County's offensive message that the purchase of firearms and/or ammunition is causally associated with any increased risk of suicide or the illegitimate use of firearms in conflict resolution, a message with which they strongly disagree. This burdens the speech of MSI members as recipients of such official communications from the County will objectively be less willing to articulate their own views where, as here, the dealer is the distributor and thus may be reasonably understood to endorse the views of the literature that will 108-21 compels the dealer to distribute and display. Other MSI members may feel compelled to object to the County's message when they otherwise would have preferred to remain silent on the subject of suicide and the use of firearms in conflict resolution.

In its interrogatory responses, MSI identified at least one member who is directly affected in this manner. See MSI Confidential Resp. to Interr. 13 (Exh. M) (filed under seal). At the MSI Rule 30(b)(6) deposition, another MSI member was likewise identified as someone who would feel compelled to object to the County's compelled literature. (MSI Dep. Tr. at 78, 83-86) (filed under seal) (Exh. L).

Similarly, Worth-A-Shot testified that the forced distribution of this literature was "very accusatory" and would harm its relationship with its customers. (Worth-A-Shot Dep. Tr. at 106-09, 124) (Exh. K). During the short period this ordinance was in effect, plaintiff Field Traders was forced

to deal with customers who expressed "disgust and pause," who demonstrated "repulsion" at the receipt of this literature and perceived the literature "as a statement attempting to sway customers from exercising their Second Amendment right[s]." Field Trader Resps. to Interr. 8 (Exh. A); Field Traders Dep. Tr. at 51-54 (Exh. H).

## IV.     RELIEF REQUESTED

A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, (2006). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (plurality opinion). See also *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011) (same); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978) (same). Unless enjoined, the County will enforce Bill 108-21 in the future and such continuing future injuries obviously cannot be remedied by an award of damages for past violations. The public interest is served, as a matter of law, by enjoining the unconstitutional actions of a locality. See, e.g., *Legend Night Club*, 637 F.3d at 303 ("upholding constitutional rights is in the public interest"). The balance of equities plainly favor plaintiffs. The "system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted). Thus, the issuance of an injunction would cause no cognizable harm to the County, but a denial leaves unaddressed the harm suffered by plaintiffs. That misbalance favors plaintiffs.

Plaintiffs are likewise entitled to declaratory relief, which is available where there is "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. Pacific Coal & Oil Co*., 312 U.S. 270, 273 (1941). See also *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506 (1972). Such relief is available even in the absence of irreparable harm. *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 121 (1974) (holding that even though events had effectively mooted the request for injunctive relief, "the parties to the principal controversy ... may still retain sufficient interests and injury as to justify the award of declaratory relief"). Such a controversy is present here.

42 U.S.C. § 1983, allows plaintiffs to recover damages arising from policies adopted the County. Complaint ¶ 15. However, given the difficulty of proving compensatory damages and the County's suspension of Bill 108-21's requirements, the plaintiffs have waived compensatory damages. Plaintiffs are nonetheless entitled to nominal damages. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 800 (2021) ("the prevailing rule, 'well established' at common law, was 'that a party whose rights are invaded can always recover nominal damages without furnishing any evidence of actual damage'") (citation omitted). See *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (a court is "obligate[d]" to award nominal damages under Section 1983); *Central Radio v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016) (same).

Plaintiffs were harmed by the forced display and distribution of the County literature every day that Bill 108-21 was in force, *viz.,* from the ordinance's effective date, April 10, 2022, until May 5, 2022, when the County communicated to this Court its decision to suspend the operation of Bill 108-21. Dkt Entry #18. That period is 25 days. For purposes of nominal damages, at a minimum, each day the Bill was enforced in the past is a separate and completed violation of the First Amendment. Nominal damages of at least $1.00 for each day that the plaintiff dealers were subjected to the requirements of Bill 108-21 is the minimum recovery.  For the plaintiff dealers, that sum is $100.00 (4 x 25 x $1). That said, a higher nominal damages award would be justified because the

plaintiff dealers undoubtedly had multiple daily sales of firearms or ammunition and thus distributed multiple copies of the County's literature each day. Each such distribution harms the dealers.

MSI had precisely 1,606 members during the 25 days Bill 108-21 was in effect, including 235 members who were County residents (both figures exclude the four plaintiff dealers). See Supp. Decl. of Daniel Carlin-Weber, ¶ 3 (Exh. F). As explained above, under the "relaxed" standing test applicable to First Amendment cases, every MSI member has standing to challenge the County's violation of their First Amendment rights at places that they are entitled to do business. See MSI Resp. to Interrs. 10, 13 (Exh. E). MSI informed its members and the public via the MSI website and social media that this suit had been brought. Its membership was fully aware of the Bill and is supportive of this suit. MSI Dep. Tr. at 51-52 (Exh. L) (filed under seal); MSI Resp. to Interrs. 4, 8 (Exh. E). See also https://bit.ly/3Sb1I0p. Every member is entitled to nominal damages.

Nominal damages are important because they "'affec[t] the behavior of the defendant towards the plaintiff.'" *Uzuegbunam*, 141 S.Ct. at 801, quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). See also *Farrar*, 506 U.S. at 112. That point applies to suits brought by organizations on behalf of its members. See *Global Impact Ministries v. Mecklenburg County*, 2021 WL 982333 at *3 (W.D.N.C. 2021) ("while an organization ordinarily will not have representational standing to sue for damages on behalf of its injured members, that rule does not necessarily apply where the organization is suing for nominal damages on its members' behalf"); *Am. Humanist Ass'n v. Perry*, 303 F. Supp. 3d 421, 427, 433 (E.D.N.C. 2018) (finding representational standing and awarding nominal damages). Cf. *Norwood v. Bain*, 143 F.3d 843, 856 (4th Cir. 1998) (reversing denial of nominal damages for class members), *reinstated in part*, 166 F.3d 243, 245 (4th Cir.) (en banc) (reinstating panel opinion on nominal damages), *cert. denied*, 527 U.S. 1005 (1999). Nominal damages for MSI members are $40,150 (1,606 x 25 x $1), including $5,875 (235 x 25 x $1) for MSI

members who actually were residents of the County during this time period. Plaintiffs are also entitled to attorneys' fees and costs, but those matters are collateral to the merits.

## CONCLUSION

For all the forgoing reasons, plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
District Court Bar No. 21033