**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No.: 1:22-cv-00865-SAG |
| ANNE ARUNDEL COUNTY, MD | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

Eric Tirschwell
James Miller
Nina Sudarsan
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
etirschwell@everytown.org
jedmiller@everytown.org
nsudarsan@everytown.org

Andrew Nellis
EVERYTOWN LAW
P.O. Box 14780
Washington, DC 20044
(202) 517-6621
anellis@everytown.org

Gregory J. Swain
County Attorney
Hamilton F. Tyler, Bar No. 9423
Deputy County Attorney
Tamal A. Banton, Bar No. 27206
Senior Assistant County Attorney
ANNE ARUNDEL COUNTY OFFICE
OF LAW
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
(410) 222-7888
htyler@aacounty.org
tbanton@aacounty.org

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND AND STATEMENT OF UNDISPUTED FACTS ......................................3

    Anne Arundel County Initiatives and Bill 108-21 ..........................................................3

    The Public Safety Literature .............................................................................................5

    Plaintiffs ............................................................................................................................8

STANDARD OF REVIEW .................................................................................................10

ARGUMENT .......................................................................................................................10

I.  Bill 108-21 mandates health and safety disclosures about consumer products and is
constitutional. ...............................................................................................................10

    A.  Bill 108-21 is properly reviewed under Zauderer because it regulates commercial
speech and imposes a disclosure requirement rather than a restriction on speech.....12

        1.  Bill 108-21 regulates commercial speech.........................................................12

        2.  Bill 108-21 imposes a compulsory disclosure, not a restriction on speech.....15

    B.  Bill 108-21 is reasonably related to the County's public safety interest in suicide
prevention and conflict resolution................................................................................16

    C.  The pamphlets are purely factual and uncontroversial. ...............................................20

        1.  The content of the pamphlets is purely factual and uncontroversial. ..............20

        2.  Any implied messages that Plaintiffs unreasonably read into the pamphlets are
irrelevant..........................................................................................................24

    D.  The display and distribution of the pamphlets does not impose an undue burden. ...26

    E.  Bill 108-21 is not subject to strict scrutiny. ...............................................................27

        1.  NIFLA is inapplicable here. ............................................................................27

        2.  Plaintiffs' content-based restriction arguments fail.........................................29

II.  Plaintiffs have no claim on behalf of customers of gun dealers. .................................31

    A.  The Bill does not affect customers' rights. .................................................................31

    B.  The customers' claims are speculative and unreasonable............................................32

    C.  The First Amendment does not confer protection from the County's literature........33

III. Plaintiffs are not entitled to relief. .............................................................................34

CONCLUSION ...................................................................................................................35

## INTRODUCTION

Facing a crisis of gun violence within its borders, and as part of a comprehensive public safety approach to reduce both suicides and homicides involving firearms, Anne Arundel County, Maryland (the "County") passed an ordinance (Bill 108-21, or "the Bill") pursuant to which local gun stores are required to distribute to customers a suicide prevention pamphlet along with an insert containing conflict resolution resources.

The suicide prevention pamphlet is entitled "Firearms and Suicide Prevention." It lists risk factors for suicide that closely follow nearly identical lists published by the Centers for Disease Control and Prevention, National Institute of Mental Health, and Maryland Department of Health; identifies suicide warning signs; explains how having conversations about suicide and showing concern will not put someone at greater risk; encourages storing firearms securely when not in use and provides information about safe storage options; and lists resources including suicide prevention hotlines and mental health resources. The second pamphlet provides Anne Arundel County-specific resources for conflict resolution.

Importantly, the suicide prevention pamphlet that is central to the dispute before this Court—and that Plaintiffs claim conveys a "guns are bad" message—was created by the National Shooting Sports Foundation ("NSSF"), *the gun industry's own trade group*, along with the American Foundation for Suicide Prevention ("AFSP"), the largest private funder of suicide prevention research, as part of a suicide prevention toolkit created for distribution by retail gun stores. In fact, the NSSF encourages gun stores and other firearm industry members to use the toolkit, has distributed thousands of the suicide prevention pamphlets to firearm retailers around the country to distribute to their customers, and promotes the pamphlet on its website.

Both the Bill and the literature distributed thereunder easily pass constitutional muster, which in the commercial context requires only that factual and uncontroversial disclosures be

1

reasonably related to a substantial governmental interest. Everything in the pamphlets is overwhelmingly supported by decades of peer-reviewed social science relating to suicide prevention and furthers the County's interest in public safety. The County's policy decisions and the steps it has taken to curb the public health crises of gun violence and suicide and to save the lives of County residents deserve the deference the Supreme Court and the Fourth Circuit reserve for just these types of incremental, public health-related policies that regulate commercial speech.

Plaintiffs avoid grappling with the weight of authority backing the commercial speech regulation at issue here, instead pinning all their claims on the Bill's purported inability to survive strict scrutiny. But strict scrutiny is inapplicable here, as demonstrated best by the very case law Plaintiffs principally rely on. Those cases, arising in the context of pure political, religious, or ideological speech, say nothing about the County's Bill that only impacts Plaintiffs in the context of their retail firearm stores, and exclusively regulates their commercial transactions and speech.

Plaintiffs' objections come down to one statement on one page of the suicide prevention pamphlet, identifying "access to lethal means including firearms" as a "risk factor" for suicide. But even their own expert—not to mention the overwhelming consensus of social science research—agrees that firearm access is associated with a higher risk of suicide. Plaintiffs' expert then tries to muddy the plain reading of the pamphlet and to raise a factual dispute over whether access to firearms *causes* suicide risk, but this is irrelevant because the pamphlet speaks only of "risk factors," which refer to association—not causation. Regardless, Plaintiffs' expert offers an opinion so fundamentally flawed that—if the Court even reaches this issue, which it need not— the Plaintiffs' expert should be excluded under *Daubert*.

It is clear why Plaintiffs bring this suit: they chafe at any regulation of their businesses as "anti-gun." They disagreed with the Bill before they even received the pamphlets at issue. But

their mere disagreement is insufficient to invalidate the Bill, or to create a constitutional controversy where leading public health authorities, a mountain of scientific research, and even the gun industry's own trade association all support the County's straightforward public safety message. Therefore, summary judgment should be granted for the County, and Plaintiffs' motion should be denied.

### BACKGROUND AND STATEMENT OF UNDISPUTED FACTS[1]

The staggering toll of gun violence in this country and in Anne Arundel County—the public health crisis that drove the County's actions at issue in this case—is undisputed. Firearms are the single most common means of both homicide and suicide in the United States, and the majority of firearm deaths are suicides. Exp. Rep. of Dr. A. McCourt ("AM Report"), Ex. 1,[2] ¶¶ 5-6. In 2020 (the last year for which data is available), 24,292 suicides, or 53% of the nationwide total, involved the use of a firearm. Exp. Rep. of Dr. N. Kalyanaraman ("NK Report"), Ex. 2, ¶¶ 9-10. Firearms are also the leading means of suicide in Anne Arundel County, accounting for 34 suicides in 2019—45% of all suicides in the County—as well as 36 suicides in 2020 and 37 suicides in 2021. NK Report ¶ 9.

*Anne Arundel County Initiatives and Bill 108-21*

In April 2019, in the aftermath of the mass shooting at the offices of Annapolis's *Capital Gazette* newspaper, the Anne Arundel County Executive issued an executive order creating the Anne Arundel County Gun Violence Prevention Task Force, with the mission of investigating the problem of gun violence in the County, researching public health strategies to provide behavioral health services to people who may be at risk to commit or be the victim of gun violence, and

---

[1] This section identifies the material facts that the County submits are undisputed by the parties and sufficient to decide the County's motion for summary judgment.

[2] All exhibits are attached to the Declaration of James Miller.

recommending solutions. NK Report ¶ 3; Exec. Order No. 9, (Apr. 5, 2019).[3] On December 19, 2019, the task force issued its preliminary report, which found that 67% of gun deaths in the County were suicides. NK Report ¶ 11.[4] The task force later released its final report analyzing gun violence and making recommendations to address the public health crisis of gun violence in the County. *Id.* ¶ 4.[5] One of the task force's recommendations was to form the County's Gun Violence Intervention Team ("GVIT"), a permanent multiagency group which launched in August 2020. *Id.* ¶ 5. The GVIT's work has included: (1) publishing community resource toolkits on suicide prevention, domestic violence, youth gun safety, and responsible gun ownership; (2) providing an online data dashboard on gun suicides, homicides, and injuries; and (3) in June 2022, releasing a strategic plan to reduce gun violence through collecting and reporting data, education and public awareness, violence interruption, and coordinating interventions across the County. *Id.* ¶ 6.

On January 3, 2022, as one part of the County's efforts to address the problems of firearm suicide specifically and gun violence more generally, the Anne Arundel County Council passed Bill 108-21, titled "Public Safety—Distribution of Literature to Purchasers of Guns or Ammunition." (the "Bill"). Ex. 4. The Bill requires the Anne Arundel County Department of Health to "prepare literature relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution," and to distribute this literature to stores that sell guns or ammunition. *Id.* Gun dealers in turn are required to distribute this public-safety literature to firearm and ammunition

---

[3] *See* https://www.aacounty.org/departments/county-executive/executive-orders/steuart-pittman/SP-9.pdf

[4] *See* Gun Violence Prevention Task Force, Preliminary Report 3 (Dec. 19, 2019), https://www.aacounty.org/boards-and-commissions/gun-violence-task-force/reports/final-preliminary-report-20191219.pdf (also finding 30% of gun deaths in the County were homicides).

[5] See Report of the Gun Violence Prevention Task Force 6 (June 5, 2020), https://www.aacounty.org/boards-and-commissions/gun-violence-task-force/reports/fina-report-20200605.pdf (making 55 different recommendations to address gun violence).

purchasers and to make the public safety literature "visible and available at the point of sale." *Id.* The Bill took effect on April 10, 2022.[6]

*The Public Safety Literature*

At issue in this case are two documents that the County distributed to sellers of guns or ammunition and required them to display and make available to their customers pursuant to the Bill. The first is a pamphlet entitled "Firearms and Suicide Prevention." Ex. 5. The County did not author or produce the suicide prevention pamphlet. Rather, it was created in a collaboration between the NSSF and the AFSP, whose logos and names appear on the front and back covers. *Id.*

NSSF is the "firearm industry trade association," and according to its website, it "leads the way in advocating for the [firearm] industry and its business and jobs" and "champions for gun industry and firearm owners' rights."[7] NSSF also "advocates for measures on behalf of and works in defense of the firearms and ammunition industry at all levels and before all branches of government."[8] According to its website, AFSP is "the largest private funder of suicide prevention research,"[9] and "is dedicated to saving lives and bringing hope to those affected by suicide…."[10]

The NSSF and AFSP jointly developed a suicide prevention toolkit, of which the suicide prevention pamphlet is one part, "to help firearms retailers, shooting range operators and customers understand risk factors and warning signs related to suicide, know where to find help and

---

[6] After Plaintiffs filed their complaint, the County agreed, on May 5, 2022, not to enforce the provisions set forth in the Bill against any gun dealer in the County until a decision on the merits of this case is reached. (County's Response to TRO, ECF No. 16 ¶ 2). Accordingly, the Bill was in effect for a total of 25 days.

[7] NSSF, https://www.nssf.org/ (last visited Oct. 20, 2022), Ex. 6.

[8] *Legislative Action Center*, NSSF, https://www.nssf.org/government-relations/legislative-action-center/ (last visited Oct. 20, 2022), Ex. 7.

[9] *Suicide prevention research*, AMERICAN FOUNDATION FOR SUICIDE PREVENTION, http://afsp.org/suicide-prevention-research-federal-priority (last visited Oct. 20, 2022), Ex. 8.

[10] *About AFSP*, AMERICAN FOUNDATION FOR SUICIDE PREVENTION, http://afsp.org/about-afsp (last visited Oct. 20, 2022), Ex. 9.

encourage secure firearms storage options."[11] The two organizations ask that retailers and ranges participate in their program "because doing so can help save lives."[12] According to NSSF's website, NSSF has distributed at least 6,000 of the suicide prevention kits.[13]

The suicide prevention pamphlet is supported by information disseminated by the Centers for Disease Control and Prevention (CDC), the National Institute for Mental Health (NIMH), and the Maryland Department of Health (MDH). *See generally* NK Report (comparing County's literature to CDC and NIMH information and best practices). Like the suicide prevention pamphlet, the CDC, NIMH, and MDH all expressly identify access to firearms as a risk factor for suicide.[14] These statements by public health authorities are backed by the findings of numerous studies, many of which are cited and discussed in the expert report offered by the County from Professor Alex McCourt of Johns Hopkins Bloomberg School of Public Health. *See* AM Report ¶ 4 (opining that the County's literature is factually accurate and likely to contribute to reduction in gun-related injuries and death). Similarly, the CDC, MDH, and others define "risk factors" as the pamphlet does: "characteristics or conditions that increase the chance that a person may try to take their life."[15]  And there is no dispute—and even Plaintiffs' expert has conceded—that access

---

[11] *Suicide Prevention Program for Retailers and Ranges*, NSSF, https://www.nssf.org/safety/suicide-prevention/ (last visited Oct. 20, 2022), Ex. 10.

[12] *Id.*

[13] *Suicide Prevention*, NSSF REAL SOLUTIONS, https://www.nssfrealsolutions.org/programs/suicide-prevention/ (last visited Oct. 20, 2022), Ex. 11.

[14] *See, e.g.*, DEB STONE, ET AL., PREVENTING SUICIDE: A TECHNICAL PACKAGE OF POLICIES, PROGRAMS, AND PRACTICES, CDC 8, 23 (2017), https://www.cdc.gov/suicide/pdf/suicide_TechnicalPackage.pdf, Ex. 12 (listing "availability of lethal means" as a risk factor for suicide, and recommending safe storage of firearms as way to reduce access to lethal means); FREQUENTLY ASKED QUESTIONS ABOUT SUICIDE, NAT'L INST. OF MENTAL HEALTH 2 (2021) https://www.nimh.nih.gov/sites/default/files/documents/health/publications/   suicide-faq/suicide-faq.pdf, Ex. 13 ("main risk factors for suicide" include "[p]resence of guns or other firearms in the home"); RISK FACTORS OF SUICIDE, MARYLAND DEPT. OF HEALTH 1, https://health.maryland.gov/bha/suicideprevention/Documents/Stories of Hope/Risk Factors of Suicide Fact Sheet.pdf, Ex. 14 (risk factors include "[e]asy access to lethal means among people at risk (e.g., firearms, medications)").

[15] *Risk factors, protective factors, and warning signs*, AMERICAN FOUNDATION FOR SUICIDE PREVENTION, https://afsp.org/risk-factors-protective-factors-and-warning-signs, Ex. 15. *See also* Risk and Protective Factors, SUICIDE PREVENTION, CDC, https://www.cdc.gov/suicide/factors/index.html, Ex. 16 (risk factors are "situations or

to a firearm is associated with an increased risk of death by suicide. AM Report ¶ 11 (citing studies finding that "[w]hen a gun is in the household, risk of death by suicide increases for anyone in the household, including children"); NK Report ¶ 25 ("higher rates of gun ownership are associated with increased rates of gun suicide"); Kleck Tr., Ex. 3, 48:10-11 (describing access to firearms as "a noncausal correlation or association with suicide").

Dr. Kalyanaraman, who is the County Health Officer and the County's other expert, explained that one key goal of the County's literature is to inform gun owners about "lethal means reduction," a "strategy that addresses how suicides are attempted and focuses on reducing the lethality of the means of suicide chosen by an individual so that they are more likely to survive a suicide attempt." NK Report ¶ 20. The NSSF and AFSP likewise identify lethal means reduction as a key goal of their suicide prevention toolkit, citing "research show[ing] that the urge to harm oneself is often a spur of the moment action, and that if it's thwarted, it will not reoccur."[16] Studies cited by Dr. Kalyanaraman found that 70% of those who attempted suicide did not do so again, 23% did attempt suicide and didn't die, and 7% died from suicide in a subsequent attempt. NK Report ¶ 20. According to Dr. Kalyanaraman, "[l]ethal means reduction reflects the scientific consensus on how to decrease the chances of death from a suicide attempt." *Id.*

Finally, the suicide prevention pamphlet identifies different firearm storage options with estimated costs, including cable locks, lock boxes, gun cases, and safes. The pamphlet also encourages talking to friends or family members who may be at risk "about suicide and

---

problems that can increase the possibility that a person will attempt suicide"); *Risk Factors of Suicide*, MD. DEPT. OF HEALTH, *supra* 6 n.14 ("Risk factors are characteristics that make it more likely a person will think about, attempt, or die by suicide….Risk factors do not cause or predict suicide.").

[16] NSSF, *Finding the Right Partner: AFSP | Suicide Prevention Education #2 | NSSF & AFSP*, Vimeo (Mar. 15, 2018), https://vimeo.com/258685826 / (last visited Oct. 21, 2022).

encourage[ing] them to seek help," and lists on its back cover several resources for crisis management and suicide prevention, including hotlines. *See generally* Ex. 5.

The second piece of literature distributed by the County is a one-page pamphlet ("conflict resolution pamphlet") that states: "Conflict Resolution is a process to help you find the best way to resolve conflicts and disagreements peacefully." Ex. 5. The conflict resolution pamphlet provides contact and website information for the County's Conflict Resolution Center, the County's Suicide Prevention Toolkit, the County Warmline,[17] the County Police, and the Veteran's Crisis Line. Plaintiffs do not challenge any of the assertions or statements in the conflict resolution pamphlet. Plaintiffs' expert offered no opinion on the conflict resolution pamphlet. *See generally* Kleck Report.

*Plaintiffs*

Plaintiffs Cindy's Hot Shots, Worth-A-Shot, Pasadena Arms, and Field Traders ("Dealer Plaintiffs") are licensed firearm dealers located in Anne Arundel County. *See* Compl. ¶¶ 10-13. The fifth Plaintiff, Maryland Shall Issue, Inc. ("MSI"), purports to bring claims on behalf of its members who are either firearm dealers in the County or customers of such dealers. *See id.* ¶ 9.[18]

Although Plaintiffs object to the Bill on ideological grounds, Plaintiffs have presented no evidence that the Bill tangibly harms their businesses in any way. Dealer Plaintiffs have no evidence that the Bill has decreased or would decrease their sales. *See* Walker Tr., Ex. 18, 103:3-11; Quick Tr., Ex. 19, 120:3-14; Schaefer Tr., Ex. 20, 96:10-13; *see also* Novotny Tr., Ex. 21, 92:4-12 (MSI also has no such evidence). Nor does the Bill affect the Dealer Plaintiffs' ability to offer trainings or assistance to their customers. *See* Worthy Tr., Ex. 22, 22:5-8; Ex. 18, at 19:2-5;

---

[17] The Anne Arundel County Warmline is a 24-hour service that provides callers in crisis "with supportive assistance and linkages to resources within the community." *Crisis Services*, Anne Arundel County Mental Health Agency, https://www.aamentalhealth.org/pr_warmline.cfm, Ex. 17 (last visited Oct. 14, 2022).

[18] There is no evidence that any such dealers exist other than the parties to this lawsuit. *See* Ex. 21, at 20:15-21.

Ex. 19, at 25:7-29:2, 30:15-33:8; Ex. 20, at 15:7-9; *see also* Ex. 21, at 19:7-9 (MSI's ability to offer trainings also unaffected). Several Dealer Plaintiffs sell the various types of secure-storage products that are promoted by the suicide prevention pamphlet. *See* Ex. 22, at 53:13-54:6; Ex. 18, at 17:21-18:1; Ex. 19, at 22:6-11.

Additionally, although the Bill requires Dealer Plaintiffs to distribute literature from the County, that literature does not contradict any speech that the Dealer Plaintiffs engage in or would prefer to engage in. *See* Ex. 22, at 21:5-19, 24:5-9, 39:12-16, 58:7-10, 105:15-20, 128:19-129:7; Ex. 18, at 19:2-5, 68:7-14, 98:4-7; Ex. 19, at 25:10-16, 27:8-20, 28:17-30:2, 66:2-13, 84:9-13, 89:20-90:18, 107:4-108:11; Ex. 20, at 87:8-21, 88:5-89:9. In fact, the Dealer Plaintiffs do not usually discuss suicide prevention or conflict resolution with their customers, *see* Ex. 22, at 124:7-11; Ex. 18, at 68:7-14, Ex. 19, at 29:15-30:2, 107:8-21, 111:1-19; Ex. 20, at 88:5-20, 90:12-91:2, and as such have no basis for knowing what their customers' views are on these subjects, *see, e.g.*, Ex. 18, at 97:19-98:7; Ex. 19, at 110:19-111:19. The Dealer Plaintiffs displayed and distributed the literature for the 25 days the Bill was in effect, *see* Pls.' Mem. in Supp. of Summary Judgment (Pls.' Br.), ECF No. 39-12, at 33; Ex. 22, at 99:12-20, 101:2-7, 102:2-7; Ex. 18, at 52:4-9, 54:4-12; Ex. 19, at 101:11-15, 109:6-20; Ex. 20, at 49:5-7, 80:21-81:3, and in that time three of the four Dealer Plaintiffs did not speak with a single customer about the Bill or the literature, and none of those dealers' customers indicated any disagreement with the Bill or the literature. *See* Ex. 22, at 30:2-20, 102:8-14; Ex. 18, at 95:17-96:15; Ex. 19, at 36:10-15. Meanwhile, the fourth Dealer Plaintiff, Field Traders, affirmatively told their regular customers that the County was requiring them to distribute the literature and asked the customers for their feedback. *See* Ex. 20, at 54:1-9, 55:3-18, 61:9-18. Some of those customers responded with what Field Traders has characterized— in inadmissible hearsay testimony—as "repulsion" that "the [C]ounty [was] forcing this material"

to be distributed. *Id.* at 53:8-54:7, 61:19-20.[19] Field Traders has produced no evidence, however, that the Bill or the literature chilled any of its customers' speech. *See* Ex. 20, at 93:4-18.

**STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.... and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). When deciding cross-motions for summary judgment, a court considers each motion separately and resolves all factual disputes and competing inferences in the light most favorable to the opposing party. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The court must ask "whether the evidence presents a sufficient disagreement to require submission to the [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**ARGUMENT**

**I.  Bill 108-21 mandates health and safety disclosures about consumer products and is constitutional.**

Bill 108-21 requires that Dealer Plaintiffs display and distribute certain pamphlets in their retail stores, at the point of sale.  These pamphlets relate directly to the very products these retailers sell—firearms and ammunition—and have as their target audience Plaintiffs' customers, the consumers of their products. Together, the pamphlets inform consumers about the products they

---

[19] In their brief, Plaintiffs assert that feedback from Field Traders' customers "showed repulsion that the County claims via its literature that they are more likely to use their purchases for nefarious and ill-intended manners than good." Pls.' Br. at 8 (citing Field Traders' Response to Interrogatory No. 8). In his deposition, however, the owner of Field Traders clarified that this was Field Traders' understanding of the literature, not necessarily its customers'. *See* Ex. 20, at 61:21-62:8. In any event, of course, the pamphlet says nothing of the kind.

are purchasing, specifically how those products relate to their and others' health and safety and how to use (and store) those products safely. In short, the compelled speech here consists of quintessential health and safety disclosures, akin to the warning labels, nutrition facts, and myriad disclosures to which consumers are accustomed. Stated alternatively, they relate to public safety concerns of the County.

Because the County's Bill regulates commercial speech and constitutes a mandated disclosure rather than a restriction, it is properly analyzed under the framework set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). That makes the Bill subject to *Zauderer*'s deferential review—not strict scrutiny or intermediate scrutiny, as Plaintiffs argue. *See Recht v. Morrisey*, 32 F.4th 398, 416, 419 (4th Cir. 2022) (recognizing state's authority to "come to its own conclusions as to the value of disclosure requirements amid [an] ongoing [public health] crisis" and upholding disclosures that reasonably related to state's interest in "furthering public health and safety"), *petition for cert. filed*, No. 22-175 (Aug. 25, 2022); *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (describing *Zauderer* as "rational basis scrutiny").[20] Under the appropriate framework of *Zauderer*, Bill 108-21 is not unconstitutional as applied to Plaintiffs because its mandated disclosure (1) reasonably relates to the County's substantial interest in public health and safety; (2) consists of purely factual and uncontroversial information; and (3) is not unduly burdensome on Plaintiffs.

---

[20] Plaintiffs' erroneous arguments regarding the applicability of strict scrutiny, including their misplaced reliance on *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), are discussed below in section I.E.

**A. Bill 108-21 is properly reviewed under *Zauderer* because it regulates commercial speech and imposes a disclosure requirement rather than a restriction on speech.**

Two threshold questions govern the appropriate level of scrutiny under the First Amendment. First, does the Bill regulate commercial speech? *See Recht*, 32 F.4th at 416. And second, does the Bill require a disclosure or impose a restriction on speech? *Id.* Here, Bill 108-21 regulates retailers engaged in commercial speech at the point of sale and requires that those retailers disclose information about the products they are selling. As the Fourth Circuit instructs in *Recht*, "*Zauderer* generally applies to the mandatory disclosure of commercial speech." 32 F.4th at 416. As explained below, Bill 108-21 is therefore properly analyzed under *Zauderer*'s deferential standard.

### 1. Bill 108-21 regulates commercial speech.

As the Fourth Circuit recently explained, commercial speech encompasses "expression related solely to the economic interests of the speaker and its audience[.]" *Recht,* 32 F.4th at 407 (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980)). This includes, but is not limited to, speech that "does no more than propose a commercial transaction." *Greater Balt. Center for Pregnancy Concerns v. Mayor and City Council of Balt.*, 879 F.3d 101, 108 (4th Cir. 2018). Here, Plaintiffs' regulated speech fits easily within either definition and is plainly commercial. The Bill applies to "all establishments that sell guns or ammunition," and the County's literature is to be distributed "at the point of sale" and "to all purchasers." Ex. 4. And the Dealer Plaintiffs here propose commercial transactions[21]—their sales of firearms and ammunition—in the same location where the disclosures are distributed, unlike in *Greater Baltimore* where the required notice about abortion services was to be posted far from the

---

[21] Plaintiffs try to artificially cabin the timeframe that Plaintiffs' speech is being regulated to only "*after*" the commercial sale. *See* Pls.' Br. at 16. Plaintiffs, however, point to no authority for this hyper-technical view of commercial transactions or of this reading of the Bill.

*free* services the pregnancy clinic provided (which were not even economically motivated commercial transactions). *See* 879 F.3d at 108 ("Nothing in the record suggests that the Center proposes any transactions in the waiting room where the disclaimer would appear," and "[e]ven if pregnancy-related services are discussed there, the Center collects no renumeration of any kind, including referral fees from physicians."). In sum, the Bill directly regulates commercial retailers' speech relating to their products, at the time and place where those products are being sold. It is therefore squarely within the category of commercial speech that *Zauderer* governs. *See, e.g., CTIA–The Wireless Association v. City of Berkeley* ("*CTIA II*"), 928 F.3d 832, 838, 845-49 (9th Cir. 2019) (applying *Zauderer* to local ordinance requiring cell phone retailers to "provide" a notice with health and safety information "to each customer who buys or leases a Cell phone").

Plaintiffs' assertion that the Bill regulates non-commercial speech is meritless. Plaintiffs cite a three-part test for evaluating unclear cases of commercial speech that the Fourth Circuit set forth in *Greater Baltimore*, 879 F.3d at 106; *see also* Pls.' Br. at 15-16. This test applies to speech "outside th[e] 'core notion'" of speech that is "deemed commercial,"[22] and is therefore irrelevant and unnecessary in cases—like this one—lying at the "core" of commercial speech—meaning speech that "propose[s] a commercial transaction." *Greater Balt.*, 879 F.3d at 108. *Accord Zauderer*, 471 U.S. at 637 ("commercial speech doctrine rests heavily on the 'common-sense

---

[22] The three-factor test is typically applied to *mixed* commercial and non-commercial speech where the question is whether, within the specific "context" of the speech restriction and/or the mandatory disclosure, the regulated speech is sufficiently commercial. *See, e.g., Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67–68 (1983) (speech can be commercial "notwithstanding the fact" that it also "contain[s] discussions of important public issues."). This determination therefore "presents a closer question." *Id.* at 66. By contrast, here, Plaintiffs' speech does "*no more* than propose a commercial transaction." *Greater Balt.*, 879 F.3d at 108 (emphasis added). Plaintiffs do not dispute that their conversations, product displays, and advertisements in their stores all relate to commercial transactions—selling firearms and ammunition. *See* Pls.' Br. at 3 ("Each of these plaintiff dealers regularly sells firearms, included regulated firearms, as well as ammunition."). Nor do Plaintiffs assert that they engage in any non-commercial speech that the Bill regulates. Plaintiffs' display of the Second Amendment (Ex. 19, at 101:2-3) or a political campaign sign (Ex. 18, at 51:14-52:3) may constitute expressive conduct, but these activities are not affected by the Bill.

distinction between speech proposing a commercial transaction … and other varieties of speech")
(citation omitted).

Even if the three-factor test identified in *Greater Baltimore* for speech "outside the core"
applied here—which it does not—the answer would be same: the regulation here relates to
commercial speech and should be evaluated as such. The evidence in the record indicates that
Dealer Plaintiffs' speech (if any) "at the point of sale" with the "purchasers" of their firearms and
ammunition is speech *about those very products*. *See, e.g.*, Ex. 18, at 66:17-67:2 ("Q: [W]hen your
customers are checking out in your store, what kinds of conversations do you have with them?
A: Just answer whatever questions they ask about the firearms. Q: Anything else? A: They ask—
just their questions."). Thus, the speech at issue (if any) clearly "refer[s] to a specific product"
being sold—namely, firearms and ammunition. In addition, the Bill requires a disclosure only in
the context of an "economic[ally] motiv[ated]" transaction (the sale of firearms or ammunition).
*Greater Balt.*, 879 F.3d at 108. Thus, the Bill easily satisfies the second and third factors. *Id.* And
unlike the challengers in the cases Plaintiffs rely on, Plaintiffs here do not provide free services or
products, do not operate as nonprofit organizations, and do not exist for purely ideological reasons.
*See* Pls.' Br. at 16; *see Greater Balt.*, 879 F.3d at 108-09 ("A morally and religiously motivated
offering of free services cannot be described as a bare 'commercial transaction.'").

As to the first factor—which asks "is the speech an advertisement" (*id*.)—while it may be
true in a narrow sense that the Bill applies whether or not a particular firearm retailer advertises
outside the confines of their brick and mortar store, *see* Pls.' Br. at 16, the more relevant point is
that the disclosures are required only as to retail establishments that exist for the very purpose of
promoting and selling specific products, and even then the Bill applies only in the context of an
unambiguously commercial transaction—the sale of a firearm or ammunition. *See* Ex. 4. So while

the first factor may not perfectly map onto this case, the clear presence of the other two factors and

the overall context are more than sufficient for this Court to conclude that this is commercial

speech under the three-factor test as well. *See Greater Balt.*, 721 F.3d 264, 285 (4th Cir. 2013) (en

banc) ("it is not necessary that each of the characteristics 'be present in order for speech to be

commercial'") (citing *Bolger*, 463 U.S. at 67 n. 14).

### 2.   Bill 108-21 imposes a compulsory disclosure, not a restriction on speech.

The second threshold matter governing the proper level of scrutiny applied to a regulation

of commercial speech is whether the regulation restricts speech or requires a disclosure. In

*Zauderer,* the Court emphasized that First Amendment jurisprudence distinguishes between these

two categories because required disclosures "trench much more narrowly on an advertiser's

interests than do flat prohibitions on speech[.]" *Zauderer*, 471 U.S. at 651. Under the Constitution,

this is a "material difference[]" because a disclosure does not prevent the commercial actor "from

conveying information to the public; it [] only require[s] them to provide somewhat *more*

information than they might otherwise be inclined to present." *Id.* at 650 (emphasis added).

Accordingly, the Court held that while *restrictions* on commercial speech are subject to

intermediate scrutiny, *disclosure requirements* need only survive rational basis scrutiny; in other

words, if the regulation requires the disclosure of "purely factual and uncontroversial

information[,]" it need only be "reasonably related to the State's interest in preventing deception

of customers." *Id.* at 651. The Court applied this standard to uphold certain disclosure requirements

regarding litigation costs in attorney advertisements. 471 U.S. at 632-34.[23]

---

[23] Plaintiffs reference the Supreme Court's intermediate scrutiny analysis in *Zauderer* in their argument that the case does not apply, incorrectly anticipating that the County will argue that intermediate scrutiny applies here. *See* Pls.' Br. at 14. That portion of the Supreme Court's analysis in *Zauderer*, however, is inapplicable here. Bill 108-21 places no *restrictions* on Plaintiffs' speech whatsoever, as evident by the text of the Bill and as acknowledged by Plaintiffs. *See, e.g*, Ex. 22, at 107:9-12 (denying that pamphlets stop plaintiff from communicating with customers); *see also* Ex. 19, at 90:14-18 (same). But even if intermediate scrutiny were to be applied, the County's Bill would still pass constitutional muster under that heightened standard that still "gives the [s]tate needed leeway in a field (commercial

The Fourth Circuit recently reaffirmed that *Zauderer* rational basis review governs compulsory disclosures in the context of commercial speech, like the one at issue here. In *Recht*, the circuit court reversed the district court and upheld the constitutionality of a West Virginia statute that imposed a combination of restrictions and disclosure requirements on attorney advertisements related to medical device and prescription drug litigation. The disclosure requirements required attorneys to disclose to potential clients: (1) that they should consult with their doctor before discontinuing prescribed medication, because ceasing treatment without a doctor's advice can cause injury or death; and (2) whether the medical device or drug that is referenced remains approved by the FDA. *Recht*, 32 F.4th at 417-18. The court confirmed that, as in *Zauderer*, the "even *more* deferential standard" of rational basis scrutiny applied to "the statute's disclosure requirements" in the context of commercial speech. *Id.* at 405 (emphasis added).[24]

### B. Bill 108-21 is reasonably related to the County's public safety interest in suicide prevention and conflict resolution.

Here, the display and distribution of suicide prevention and conflict resolution literature to firearm owners satisfies *Zauderer* rational basis review because the dissemination of public health literature is reasonably related to the County's substantial interest in the public health and safety of its residents, including the prevention of suicide and the promotion of conflict resolution.

First, the promotion of public safety, including the prevention of suicide and armed conflict among County residents, is a substantial government interest. *See Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986) ("health, safety, and welfare" of citizens

---

speech) traditionally subject to governmental regulation." *Recht*, 32 F.4th at 413-14 (citation omitted). As described herein, the County's interests in gun violence and firearm suicide prevention are substantial. And the record establishes that the Bill "directly advances" those substantial interests because, among other things, there is a "fit between the [County's] ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable[.]" *Recht*, 32 F.4th at 414 (citations omitted); *see, e.g.,* AM Report ¶ 22 (concluding the County's literature will help prevent suicides) *and* NK Report ¶ 32 (concluding the County's literature will likely reduce gun homicides).

[24] In contrast to the "even more deferential standard" applied to the disclosure requirements, *Recht*, 32 F.4th at 405, the Fourth Circuit applied intermediate scrutiny to the advertising restrictions. *See id.* at 410.

is a substantial government interest for purposes of First Amendment scrutiny). Indeed, Plaintiffs concede as much in their brief. *See* Pls.' Br. at 19 (acknowledging that County's "interest in suicide and 'conflict resolution' may be legitimate"). And as the Fourth Circuit recently recognized, the state's interest in "furthering public health and safety" can be promoted by mandatory commercial disclosures under *Zauderer*. *Recht*, 32 F.4th at 419 (quoting *CTIA II*, 928 F.3d at 844) (state's "substantial interest" in "public health and safety" justified cell phone radiation warnings). Numerous other circuit courts have similarly concluded that the protection of public health and safety is a substantial government interest under *Zauderer*. *See, e.g.*, *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc) (meat country-of-origin labels); *Nat'l Elec. Mfrs. Assoc. v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (mercury-containing product disclosures); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. Of Health*, 556 F.3d 114, 133 (2d Cir. 2009) (restaurant calorie disclosures).

Second, the distribution of public health literature that educates consumers about the risks of suicide and interpersonal conflict, and provides resources and advice to mitigate those risks, advances the County's interest in protecting the public, and thus easily satisfies the "reasonable relation" prong under *Zauderer*. The suicide prevention pamphlet "tailors its message to gun owners through the use of images and language that clearly identifies gun owners as the target audience. Key messages are clearly identified and includes [sic] actions that gun owners can take to make themselves and their household safer." NK Report ¶ 23. The Bill also appropriately and in line with "well established public health practice" targets gun owners because of the association between gun ownership and suicide, and between gun ownership and increased rates of gun homicide. *See id.* ¶ 25 & ¶ 32; AM Report ¶ 22. These findings are undisputed by Plaintiffs.

17

Plaintiffs have failed to directly challenge whether the Bill is reasonably related to the County's substantial interests. Instead, they erroneously contend that the Bill is underinclusive because it applies only to firearm dealers. Pls.' Br. at 21-22. This misapprehends the standard of review and ignores that "governments are entitled to attack problems piecemeal." *Zauderer*, 471 U.S. at 651 n.14; *see also Sorrell*, 272 F.3d at 116 (reasonable relation to a government interest does not require that a regulation "get at all facets of the problem it is designed to ameliorate."). It is undisputed that firearms are the most common means used in suicides in the County (and nationwide), and that generally, the County is addressing gun violence as a public health crisis. NK Report ¶¶ 4, 9-10. Thus, it makes perfect sense for the County to focus its limited public health resources on these issues. Nothing in the First Amendment requires the County to simultaneously address *all other methods of suicide and homicide* before it can constitutionally tackle the leading ones. This piecemeal approach is not only constitutionally sound, but, as explained by Dr. McCourt, conforms to public health practice: "In my opinion, these materials will help prevent suicide….[S]uicide prevention is most effective through a holistic, multipronged approach that involves laws, behavioral interventions, and diverse collaborations." AM Report ¶ 22 (citation omitted); *see also* NK Report ¶ 32 (concluding that the "distribution of conflict resolution literature by gun dealers is likely to be an effective method to reduce gun homicides"). And regardless, the County *does* combat gun violence and suicide through numerous other approaches, including through the multifaceted work of its Gun Violence Intervention Team. *See supra* at 4.

Through their expert Professor Kleck, Plaintiffs imply that the Bill will have no impact on suicide rates in the County at all. Pls.' Br. at 21 (quoting Kleck Report at 13-14). For the many reasons outlined herein and in the County's accompanying *Daubert* motion, Professor Kleck's outlier views on suicide should be disregarded. Moreover, as Dr. Kalyanaraman explains, "[l]ethal

means reduction reflects the scientific consensus on how to decrease the chances of death from a suicide attempt." NK Report ¶ 20; *see supra* at 7 (discussing efficacy of lethal means reduction).

In any event, a battle of the experts regarding the measures that should be taken to prevent suicides and firearm suicides is unnecessary to resolve the issues here. In assessing whether a mandatory disclosure is "reasonably related" to the government's asserted interest, the Court need not "assess the validity of the studies relied upon by the [government] or [] make an empirical judgment as to whether mandatory disclosures are the most appropriate remedy[,]" because "[t]hese are questions quintessentially reserved to the political branches, an assignment of responsibility that *Zauderer*'s deferential standard emphatically reinforces." *Recht*, 32 F.4th at 418-19. The County is therefore "free to come to its own conclusions as to the value of disclosure requirements amid [an] ongoing … crisis." *Id.* Even Plaintiffs' expert agrees that secure firearm storage "might reduce firearm suicide." Ex. 3, at 50:15-19. The Constitution does not require the County to prove that it can prevent every suicide before it can act to prevent any of them.

Here, the evidence presented by the County's experts supporting the efficacy of the public health disclosures makes it "reasonable to expect that some consumers will use the information disclosed" as the County intends—to correctly identify suicide warning signs and risk factors in others, to take appropriate precautionary measures with regards to their firearms, and to contact the suicide prevention and conflict resolution resources—"and that these choices will lead to a lower incidence of" firearm suicides and gun violence, the crises that the County aims to curb. *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,* No. 08 Civ. 1000 (RJH), 2008 WL 1752455, at *12 (S.D.N.Y. Apr. 16, 2008), aff'd, 556 F.3d 114, 135 (2d Cir. 2009) (calorie disclosures would lead to healthier choices, furthering the city's interest in curbing obesity); *see also CTIA II*, 928 F.3d at 845 (cell phone warnings would raise awareness of radiation risks in furtherance of city's interest

in health and safety); *Sorrell*, 272 F.3d at 115 (mercury warnings would lead some consumers to properly dispose of products and limit mercury pollution).

### C. The pamphlets are purely factual and uncontroversial.

The County's two pieces of literature provide factual information related to the uncontroversial topics of suicide prevention and conflict resolution, and are therefore permissive compelled disclosures under *Zauderer*.

#### 1. The content of the pamphlets is purely factual and uncontroversial.

Plaintiffs challenge the factual accuracy of only one piece of information within the literature—the statement in the Firearms and Suicide Prevention pamphlet that "access to lethal means, including firearms and drugs" is one of many "risk factors" for suicide, which the pamphlet defines as "characteristics or conditions that increase the chance that a person may try to take their life."[25] Pls.' Br. at 6, 24; *see also* Ex. 3, at 16:17-18:6 (disclaiming analysis or opinion on any part of pamphlet other than specific language allegedly asserting causal claim). But this statement is undisputedly true. As explained above, *supra* at 6-7 & n. 14-15, public and private sector health authorities are unanimous in describing access to firearms as a risk factor for suicide. The social-science scholarship is unequivocal too: at least 44 separate studies have found that access to firearms is associated with an increased risk of suicide. *See* Miller Dec. App. 1 (listing studies).

Indeed, both the County's and Plaintiffs' experts agree on this point: Firearms are, in fact, correlated or associated with suicide risk, and in this sense are a risk factor for suicide. *See* NK

---

[25] Plaintiffs do not contest anything within the conflict resolution insert. Nor can they, as the document includes a one-sentence description of "conflict resolution" and otherwise simply lists County and other resources to complement the national resources listed in the other pamphlet. Plaintiffs' breezy statement that, for whatever they have contended as to suicide prevention "[t]he same is true with respect to 'conflict resolution,'" is unsupported by the record, as the only evidence concerning the conflict resolution insert is the County's experts' opinions that it is factually accurate. *Compare* Pls.' Br. at 24 *with* NK Report ¶¶ 31-32 *and* AM Report ¶ 21. Plaintiffs' expert did not offer an opinion on this insert. The County therefore understands Plaintiffs' disagreement with the conflict resolution insert to largely be encompassed by their general disagreement with having to comply with a Bill that only regulates gun dealers. *See* Pls.' Br. at 17.  But that general disagreement does not render the disclosures unconstitutional under the First Amendment. *See Recht*, 32 F.4th at 418; *see infra* Section I.C.2.

Report ¶ 25 ("[H]igher rates of gun ownership are *associated* with increased rates of gun suicide") (emphasis added); AM Report ¶ 5 ("Firearms and violence are tightly linked, particularly when it comes to suicide"); *see also* Ex. 3, at 200:20-201:3 ("Q. So you—you agree with the proposition that firearms ownership and firearms access is a risk factor for suicide if risk factor is used to mean a correlate?  A.  Yes.  If it means nothing more than a correlate and not a causal assertion about causality, then yes."); Ex. 3, at 78:24-79:2 (agreeing there is a correlation between firearms access and suicide); Ex. 3, at 48:10-11 (same). In short, while Plaintiffs in their brief object to "the County's view that firearms are *associated* with suicide," Pls.' Br. at 13 (emphasis added), their own expert acknowledges and concedes that "view" is factually accurate, *see, e.g.*, Ex. 3, at 200:20-201:3 (affirming that firearms ownership and firearms access is a "correlate" for suicide). And Plaintiffs have produced no other evidence to qualify their expert's concession on the association point or to otherwise challenge the factual association between firearms and suicide.

It is simply not enough that Plaintiffs themselves subjectively "disagree" with the content of the pamphlets. Their argument is not only empty and circular, but it also "misinterprets *Zauderer*." *Recht*, 32 F.4th at 418 ("[A]ny time there is litigation over a disclosure requirement, there is, by definition, a 'case' or 'controversy' concerning that requirement."). If a plaintiff's disagreement were sufficient, then no compelled commercial speech—even if indisputably factual—could *ever* be deemed uncontroversial once it was challenged in court. *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 907 F.Supp.2d 1, 17-18 (D.D.C. 2012) (explaining that "controversy must mean more than the fact that some people may be highly agitated and be willing to go to court over the matter").

To be sure, Plaintiffs' expert does quibble with one point: he asserts that there is no *causal* relationship between firearms and suicide. *See, e.g.*, Kleck Report at 4-5. But this opinion, which

Plaintiffs acknowledge is immaterial for other reasons, *see* Pls.' Br. at 7, misses the mark for several reasons. Most importantly, it is irrelevant: Kleck attacks a statement about the *causes* of suicide risk that the County's literature simply does not make. *See* Ex. 3, at 93:24-94:4 (arguing the pamphlet's definition of "risk factors" is "unambiguously an assertion about causal effects"). Instead, the pamphlet speaks of firearms access as a "risk factor" for suicide, which is a designation commonly understood in the field of public health and epidemiology to be *associated with* an outcome, regardless of whether or not it actually *causes* the outcome. *See* NK Report ¶ 25.[26]

Further, that same page of the pamphlet, titled, "What leads to suicide?" notably does not even list access to firearms, nor does the pamphlet's page instructing readers to "Take Suicide Warning Signs Seriously" reference firearms access. Ex. 5 at 2, 5. Again, no reasonable reader would understand the pamphlet to convey a message that guns *cause* suicides. And *Recht* strongly cautions against any reading that "cleaves" one part of a disclosure from the rest in a way that distorts the overall message. 32 F.4th at 417.

Even if Kleck had opined on an assertion that a reasonable reader would understand the pamphlet to be making, which he has not, his opinion would still be inadmissible for lack of a sufficient factual basis or reliable methodology, as explained in greater detail in the County's motion in limine to exclude Kleck under *Daubert*. Among other defects, Professor Kleck's opinion simply copies his own three-year-old and incomplete analyses, and fails to address more recent research or the glaring omissions of relevant older scholarship from the source material he copied.

---

[26] *See also, e.g.*, Stone, *supra* note 14, at 8, 23 ("Suicide is *associated* with several risk and protective factors.") (emphasis added); Risk and Protective Factors, CDC, *supra* note 15 (risk factors are "situations or problems that can increase the possibility that a person will attempt suicide").

Additionally, Professor Kleck can only speculate as to whether his theory could actually explain away the results of dozens of studies that support the statements in the County's literature.[27]

That Plaintiffs rely on the one person who continues to opine against the otherwise *unanimous* weight of authority is wholly insufficient to create a legitimate scientific debate. *See CTIA-The Wireless Ass'n v. City of Berkeley,* 139 F. Supp. 3d 1048, 1070-71 (N.D. Cal. 2015) (acknowledging "scientific uncertainty" and "scientific debate" over radiation risks, but finding mandated disclosure factual and uncontroversial where it was supported by "some reasonable scientific basis"); *cf. Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1264 (E.D. Cal. 2020) (noting, in context of summary judgment, that "[t]here need not be complete consensus among the scientific community before a warning may be required"). The fact that "science is almost always debatable at some level" does not mean that a lone contrarian viewpoint can disrupt the scientific consensus for purposes of the First Amendment; otherwise "any science-based warning required by a governmental agency would automatically be subject to heightened scrutiny[.]" *CTIA-The Wireless Ass'n v. City of Berkeley*, 158 F. Supp. 3d 897, 904-05 (N.D. Cal. 2016), *aff'd,* 928 F.3d 832 (9th Cir. 2019). While Courts have not been called upon to decide the precise demarcation between disclosures that are purely factual and those subject to reasonable scientific debate, this case is nowhere near that line.

---

[27] Even if the pamphlet could reasonably be read to make the causal statement that Professor Kleck opines on, which it cannot, it would still be factually accurate. Numerous studies provide a factual basis for the conclusion that access to firearms causes an increased risk of suicide. See, e.g., AM Report ¶¶ 7-8 (discussing studies supporting conclusion that "access to firearms increases the risk of death by suicide," as well as the causal mechanism in this relationship). *See also, e.g.*, Justin T. Briggs & Alexander Tabarrok, Firearms and suicides in US states, Int'l Review of Law & Econ., 2014, at 187, Ex. 40, ("[W]e…see strong evidence that increased gun prevalence causes an increase in overall suicide."). To counterbalance this evidence, Plaintiffs' expert cites only himself. *See* Ex. 3, at 105:16-20, 171:13-21 (conceding that he cannot identify any other scholar or study that agrees with his findings).

**2. Any implied messages that Plaintiffs unreasonably read into the pamphlets are irrelevant.**

Taking a different tack, and to create controversy where none legitimately exists, Plaintiffs baldly assert that the "[t]he Bill basically embodies a 'guns are bad' ideological message." Pls.' Br. at 18. Of course, neither the pamphlet nor the insert contains any such language, directly or impliedly. Plaintiffs evidently disagree with having to comply with any disclosure requirements, regardless of the content.[28] But as *Recht* makes clear, that disagreement does not render the disclosures unconstitutional under the First Amendment. 32 F.4th at 418 ("The question is not whether the *existence* of a given disclosure requirement is controversial; … Rather, the question is whether the *content* of a required disclosure is controversial.") (emphases in original).

Plaintiffs' strained reading of the literature is a clear attempt to recast this case as akin to the narrow and entirely distinct set of cases regarding pregnancy clinics and abortion services. They attempt to position the County's supposed "guns are bad" viewpoint as "'antithetical' to Plaintiffs' belief that the exercise of Second Amendment rights by law-abiding, responsible adults is a positive social good." Pls.' Br. at 18. Neither Supreme Court nor Fourth Circuit precedent, however, stand for the proposition "that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial." *CTIA II*, 928 F.3d at 845. Moreover, to the extent that any of the *topics* at issue here—firearm safety, suicide prevention, or conflict resolution—can reasonably be understood to come even close to the level of general controversy that abortion occupies, the pamphlets nevertheless do not "force [firearm] retailers to take sides in a heated political controversy" related to those topics, as it is "no more and no less than a safety warning." *Id.* at 848. Nor does the County "elevate[] one side of a legitimately

---

[28] *See, e.g.*, Ex. 19, at 54:14-18 (Q: Did you not think it was important to give Cindy's Hot Shots' input on the literature that you would be displaying and distributing at your store? A: No, because I wasn't going to agree with it anyway.").

unresolved scientific debate." *Cal. Chamber of Commerce v. Council for Educ. and Research on Toxics*, 29 F.4th 468 (9th Cir. 2022).

Plaintiffs also fail to contend with the critical and dispositive differences with these abortion-related cases. In *Greater Baltimore*, for example, the compelled speech, requiring pregnancy clinics to post a disclaimer that they do "not provide or make referral for abortion or birth-control services," 879 F.3d at 106, was not simply "antithetical" to the clinic's articulated views, *id.* at 110. Instead, the factual record established that the clinic was an avowed religious organization, offering services such as Bible study, and operated out of a church-owned property. *Id.* Because the clinic's "pro-life Christian beliefs permeate[d] all that the Center d[id]," and its avowed mission was to "provid[e] alternatives to abortion," the required disclosures regarding abortion were therefore found to be "antithetical to the very moral, religious, and ideological reasons the Center exists." *Id.* (emphasis added).

Here, by contrast, there is perhaps no clearer possible evidence for a *lack* of controversy than the fact that the firearms industry's own advocacy and lobbying association co-authors, approves, and promotes the disclosure in question. Here, NSSF—the gun industry's own trade association—developed the suicide prevention pamphlet specifically to speak to an audience of firearm owners, with an inoffensive message from a trusted source.[29] NSSF advises that firearms retailers participate in its suicide prevention efforts by displaying and distributing the pamphlet. *See* Ex. 10. For Plaintiffs' distorted reading of the pamphlet to be true, the Court would have to find that the firearm industry's own trade association has authored and disseminated a pamphlet stating or implying that guns are bad—a proposition that is illogical and nonsensical, if not

---

[29]  *See* The Gun Industry Speaks, *NSSF's Initiatives for Suicide Prevention*, NSSF, at 8:15, https://soundcloud.com/user-728416596/nssfs-initiatives-for-suicide-prevention (identifying NSSF as a "trusted messenger in conveying safety messaging to gun owners").

frivolous. Plaintiffs simply wish to remain blind to what their own trade association readily acknowledges—that more than half of all deaths with a firearm nationwide and in the County are suicides, and that most suicides nationwide and in the County are carried out with a firearm.

On the outer edges, "[w]hat 'purely factual and uncontroversial' means has not been completely explained by the Supreme Court." *National Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1258 (E.D. Cal. 2020). But the required disclosures here—identifying well-established warning signs and risk factors for suicide, providing information about secure gun storage in case a firearm owner has concerns about a family member, highlighting mental-health and suicide prevention resources, and promoting conflict resolution—are factually accurate and uncontroversial under any reasonable application of those terms.

### D. The display and distribution of the pamphlets does not impose an undue burden.

Under *Zauderer*'s reasonable relation test, disclosure requirements cannot be "unjustified or unduly burdensome." 471 U.S. at 651. This standard, though, is applied "where the *only* asserted justification for a disclosure requirement is 'purely hypothetical.'" *Recht*, 32 F.4th at 419. (emphasis added). Overall, the "standard remains deferential, in keeping with the 'minimal' interest that advertisers have in refraining from 'providing any particular factual information.'" *Id.* (quoting *Zauderer*, 471 U.S. at 651). As a result, as the Fourth Circuit notes, courts have overturned disclosure requirements on the basis of burden where, for example, the compulsory disclosure would be "a large fraction of the advertisement" or would render the underlying commercial speech "functionally impossible." *Id.*

While Plaintiffs argue otherwise (Pls.' Br. at 23),the Bill and the County's literature pose no such undue burdens. In response to a public health suicide and gun violence crisis (and not a hypothetical problem), the County imposes "relatively benign" burdens on gun retailers. *Id.* at 419. Plaintiffs acknowledge that the Bill does not require them to say anything. *See, e.g,* Ex. 19, at 88:5-

8, 89:10-13. If Plaintiffs do not want to serve as a "conduit" for these messages, Compl. ¶¶ 10-
14—with the main pamphlet clearly identified as originating from NSSF and AFSP—they are not
required to say anything at all; they may simply hand out the pamphlet and are otherwise free to
divulge to their customers that they strenuously oppose its message, if that is their desire.

Further, the pamphlets measure only 6-inch by 6-inch, with the one-page conflict resolution
insert fitting into the folded suicide prevention pamphlet. *See* Ex. 5. The Bill is satisfied by making
the pamphlets visible and available near the stores' points of sale and through the distribution of
the pamphlets to firearms and ammunition purchasers. Plaintiffs will not have to significantly
rearrange their stores to make room for their display. Indeed, Plaintiffs were able to find space
during the 25 days they displayed and distributed the pamphlets prior to the stay. Finally, there is
no cost to Plaintiffs to comply as the pamphlets are provided and distributed by the County.[30]

**E. Bill 108-21 is not subject to strict scrutiny.**

The central argument of Plaintiffs' motion is that Bill 108-21 cannot survive strict scrutiny.
*See* Pls.' Br. at 18-24. But because this case involves commercial speech, *see supra* at 12-15,
strict scrutiny does not apply. *Recht*, 32 F.4th at 408. As such, Plaintiffs' motion should be denied.

**1. *NIFLA* is inapplicable here.**

Plaintiffs' reliance on the Supreme Court's opinion in *National Institute of Family & Life
Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018), is particularly misplaced. First, the Court
in *NIFLA* expressly stated that it was "not question[ing] the legality of health and safety warnings
long considered permissible, or purely factual and uncontroversial disclosures about commercial

---

[30]  Plaintiffs allege they will be at risk of penalty if they run out of pamphlets, Pls.' Br. at 23, but there is no evidence
of this hypothetical risk in the record. In any event, the Bill expressly delegates to the County Health Department the
responsibility to distribute the literature to the gun dealers. *See* Ex. 4 (Bill No. 108-21(A)). A dealer would therefore
only be in violation of subsection (B) of the Bill if it failed to display and distribute the literature *already* "distributed
by the Health Department." *See id.* (Bill No. 108-21(B)).

products." *Id.* at 2376. Here, the disclosures fit squarely within both of these categories that *NIFLA* did "not question."

More specifically, in *NIFLA*, California required, in relevant part, that certain clinics post notices stating that California provides free or low-cost family planning services, prenatal care, and abortion. *Id.* at 2369. Petitioners were clinics that provided prenatal and pregnancy-related services but were strictly opposed to abortion. The Court ruled that *Zauderer* did not apply to the compelled disclosures about abortion services for two main reasons. First, the statute required clinics to disclose information about a service—abortion—that they did not offer, and thus the disclosure "in no way relate[d]" to the services the clinics provided. *Id.* at 2372. Second, the petitioner clinics, described by the Court's majority as "pro-life (largely Christian belief-based) organizations," *id.* at 2368, were required to inform their patients about "the availability of…abortion—the very practice that [the clinics were] devoted to opposing." *Id.* at 2371. Therefore, by "requiring [the clinics] to inform women how they can obtain state-subsidized abortion—at the same time [the clinics] try to dissuade women from choosing that option"—the mandated disclosure "plainly 'alter[ed] the content' of [the clinics'] speech." *Id.* (citations omitted).

Plaintiffs assert that *NIFLA* applies because "as in *NIFLA*, the government is compelling private entities to display County generated or adopted information about '*state*-sponsored services." Pls.' Br. at 15. To be sure, here, as in *NIFLA*, the pamphlets contain information about "state sponsored services"—specifically suicide- and conflict prevention hotlines. *Cf.* 138 S. Ct. at 2372. But this is only a portion of the pamphlets' broader message about firearm suicide and gun violence. And *NIFLA* does not stand for the proposition that government can never mandate disclosures about government services. Instead, as the Fourth Circuit explained in *Recht*, *NIFLA*

applies when a disclosure requirement concerns "entirely unrelated" or "competing services." 32 F.4th at 417. Here, the required disclosures overall—and the referenced state-sponsored services in particular—both relate to firearm suicide and gun violence, and thus to the firearms and ammunition that Plaintiffs sell.[31]

   *NIFLA* also turned largely on the fact that the mandated disclosure concerned the precise services—abortion services—that the petitioner clinics were "devoted to opposing." 138 S. Ct. at 2371. The Dealer Plaintiffs do not claim to have any such opposition, nor do they point to any "stated goal[s]" of dissuading their consumers from seeking suicide prevention or peaceful conflict resolution. As in *Recht*, "[t]his case is far from the boundary line staked out by *NIFLA*." 32 F.4th at 417. Accordingly, as in *Recht*, *NIFLA* does not displace *Zauderer*'s applicability here.

### 2. Plaintiffs' content-based restriction arguments fail.

   Plaintiffs' assertion that Bill 108-21 is content-based also misses the mark, and again relies on case law whose applicability to commercial speech has been squarely rejected by the Fourth Circuit. *Cf.* Pls.' Br. at 10-14 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). As explained in *Recht*, the case law applying strict scrutiny to content-based restrictions is from "a different context" and does not "displace commercial speech doctrine." 32 F.4th at 408. Specifically, *Recht* distinguished *Reed* as a case that "concerned political speech at the heart of the First Amendment," and thus one that "never needed to mention commercial speech or any precedents in that vein." *Id.* at 409. Indeed, the Fourth Circuit has observed that "[a] regulation compelling speech is by its very nature content-based," *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014), but that does not require the application of strict scrutiny to compelled speech in the

---

[31] Further, it was not, as Plaintiffs appear to read the case, the requirement to disclose information about state-sponsored services in general that was itself controversial; it was that those services, and therefore the required speech, was about abortion, a topic that nearly defines "controversial" and to which the clinic was specifically opposed. *See* Pls.' Br. at 15 (arguing that decision in *NIFLA* was "because requiring the licensed providers 'to disclose information about *state*-sponsored services' was 'anything but an uncontroversial topic.'" (quoting *NIFLA*, 138 S. Ct. at 2172)).

commercial context, *see id.* at 248. *See also Recht*, 32 F.4th at 409 (observing that strict scrutiny does not apply to content-based laws in the commercial-speech context).

Finally, Plaintiffs assert that even if the literature is "merely factual, strict scrutiny would still apply." Pls.' Br. at 17. This is simply incorrect, and the case law Plaintiffs cite for this proposition says nothing of the kind. It is true that *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006), confirms that "compelled statements of fact … are subject to First Amendment scrutiny," but that quotation says nothing about *what level* of scrutiny to apply. As it happens, the Supreme Court in *Rumsfeld* did not apply strict scrutiny and upheld the compelled speech at issue. *See id.* at 64-65.

Similarly, Plaintiffs' repeated citations to *Greater Baltimore* are inapposite because that case, as described above, did not involve commercial speech. *See* 879 F.3d at 108-09 (the pregnancy clinic "is a non-profit organization" that "provides free services and collects no fees"). Moreover, in *Greater Baltimore*, much like in *NIFLA*, the court was particularly concerned that "[t]he message conveyed [was] antithetical to the very moral, religious, and ideological reasons the [plaintiff] exist[ed]." *Id.* at 110. Here, while Plaintiffs may doubt the empirical relationship between firearms and suicide risk, *see, e.g.*, Pls.' Br. at 5, none of them oppose—or reasonably could oppose—the goals of Bill 108-21: "gun safety, gun training, suicide prevention, mental health, and conflict resolution," Ex. 4. *See, e.g.*, Ex. 22, at 20:6-10, 21:2-4, 60:9-11, 62:16-21, 90:8-10; Ex. 18, at 57:6-21, 64:11-13; Ex. 19, at 29:8-10, 71:5-9, 82:13-83:15; Ex. 20, at 71:20-72:3, 86:13-14, 87:14-21; Ex. 21, at 16:21-17:9, 69:4-9. Indeed, Dealer Plaintiffs sell many of the same safe-storage products the County-mandated literature promotes. *See* Ex. 22, at 53:13-54:6; Ex. 18, at 17:21-18:1; Ex. 19, at 22:6-11.[32]

---

[32] If Plaintiffs were correct that strict scrutiny applies (which they are not), more than Bill 108-21 would be imperiled. For example, federal law requires firearms dealers to distribute a different safety warning—called a Youth Handgun

## II. Plaintiffs have no claim on behalf of customers of gun dealers.[33]

In addition to their claims on behalf of gun dealers, Plaintiffs also advance claims on behalf of those dealers' customers. These claims fail both for lack of standing and on the merits. First, the Bill plainly regulates gun dealers; it neither asks nor deprives their customers of anything and thus in no way infringes upon any of the customers' rights. Second, the harms to customers proffered by Plaintiffs, Pls.' Br. at 26, are both unreasonable and entirely speculative. And third, on the merits, there is simply no First Amendment right to be free from encountering government-sponsored literature with which one disagrees.

### A. The Bill does not affect customers' rights.

The Bill requires only that the County Health Department prepare and distribute literature to gun dealers, Anne Arundel County, Md., Code § 12-7-108(A), and that those dealers make that literature available and distribute it to their customers, § 12-7-108(B). The Bill requires nothing of the customers themselves, who are free to disregard the literature entirely, or discard it even before reading it. *See id.* This is apparent from the language of the Bill, which provides for enforcement only against owners of gun stores. *See* § 12-7-108(C). For customers to have standing, then, Plaintiffs must show that the application of the Bill nevertheless injures the customers in some way. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009).

The only effect on customers that Plaintiffs allege is the receipt of literature with which they may disagree. *See* Compl. ¶ 22. As set forth below, this is not a cognizable First Amendment injury. *See infra* Section II.C. Moreover, although Plaintiffs' brief discusses the Second Amendment at some length, *see* Pls.' Br. at 24-27, nowhere in their complaint do they allege that

---

Safety Act Notice—to all handgun purchasers. 27 C.F.R. § 478.103; *see* ATF I 5300.2. This additional "compelled speech," which has not been held unlawful or challenged in this case, takes place in exactly the same context regulated by Bill 108-21.

[33] The County does not challenge the Dealer Plaintiffs' standing to raise their own claims in this case.

customers' Second Amendment rights would be at all infringed by the Bill. Nor is there support for this in the record. On the contrary, Plaintiffs testified consistently that they had no evidence that the Bill would cause or had caused their customers not to purchase firearms or ammunition. *See* Ex. 18, at 103:3-11; Ex. 19, at 120:3-14; Ex. 20, at 96:10-13; Ex. 21, at 92:4-12.

For this reason, not only are customers not injured by the Bill, but the Dealer Plaintiffs have no standing to challenge it on their customers' behalf. The dealers rely on *Maryland Shall Issue v. Hogan* to support their third-party-standing argument, *see* Pls.' Br. at 28, but that decision recognizes nothing more than that "a vendor has a sufficiently close relationship with its customers [to sue on their behalf] when a challenged statute prevents that entity from transacting business with them," *Md. Shall Issue v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020). Here, by contrast, nothing is preventing the Dealer Plaintiffs from continuing to sell exactly the same type and quantity of products to their customers as before. Thus, the normal rule applies, and the dealers may raise only their own claims. *See id.* at 214.

## B.  The customers' claims are speculative and unreasonable.

Moreover, the harms that Plaintiffs speculate will befall customers are objectively unreasonable. Although self-censorship can be a First Amendment injury, "'[s]ubjective' or speculative accounts of such a chilling effect … are not sufficient." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (citation omitted). Rather, for a plaintiff to have standing, the claimed chilling effect "must be objectively reasonable" such that it "would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (quoting *Benham*, 635 F.3d at 135).

Plaintiffs offer no authority for the startling proposition that simply being exposed to speech with which one disagrees—especially speech in the form of suicide prevention tips and conflict resolution resources—would chill an ordinary person's speech. *Cf.* Pls.' Br. at 26. Instead,

Plaintiffs offer only their speculative subjective belief that customers who receive the County's literature might conceivably be inhibited from sharing their own views. *See, e.g.*, Ex. 20, at 93:4-94:8. Plaintiffs have failed to produce any evidence from a single customer to support these claims, which alone is sufficient basis to grant summary judgment against them on this issue. During their depositions, through inadmissible hearsay testimony, Plaintiffs were able to identify just one customer who they claim felt a subjective chill from the Bill, and even then, Plaintiffs were unable to describe what views, exactly, he is afraid to express. *See* Ex. 21, at 78:9-80:11. The bar for establishing an objective, reasonable chilling effect is much higher than this. *See, e.g.*, *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000).

Plaintiffs further speculate that some customers may not feel chilled and will instead feel a need to speak out. Pls.' Br. at 26. This is even further from a cognizable First Amendment injury. The First Amendment is implicated when individuals are forced to "mouth support for views they find objectionable," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018), not when they may feel compelled to voice *their own* views. *Cf. Overbey v. Mayor of Balt.*, 930 F.3d 215, 223 (4th Cir. 2019) (First Amendment not implicated where "[n]o one tried to compel [plaintiff] to make speech she did not want to make; no one tried to punish [plaintiff] for refusing to say something she did not want to say"). Here, firearm customers are "free to speak their piece." *Wash. Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019).

### C. The First Amendment does not confer protection from the County's literature.

In any event, Plaintiffs' claims place far too much weight on firearm customers' interest in "avoid[ing] exposure" to purportedly unwanted speech. *See* Pls.' Br. at 25-26. To be sure, the Supreme Court has "recognized the interests of unwilling listeners," but only "in situations where 'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure.'" *Hill v. Colorado*, 530 U.S. 703, 718 (2000) (quoting *Erznoznik v. City of Jacksonville*,

422 U.S. 205, 209 (1975)); *see also Snyder v. Phelps*, 562 U.S. 443, 459 (2011) ("[W]e have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech."). Outside one's home, "the burden normally falls upon the viewer to 'avoid further bombardment of (his) sensibilities simply by averting (his) eyes'" away from offensive speech. *Erznoznik*, 422 U.S. at 210-11 (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)).

Against this backdrop, Plaintiffs' arguments fall flat. Plaintiffs rely on *Hill v. Colorado*, *see* Pls.' Br. at 26-27, in which the Supreme Court extended the captive-audience doctrine to uphold a statute protecting women entering abortion clinics from "aggressive" and "confrontational" protestors. 530 U.S. at 707-10. The prospective gun purchasers in this case are nothing like the patients in *Hill*. A gun store is not a "confrontational setting[]," *id.* at 717, nor does Bill 108-21 subject customers to "persistent 'importunity, following and dogging,'" *id.* at 718 (citation omitted). Instead, customers are simply provided with literature, which they are free to read, or not, or keep or discard, as they please. *See* Ex. 18, at 66:1-9; Ex. 19, at 88:19-89:3; Ex. 20, at 58:19-21. The customers in this case are akin, not to women being shouted at as they enter a clinic, but to customers of a utility who object to receiving inserts in their electricity bills. *Cf. Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 532 (1980). And as the Supreme Court explained in that latter context, "customers who encounter an objectionable billing insert may 'effectively avoid further bombardment of their sensibilities simply by averting their eyes.'" *Id.* at 542 (quoting *Cohen*, 430 U.S. at 21); *accord id.* ("The customer … may escape exposure to objectionable material simply by transferring the bill insert from envelope to wastebasket."). The customers' claims here fail for the same reason.

### III.  Plaintiffs are not entitled to relief.

For all the reasons laid out above, the County is entitled to summary judgment and Plaintiffs' claims should be dismissed and their requests for relief denied. As a final matter,

Plaintiffs' outlandish claims regarding nominal damages require little response. Plaintiffs point to no authority justifying over $40,000 in *nominal* damages. Plaintiffs also offer no basis for using *calculations* based on the number of MSI's members or the number of days the Bill was in effect to arrive at their nominal damages figure. The cases Plaintiffs cite provide no such support and feature no such calculations. *See* Pls.' Br. at 34, (first citing *Am. Humanist Ass'n v. Perry*, 303 F. Supp. 3d 421, 427, 433 (E.D.N.C. 2018) (awarding associational plaintiff with multiple affected members and individual named plaintiff nominal damages in the amount of $1.00); and then citing *Norwood v. Bain*, 143 F.3d 843, 856 (4th Cir. 1998) (remanding for "entry of an award of nominal damages not to exceed $1.00")).

## CONCLUSION

For the foregoing reasons, Anne Arundel County's Cross-Motion for Summary Judgment should be granted, and Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted,

GREGORY J. SWAIN
County Attorney

*Hamilton F. Tyler*
Hamilton F. Tyler, Bar No. 9423
Deputy County Attorney

*Tamal A. Banton*
Tamal A. Banton, Bar No. 27206
Senior Assistant County Attorney
ANNE ARUNDEL COUNTY OFFICE OF LAW
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
(410) 222-7888 telephone
(410) 222-7835 facsimile
htyler@aacounty.org
tbanton@aacounty.org

35

Eric Tirschwell*
James Miller*
Nina Sudarsan*
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
etirschwell@everytown.org
jedmiller@everytown.org
nsudarsan@everytown.org

Andrew Nellis*
EVERYTOWN LAW
P.O. Box 14780
Washington, DC 20044
(202) 517-6621
anellis@everytown.org

*Admitted pro hac vice

Attorneys for Defendant
Anne Arundel County, Maryland

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 24th day of October, 2022, the foregoing motion was electronically filed in the United States District Court for the District of Maryland.

<u>*Tamal A. Banton*</u>

Tamal A. Banton