# EXHIBIT
# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
--------------------------------------x
MARYLAND SHALL ISSUE, INC., et al.,
9613 Harford Rd., Ste C #1015
Baltimore, Maryland 21234-2150,
Plaintiffs,
-against-
ANNE ARUNDEL COUNTY, MARYLAND
44 Calvert Street
Annapolis, Maryland 21401,
Defendant.
No.: 1:22-cv-00865-SAG
--------------------------------------x
(Via Zoom Videoconference)
September 29, 2022
9:39 a.m. Eastern

Video-recorded Videoconference Deposition of GARY KLECK, before Kristi Cruz, a Stenographic Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

MARYLAND SHALL ISSUE, INC.
Attorneys for Plaintiffs
9613 Harford Road, Suite C #1015
Baltimore, Maryland 21234
BY: MARK W. PENNAK, ESQ.
mpennak@marylandshallissue.com

EVERYTOWN LAW
Attorneys for Defendant
450 Lexington Avenue
New York, New York 10017
BY: JAMES MILLER, ESQ.
ERIC TIRSCHWELL, ESQ.
jedmiller@everytown.org

ALSO PRESENT:
TAMAL AJANI BANTON, Office of Law, Anne Arundel County
HAMILTON TYLER, Office of Law, Anne Arundel County
WINSTON LESLIE, Paralegal, Everytown Law

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are now on the record at 9:39 a.m. on September 29, 2022.

Please note that this deposition is being conducted virtually. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Gary Kleck taken by counsel for defendant in the matter of Maryland Shall Issue incorporated, et al., versus Anne Arundel County, Maryland, filed in the U.S. District Court for the District of Maryland, Case Number 122-c-00865-SAG. This deposition is being conducted remotely using virtual technology.

My name is Anthony Piccirilli representing Veritext, and I am the

PROCEEDINGS

videographer. The court reporter is Kristi Cruz from the firm of Veritext. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are there any objections to the proceeding, please state them at the time of the appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. MILLER: Good morning. This is James Miller of the firm Everytown Law based in New York, New York, and I am counsel for the defendant Anne Arundel County, Maryland. And I'm joined by a couple colleagues who will introduce themselves.

MR. TIRSCHWELL: Good morning, Eric Tirschwell from Everytown Law, as well.

MR. LESLIE: Good morning. Winston Leslie from Everytown Law.

G. KLECK

MR. BANTON: Good morning. Tamal Banton, Office of Law for Anne Arundel County.

MR. TYLER: Good morning. Hamilton Tyler, also representing Anne Arundel County.

MR. PENNAK: I don't see Greg, but this is Mark Pennak, I represent the plaintiffs, I'm with Maryland Shall Issue, Inc.

G A R Y K L E C K,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. MILLER:

Q. Professor Kleck, my name is Jed Miller, I am an attorney with Everytown Law, and we are defending Anne Arundel County, Maryland in this lawsuit.

Can you please state and spell your name for the record?

THE VIDEOGRAPHER: I believe the witness is frozen.

G. KLECK

THE WITNESS: The audio is being distorted. I'm getting a notice on the computer screen that the internet connection is unstable. So it's like, you know, your voice is distorted. I think you said --

MR. MILLER: Let me repeat the question for you.

Q. Could you state and spell your name for the record, please?

A. Gary Kleck; G-A-R-Y, K-L-E-C-K.

Q. Mr. Kleck -- Dr. Kleck, you understand that you're under oath and therefore, required to testify truthfully and accurately?

THE VIDEOGRAPHER: I hate to interrupt again. I'm getting a notice that the witness' bandwidth is low and he's frozen on my recording.

MR. MILLER: Yeah, I can see that, as well.

A. Yes.

Q. Let me ask the question again to make sure you heard.

G. KLECK

You understand that you're under oath, and therefore, required to testify truthfully and accurately today?

A. Yes.

Q. The most important thing is that you understand the question and give accurate answers. And so if you don't understand a question or if there's anything you don't know or aren't sure of, would you please agree to let us know that?

A. Yes, I will do that.

Q. And obviously because we are conducting this deposition remotely, it's especially important that you be able to hear and could my question and we be able to hear and understand your answers, notwithstanding any technical challenge by virtue of conducting this deposition remotely. So if you are unable to hear or understand a question that I've asked because of a technical problem, would you please let me know?

A. I will do that.

Q. And if I or the court reporter or

                      any other counsel cannot hear or understand your answers because of a similar technical problem, would counsel please flag that and I may ask the question again to ensure we get a clear record. Is that fair, Mr. Kleck?

A. It is.

Q. If you respond to a question, I will assume that you heard it clearly and understood it unless you say otherwise. Is that fair?

A. That's fair.

Q. Because we're conducting this remotely, it's particularly important also that you wait until I finish asking my question before you answer, and I, of course, will wait until you've completed your answer before I ask the next question. Is that fair?

A. That's fair.

Q. We may from time to time show you documents. In order to do that, my colleague will display the document using the screen share feature of Zoom. Everyone on the Zoom call should be able to see the document when it's being displayed this way. If you cannot

G. KLECK

clearly see a document that's being displayed this way, would you please let me know?

A. Yes, I will do that.

Q. We have also prepared courtesy copies of all or nearly all of the documents that we may choose to show during this deposition, and we have sent duplicate binders of that document to you and to plaintiff's counsel, Mr. Pennak.

Do you have the box that contains those courtesy copies with you today?

A. Yeah, I received a FedEx box. I don't know what the contents are.

Q. Is the box still sealed presently?

A. Yes.

Q. Would you please unseal the box and retrieve its contents now?

MR. MILLER: And you, as well, Mr. Pennak.

MR. PENNAK: Jed, I can confirm that I have received the documents and they're in my lab at the moment.

MR. MILLER: Great. Thank you.

MR. PENNAK: And a very nice job of

G. KLECK

bringing this together, whoever did it.

MR. MILLER: Thanks.

Q. Dr. Kleck --

A. All right, I now have the binder.

Q. It appears that you have also retrieved the binder. Can you confirm that you have?

A. I do.

Q. One of the other ground rules for making a clear record at this deposition is that you give spoken answers, as opposed to nonverbal answers like a head shake or a head nod, which are difficult to convert on to a transcript. Is that understood?

A. It is.

Q. Plaintiff's counsel, Mr. Pennak, may object to my questions. If he does, you must still answer my question unless he instructs you not to answer. Do you understand?

A. I do.

Q. And if you need to take a break, please just ask. The only requirement is, I will ask that you answer any question that is then pending. Is that understood?

G. KLECK

A. It is.

Q. We may refer to a few things in this case by shorthand, and I want to agree on our understanding of some defined terms.

You're familiar with the organization Maryland Shall Issue, Inc.?

A. Yes.

Q. And it's often referred to by its initials, MSI?

A. Yes.

Q. Can we agree that if either of us refers to MSI, we mean Maryland Shall Issue, Inc.?

A. Yes.

Q. Are you familiar with Bill 108-21, which was a law passed by Anne Arundel County in January 2022 and that's the subject of plaintiff's lawsuit here?

A. Yes.

Q. Have you read Bill 108-21?

A. Yes.

Q. Can we agree if I refer to Bill 108-21, or simply the ordinance, we're referring to that bill that is the subject of

G. KLECK

this lawsuit?

A. I'm sorry, I didn't understand the question.

Q. Can we agree that if either of us refers to Bill 108-21, or simply the ordinance, that we are referring to Bill 108-21 which was passed by Anne Arundel County in January of this year and that is the subject of the lawsuit?

A. Yes.

Q. And the last thing I think we'll probably refer to quite a bit is pamphlets. By the term pamphlets, can we agree that I'm referring to the specific literature that is required to be distributed under Bill 108-21, copies of which were attached to plaintiff's complaint in this case?

A. Yes.

Q. Have you taken any alcohol, medication, or other drugs that would affect your ability to testify today truthfully and accurately?

A. No.

Q. Are you aware of any other

circumstances that would affect your ability to testify truthfully and accurately today?

A. No.

Q. You're located presently in Tallahassee, Florida; is that correct?

A. Yes.

Q. There are no impacts from the recent hurricane in your area that would prevent you from testifying today; is that correct?

A. That's correct.

Q. How did you prepare for today's deposition?

A. I wrote an expert witness report. I'm not sure that constitutes preparation for the deposition. Beyond that, nothing really.

Q. Did you review any documents in preparation for your testimony today?

A. Nothing that wasn't covered in the expert witness report.

Q. Did you review the report itself?

A. Not recently, no.

Q. Did you review any of the documents that are referenced in your expert report?

A. Not recently. Not since I wrote the

G. KLECK

expert witness report.

Q. Did you speak to anyone in preparation for your deposition today?

A. No.

Q. All right. I want to turn our attention now to the pamphlet that is the subject of plaintiff's lawsuit and of your report. We'll review it in a minute. But before we do, I want to ask more basic questions about it.

When did you first become aware of the pamphlet or the pamphlets in this case?

A. When Mr. Pennak contacted me about the case.

Q. And when was that?

A. I couldn't tell you. I'd have to review my emails.

Q. When did you first read the pamphlets?

A. Shortly after Mr. Pennak sent me the materials.

Q. And you had not been aware of the pamphlets prior to that contact from Mr. Pennak?

G. KLECK

A. That's correct.

Q. Were you asked to read the pamphlets?

A. Yes.

Q. What was the context of that request? Why were you asked to read the pamphlets? If you know.

A. Mr. Pennak was asking whether or not I could serve as an expert witness.

Q. Tell me in your own words what you believe the pamphlet conveys to readers.

A. The point that it conveyed that was relevant to my expert witness report was that guns -- possession of a gun or ownership of a gun increases the likelihood one will commit suicide.

Q. In your view, is that the -- is that what -- is that what the pamphlet conveys to all readers?

MR. PENNAK: Calls for speculation of the witness.

A. Well, I would guess that the intent is plain enough that the vast majority of readers would, indeed, draw that conclusion.

G. KLECK

Q. You said that when you read the pamphlet, you were doing so in the context of a request to serve as an expert in this case; is that right?

A. Yes.

Q. Most readers will not read the pamphlet in that context; is that right?

A. Yes.

Q. What is your understanding, then, of the message that the pamphlet conveys to those readers who are not reading it in the context of drafting an expert report?

A. Essentially the same. I don't think the context would matter. Again, the intent was plain enough.

Q. How would you describe the pamphlet's overarching message to readers?

A. I wouldn't have any opinion on that. Frankly, I was really only concerned as an expert witness with the assertion about suicide.

Q. What do you mean that you were only concerned with an assertion about suicide?

A. It was the only point made by the

G. KLECK

pamphlets on which I had an expert opinion.

Q. You didn't have an expert opinion about any of the remaining contents of the pamphlet?

A. Not that I recall, no.

Q. Does the pamphlet convey any public health information to readers?

A. Well, I assume that the assertion that having a gun increases the likelihood of killing yourself is certainly relevant public health.

Q. Are there any of the other statements in the pamphlet relevant to public health?

A. I really don't recall that, since that wasn't my focus.

Q. Your focus was on a specific statement within the pamphlet?

A. Yes.

Q. What, in your recollection, was the statement that you focused on?

A. The statement that owning a gun is a risk factor for suicide.

Q. And beyond that statement, that

                        G. KLECK

owning a gun is a risk factor for suicide, you can't recall what the pamphlet -- what else the pamphlet conveys to readers?

A. Not that I addressed as an expert witness, no.

Q. Does the pamphlet convey any advice to readers?

MR. PENNAK: The document speaks for itself.

Q. You can answer.

A. You could say that implicit in the notion that owning a gun is a risk factor for suicide, and any reader would think suicide is a bad thing, then the implication is -- the recommendation implied is don't own a gun.

Q. You say "implied" there. Is that because the pamphlet does not, in fact, make any statement about whether or not a reader should own a firearm?

A. No, it does not explicitly say any such thing.

Q. Does it make any recommendations about the behavior or activities of gun owners vis-a-vis their firearms in light of the risk

of suicide?

A. I'm not sure I understand the question.

Q. Does it recommend that firearms owners do anything with their firearms in light of the risk of suicide?

A. I don't recall any such content.

Q. You weren't focused on any content recommending what gun owners should or shouldn't do with firearms in light of a risk of suicide?

A. No, other than the implicit suggestion that you'd be at less risk of suicide if you didn't own a gun.

Q. Does the pamphlet provide any resources, phone numbers, contact information, help lines, to readers?

A. Yes.

Q. What does it provide?

MR. PENNAK: The document speaks for itself.

A. Again, I don't recall the specifics. Only that there was that kind of information in the pamphlets.

G. KLECK

Q. The pamphlet is a joint production of the NSSF and AFSP; is that correct?

A. Yes.

Q. Are you familiar with those two organizations?

A. First one. It's a manufacturers lobbying organization.

Q. Manufacturers of what?

A. Firearms.

Q. The NSSF is the firearm industry's trade association; is that correct?

A. Yes.

Q. How would you describe the NSSF's mission?

A. To protect the financial interests of firearms manufacturers.

Q. So is it fair to say that it advocates for and promotes the interest of the firearms industry, specifically firearms manufacturers?

A. Yes.

Q. The NSSF is not, to your knowledge, known for promoting gun regulations or gun restrictions, right?

G. KLECK

A. Yes.

Q. It's not known for promoting restrictions on the purchase, possession, or use of firearms?

A. Not to my knowledge, no.

Q. Have you ever worked with the NSSF or for the NSSF?

A. Yes.

Q. On what occasions?

A. I believe on some occasions they've asked me for comment on some report or article that was done on firearms, and I would provide them with a response or an assessment.

Q. How many times would you say you've worked for the NSSF in that capacity?

A. Maybe twice, something like that.

Q. And when you say the NSSF asked you to comment on a report, a report by whom?

A. Could be anybody. Could be a scholar published an article in a journal, could be a report by an advocacy organization. I'd, again, have to consult my records to be more specific.

Q. When the NSSF asked you to comment

G. KLECK

on this type of report, what type of output were they asking for from you?

A. Just whether or not the conclusion was credible.

Q. Did they ask you to produce any written work product?

A. Yes.

Q. Were you paid for any of your work in connection with either of these two engagements?

A. Yes.

Q. How much were you paid?

A. $400 an hour -- well, let me amend that. If it was fairly rent, it would have been $400 an hour. If it were earlier in the past, it would have been about $350 an hour.

Q. Do you recall whether either of those engagements were at $400 versus $350 an hour?

A. More likely 350 because it hasn't been done recently.

Q. When did your rate change?

A. I don't know. A couple of years ago maybe.

G. KLECK

Q. And how many hours would you say you worked on each of these two NSSF engagements at $400 or $350 an hour?

A. Again, I'd only be guessing. Of the it wasn't a lot. It would have been less than a workday, so fewer than eight hours, I'd say.

Q. Or eight or less hours each time?

A. Yes.

Q. Potential maximum of 16 hours, then?

A. Yes, probably.

Q. Have you worked on any other engagement for the NSSF, whether paid or unpaid?

A. No.

Q. And are you sure only those two engagements where you were asked to comment on a report, or are there possibly other times where you've done the same or similar work for the NSSF?

A. No. As I said, it could be three rather than two occasions. But it was the same sort of work, you know, take a look at this piece and tell us what you think.

Q. Could it have been more than three?

G. KLECK

A. I'm pretty sure not, no.

Q. Have you ever served as an expert witness in a case in which the NSSF was a party?

A. I don't recall any specific involvement of that organization as a defendant, no; as a participant.

Q. In your view, does the NSSF have expertise on issues that relate to firearms?

A. As an organization, I'd be reluctant to say what an organization's expertise is. I'm sure they have individuals employed by them who are expert on legal issues. I'm sure they have legal staff and they're quite familiar with gun control laws, especially as they pertain to manufacturing the firearms.

Q. Does the NSSF, to your knowledge, provide advice to members of the firearm industry or to the general public about firearms?

A. I don't really know. I assume they provide advice to members of the firearms industry.

Q. Does the NSSF, in your view, have

G. KLECK

expertise on the issue of firearm safety?

A. No, they don't have any expertise of their own. I mean, they can call on other people for their expertise, but I don't know for a fact that they themselves have expertise.

Q. Does the NSSF provide advice, to your knowledge, to members of the firearms industry or to the general public about firearm safety?

A. I wouldn't know.

Q. Have you ever known the NSSF to do or say anything to discourage gun ownership?

A. Well, to the extent that they've endorsed the notion that firearms are a risk factor for suicide, that would definitely tend to discourage having a gun if it raises the risk of somebody killing themselves.

Q. Beyond that, have you ever known the NSSF to do anything to discourage people from buying or owning or possessing a firearm?

A. I wouldn't be qualified to say one way or another. I'm not that familiar with the history of the organization.

G. KLECK

Q. Well, I'm asking to your knowledge. To your knowledge, what is the answer?

A. To my knowledge, no, I'm not aware of any such thing.

Q. The other author of the pamphlets, the AFSP, that's the American Foundation for Suicide Prevention, are you familiar with that organization?

A. Vaguely.

Q. What's your understanding of that organization's mission?

A. As their title indicates, they're concerned with preventing suicide.

Q. Does the AFSP have expertise, in your view, on issues that relate to suicide and suicide prevention?

A. Yes.

Q. Is it a credible authority on this topic?

A. Yeah, within limits. There's limits to everybody's knowledge, and certainly in controversial areas that knowledge would be especially limited or unreliable.

Q. What are the limits of AFSP's

G. KLECK

knowledge or authority on this topic?

A. When you're an advocacy group, you're not necessarily a scholar. You're interested in pushing the goals of the organization, in this case suicide prevention. And if you believe that policy X will advance that mission, then you're likely to support that policy, whether or not you're an expert on that particular policy.

Q. You used the term a minute ago "advocacy group." Was that in reference to AFSP?

A. Yes.

Q. In what sense is AFSP an advocacy group?

A. They advocate for the prevention of suicide.

Q. Do they advocate, for any policies, to your knowledge, for or against -- strike that.

Do they advocate for any policies, to your knowledge, that relate to firearms?

A. I'm not familiar enough with the organization to know.

G. KLECK

Q. The NSSF website, in its description of its partnership with AFSP, states, quote, "Importantly to NSSF, its members, and our industry, AFSP is not involved in gun control politics and is focused on saving lives."

Do you agree with that statement by the NSSF?

A. Again, I wouldn't be familiar enough with the organization to know one way or the other.

Q. So you neither agree nor disagree?

A. Correct.

Q. Have you ever known the AFSP to take a position with respect to gun possession or ownership?

A. Again, I wouldn't know enough about the organization to say.

Q. Have you ever talked to anyone at the NSSF about this brochure?

A. I don't believe so, no.

Q. Have you ever talked to anyone at the NSSF about that organization's partnership with AFSP?

A. No.

G. KLECK

Q. This brochure is part of a tool kit that the NSSF and AFSP publish and which is hosted, among other places, on the NSSF's website. The NSSF describes the purpose of this suicide prevention tool kit, of which the brochure is a part, as follows:

"Recognizing that nearly two-thirds of all firearm deaths are by suicide, NSSF and the American Foundation for Suicide Prevention have developed a suicide prevention tool kit to help firearms retailers, shooting range operators, and customers understand risk factors and warning signs related to suicide, know where to find help, and encourage secure firearms storage options. NSSF asks retailers and ranges to participate in this program because doing so can help save lives."

Is that description from the NSSF website an accurate description of the pamphlet, in your view?

A. I really don't understand the question.

Q. The NSSF describes the purpose of its suicide prevention tool kit, of which this

G. KLECK

pamphlet is a part, as, in relevant part, "A tool kit to help firearms retailers, shooting range operators, and customers understand risk factors and warning signs related to suicide, know where to find help, and encourage secure firearms storage options."

Is that an accurate description of the pamphlet and its contents, in your view?

A. Well, that certainly could be a partial explanation of the contents of the pamphlets.

Q. And the NSSF's website also describes the suicide tool kit of which this pamphlet is a part -- excuse me. The NSSF asks retailers, firearms retailers and ranges to participate in this suicide prevention program, quote, "because doing so can help save lives."

Do you understand the pamphlet to be in service of that goal?

A. It's possible that its devisors intended that purpose, sure.

Q. Specifically, the NSSF and AFSP intended that goal in developing and

G. KLECK

publishing this pamphlet. Would you agree with that statement?

A. [Audio interference] their justification.

Q. I'm sorry, your answer was truncated, I think, because of technical reasons. Can you repeat that?

A. That may be part of their justification.

Q. What else do you believe is the justification of NSSF or AFSP in publishing and developing this pamphlet?

A. Well, NSSF is, you know, an advocate for the interest of firearms manufacturers, and they'd certainly like to do anything to reduce the likelihood of lawsuits being brought against firearms manufacturers, and specifically lawsuits in connection with suicides. And so, you know, they provide a justification for the manufacturers not being responsible in any way for suicides by saying, hey, we distributed these pamphlets, and through retail dealers of firearms, people were forewarned.

G. KLECK

Q. Your answer suggests that the NSSF is concerned about the risk that individuals will use firearms to commit suicide; is that correct?

A. Well, they're primarily concerned with, in this case, and this is my speculation, they're primarily concerned with survivors of a suicide bringing lawsuits against firearms manufacturers having purportedly contributed to the suicide.

Q. Does the NSSF advocate for and defend the interest of gun owners, in addition to the interests of manufacturers?

A. I don't know that they have any interests in protecting the interests of gun owners above and beyond what is implied by protecting the interests of firearms manufacturers.

Q. So would you agree that to the extent the interest of gun owners and gun manufacturers align, and that would be in areas relating to the possession and purchase of firearms, that the NSSF advocates for and defends the interest of gun owners and gun

G. KLECK

industry alike?

MR. PENNAK: Argumentative.

A. When they align; but they don't always align.

Q. As is relevant to firearm suicide, do they align or not align?

A. They don't necessarily align, because if you're going to discourage people from having guns who otherwise would have wanted to have one, then that's not in the interest of the gun owners or prospective gun owners. But it would be in the interest of manufacturers in avoiding or at least minimizing the risk of lawsuits over suicides.

Q. In your view, does the NSSF's pamphlet discourage the ownership of firearms?

A. Yeah, I think it has that implication because, you know, how many people want to have a higher risk of a suicide occurring in their household.

Q. And specifically, your view is that the NSSF is publishing this pamphlet to discourage people from buying firearms from the firearms industry. Is that what you're

G. KLECK

saying?

A. I suspect what they thought was this would be a very limited segment of their potential consumer base who would be concerned about suicide, and so it would have a limited affect on sales of their product.

Q. I'd like to back up and show you an exhibit now. Just as a sort of formality, I'm going to show you Exhibit Number 1.

I'm going to show you on the screen Exhibit 1, which is your deposition notice, and it's in your binder as tab 1, or should be. And I will confirm that.

(Exhibit 1, Deposition notice, marked for identification, as of this date.)

Q. Dr. Kleck, if I could direct your attention to the screen momentarily, can you confirm that the document that's being shown on the screen as Exhibit 1 is the document in your binder as Exhibit 1?

A. Yes, I can confirm that.

Q. What is this document?

A. It's defendant's notice to take

deposition.

Q. Have you seen this document previously?

A. I believe I have.

Q. This is the subpoena that seeks to take your deposition today; is that correct?

A. Yes. The.

Q. And you're testifying here pursuant to this deposition, not on your own voluntarily; is that right?

A. Yes.

Q. Have you reviewed Exhibit A to that notice, the third page?

A. You mean exhibit -- oh, okay. Oh, yes.

Q. What do you understand Exhibit A to be?

A. It was a demand for me to produce a vast volume of information.

Q. Did you produce any of this information that's requested in Exhibit A?

A. Yes.

Q. Did you produce all of the requested information that's asked for some Exhibit A?

G. KLECK

A. No.

Q. Which request did you not produce information for that you have?

A. It would be numbers 2, 4, 5, 6, 8, 10, and that's it. I did not supply those.

Q. So you're saying, if I understand you correctly, that, among other things, you have correspondence that was sent to you or prepared by you, including emails, that you have not produced?

A. Yes.

Q. About how many such pieces of correspondence do you have?

A. I wouldn't know. I mean, probably in the order of six or seven, perhaps.

Q. And who would those pieces of correspondence be to or from other than you?

A. From Mark Pennak.

Q. Only Mark Pennak?

A. I'm not sure. Other attorneys in his firm might have also contacted me.

Q. When you say that you did not produce documents in response to number 4, which asks for notes the expert has made in

                          G. KLECK

conjunction with this case, how many notes do you have that are responsive to request 4 that are not produced?

A. I wouldn't know how to count the notes, but I would say three or four pages worth of handwritten notes.

Q. And same question for number 5: To the extent you have writings or recordings which reflect your expert opinions, what do those materials constitute?

A. Published articles, journal articles.

Q. Did you review or rely on any articles which are not cited in your report?

A. No.

Q. All of the articles, journal articles, studies, and similar academic writings that you considered or relied upon in this opinion are referenced in the opinion or in the bibliography for the person; is that correct?

A. Yes.

Q. And beyond what's listed there, you didn't review or consider any other materials

G. KLECK

in connection with your opinion?

MR. PENNAK: Asked and answered.

A. Yes.

MR. MILLER: We can take that exhibit down.

Q. I want to walk you through the brochure, or the pamphlet at issue here. It's been pre-marked as Exhibit 2, and we'll show it now on the screen. And you can turn to tab 2 of your binder.

(Exhibit 2, Firearms and Suicide Prevention pamphlet, marked for identification, as of this date.)

Q. Can you confirm that the document in your binder at tab 2 is the document that's shown on the screen as Exhibit 2?

A. Yes.

Q. Okay. You can review it in either location. If you'd like us to page through it, we can certainly do that, we'll walk through it in a moment. If it's easier to review in your binder, that is also fine.

Do you recognize the document that's Exhibit 2?

G. KLECK

A. Yes.

Q. What is this document?

A. That's one of the pamphlets that firearms retailers were required by the ordinance to provide to their customers.

Q. And this is the pamphlet specifically that is the product of joint partnership between the NSSF and the AFSP, as we described in questioning a moment ago; is that right?

A. Yes.

Q. Is there anything on this first page that's being displayed that you provided an opinion on?

A. No.

Q. Do you agree with or disagree with the statements made on the first page of this brochure?

A. No -- well, I mean, I don't disagree.

Q. To your knowledge, there's nothing factually inaccurate or controversial about what is displayed on page 1 of this brochure?

A. That's correct.

G. KLECK

Q. Okay. Can we turn to the next page, please, and I'm directing your attention to page 2 of Exhibit 2 which has the heading What Leads To Suicide. Hang on while we bring that up. Excuse me, pages 2 and 3.

Do you see the images on pages 2 and 3 of Exhibit 2?

A. I do.

Q. Does any part of your opinion concern these pages?

A. No.

Q. Do you dispute any of the statements that are made on these two pages of the pamphlet?

A. No.

Q. No, you do not dispute them?

A. That's correct; I do not dispute them.

Q. Let me turn to the next page. I'm going to take these pages one at a time. So we'll concentrate first on the page, which I believe is 4, with the header Some People Are More At Risk For Suicide Than Others. Do you see that page?

G. KLECK

A. Yes.

Q. Is there anything on this page that you provide an opinion on?

A. Yes.

Q. What specifically?

A. The middle column, last item, "Access to lethal means including firearms and drugs."

Q. Anything else on this page that you provide an opinion relating to?

A. No.

Q. Do you disagree with the statement at the top, that some people are more at risk for suicide than others?

A. I do not disagree.

Q. You believe that's a factually accurate statement?

A. Yes.

Q. In the first column, there are listed a number of what the brochure titles Health Factors, including various mental health conditions listed, serious or chronic health conditions or pain, and traumatic brain injury.

G. KLECK

Do you agree or disagree that those are factors that can put people at risk for suicide?

A. I have no basis for disagreeing with any of that.

Q. Those factors, in fact, mirror or are very similar to factors that are listed on the CDC's website concerning suicide prevention; isn't that correct?

A. Yes.

Q. And those factors are the same or very similar to factors that are listed on the National Institute of Mental Health's website concerning suicide prevention. Isn't that correct?

A. I wouldn't know.

Q. In the second column, it lists Environmental Factors. Do you see those?

A. Yes.

Q. Do you dispute that stressful life events are environmental factors that impact a person's suicide risk?

A. No, I do not.

Q. Do you dispute whether prolonged

G. KLECK

stress, such as the examples or types listed, are a risk factor for suicide?

A. No.

Q. Do you dispute whether exposure to another person's suicide or to graphic or sensationalized objects of suicide is also a risk factor for suicide?

A. No.

Q. Do you dispute that access to lethal means, including firearms and drugs, are a risk factor for suicide?

A. Yes.

Q. Do you dispute that drugs are a lethal means that is a risk factor for suicide?

A. Yes.

Q. Drugs are not, in your view, a lethal means that is a risk factor for suicide?

A. I have no opinion on that.

Q. Your opinion is confined to whether firearms -- excuse me, whether access to lethal means, including firearms, is a risk factor for suicide; is that correct?

G. KLECK

A. Access to firearms specifically, that's what I would dispute.

Q. But not access to drugs?

A. No, I don't have an expert opinion on that.

Q. The third column lists Historical Factors, such as previous suicide attempts, family histories of suicide, and childhood abuse, among other historical factors.

Do you dispute any of those historical factors as risk factors for suicide?

A. No.

Q. When we say risk factor, what is your understanding of that phrase?

A. Unfortunately, it's ambiguous as it's used in the public health literature. Sometimes it seems to mean nothing more a correlate, which is trivial. It could be cause, it could be consequence, it could be simply's coincidental association. But in context, it usually means it's a causal factor; that is, it actually has a causal effect on the likely hood of the behavior

G. KLECK

occurring.

Q. So you -- strike that.

The phrase "risk factor" in public health literature can refer simply to a correlation. Is that what you're saying?

A. Yes. Often in the public health literature, an author will say it's a risk factor and imply that it's a causal factor, because they then draw a conclusion about how you might, in this case, prevent suicide. Well, of course, you can't prevent suicide by eliminating something that's merely coincidentally associated with suicide. It's got to be a factor that has some causal effect.

And so putting those facts together, it implies that risk factor is a causal factor. Otherwise, it wouldn't make any sense to say, well, you can affect people's likelihood of committing suicide by removing this risk factor.

Q. Wouldn't it make sense to make readers aware of risk factors not so that they can be eliminated -- one can't obviously

G. KLECK

eliminate a family history of suicide -- but so that the reader can be aware and take protective measures as warranted?

MR. PENNAK: Ambiguous question.

A. I guess I don't understand the question. Could you rephrase it?

Q. As I understood your question -- your response a minute ago, you suggested that the only reason to warn of risk factors is if they have a causal relationship and can be eliminated or mitigated. Is that what you were saying?

A. Yes, I would agree with that interpretation.

Q. How would you eliminate or -- how would a reader eliminate or minimize the historical factors on this page? How does that make sense as an interpretation of, for example, the third column?

A. Well, your question premised that it would be something that was affectable by the individual. So that wouldn't apply to historical factors.

Q. It is your understanding that the

G. KLECK

historical factors listed here cause suicide or that they're correlates?

A. I'm not an expert on it, but I think there's some foundation for believing they have a causal effect, influence. For example, family history of suicide may imply a genetic factor, and there's strong evidence that there are genetic factors underlying depression and suicide. And so in that sense, yeah, there's reason to believe that those historical factors have a causal effect on suicide.

Q. Can those historical factors be mitigated or eliminated?

A. No.

Q. And so what is the purpose -- what is the public health purpose of informing people about historical factors for suicide if they can't be eliminated or even mitigated, in your view?

A. I wouldn't be able to infer what the underlying motives of the authors of the pamphlet would have, so I really couldn't say.

Q. Is it your opinion that access to a firearm is only coincidentally linked to

G. KLECK

suicide?

A. Yes, probably, although no scientific conclusion is ever absolutely final and definitive. There always might be better evidence that comes along in future. But based on our present knowledge, I think there is no convincing evidence that having a firearm has a causal effect on suicide rate. So it's a noncausal correlation or association with suicide.

I shouldn't say coincidental, by the way. That sort of implies it's just random or there's no particular reason. Rather, I believe there are confounding factors that have an influence on both firearms acquisition and ownership and on suicide. And so it's not coincidental, but it's also not causal in nature.

Q. What is the nature of the relationship, then?

A. A spurious association is what a statistician would say about it. That is to say, there are antecedent factors that create an association between having guns and

G. KLECK

suicide. Even though firearms don't have a causal effect of their own, both firearms ownership and suicide are consequences of other factors.

Q. Let me direct you to the next page of the pamphlet. In is the page that reads Take Warning Signs Seriously. Do you see that page?

A. Yes.

Q. Does your opinion concern any of the information on this page?

A. No.

Q. Do you dispute any of the information on this page?

A. No.

Q. To your knowledge, is the information on this page factually accurate and noncontroversial?

A. That I wouldn't be qualified to say.

Q. Let me direct your attention to the following page, Reaching Out Can Help Save a Life. Do you see that page?

A. Yes.

Q. Does your opinion concern anything

G. KLECK

on this page?

A. No.

Q. Do you dispute any of the information on this page?

A. Well, by -- that assertion, "By keeping secure firearm storage in mind, you can help reduce the number of suicides involving firearms," it's an ambiguous statement, but if it implies that there would be a causal effect on the likelihood of somebody committing suicide through their manner of firearm storage, if that's what was intended, then I would dispute it.

Q. You do not believe that secure firearm storage can help reduce firearm suicide?

A. Well, it might reduce firearm suicide, but of course, that's not really the issue. The issue is, could it reduce suicide; that is, suicide by any means. And no, I don't believe that manners of storage of firearms would affect whether or not somebody commits suicide, period, by any and all means.

Q. Do you dispute the statement in the

G. KLECK

first sentence that suicide is preventible?

A. No.

Q. You believe suicide is, in fact, preventible?

A. Yes.

Q. Is firearm suicide preventible?

A. That I wouldn't -- I really never thought about the issue in that context, so I really don't have much of an opinion. It's possible it does, but it's trivial if you only prevent firearm suicide, but you don't prevent the suicide itself. If you don't save any lives by preventing people from killing themselves, then there's no particular benefit in just preventing a firearm suicide, preventing somebody from killing themselves with guns as opposed to some alternative means.

Q. Let me direct your attention to the next page. The this is the page with the headline Firearms Storage For Your Lifestyle. Does your opinion concern anything on this page?

A. No, not directly.

G. KLECK

Q. Is there anything on this page that you would dispute the accuracy of?

A. Only that it's sort of an incomplete assertion about how sensible firearm storage practices are.

Q. Incomplete in what way?

A. Incomplete in that it leaves out entirely the issue of the main reason people keep loaded guns in their homes, which is self defense. The more you make the gun inaccessible, the less available it is for immediate use for self protection. So it's a major factor that's left out of this discussion of firearm storage.

Q. Does the NSSF, to your knowledge, discourage the use of firearms for self defense?

A. Not to my knowledge.

Q. And the NSSF authored or coauthored the entire brochure, including this page?

MR. PENNAK: The document speaks for itself.

A. They certainly authorized the documents, including this page in the

G. KLECK

document.

Q. If I can turn your attention to the next page, which along the side has the large heading Resources. Do you see that?

A. Yes.

Q. Does your opinion concern any of the information on this page marked Resources?

A. No.

Q. Do you dispute the factual accuracy of any of the information on this final page of the brochure?

A. No.

Q.

MR. MILLER: I think now is a good time for us to take a quick break. If we could do like a five-minute break, and we will resume at 10:45.

MR. PENNAK: That's fine.

THE VIDEOGRAPHER: The time is 10:39. This is the end of Session Number 1 and we are now off the record.

(Recess was taken.)

THE VIDEOGRAPHER: The time is 10:48 and we are now back on record.

G. KLECK

BY MR. MILLER:

Q. Dr. Kleck, before we started to review the brochure, we spoke for some time about NSSF's purposes in publishing and developing this pamphlet, and I believe you testified that NSSF's purpose was to prevent lawsuits by families of individuals who died by firearm suicide. Do you remember that testimony?

A. I believe I said that one can speculate that.

Q. Is your view that that is the only purpose that NSSF had in developing and publishing this pamphlet?

A. No, I don't rule out the possibility that they are sincerely, genuinely interested in preventing suicide. It's just that some of that has nothing to do with their status as an industry organization. The industry organization-specific reason might well be to prevent lawsuits.

Q. So you're testifying that NSSF's aim in publishing this pamphlet is as a liability shield for the industry. Am I understanding

G. KLECK

that correctly?

A. What I'm speculate suggest that's part of the rationale for supporting the publication of this document.

Q. What lawsuits are you referring to?

A. The possibility that a survivor of someone who has killed themselves with a firearm could sue the gun industry.

Q. Are you aware of such lawsuits?

A. I don't know one way or the other whether there are actually such lawsuits. I'm only pointing out a possibility.

Q. I want to pivot now to your prior engagements as an expert witness. You've testified as an expert in a number of prior lawsuits; is that correct?

A. Yes.

Q. I want to show you a document that I don't believe we had gotten time to put in your binder. I'm going to put it up on the screen here. It's been pre-marked as Exhibit 66. It will not be in your binder. It is only going to be displayed on the screen here.

G. KLECK

(Exhibit 66, Listing of previous depositions and legal cases, marked for identification, as of this date.)

Q. Do you recognize this document that's been pre-marked Exhibit 66?

A. Yes.

Q. What is this document?

A. It's a list of legal cases in which I have been deposed or testified.

Q. Did you write this list?

A. I did.

Q. And you furnished this list to counsel for the plaintiffs; is that correct?

A. Yes.

Q. Let's turn to the second page of it. So I want to work up from the bottom here, because I believe they're in descending chronological order, and I want to work from the most recent back to the oldest.

Going case by case, I'd like you to tell us on whose behalf you offered expert testimony in each case, beginning with NRA versus Swearingen.

A. NRA.

G. KLECK

Q. And the NRA is who?

A. National Rifle Association.

Q. That's a gun lobbying group; is that correct?

A. Yes.

Q. And in that case, the NRA was challenging a Florida law restricting the purchase of firearms by individuals younger than 21; is that correct?

A. I don't know. If you ask me about what the issues in each of these cases were, I would have to consult my records. Based on my sheer memory, I won't be able to tell you.

Q. Do you recall your testimony or your report in that case?

A. No.

Q. Do you doubt that you offered expert testimony in support of an NRA challenge of a Florida law restricting the purchase of firearms by people under 21?

A. No.

Q. Let's turn to the second case, Rupp versus Becerra. You serviced as an expert for who in that case?

G. KLECK

A. Probably Rupp, if they're the challengers. But again, I'm not going to be able to get into the specifics of it. I just can't recall. I would have to consult my records.

Q. How did you draft this list?

A. One by one. As each case comes up, I add it to this cumulative list.

Q. Did you consult records in order to develop this list?

A. I think I consulted records to add the last one or two items.

Q. In the Rupp case, did you serve as an expert for the California Rifle & Pistol Association, as well as several individual gun owners?

A. Again, I don't remember.

Q. Did you offer expert testimony in support of a challenge to a California law banning certain assault weapons?

A. That sounds familiar, although I couldn't swear that it was in connection with Rupp versus Becerra.

Q. What was your hourly rate for both

G. KLECK

of those engagements, NRA versus Swearingen and Rupp versus Becerra?

A. Probably $400 an hour by the NRA versus Swearingen case, and I'm not sure about Rupp versus Becerra. It might have been far enough in the past that I was charging only 350 per hour.

Q. So for the Rupp case, it was either 350 or $400 an hour?

A. Yes.

Q. How much did you bill for expert services overall in the NRA case?

A. I don't know.

Q. What is your best estimate of how much you billed for expert services in the NRA case?

A. I would be only guessing.

Q. Do you believe it's more than $1,000?

A. Probably.

Q. Do you think it's more than $10,000?

A. Doubtful.

Q. Do you think it's more than $5,000?

A. I really don't know. I mean, we

G. KLECK

couldn't narrow it down that much.

Q. I'm just trying to ballpark it. Of is your best estimate of how much you charged in that case greater than or less than $5,000?

A. I do not know.

Q. On average, how much do you get each time you do an expert engagement?

A. I wouldn't be prepared to say what the average would be because the numbers wildly vary. So again, I would just be guessing.

Q. What's the most you've ever billed, to your recollection?

A. Honestly, again, I would be just guessing.

Q. Did you provide testimony in or about December 2013 in connection with a case titled San Francisco Veteran Police Officers Association versus City and County of San Francisco, that was a lawsuit in the U.S. District Court for the Northern District of California?

A. Could you show the previous page?

Q. Yes. I'll stipulate to you I don't

                        G. KLECK

believe that case is listed here. So I'm trying to find out if you may have omitted one inadvertently.

A. It's really not ringing a bell, but yeah, there's always the possibility that I inadvertently omitted a case.

Q. Do you recall any expert support challenging a local ordinance prohibiting possession of large capacity magazines?

A. It's possible, sure.

Q. In this entire list of cases, in each one, did you testify in support of either a firearms industry group, such as the NRA or a state affiliate, or on behalf of a firearms manufacturer or dealer, or on behalf of individual gun owners? Is that true of all of the cases listed here?

A. No.

Q. How many cases is that not true of?

A. Could you show the -- well, let's see -- could you show the last page again?

Q. Sure thing.

A. Okay. If you go back to the first page, the one in which that would not apply to

G. KLECK

is Barbara Schlifer Commemorative Clinic versus HMQ Canada. In that case, I was deposed on behalf of or by the Canadian Justice Department.

Q. Okay. Setting aside the Barbara Schlifer Commemorative Clinic case, for the remaining cases, and I count 22 of them, is it true that in each of the remaining 22 cases, you provided expert testimony on behalf of either a firearms industry trade association, a manufacturer or dealer of firearms, or individual gun owners?

A. I think that's probably true.

Q. Have you ever provided testimony in a lawsuit against any of those individuals; so against a member of a gun industry, against a gun industry trade association, or against a gun owner?

A. No.

Q. In the Barbara Schlifer commemorative clinic versus H M Q Canada, what was the dispute in that case, to your knowledge?

A. I believe it concerned preservation

G. KLECK

of the existing Canadian firearms registration system, and Canada decided that they didn't want to have it anymore, and the Barbara Schlifer commemorative clinic wanted to retain it.

Q. And was your testimony in that case in support of a party seeking to eliminate the gun regulations you just described?

A. Yes.

Q. Who was that party?

A. The Canada -- Canadian Department of Justice.

Q. In all 23 of these cases, was your testimony in support of the party challenging a gun regulation or gun restriction?

A. Well, no, because some of these cases, they didn't really concern gun regulations or restrictions. Some of the cases, the early cases in particular, were simply civil suits suing a gun manufacturer. I think defect was -- liability was the basis for a couple of those lawsuits.

Q. Which lawsuits are you referring to that you think were suits against the gun

G. KLECK

industry or a manufacturer or industry defendant?

A. Wolf versus Colt, and Clancy versus Sale, and possibly Dix v. Beretta, those sort of ring a bell as defectless product liability cases.

Q. Other than the Wolf case, Clancy case, and Dix case, to your knowledge, are all of the remaining cases instances in which you provided testimony in support of the party challenging a gun regulation?

A. Could you show the second page again, please?

Q. Yup.

A. Probably, since the product liability cases just disappeared after a while, I think they're mostly challenges to the law. I couldn't swear that every single one was, but that sounds plausible as a description of the rest of the cases.

Q. But you believe that all of the remaining 20 cases are examples where you testified in support of the party challenging a gun regulation?

G. KLECK

MR. PENNAK: Asked and answered.

A. I believe so.

Q. Have you ever testified as an expert in support of a party seeking to uphold a gun regulation?

A. Testified? No.

Q. Provided a report?

A. Well, the Chicago Police Department, or the City of Chicago, to be precise, asked me for a report on a case, and they weren't challenging a law. And it never got to court, or it was never -- or at least with my involvement; I wasn't deposed or testified.

Q. When was that?

A. Oh, gosh, I'd be just guessing. A long time ago. It might be way back in the '90s.

Q. And to your knowledge, did that engagement relate to a lawsuit?

A. I think so. I think it was a case where a police officer had a child, a firearm -- he kept a firearm in his home, as required by Chicago Police Department regulations, and the child got ahold of the

G. KLECK

gun and either shot himself or someone else. It was something like that.

Q. And what was the subject matter of your testimony in that case? I'm sorry, the subject matter of your report in that case?

A. It might have been the nature of child gun accidents, but really I -- I'd be reluctant to say definitively. I mean, recalling the details of cases decades in the past is going to be dubious for anybody and really bad for a person with my memory.

Q. What percent of your time do you spend working on engagements as an expert witness?

A. Oh, well under 5 percent.

Q. Have you ever served as a consulting expert in a litigation matter, even though you didn't testify?

A. Well, as I say, in that Chicago case, I guess that's how I would describe my participation.

Q. What about in any other cases besides the Chicago case?

A. I don't know, I might have consulted

G. KLECK

in cases that they didn't concern a regulation, but, you know, they had something to do with firearms and violence. I think an insurance company wanted me to provide information about what the risks of firearms accidents were for various subgroups of the population for the sake of them setting rates.

Q. Have you ever served as a consultant for a gun rights organization?

A. You mean beyond the cases that are already listed in the document? No.

Q. I mean unconnected with litigation, have you ever done consulting work for a gun rights organization?

A. I don't believe so.

Q. What about advisory work?

A. I don't think so.

Q. Have you ever done consulting or advisory work for a firearms trade association?

A. Again, as I say, for the NSSF I gave my opinion, again, not in connection with a legal case, but just about an academic article or report that had been published.

G. KLECK

Q. Have you ever had an engagement like that for any other firearms industry group, such as the NRA or a state affiliate?

A. I don't think so.

Q. Ever done work for a gun manufacturer?

MR. PENNAK: As a consultant or as --

MR. MILLER: In any capacity.

A. Outside of those legal cases listed in that document, no.

Q. Have you ever worked for a gun dealer?

A. No.

Q. Are you currently consulting with, working for, or have any other relationship with the NRA or any state affiliate of the NRA or the NSSF or any other organization that works on firearms-related issues?

A. No.

Q. Are you a member of the NSSF?

A. No.

Q. Are you a member of the NRA?

A. No.

G. KLECK

Q. Are you a member of any state firearms group?

A. No.

Q. Have you ever been paid to speak at a firearms-related event?

A. No.

Q. Have you ever been paid to speak at a firearms industry conference?

A. No.

Q. Have you ever spoken at a firearms industry conference?

A. No.

Q. Have you ever spoken at a firearms industry trade show?

A. No.

Q. Have you ever received any awards or prizes from the gun industry?

A. No.

Q. What about from the Citizens Committee for the Right to Keep and Bear Arms, have you ever received an award from that organization?

A. No.

Q. Did you receive an award from that

G. KLECK

organization in 2000 as their gun rights defender of the month? To jog your memory.

A. I don't know. You're awfully specific. It sounds like you're assuming that I did. You know, they can declare an award for me without my, you know, permission or approval, so I suppose that's possible that 22 years ago that they named me that.

Q. Have you ever received a financial prize or payment associated with any award from the gun industry?

A. No.

Q. Aside from expert work, what are your other sources of income?

A. I receive a pension from the State of Florida for my service as a professor of criminology at Florida State University, and I receive social security.

Q. Do you receive a salary for your work as a professor?

A. No; I'm retired.

Q. When did you retire?

A. 2016.

Q. Since 2016, what percent of your

                            G. KLECK

income has come from expert work, such as the work you're doing here?

A. Well under 5 percent.

Q. Do you have any other income from the university other than your pension?

A. No.

Q. Do you hold a position at the University of Florida or any other university presently?

A. I'm an emeritus professor, which is a strictly honorary, unpaid position.

Q. Have you ever held a position at a university that's paid for in any capacity by the firearms industry?

A. No.

Q. Is any of your research paid for or supported in any way by the firearms industry?

A. No.

Q. Has any of your research ever been paid for or supported in any way by the firearms industry?

A. No.

Q. You're familiar with conflict of interest disclosures in social science

G. KLECK

research?

A. Yes.

Q. Are you familiar also with funding statements in such research?

A. Not especially. It just hasn't arisen with me.

Q. Have you ever made a conflict of interest statement in any of your published works?

A. Not that I recall.

Q. Have you ever considered making one?

A. No.

Q. Were any of the studies that are cited in your report in this case funded, in whole or in part, by the firearms industry or any organization that deals with firearms-related issues?

A. No.

Q. At the time you published your works in 2019, were you working on at least four paid expert consulting cases for the gun industry?

A. Could you put that case list up again, please?

G. KLECK

Q. Sure.

I'm showing you Exhibit 66 again.

A. Second page.

Q. I'll go to the second page, yeah.

A. Well, the only case I might have been working on is the last one, NRA versus Swearingen.

Q. When you published works in 2019, you submit them in advance; is that correct?

A. Correct.

Q. And before you submit them, obviously you spend a fair amount of time working on them?

A. Yes.

Q. So for a work submitted in 2019, is it fair to assume you were likely working on it during 2018?

A. Possibly, yeah.

Q. How were you engaged in this matter?

A. Mark Pennak or one of the other attorneys in his firm contacted me and introduced me to the case, broad outline of the case, and asked me if I would be willing to serve as an expert witness.

G. KLECK

Q. Do you advertise your availability as an expert witness in any way?

A. No.

Q. How many hours have you billed for on this case to date?

A. Oh, gosh. Probably under 20, although I wouldn't swear to it. Something like that, maybe.

Q. So around 20 hours?

A. Could be, sure.

Q. Who selected the documents that you reviewed in connection with this case?

A. I assume Mark Pennak or his colleagues.

Q. And what about the materials that are cited in your expert report, who selected those for your review?

A. Me.

Q. Only you?

A. Yes.

Q. Did anyone else indicate to you to review other documents?

A. You mean among the things that my for the report was based on?

                            G. KLECK

Q. I mean, did anyone else advice you to review or consider any other document not listed in your expert report?

A. No.

Q. Did you speak to any of the plaintiffs in this case?

A. No.

Q. Have you ever spoken to any of the plaintiffs in this case?

A. No.

MR. PENNAK: Other than MSI, of course, which is a party plaintiff in this case.

Q. Who did you speak with at MSI, Mr. Kleck, if you spoke to anyone?

A. I wasn't aware that I did speak with anybody at MSI, unless it was one of the attorneys that was in communication with me.

MR. PENNAK: And for the record, I'm the president of MSI, as well as counsel. So when he was speaking to me, he was speaking to MSI.

THE WITNESS: All right. Fair enough.

G. KLECK

Q. Did anyone help you draft your report?

A. No.

Q. Did you work with anyone else in any way to prepare your report?

A. No.

Q. Did anyone other than you review your report?

A. Well, I assume Mark Pennak did. I submitted it to him, so...

Q. Anyone other than counsel?

A. No, not to my knowledge.

Q. The question of whether or not access to firearms increases the risk of death by suicide, to your knowledge, is that a question of opinion, or is that a question that can be determined by social science?

A. It's a matter that can be addressed by social science. Science never provides final and definitive answers to any question, but it can certainly provide relevant information, and that information, in turn, is assessed by scholars as best they can in drawing a tentative conclusion, which

G. KLECK

conceivably might be revised in future as better evidence comes along.

Q. Do you believe that the question of whether or not access to firearms increases the risk of death by suicide is a factual question or not a factual question?

A. Yes, it's a factual question.

Q. It's not a question of opinion?

A. That's correct.

Q. It's not a philosophical or political or religious question?

A. That's correct. While those factors may influence people's assessment of the evidence, the evidence itself concerns a factual matter. Suicide is -- either is or is not affected by gun ownership.

Q. How do you answer a question like whether or not access to firearms increases the risk of death by suicide as a social scientist?

A. How do I answer it?

Q. What are the steps involved in answering that question?

A. Well, it's a hypothesis. The

G. KLECK

hypothesis is that gun ownership increases the likelihood that a person will kill themselves. And so you devise tests of that proposition, and the more definitive and decisive the tests that the hypothesis passes, the more likely you are to conclude that the hypothesis is correct.

On the other hand, unfortunately a lot of the research in the area doesn't do that. There's no serious effort to falsify the hypothesis; that is, no real serious effort to test it. An example being most public health researchers simply establish there's a correlation between gun ownership and suicide, and then they stop and, you know, they draw their conclusion solely on the basis of what should be only the beginning of an exploration and investigation. In other words, there's no serious attempt to falsify the hypothesis, and because there's no serious attempt, the support for the hypothesis is weak.

Q. Is there a correlation between firearms access and death by suicide?

                        G. KLECK

A. Yes.

Q. So, as I understand the process that you just described, one way that social scientists answer or test a hypothesis is by devising tests and then evaluating the results; is that correct?

A. Yes.

Q. Is it also possible to answer this question by reviewing the research of others?

A. That certainly would be a mandatory part of the process.

Q. When you were asked to evaluate the brochure at issue here, or the pamphlet at issue here, what were the steps you took?

A. After having carefully read the pamphlet, I compared it with material that I had already published on the subject of the effect of gun ownership on suicide.

Q. Did you compare it with anything other than what you had already published?

A. Well, I also considered what the opposing experts had written on the subject.

Q. Did you attempt to identify and review any other publications by social

G. KLECK

scientists on firearms access and suicide?

A. Beyond what I had already reviewed? No.

Q. You did not -- then let me back up and understand, what were the publications that you reviewed in order to answer this question, or evaluate this pamphlet?

A. The studies cited in those two publications from 2019, The Effect of Firearms on Suicide in the volume gun studies, and the article in social science quarterly, macro-level research on the effect of firearms prevalence on suicide rates.

Q. In order to evaluate the pamphlet, you also mentioned that you did something with respect to the reports or publications of the other experts. What was that?

A. Well, it was different for the two experts. One expert was not an expert at all. I don't recall the guy's name, but he had a very long Indian name. And he simply wasn't an expert; he has no place in the suicide literature. And the other one, I reviewed the articles that he had done that bore on the

G. KLECK

proposition that owning a gun makes it more likely a person would commit suicide, and it was essentially research of the same character that I had already reviewed.

Q. Did you search for or review any other sources other than the two publications of your own that you've just mentioned and the publications of Andrew McCourt and Nilesh Kalyanaraman, who are the defendant's experts in this case?

A. No.

Q. Did you review any of the studies that are cited in your 2019 book chapter or 2019 article in Social Science Quarterly?

A. You mean reviewed them again?

Q. Did you review any of the materials cited in either of those publications?

A. Well, I reviewed all of them.

Q. In connection with this report?

A. In connection with this report, no.

Q. I'm sorry, I think that answer was cut off, at least on my end by a tech issue, so I did not hear it clearly. Could you reread the question so the witness could

G. KLECK

answer it?

(Record read.)

A. No, I did not review them again in connection with this report above and beyond what I had already done to review them for the purposes of producing those original articles.

Q. Did you attempt to identify or review any other social science research on the topic of firearms access and suicide in order to prepare your report?

A. I might have read some of the articles cited by McCourt other than just McCourt's own publications. I reviewed those, but in some cases I think I also reviewed some of the studies he cited that I was not already familiar with.

Q. Which studies are those?

A. I couldn't tell you.

Q. Are all of those studies listed in your report?

A. No.

Q. So there are studies that you believe you reviewed in preparation for your report but did not list in your report?

G. KLECK

A. Studies that had no bearing on the conclusions I drew, yeah.

Q. Studies that you considered, but rejected the conclusions of?

A. No, that just didn't bear on the issue addressed in my report.

Q. And you cannot, sitting here today, identify what those were, what studies those were?

A. No.

Q. When you say that these studies were not relevant to your conclusion, help me understand how they were not relevant. What was irrelevant about them, in your view?

A. Well, since I can't recall the specific studies in question, I can't answer that question.

Q. Did --

A. I can't say why they were irrelevant.

Q. Did the studies that you reviewed concern firearms access and suicide, or did they concern some other topic?

A. Probably concerned that topic, yeah.

G. KLECK

Q. Why didn't you conduct a review of -- why didn't you make an attempt to identify and review other papers or publications on the topic of firearm suicide -- excuse me, on the topic -- let me strike this whole question and say it more succinctly.

Why did you not attempt to identify and review other social science on the topic of gun access and suicide beyond your two papers and the citations in Dr. McCourt's and Kalyanaraman's reports?

A. Because I believed there was already a fairly comprehensive coverage of the relevant literature.

Q. In answering a social sciences question like this, is it important to do a comprehensive review of literature?

A. It's certainly a good idea.

Q. Why is it a good idea?

A. Partly because you don't want to duplicate what others have said, partly because you want fresh ideas that already didn't occur to you, and partly because you

                        G. KLECK

want to make sure you've covered all your bases, that you considered the full array of relevant evidence, rather than just what coincidentally happened to come to your attention.

Q. If a social scientist doesn't consider the full set of publications on a given topic, is it possible their conclusions would be erroneous?

MR. PENNAK: Calls for speculation.

A. Yeah, there's no way to know. I mean, if what you omitted was a far more authoritative and critical test of a hypothesis than what had preceded it, in other words, for example, it was technically quite superior to anything that had gone before, then that might affect your conclusions. But again, that's pure speculation. In this case, I was not made aware, and as I sit here, I'm still not aware of any such additional study.

Q. What opinions have you reached in this matter?

A. I've concluded that there is no sound scientific foundation for the

G. KLECK

proposition that owning a gun causes an increase in the likelihood you will commit suicide.

Q. And when you say "commit suicide," do you mean die by suicide or attempt suicide?

A. I would say that's an important distinction, but the proposition would be correct in any case, whether we were talking about suicide attempts or completed suicides.

Q. What is your opinion? How do you resolve that ambiguity in your opinion? Is your opinion about the link between firearms ownership and attempted suicide or the link between firearms ownership and death by suicide?

A. Well, it was the latter, since that's what was asserted in the pamphlet and that's what I was disputing. It didn't refer to suicide attempts; it referred to suicide, period.

Q. And as you understood that and as you evaluated it, that is a reference to death by suicide?

A. Yes.

G. KLECK

Q. Do you have any other opinions rendered in this case?

A. No.

Q. I believe you testified a minute ago, in describing your opinion, that you evaluated the scientific basis for the conclusion that firearms ownership causes an increased risk of suicide. Is that accurate?

A. Yes.

Q. Did you evaluate whether firearms access, short of ownership, causes an increased risk of death by suicide?

A. Actually, the distinction is rarely made in the literature. Ownership is usually just assumed by access; that is, either the attempter owned the gun or someone in their household owned the gun, and that's why they had access. But the distinction is almost never made in the research.

Q. From a public health standpoint, it makes sense to provide warnings and advice about suicide risk that relates to access, even if that's short of ownership. Would you agree?

G. KLECK

A. Yes. I mean, if it's relevant at all.

Q. For example, children in a home in which there are firearms, the risk of suicide to those children is a significant public health concern even if those children are not the owners themselves of the firearms. Would you agree with that?

A. No.

Q. Sorry. You don't believe that children's access to firearms and the ensuing risk of suicide is a public health concern?

MR. PENNAK: Mischaracterizes his testimony, and asked and answered.

A. No. To repeat what I said, I don't believe that there's any scientific foundation for the proposition that either gun ownership or access to firearms with regard to either children or adults, whether it has any causal effect, and if it has no causal effect, then of course it's not public health concern.

Q. Do children use firearms to commit suicide?

A. Yes.

G. KLECK

Q. Do children who are not gun owners use firearms to commit suicide?

A. I'm not sure that the issue has been addressed in research. I mean, the children themselves normally would not be owners, but, you know, their parents or some other adult in the household might be the owners.

Q. And those children who are not themselves owners, but who live in that household with an adult who owns firearms, you would agree that children of that nature do sometimes commit suicide by firearm?

A. Yes.

Q. Did you render any opinion with respect to the access of children like that, who are not owners?

A. No.

Q. You only evaluated whether the claim was true as to firearms owners and whether firearms owners were at -- excuse me, whether firearms ownership caused an increased risk of death by suicide?

MR. PENNAK: That's not what he testified. That mischaracterizes his

G. KLECK

prior testimony.

A. I wouldn't make any distinction between firemans effects on adults versus children, and I made -- my opinion made no distinction between access to firearms versus ownership of firearms.

Q. You only evaluated a causal assertion; is that correct? A causal premises?

A. Yes.

Q. You did not -- and specifically, that is whether access to -- excuse me, whether ownership of firearms causes an increased chance of death by suicide?

A. Yes.

Q. You did not evaluate whether ownership of a firearm is associated in had a noncausal way with an increased risk of death by firearm suicide?

A. I'm sorry, my audio is going out. Could you repeat that, please?

Q. I think I mangled the question regardless, so I'm going to restate it.

The preceding question -- can you

G. KLECK

hear me clearly?

A. Yes, but it goes in and out.

Q. Okay. If you do not hear me clearly, I want you to let me know, as you just did. Did you hear my prior question, which was: You evaluated specifically whether ownership of a firearm causes an increased chance of a person dying by suicide? Did you hear that question?

A. Actually, I think my conclusion pertained to just access to firearms, independent of the issue of ownership.

Q. Okay. When you evaluated the claim that access to firearms causes an increased chance of a person dying by suicide, you were specifically evaluating the causal claim there; is that correct?

A. Yes.

Q. You did not evaluate whether access to firearms is associated, but not necessarily caused an increased risk of a person dying by suicide?

A. Only to the extent that the correlation is one thing that's relevant to

G. KLECK

whether or not there's a causal effect.

Q. Help me understand what you mean by that.

A. To take a random variable X and a random other variable Y, X might be correlated with Y, and yet X does not have any causal effect on Y, and one common reason for that would be there are other factors that affect both X and Y, even though X does not affect Y.

Q. And in this instance, did you consider or evaluate whether or not firearms access affects the chance that someone will die by suicide?

A. Yes.

Q. And what was your opinion on that question?

A. My opinion is that there's no scientific foundation for the assertion that access to firearms affects whether or not a person commits suicide.

Q. Turning your attention back to the pamphlet, which was Exhibit 2, and we'll show it back on the screen there. But if you would turn to it in your binder, where in the

G. KLECK

pamphlet does the pamphlet make the statements you evaluated for your opinion? If you can direct me to the page, then I'll have it displayed.

A. In the upper right of the page, it reads page 20 of 25.

Q. Okay. I'm displaying a page in Exhibit 2 that has the header Some People Are More At Risk For Suicide Than Others. Is that the page you're referring to?

A. Yes.

Q. Any other page bear on this question, or just this page?

A. Just this page.

Q. Okay. Where on this page is the statement that you evaluated for purposes of your report?

A. First of all, the title of the page as a whole, as you said, Some People Are More At Risk For Suicide Than Others, that introduces the topic of risk factors, which is reinforced in the lower right text, which reads, "Risk factors are characteristics or conditions that increase the chance that a

G. KLECK

person may try to take their life." That's unambiguously an assertion about causal effects.

Then you go to the middle column, the last item listed under Environmental Factors, we see, "Access to lethal firearms [sic], including firearms and drugs." That means the authors of this pamphlet were asserting that access to firearms causes an increase in the likelihood a person will commit suicide.

Q. I want to show you your report. It's tab 3. And I want to -- we'll pull up on the screen here.

(Exhibit 3, Expert Report of Gary Kleck, marked for identification, as of this date.)

Q. So I'm showing you the document that's been pre-marked Exhibit 3. Do you recognize that document?

A. Yes.

Q. And is that the report you submitted in this case?

A. Yes.

G. KLECK

Q. If we can turn to page 3, and you can follow along in your binder or on the screen. You state in this report that what you call the suicide claim, quote, "is not supported by the most credible scientific evidence and is probably false."

How did you arrive at this conclusion -- excuse me, at this opinion?

A. I reviewed the relevant evidence as seen in two articles that I have published, one in Social Science Quarterly and a chapter in a volume called Gun Studies.

Q. What do you mean in that sentence by the phrase "scientific evidence"?

A. I mean evidence that uses logic and empirical evidence to evaluate an idea.

Q. What makes such evidence credible or not credible, in your view?

A. To the extent that the research that generated the evidence follows the textbook rules of how to do the relevant kind of research, it's credible.

Q. And what are those rules?

A. There are dozens of rules, hundreds

G. KLECK

of rules. But the one that's probably most relevant in this case is the rule that you test for the possibility of confounding factors, which means you would do thorough literature reviews to find out not only what affects suicide, but what is a correlate of gun ownership, so you can measure and control for those factors in hopes of isolating better the effect of gun ownership or access on suicide.

Q. For scientific evidence to be credible, does it need to be peer reviewed?

A. Not necessarily. It can stand on its own. I mean, it can meet the criteria that I just discussed; that is, it can satisfy the rules of research methodology without having been reviewed and anyone confirming that that those were obeyed. What matters is that it follows the research for how -- the rules for how to do competent research.

Q. For scientific evidence to be credible, does it need to be capable of replication?

A. It's certainly helpful.

                              G. KLECK

Q. If a person were to repeat the steps of a given study, but arrive at different results, would that make the study less credible, in your view?

A. It wouldn't really matter. Again, that's not really relevant to the issue of whether the rules of research were followed. If the rules were how to do research competently were not followed in the first study, then the second study attempting to replicate it, if it followed the same methods, it's likely to lead to the same erroneous conclusion. So it's really not relevant whether or not it arrives at the same conclusion or arrives at a different conclusion. What matters is if neither study was competently conducted, then that's a reason for attributing very little credibility to it.

Q. What did you do to identify the scientific evidence to consider for your opinion here?

A. Well, in this particular case, the critical methodological issue at hand is, how

many confounding factors researchers measured and controlled for. And most of the studies that conclude that access to firearms increases the risk of suicide don't control for any confounding factors at all. It's not even a matter of opinion about how many they should have controlled for. They didn't control for any, which means there was simply no serious effort to subject the hypothesis to a scientific assessment.

Q. I want to back you up, though. This is a statement about what is or isn't the most credible scientific -- excuse me, the most credible available scientific [audio interference], and I'm wondering, what did you do to identify what scientific evidence -- what the scientific evidence is on this topic in the first instance?

A. For each study, I counted up how many confounding factors the researchers who were authors of the study controlled for. In other cases, I also assessed whether or not they had a valid measure of access to firearms where that was a relevant issue.

G. KLECK

Q. When you make a statement about the most credible available scientific evidence here in your report, are you referring to -- did you consider any scientific evidence other than the two papers that you authored that you referred to -- or excuse me, the Kleck 2019 book chapter and I believe another paper that you authored, did you consider any other scientific evidence other than those two papers to make this statement?

A. Yes, the article authored by, I think his name was McCourt.

Q. What article authored by McCourt?

A. It was articles, plural, like six or seven Andrew McCourt articles that he published that were pertinent to this hypothesis.

Q. Did you attempt to identify any other scientific evidence other than publications by McCourt, the handful of publications by yourself, in order to make a statement about what the credible available scientific evidence on this topic was?

A. Well, the articles by myself weren't

G. KLECK

just single articles. They were reviews of dozens of previous articles. And so basically, I was trying to be relatively comprehensive in covering the published literature on this topic.

Q. So aside from the materials that those articles cite, did you do any other attempt to identify or evaluate any other scientific evidence on these topics?

A. Plus the McCourt articles, no, nothing beyond those.

Q. As part of this opinion, you fault what you call case control literature for, among other reasons, failing to control for confounders. I want to understand, what do you mean in your report by case control literature?

A. Case control studies are nonexperimental studies in which people with some topic of interest, characteristic of interest, are compared with those who don't have that attribute. In this particular application of that methodology, it's comparing people who have committed suicide

G. KLECK

with people who have not, either people who are still alive or people who died by some other cause other than suicide.

Q. What case control studies did you consider in order to arrive at this opinion concerning the body of case control literature on firearms access and death by suicide?

A. All of the studies cited in the reference list for the chapter The Effect of Firearms on Suicide published in Gun Studies.

MR. MILLER: Let's go off the record for a couple minutes. We'll be back on at -- why don't we come back on at noon. Of the it's 11:55 presently.

MR. PENNAK: So we're taking a break right now?

MR. MILLER: Yeah, five-minute break, please.

MR. PENNAK: Okay.

THE VIDEOGRAPHER: The time is 11:55. This is the end of Session Number 2 and we are now off the record.

(Recess was taken.)

THE VIDEOGRAPHER: The time is

G. KLECK

12:02. This is the beginning of Session Number 3 and we are now back on the record.

BY MR. MILLER:

Q. Dr. Kleck, to your knowledge, are there any other peer reviewed publications that have reached a similar conclusion as the one you do in your 2019 book chapter, that case control studies on firearms ownership and the risk of death by suicide are unreliable for the reasons you discuss?

A. I wouldn't be able to say. You know, you can't prove a negative, so it's possible there are other articles that say the same thing. It's a factual issue. It's simply true or not true, regardless of whether or not other people communicated the same opinion.

Q. Can you think of or identify any scholarly article or publication that has reached a similar conclusion as the one you have in your 2019 book chapter?

MR. PENNAK: Asked and answered.

A. I wouldn't know, and to me, the

                            G. KLECK

issue is irrelevant. It's a factual question. If the evidence is weak, the evidence is weak. If the studies didn't control for any significant share of likely confounding factors, then they didn't and the research fails. So it really wouldn't matter to me whether or not there were other articles that did or did not confirm that same assessment.

Q. Are you the only scholar who has published a conclusion like the one in your 2019 book chapter that case control studies on firearms ownership and the risk of death by suicide are unreliable?

A. I wouldn't know.

Q. Have you made any effort to identify other publications that reach that same or similar conclusion?

A. No, except to the extent that they might coincidentally be among the studies I reviewed bearing on the issue of whether or not access to firearms increases the likelihood of suicide.

Q. To your knowledge, who else in this field agrees with your conclusion in the 2019

G. KLECK

book chapter, that case control studies on firearms ownership and suicide are unreliable?

A. I wouldn't know.

Q. Who in the field disagrees with you?

A. Again, I wouldn't know.

Q. Sitting here today, you can't identify any study or researcher who agrees with the conclusion in your 2019 book chapter?

MR. PENNAK: Argumentative. Asked and answered.

A. Again, I make no effort to search out other people who share my opinions on the subject. This is a factual matter. It's not a matter of opinion, as I've noted in previous statements. And so it is a fact that the evidence in case control studies is extremely weak, and it doesn't matter in the slightest whether lots of other people have expressed the same opinion or nobody else has expressed the same opinion. It's simply irrelevant.

Q. And so to try to sum that up, you cannot sitting here today identify any other scholar or article that agrees with the conclusions in your 2019 book chapter?

G. KLECK

MR. PENNAK: Asked and answered.

MR. MILLER: He absolutely did not answer the question just then.

A. I can only say it's totally irrelevant.

Q. I'm asking whether you can identify or cannot identify any other scholar or article that agrees with your 2019 book chapter's conclusions. Can you or can you not?

A. I have made no effort whatsoever to identify any such individual who have drawn the same conclusion.

Q. That's not answering my question whether you have tried or not. Can you, sitting here today, identify any other scholar or paper that agrees with the conclusion in your 2019 book chapter?

A. No.

Q. When did you perform the analysis that you later published in this 2019 back chapter?

A. Probably somewhere in 2018 or early 2019.

                              G. KLECK

Q. And this book chapter, it's not published in an academic journal, is it?

A. No.

Q. Have you published this article or paper in any other location?

A. No.

Q. Was the article peer reviewed prior to publication in this book chapter?

A. It was reviewed by the editors. I'm not sure if it was reviewed by anybody else.

Q. Who were the editors that you say reviewed this?

A. Jennifer Carlson, Kristen Voss, and Harold Shapiro.

Q. And what was the nature of their review?

A. I don't know.

Q. What are these individuals' qualifications to review this type of literature?

A. They're all Ph.D. scholars who are experts in one way or another on suicide -- I'm sorry, on firearms issues.

Q. Your expert opinion in this case

                        G. KLECK

refers to your 2019 book chapter as, quote, "My systematic 2019 review of the case control literature." What do you mean by "systematic review"?

A. Meaning I attempted to find each study that had -- each published study that had produced an empirical assessment of this hypothesis.

Q. Isn't the defining feature of a systematic review in this field the use of systematic and explicit methods to identify, select, and critically appraise relevant research?

A. Whether it's explicit or not is not necessarily a part of what makes it systemic. It helps. You'd like to be systematic about any aspect of your methodology, but sometimes space limitations limit how much detail you can provide on any aspect of research, including literature reviews.

Q. Being explicit about the methods that a social scientists use to identify, select, and appraise relevant research, that wold ensure that the author isn't simply

G. KLECK

cherry picking studies to support a desired conclusion. Isn't that right?

A. Yes.

Q. Does your 2019 book chapter describe the methods that you use to identify and select the case control studies that you analyzed?

A. No.

Q. Is it fair to say that the opinion offered in your report on the case control studies is the same opinion as your book chapter that we're discussing?

A. Could you repeat the question, please?

Q. Is it fair to say that the opinion offered in your report on the topic of case control research is the same opinion as your 2019 book chapter?

A. Yes.

Q. Did you, in fact, copy portions of your 2019 book chapter into your opinion?

A. Yes.

Q. In your 2019 back chapter, you compared I believe 16 different case control

G. KLECK

studies that examine the association between firearms ownership and suicide; is that correct?

A. I'd have to take your word for it on the number. That sounds plausible.

Q. Let me direct you to the book chapter. Hold on. It's tab 6, and we're going to display it.

(Exhibit 6, Kleck 2019 book chapter in Gun Studies, marked for identification, as of this date.)

Q. So, Professor -- excuse me, Dr. Kleck, I'm going to show you what's been pre-marked as Exhibit 6. I'm showing you what's been pre-marked as Exhibit 6. Do you recognize this document?

A. Yes.

Q. What is it?

A. That's the chapter in Gun Studies that I published.

Q. This is the book chapter we've been referring to as your 2019 book chapter; is that right?

A. Yes.

G. KLECK

Q. And it should be in your binder as tab number 6, if you want to -- if it's easier for you to review there. Can you confirm it's, in fact, the same document?

A. Yes.

Q. I want to direct your attention to the table T -17.1 that stretches for three pages in the middle of your book chapter. Does that list the case control studies that you considered for this chapter, for this analysis?

A. Yes.

Q. I note that the most recent of those studies is a 2004 study by Dahlberg, et al., that's D-A-H-L-B-E-R-G. You didn't analyze any case control study published after that 2004 Dahlberg paper in order to conduct this analysis?

A. No.

Q. Why not?

A. Because I wasn't aware of any studies that would have changed the conclusion.

Q. Are you aware of any case control

G. KLECK

studies on this topic published since the Dahlberg study in 2004?

A. Yes, some studies cited by the -- Andrew McCourt, I think his name is.

Q. Were you aware of those studies at the time you published this book chapter?

A. No.

Q. Would you agree it's fair to say that most of the studies analyzed in this book chapter are from the 1990s or earlier?

A. Yes.

Q. Have you demographics of suicide changed since the 1990s?

A. Not significantly, no.

Q. Have suicide rates changed since the 1990s?

A. They fluctuated up and down.

Q. What about the frequency of various methods of suicide, have those remained constant or fluctuated since the 1990s?

A. I believe they fluctuated.

Q. What about the demographics and rate of gun ownership, has that changed since the 1990s?

G. KLECK

A. Not much, no.

Q. What, if anything, did you do in this 2019 book chapter to assess whether the results of 20- and 30-year-old studies remained an accurate representation of the relationship between firearms access and death by suicide when you published this?

A. Nothing.

Q. In your opinion and in this book chapter, you talk at length about what you call confounders. What is a confounder?

A. In this case, it's a variable that affects a suicide risk, but is also correlated with gun ownership.

Q. How did you identify the confounders that are listed in your expert report in this case?

A. I did a systematic review of the correlates of gun ownership within previous books I've published, including Point Blank and Targeting Guns, and I did a review of the risk -- suicide risk factors that are mentioned in the case control studies, and then you look for variables that occur in both

G. KLECK

lists. A variable is a confounder, or at least a potential confounder, to the extent it is both a correlate of gun ownership and found to be a risk factor for suicide.

Q. One of the confounders you reference is being male; is that correct?

A. Yes.

Q. And that's a confounder, in your view, because men are overrepresented in a population of gun owners and are also overrepresented in the population of suicide deaths; is that correct?

A. No, not simply overrepresented, which is a purely statistical issue. There is belief among suicide researchers that there's something about being male that causes people to commit suicide. So it's both of correlate of gun ownership and a risk factor that is a causal factor that influences the likelihood of committing suicide, and it's that combination that makes it a confounder.

Q. When you listed the confounders -- when you identified a list of confounders in your expert report, did you copy that list

G. KLECK

from your 2019 book chapter?

A. Yes.

Q. In fact, you copied it verbatim; is that correct?

A. Yes.

Q. You even copied a typo from the book chapter into the report; is that correct?

A. Excuse me, I'm coughing. I'll take your word for it.

Q. Did you do any additional analysis beyond the analysis performed to develop the list for your book chapter when you copied it into your report?

A. No.

Q. Your book chapter and report describe the first 15 confounders, as you use the term, as variables that have empirically documented association with both gun ownership/possession and suicide. What do you mean by empirically documented?

A. I mean they're empirical scientific studies which have shown both of those factors to be true, both of those attributes. That is to say, there was credible evidence indicating

G. KLECK

that the factor affected whether people committed suicide, and credible evidence that it was correlated with gun ownership.

Q. What do you mean credible evidence that a factor effects -- or you're using affect, excuse me. What do you mean affects suicide?

A. It had a causal affect on.

Q. So for something to be a confounder, in your view, it needs to have a causal effect on both firearms ownership and on suicide?

A. No, it does not have to have a causal effect on gun ownership. It merely has to be correlated with it for whatever reason.

Q. So in your definition of the term "confounder," a factor that is correlated with gun ownership, but causes suicide, that is a confounder, in your view?

A. Yeah, that has a causal effect on. It's not necessarily the sole cause of suicide, but it has a causal effect on suicide.

Q. When your report and book chapter used the phrase "empirically documented," you

G. KLECK

don't mean that -- excuse me. Why didn't you quantify the effect of these identified confounders on the association between firearm ownership and suicide?

A. Because it wasn't really relevant. I mean, it wasn't relevant to the conclusion I was drawing. If there's any causal effect at all, whether strong or weak, no matter how you would quantitatively measure it to be, and it's correlated with gun ownership to whatever degree, then it is a confounder. It's just there's some confounders that are stronger than others.

Q. And the opposite is also true, there are some confounders that are weaker than others; is that correct?

A. Yes.

Q. And by "weaker," do you mean that they would not -- what do you mean by "weaker"?

A. It would have less effect on your final conclusions if you controlled or didn't control for that particular factor.

Q. And is that true for the confounders

                        G. KLECK

that you identified on this list, that some of the identified confounders are, in your view, stronger and others are weaker?

A. Well, unfortunately we really don't know. You can't know for sure until somebody actually does measure and control for those factors, and case control researchers have been remiss in not making any serious effort to measure and control for them.

Q. Do you know the quantitative effect of any of the identified confounders on your list?

A. Effect on what?

Q. On the relationship between firearms access and death by suicide.

A. Well, again, my previous answer applies here. You can't really know how much affect it has on your estimate of the gun ownership effect unless you go ahead and measure and control for that factor and see how much your estimated effective guns on suicide changes. That would be your measure on whether it's an important factor.

In this case, there are just so many

G. KLECK

of them, even if each one was a weak confounder, there's a huge problem with the failure to control for confounders. The effect of even 15 weak confounders could be decisive. I mean, it could literally reverse your conclusions.

Q. Have you ever attempted to measure the cumulative effect of confounders on findings relating to the association between firearms access and death by suicide?

A. No, it's impossible for the reasons I've said before. The only way you can do that is by measuring and controlling for the factors and see how much your estimate of gun effects changes as a result of introducing those controls, cumulative or not; I mean, collectively or not.

Q. Have you ever tried to measure the strength of the association between your -- any of the identified confounders and death by suicide?

A. Well, in the sense that I reviewed studies that have included those variables as a risk factor for suicide, yeah. But I

                              G. KLECK

haven't made any attempt to sort of average those estimated effects across multiple studies. But certainly it's, in principle, a possible thing one can do.

Q. Have you ever attempted to measure the strength of the association between any of the identified confounders and firearms ownership or firearms access?

A. Yeah, in some cases. I mean, if you look in Targeting Guns or Point Blank, there's a chapter that covers the correlates of gun ownership -- and some of which are relevant to suicide, some of which are not -- and yeah, they measure the strength of association in terms of some -- by varying correlation coefficient or difference of percentages.

Q. Does your 2019 book chapter on this topic do that?

A. No.

Q. Does your report do that?

A. No.

Q. Are there any of your proposed list of confounders colinear with one another?

A. Yes.

                        G. KLECK

Q. What does it mean for two variables to be colinear?

A. Simply means they have a correlation.

Q. If two or more proposed confounders are colinear, doesn't that mean that controlling for one will, by and large, control for the other?

A. No, not by and large. It will partially control for the other.

Q. And, in other words, the -- if two confounders are colinear and they study controls for one, the effect of the other colinear confounder on the conclusion will be reduced?

A. No. The more variables you had simultaneously controlled, the more unpredictable the effect becomes.

Q. Can I stop you there? I did not catch all of your answer, I think, because of a tech issue.

MR. MILLER: I'd like to ask the court reporter to read my last question back and have you answer it, because I

G. KLECK

believe we may be having a slow connection at the moment with you.

And before you do, let me make sure that the witness is on and can hear us clearly.

THE WITNESS: I can hear you.

MR. MILLER: Mark, and other counsel on, are you able to hear me clearly, as well?

MR. PENNAK: I hear you quite clearly.

MR. MILLER: Thank you.

Madam Court Reporter, can you please read my last question to the witness?

(Record read.)

A. Okay. And my answer would be probably, although the more factors you simultaneously control for, the less predictable it is as to what the effect of controlling for a given variable will be, because there are other variables involved with which the factor in question is also correlated.

Q. But in general terms, when two

                              G. KLECK

variables are colinear, controlling for one reduces the effect of the other on the conclusion, or the findings; is that correct?

A. If you only added one other control variable -- let's say you had two control variables, A and B, and first you just controlled for A, and then you controlled for B, then the -- you would be partially controlling for the effect of A, as well. But if you have, let's say, three or four or five control variables and then you add one more variable in, the effect of doing so would be less predictable.

Q. Is it not true, though, that when you control for A and B and -- excuse me. If variables A, B, and C were all colinear with one another, and you controlled for A, the uncontrolled effect of B and C would just -- would be some reduced residual amount, rather than the full confounding effect of either B or C; is that correct?

A. I would say generally speaking, that's true.

Q. Have you made any effort to identify

                            G. KLECK

which of the confounders listed on your table or in your report are colinear with one another?

A. No.

Q. It's possible that they all could be colinear with one another. Is that true?

A. Partially colinear, but no, it's not possible that they are totally colinear. In other words, there would always be some additional effect of controlling for yet another confounder because it's not perfectly correlated with the variables you've already controlled for. In other words, there's always benefit from controlling for additional confounders.

Q. But that additional benefit may, in fact, be quite modest if you've already controlled for a variable that's colinear with another; is that correct?

A. I wouldn't say "quite modest." It could be less, and that's all I can say.

Q. You can't say one way or another how much effect any of the identified confounders, in fact, has on the relationship between

G. KLECK

firearms access and death by suicide?

A. Well, not exactly, you know, because as I said before, the way you find out how much effect it has on the estimated effect of guns on suicide is by measuring and controlling for that factor, that possible confounder. So you can discover that way empirically whether or not there's a big effect of controlling for the confounder. In at least one study, they did that.

It's unusual among case control studies, but in one study it was -- the issue was whether or not a suicide was an attempted suicide or a completed suicide. That's one way of approaching this issue. And, you know, a lot of people would say one of the factors that affects whether or not a suicide is completed is not just the method that's used, but, you know, how likely it is the suicide attempter really wanted to die; in other words, the lethality of their intentions, as opposed to the lethality of the methods they used.

And David Brent and his colleagues,

G. KLECK

in one study, measured lethality of intent, controlled for it, and the result was we empirically can establish in that case what the effect of controlling for the confounder was. The confounder was lethality of the intent, they controlled for it, and the association between guns and the outcome essentially disappeared. So it was a profound effect in that case.

Q. We'll discuss the Brent study in a little bit, I think. But I want to understand, because as I understand your opinion, you're contending that if you were to add up the effects of all of these confounders, the findings -- they would, in fact, nullify the findings of some or all of the case control studies that have documented an association between firearms access and death by suicide. Is that accurate?

A. No, I'm saying it could. I'm not saying it would; I'm saying it could. But since researchers in this area have made no serious effort to control for confounders, we've never really had any serious test of

G. KLECK

that proposition. When you control for a large number of these confounders, the association might well disappear. But again, we don't know, we have no empirical foundation for that just because the research quality has been so poor.

Q. Do we have any empirical foundation for the proposition that these confounders do, in fact, nullify the results of case control studies?

A. That sounds like just another way of asking the same question, and my answer is still the same. We can't know, I mean, unless we go ahead and do the controls, you can't know whether it nullifies it or just reduces it or has no effect whatsoever.

Q. So sitting here today, you do not know one way or another the quantitative impact of any one confounder or even a combination of confounders on the association between firearms access and death by suicide?

A. No, I would disagree with that characterization. First of all, as I mentioned, in one case we know that the result

G. KLECK

of controlling for suicidal intent is to completely eliminate the association between nexus to guns and suicide, completed suicide. But in other cases, all we really know is there's a strong association between the potential confounder and suicide, as well as strong correlations with gun ownership. Sex or gender being a prime example. Being male is not just correlated with gun ownership, it's really strongly correlated with gun ownership. That is, males are way more likely than females to own guns, and they're also way more likely than females to commit suicide. So in both cases, both associations are strong, and that would lead the objective analyst to expect that controlling for gender would have a profound effect on the estimated effect of guns on suicide.

Q. Which of the factors -- which of the confounders that you've identified in your report, in your view, are strong confounders?

A. Well, certainly suicidal intent, strength of suicidal intent.

Q. Any others?

                        G. KLECK

A. Gender, certainly.

Q. Any others?

A. Alcoholism or heavy drinking, illicit drug use.

Q. Any others?

A. There isn't much evidence on it, but to the extent there is any, strong association of gang membership, with both gun possession and suicide. Those would certainly be my apriori candidates for likely very strong confounders.

Q. So that was, just to recap, suicidal intent, gender, alcoholism, illicit drug use, and gang membership. Do I have them all?

A. Yes.

Q. Do you know, sitting here today, whether some or all of those confounders are colinear with one another?

A. I think virtually all the confounders are correlating with one another, because in one way or another they're sort of outward indicators, we call them misery indexes, you know, they're outward indicators of misery of one sort or another, either

G. KLECK

sources of misery or consequences of misery.

Q. Do you know, sitting here today, the extent to which these five confounders you describe as strong overlap with one another?

A. No, only that they do or lap. But to the extent that they do, I don't know.

Q. And as a result, you can't say for sure what the impact of any combination of these cob founders has on the association between firearms access and death by suicide?

A. The only thing I can be sure of is just controlling for one or two of them would not be the equivalent of controlling for all of them. There would be some additional effect of failing to control for the other confounders if you only control for some of them.

Q. But the additional affect you're describing there is just the residual affect of the confounder that's left over after the sort of colinear variable has been controlled for already?

A. Yes, but it's a residual that might be huge.

G. KLECK

Q. Could it also be small?

A. Sure, could be.

Q. And you don't know either way?

A. No, nor do any of the researchers who work in this area, and that's the problem. They draw on conclusions that seem to be premised on the notion they do know.

Q. The remaining variables that you have listed on the book chapter -- excuse me, the remaining confounders that you've listed in the book chapter, those you believe have a lesser effect than these five strong confounders; is that right?

A. No, I don't know that as a fact, for a fact. You just asked me as I sit here, what do I think offhand are the stronger confounders, and I've offered my view based on my general reading of which are likely to be the strongest confounders. For all I know, any of the remainders, remaining factors might also be strong confounders.

Q. For all you know, could any of the remaining confounders's effects also be quite small?

G. KLECK

A. They could be. But not zero.

Q. And you don't know either way whether they're quite large, as you suggest, or quite small?

A. I don't suggest anything about whether they're quite large. I suggest that they could be quite large or could be quite small. And until researchers take the issue seriously, we really won't know.

Q. Some of the confounders that you list appear to have an inverse relationship to firearms ownership and suicide, in that they're associated with an increase in one, but a decrease in the other, rather than an increase in both. And I'll direct your attention, for example, to marital status. What would the effect of such a confounder be on the association between firearms ownership and suicide -- death by suicide?

A. The effect of controlling for them or failing to control for it?

Q. Let's say failing to control for a variable like marital status, which appears to have an inverse relationship between firearms

G. KLECK

ownership and suicide? I don't know if I'm using that phrase exactly correctly, but we can zero in on what the meaning is.

A. Yeah, you would -- the result of failing to control for marital status would be that you would push the estimate of guns on suicide downward; that is, it could either go from, let's say, a large positive effect, meaning suicide elevating effect, or it could push it downward even in [audio interference] direction, whereby you conclude that people who own guns are less likely to -- I'm sorry, you would push the estimated effect of guns on suicide either lower positive or even into the negative range, so that you would erroneously draw the conclusion that owning a gun reduced the likelihood of suicide.

Q. And so for a variable -- let me back up, actually.

Am I accurately describing the sort of characteristic of that variable when I use the phrase inverse relationship to firearms ownership and suicide, meaning that an increase in one is associated with a decrease

G. KLECK

in the other?

A. Yeah, if we're talking about being married as the marital status in question, then yes, it is inversely or negatively related to suicide and positively related to gun ownership.

Q. And that's different from other confounders you've identified, like, for example, sex, which is positively associated, you contend, with both firearms ownership and with death by suicide?

A. Yes. The vast majority of these potential confounders, controlling for them would have the effect of reducing the estimated effect of gun ownership on suicide.

Q. Whereas the effect of controlling for marital status would likely do what?

A. Well, failing to control for it would result in an underestimate of the effect of guns on suicide.

Q. And is the same thing true of -- I believe there's a second variable of this nature -- income, is income also like marital status in this way?

G. KLECK

A. Higher income is positively associated with gun ownership and negatively related to suicide. So it is like marital status in that respect. It's positively related to one variable and negatively related, or inversely related to the other.

Q. Let me try to sum this up in a way that will make a clear record. And if this is not correct, we can fix it. Is it fair to say that a case control study that fails to control for marital status or income will not, in fact, likely overstate the association between firearms ownership and suicide as a result of failing to control for these two?

MR. PENNAK: So you have a double negative there. I'm sorry, that's impossible to understand.

MR. MILLER: Let me see if I can rephrase it quick better.

Q. Is it fair to say that a case control study that does not control for marital status or income is likely, if anything, to understate the association between firearms ownership and suicide rather

G. KLECK

than overstating that relationship?

A. Only if that was the only flaw, the only limitation on confounder's control. But as this list makes clear, the vast majority of likely confounders are of the opposite character, that is to say, failing to control for them results in an overestimation of the effect of guns on suicide. So the scenario you lay out would only be true under extremely restricted circumstances, and very artificial ones.

Q. I understand your contention about the remaining. I want to understand how failing to control for these two, marital status and income, would likely affect a study's findings. And if I'm understanding you correctly, a failure to control for these two variables would result in a study that underestimates the effect or the association between firearms ownership and suicide; is that correct?

A. No. That would only be true if you control for every other one of the confounders and those are the only ones you didn't control

G. KLECK

for, and then their effect of just those two omissions, or failures to control for confounders, would be an underestimation of the effect on guns on suicide.

Q. So to just focus on the effect of control or not controlling for these two confounders, the effect of not controlling for marital status or income causes the -- would cause findings to be artificially lower in terms of the observed relationship between firearms ownership and death by suicide?

A. Yes, for what it's worth. But that's such an artificial scenario, it's meaningless, basically. You know, what researchers would -- they would comprehensively control for every one of these other confounders, and only those two, those are the only ones they fail to control for.

MR. MILLER: Can we go off the record?

MR. PENNAK: Yes.

THE VIDEOGRAPHER: The time is 12:48 and we're now off the record.

(Lunch recess taken at 12:48 p.m.)

G. KLECK

A F T E R N O O N S E S S I O N

(Time noted: 1:48 p.m.)

THE VIDEOGRAPHER: The time is 1:48 and we're now back on the record.

G A R Y K L E C K,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. MILLER:

Q. Professor Kleck, I want to go back to the brochure for a minute that was Exhibit 2. We can pull that back up on the screen. I'm trying to understand your earlier testimony.

What, in your opinion, is the main message of the brochure that's marked Exhibit 2?

A. I don't know if it's the main message, but certainly a message is that owning firearms and in particular keeping them unlocked increases the likelihood that someone will commit suicide.

Q. And that is -- that result is a bad result; is that right?

A. It's making a claim that can't be sustained by any serious scientific evidence.

G. KLECK

Q. In your opinion, is the brochure conveying a message to readers that having a firearm is dangerous?

A. It's not making that broad an assertion. It's making an assertion about suicide being more likely if you have a gun.

Q. Is there any gun safety related information that, in your opinion, would be a good idea to give to gun owners or to individuals purchasing guns?

A. I don't know what you mean by "gun safety."

Q. Is there any safety information that, in your opinion, is a good idea to give gun owners or purchasers of firearms?

A. Well, if you're referring to manners of storage, then it's sensible to keep a gun locked up if you're in a low crime area where you don't have guns for self protection, but you're concerned about unauthorized users getting access to them.

On the other hand, if you live in a place where there's a significant possibility of criminal victimization, then making guns

G. KLECK

less accessible for self defense purposes is counterproductive. And it may negate any value you have in preventing access to guns by unauthorized persons.

Q. I want to turn your attention back to your 2019 book chapter, and specifically a statement in that book chapter that there is no reliable scientific evidence to show that firearms access is a risk factor for dying by suicide. When did you first come to that conclusion?

A. Well, in a way you -- you don't come to that conclusion so much as you start with the, you know, starting point of asking yourself is there a credible association. And so you start from a neutral position if you're an objective researcher, and then you examine the evidence and you try to tentatively draw conclusions as to whether that evidence has established a case for the hypothesis. And so there's no one point where that -- that's arrived at. It's just that if each study tends to make the same errors as the previous study and it remains as weak as the previous

G. KLECK

research, then you're still in the same position of not knowing one way or another. And so it's not a point at which, a single point of time at which you draw the conclusion, hey, there's no effect. It's rather, well yeah, this is yet another study that has failed to establish a connection.

Q. Yeah, I don't think that answers my question quite, though. So when you wrote the 2019 book chapter, it does, in fact, reach the conclusion there's no reliable evidence to show that firearms access causes an increased risk of death by suicide, correct?

A. Correct.

Q. And that was a conclusion that, at least, you reached in drafting the statement to that effect; is that correct?

A. Yes.

Q. Had you also held a similar opinion, as to the state of evidence and research on the connection between firearms access and death by suicide, prior to drafting that 2019 article?

A. Well, yeah. The further back you go

                            G. KLECK

in time, the less evidence there was. I mean, obviously evidence accumulates over time. So in earlier points in time, I would have drawn the same conclusion because there was even less evidence supporting a proposition that having access to a gun increases the likelihood of suicide.

Q. What prompted you to write that 2019 book chapter, if anything?

A. I couldn't really say. There was probably an invitation from the editors to make a contribution. And so the question is, why that contribution rather than on some other subject. I don't recall that they asked for something suicide related in particular, but I had been thinking about it already. I had previously reviewed the case control research, but I did so at a time when there was hardly any of it. It was barely worth reviewing.

Q. When did that review take place, if you recall?

A. You know, there were a handful of studies way back in '97 when I published

G. KLECK

Targeting Guns, and since then, you know, lots more studies have come about. So, you know, the further back in time, you know, if you had a time machine and you could get ahold of me and say what do you think about this issue, I would have been even more likely to draw the conclusion that I drew later, which is no, there's no established case for this conclusion.

Q. Your opinion on that has not changed at any time?

A. No, the evidence is not justified. Now reversing that -- that sort of default position and saying, well, yeah, now there is convincing evidence that access to guns increases the risk of suicide because of course there isn't. Instead, we've had a wave of studies that simply repeat the same errors of past research, sometimes even worse. There hasn't been a progression in the quality of research in any linear fashion since back when there was virtually no case controlled research on it at all. And the macro-level research, basically, mostly, indicates you

G. KLECK

don't have more suicide in places with more gun ownership, which is what you would expect, if the hypothesis was correct.

Q. Let me ask you a hypothetical. Imagine two people, who are equally at risk for suicide, and then one of them obtains access to a firearm, by purchase or otherwise. Is it your opinion that the one who has access to a firearm is at no greater risk of dying by suicide thereafter?

A. I'd say that's consistent with the available evidence.

Q. So you believe that the individual who has access to a firearm, all other things being equal, is not, in fact, at greater risk of dying by suicide than the individual who does not have access to a firearm?

MR. PENNAK: Asked and answered.

A. There is no credible evidence to support that claim.

Q. And as a result, your opinion is that the individual who has access to a gun is not at a higher risk of dying by suicide than the individual without access to a gun; is

G. KLECK

that right?

A. As far as we can tell at this point, yes, that's correct. That's what I believe.

Q. Turning back to your 2019 book chapter and opinion and their discussion of confounders, we had discussed before the break a number of confounders for which you described, in your words, empirically documented associations with gun ownership and with suicide. I want to now turn to the other confounders, which you describe as likely confounders. Why do you use the term "likely"?

A. Could you cite where you're getting that from?

Q. Sure.

A. I mean, it's one of the exhibits, right?

Q. Yeah. So your book chapter is Exhibit 6, and the statement is at the middle of page 311.

A. Oh, okay, I see what you're saying, then.

Q. Yeah, let's put that up on the screen. Let me put it up on the screen to

G. KLECK

make sure we're all on the same proverbial page here.

MR. PENNAK: In this case, literal page.

MR. MILLER: Yeah.

Q. Okay. I'm showing you a page from your 2019 book chapter that's marked as Exhibit 6.

A. I think you mean the next page.

Q. And I want to show you, yeah, the page that's marked 311.

A. There you go.

Q. So in the middle of this page, you say, and I quote -- no, hold on a second. I want to show you your report, excuse me.

So your report is the document that was previously marked Exhibit 3, and specifically, I want to ask you about page 9.

So Professor Kleck, I'm showing you what's been marked as Exhibit 3, and specifically page 9, which is your report. And if you see down at line 15, there's a description of, quote, "likely confounders of the guns suicide association." And I want to

G. KLECK

know why you used the term "likely" there.

A. Well, I separated out those possible confounders because the previous 15 that I listed were known to be correlated with gun ownership and known to be related to suicide. The ones listed under subsection B as likely confounders, they have known associations with gun ownership, but as yet no suicide researchers have tested their affects on suicide. And so, you know, there's a lesser apriori foundation for believing that they're confounders. That's why it's likely, rather than known confounders.

Q. Is it fair to say then that for the confounders identified as likely confounders, there is not social science research showing that they are, in fact, associated with suicide, and therefore, confirming that they are, in fact, confounders for this relationship?

A. Most of these, the factors under this heading are, you know, they're likely confounders, basically because there's -- there's some indirect relationship of the

                          G. KLECK

attribute in question and known risk factors for suicide, like, you know, the tendency to be self reliant can also be seen as the tendency to not rely on and engage in interaction with other people. So it's related to social isolation, and there is established evidence showing that social isolation contributes to suicide. So it's plausible that self reliance is simply a positive way of describing one aspect of being socially isolated. I mean, you rely only on yourself because you can't rely on other people because you're something of a social isolate.

Q. But if I'm understanding you right, you're agreeing that there is not presently social science research to connect the confounders that you've identified with an increased risk in suicide?

A. No, there's only sound theoretical reason to believe that there would be such evidence if we empirically test it. But there is no empirical test of it, so in that case I have to say, well we don't know for sure yet.

G. KLECK

So you could see this segment of the report could also be regarded as suggestions for what needs to be researched in future.

Q. Okay. I want to ask you about your assertion that suicidal intent is a confounder, and that is in your report at, among other places, pages 6 and 7.

MR. MILLER: So we can show either 6 or 7.

Q. And you may want to follow along at home, but this is, again, we're still on Exhibit 3, pages 6 and 7. And here you cite a pair of studies by Brent, et al., one from 1988 and one from 1991. Do you see that?

A. Yes.

Q. And those are cited in support of your assertion that suicidal intent is a confounder for the association between firearms access and death by suicide; is that right?

A. Yes.

Q. Why do you cite 20- and 30-year-old studies to support this assertion, and not something more recent?

G. KLECK

A. Because I'm not aware of anything that's directly tested it since then.

Q. You were --

A. And by the way, evidence is not sort of -- it doesn't have a, you know, expiration date. I mean, if it's valid information, it would retain its truthfulness for 30 years, 40 years, a century if it was legitimate evidence in the first place.

Q. So you would agree that there's not more contemporary evidence than this to support the assertion you've made about suicidal intent being a confounder?

A. Well, you can't prove a negative. I'm just -- I can only say I'm not aware of anything more recent that's tested the same notion. I know there's been more recent evidence that indicates that suicide attempts by guns, using guns, or shooting as a method, do involve people with a stronger suicidal intent. That's -- that's more recent evidence, probably in the last five or six years. On the other hand, they weren't really interested in testing the notion that the gun

G. KLECK

suicide association disappears once you control for suicide intent. It was just establishing that suicidal intent is, indeed, related to choice of method.

Q. Is that what Brent was setting out to test?

A. No. Not at all, as far as I know, I mean.

Q. What was Brent setting out to test?

A. He was testing whether or not gun ownership increases the likelihood of suicide.

Q. Are you aware of more recent research that reaches an opposite conclusion of the one you assert here regarding suicidal intent being a confounder?

A. Meaning they disagreed that it is a confounder, or just, they raised the issue?

Q. Let's start with the former. Disagreed.

A. I'm not aware of any studies where somebody wrote that we disagree with the notion that suicidal intent could be a confounder.

Q. When you drafted this book chapter,

G. KLECK

did you attempt to identify or analyze any more contemporary research on whether suicidal intent --

A. No.

Q. -- was a confounder?

A. No.

Q. I want to turn to your report, page 3. And specifically -- actually, 3 and 4 if it's possible. I don't know if it's possible. The statement you make from 3 going on to 4 -- we may not be able to display both pages at once on this screen, but I'm referring to the sentence that reads, "The suicide claim," by which you're referring, I believe, to your read of the pamphlet, "is contradicted by much of the available scientific evidence."

Do you see that statement?

A. Yes.

Q. How did you arrive at that opinion, that a statement in the pamphlet is contradicted by much of the available scientific evidence?

A. I arrived at the conclusion, first

G. KLECK

of all, by examining the macro-level research, research concerning large areas or populations, most of which indicate that there's no relationship between the prevalence of firearms ownership and suicide rates, which there would be if this claim was correct.

Q. When you use the term "contradict" here, what do you mean by that?

A. I mean it's inconsistent with the hypothesis.

Q. Is there any other scientific evidence for the basis of your statement that the suicide claim is contradicted -- let me rephrase that.

You've mentioned macro-level research, which we'll get to in a minute, as scientific evidence that contradicts the suicide claim. Is there any other scientific evidence, that you're aware of, that contradicts the suicide claim?

A. Yes.

Q. What is that?

A. Well, there's another way of testing the hypothesis about gun ownership somehow

G. KLECK

leading to suicide, which is to examine the mechanism that intervenes or the reason for why there might be an effect. And invariably, the reason offered, when any reason at all is offered by scholars supporting that conclusion, is that having a gun and using it in the suicide attempt makes it more likely the attempt will have a deadly outcome; that is, it will be a completed suicide rather than an attempted suicide.

There is no supportive evidence for the claim that having a gun makes it more likely people will attempt a suicide, but the argument was, once it's attempted, it's more likely to result in a completed suicide if a firearm was used. And the evidence doesn't support that proposition because -- certainly the public opinion on this is -- is that -- I guess you could call the common wisdom is that, well, people will just substitute another method if they're really determined to kill themselves. And the evidence more recently has supported the proposition that the people who use guns in a suicide attempt

G. KLECK

really do want to kill themselves. That is to say, their suicidal intent is far higher than the people who use other methods of suicide.

And the suicide data at the macro-level indicates that there's no significant difference in the fatality rates or case fatality rates of suicide attempts by hanging and suicide attempts by firearms, which is crucial to the hypothesis that that is the way by which having access to a gun would increase your risk of suicide. If there's no intervening mechanism that's supported by the evidence, then there's no reason for believing there's a causal effect of gun ownership on suicide. And so basically, the likeliest substitute method of suicide is indistinguishable in terms of its lethality. That is, hanging is just as likely to result in a victim as shooting is.

Q. So let me see if I can sum that up in a way that's a little bit more succinct.

In addition to the macro-level research, you believe that research -- you believe there is research showing that

                                        G. KLECK

firearms -- firearm suicide is not a uniquely lethal method of suicide, and that individuals who attempt to commit suicide by firearm would simply substitute a different equally lethal method if a firearm was unavailable?

A. Yes.

Q. Is there any other scientific evidence that you believe contradicts the suicide claim, besides what we've just covered?

A. Yes, there's also some of the individual case control research, which I stress is not very strong evidence. I mean, regardless of the findings of the study and the conclusions, none of it is very strong. But there's also a handful of studies of case character, using the case control design, which also drew the conclusion there was no association between access to guns and suicide.

But I stress, that's not what I would emphasize, because so far, nobody has really used the case control methodology very well because, as I've pointed out, they made

G. KLECK

no serious effort to control for confounders, or even to identify which ones they ought to be measuring and controlling for.

Q. So you have mentioned macro-level studies, studies into relative case fatality rates and method substitution, and also certain case control studies, as the evidence that you believe contradicts the suicide claim. Is there anything else?

A. Well, you know, anything that's methodologically wrong with the studies that support that proposition can be regarded as part of my answer to why I don't believe that access to guns increases the likelihood of suicide. So it's not just the affirmative findings of those studies that indicate no effect of guns on suicide, but it's also the absence of credibility in the studies that did assert an effect of guns on suicide. So that's also part of my position.

Q. Anything else?

A. No.

Q. I want to talk for a minute about the macro-level studies. What is a

G. KLECK

macro-level study, in your understanding?

A. It's a study where each case, or the unit of analysis you have measures for, is an aggregate of individuals, rather than just one person. So it could be the population of a city or the population of a county. And so somebody might do a study of the suicide rates of the 50 states of the United States or of nine regions or of nations in the world. So each case is not an individual person, but it's basically an aggregation of persons.

Q. Your -- is ecologic also a synonym for macro-level?

A. Yeah, it's kind of an antiquated one because it, you know, it has a lot of misleading connotations of, you know, something to do with being green, ecologically green and so on. But 30 or 40 years ago, it was a common way of describing macro-level studies.

Q. Your report -- and we can jump to page 12. So we're now looking at Exhibit 3, page 12, which is your report, you reference in the middle of that page 29 macro-level

G. KLECK

studies, and then separately, 26 out of 32 analyses. What group of studies or research does that refer to?

A. Does which refer to?

Q. Well, are those the same? I'm trying to understand what -- how you get from 29 in one count to 26 of 32 in --

A. I see. Yeah. Well, it refers to the fact that in some macro-level studies, there are multiple independent tests of the hypothesis. So they don't all just have one analysis. So, you know, if you had half of the study concerned the relationship between gun ownership rates and male suicide rates, and the other half concerned the relationship between gun ownership rates and female suicide rates, then that might be two analyses.

Q. I see. So these are the same group of studies, and in one count, you're counting individual analyses within a study, as separate analyses?

A. Yes.

Q. So the reference to 29 macro-level studies, what group of studies does that

G. KLECK

moniker refer to?

A. What, 29 macro-level studies?

Q. Yes.

A. Yeah, it's the one that's cited in the Social Science Quarterly, I think it's Table 1; I'm not sure. Yeah, it's Table 1.

Q. Let me get the -- let me get the cross-reference to that. One sec. It's 7, okay.

So if I can show you what's been marked as Exhibit 7 to confirm that's what we're talking about. Yeah, let's switch to Exhibit 7 here.

(Exhibit 7, 2019 Social Science Quarterly, marked for identification, as of this date.)

Q. So Dr. Kleck, I'm showing you what's been marked as Exhibit 7. Do you recognize it?

A. Yes.

Q. Is this the 2019 Social Science Quarterly Paper you were just referring to?

A. Yes.

Q. And this is the one specifically

G. KLECK

that contains a listing of the 29 macro-level studies referred to in your report?

A. I'm not sure it was that many studies. Let's see. Yeah, 29 studies, yes.

Q. And specifically, those studies are listed in Table 1 of this Exhibit 7?

A. I think so, although I'm not sure that they're all in there, as opposed to some of them being there and some of them being more recently published. But yeah, they're probably almost all there.

Q. All 29 studies are referenced in one way or another in this Exhibit 7 paper; is that correct?

A. It's possible there's only 27 and I added in some studies that were published after that. I only count 27 now.

Q. I wasn't going to try to play gotcha on the number. I -- what I'm more interested in is just understanding the universe that you're report refers to, and whether that universe is captured within this 2019 article or not.

A. Yes.

G. KLECK

Q. How did you identify the macro-level studies to be analyzed in your 2019 macro-level research article, Exhibit 7?

A. I searched through bibliographic databases, like Midline and the social science databases for articles that, either in their title or their abstract, had the phrase suicide rate and gun ownership or firearms ownership or firearms prevalence, key phrases like that. And I also examined the bibliographies of each study I found, as I went along, and added to the list of possible candidates for review, each study that showed up in the course of the earlier review.

Q. When did you do that search that you've just described?

A. Oh, probably circa 2017, I suppose, maybe the year before this was published.

Q. When you drafted the portion of your report relating to macro-level studies, did you do any additional or independent research to identify macro-level studies?

A. No.

Q. Did you do any independent or

G. KLECK

additional analysis of macro-level studies, beyond what you had done for this 2019 article?

A. No.

Q. Did you copy portions of this 2019 article into your report?

A. Probably. I couldn't swear to it, but yeah, probably.

Q. In your report, you level two critiques at a number of macro-level studies. First, that some of them fail to adequately control for confounding variables; and second, that some of them measured gun ownership using an estimate based on the proportion of firearm suicides to suicides.

Is that an accurate statement of your critiques of the macro-level studies in your report?

A. Yes, although, the latter part of your statement I'd expand by saying, whatever the reason, if they had an invalid measure of the prevalence of firearms ownership, then that would be a weakness, whether they used the percent of suicides committed with guns as

G. KLECK

their measure or some other measure. A variety of measures of macro-level gun ownership have been used, which are not valid --

Q. What beyond -- sorry, I didn't mean to interrupt. Were you finished?

A. No. And have been found to be unrelated to other measures of gun ownership.

Q. You've mentioned firearm suicide over suicide, or percent of suicides with guns, as one measure of gun ownership which you think is problematic. What are other measures that you think are problematic?

A. Other measures are the rate of firearms -- fatal firearms accidents, the hunting rate. That is, numbers of licensed hunters per hundred thousand. You know, those are -- that's more of an indication of sport use of firearms than it is of gun ownership as a whole. So I've done another paper in which I've comprehensively reviewed I think something like 18 different measures of gun ownership, some of which are found to be valid, and others which are not.

G. KLECK

Q. Turning to your critique of macro-level research on the basis of its confounding variabilities, or lack of control of confounding variables, what is a confounding variable in the context of a macro-level study?

A. Well, it's the same basic concept as with individual level research, except in this case it pertains to macro-level units, like the populations of cities, counties, states and so on. If a variable is related -- a macro-level variable is related to the gun ownership rate and also related to the suicide rate, so we're talking about macro-level attributes, then that can be a confounding variable.

Q. Does it need to be related not only to gun ownership, but also to both gun suicide and suicide rates?

A. No, not if your dependent variable, the thing you're trying to predict or explain, is total suicide.

Q. What are the confounding variables, in your view, that must be controlled for in

G. KLECK

macro-level research on this topic?

A. Well, kind of, as an extension of the discussion in that book chapter, it would be the macro-level equivalence of that.

Unfortunately with macro-level research, most of those things are not really measured at the level of cities, counties, and so on, because it's not measured by, either the U.S. census bureau, when they do their census, or by other government agencies. So, for example, there's no way we know what percent of the population feels, you know, very self reliant, and we have only very imperfect information for some areas and not for others on what percent of the population uses illegal drugs, and it's a dubious validity anyway.

Q. In your opinion, then, I mean, it sounds like it's not even possible to control for confounding variables in macro-level research, realistically.

A. You can never -- you can never be certain that you're controlling for all of the likely or known confounders. At best, you can

                          G. KLECK

do a thorough review of the literature and identify as comprehensive a list as possible, what is known to be relate the to suicide and correlated with gun ownership. In other words, you do the best you can. You -- you -- it's no excuse for not doing anything at all or doing a poor job just because you can't do a perfect, utterly complete job. It's still inexcusable.

Q. How would you control for suicidal intent at a macro-level study, for example?

A. You couldn't. It's just one of the numerous variables I just alluded to, where there's no macro-level equivalent because it's not something the census bureau or any other government agency measures.

Q. How would you control for experience as a victim of violent crime or sexual assault in a macro [audio interference]?

A. Well, that's a little more possible. You know, the early versions of the national crime victimization survey generated victimization rates, including victimization in violate crime or in sexual assault for each

G. KLECK

of, I think, 26 cities. And this is very old evidence now. It's now like 50 years old. But it was the last time we had direct evidence on the fraction of the population who had been a victim of those crimes recently. The thing we can do today is using FBI uniform crime reports data on rates of homicide, sexual assault, and so on.

Q. But would you agree, then, it sounds like it may be possible, to some extent, to control for crime victimization. But would you agree that there are confounding variables, that it is simply not realistically possible for social science to control for in macro-level research?

A. Yes.

Q. Is it even possible to draw conclusions, then, from macro-level research about questions like the one here, between gun access and suicide?

A. You can always draw on conclusions. It's just a matter of how relatively credible they are.

Q. Well --

G. KLECK

A. In this case, the more the researchers solve those problems I identified in that review of macro-level research, the more credible their conclusions are. So, in other words, you emphasize the studies that did relatively better, or to put it another way, were relatively less flawed, and you give them greater weight in drawing a conclusion.

Q. In your 2019 article that's Exhibit 7, you reference studies that controlled for more than two significant confounders and also used uncontaminated measures of gun levels, and you point out that they reached a particular conclusion. Is that the threshold for where in the macro-level research one can start to draw credible inferences about the relationship between firearms and suicide?

A. There isn't any one threshold. About all you can say is, the more the studies solve these various technical problems, the more credible their findings are. And so certainly, a study that used both a valid measure of the local firearms prevalence rate

G. KLECK

and that controlled for more than a handful of confounders, are to be regarded as better quality studies and their findings granted more credibility.

Q. Why did you set the number of confounding variables, the threshold, at two in that paper and not somewhere else?

A. Because if I set it any higher, there would have been virtually no studies that qualified as good studies. So I'm deliberately trying to be generous, I guess.

Q. Does it matter which two confounding studies are controlled for?

A. It didn't matter in that case. I didn't make a distinction.

Q. How come you set a different threshold for confounding variables when you assess case control studies?

A. It's totally arbitrary. No particular rationale for it. I guess the same general principle would apply; if you were too rigorous in establishing a high number of confounders that people had to control for before they qualified as a good study, there

G. KLECK

would have been virtually no studies to base your conclusions on.

Q. Is your -- your 2019 paper in Social Science Quarterly, that's a peer reviewed journal?

A. Yes.

Q. Are there other peer reviewed papers, metaanalyses, publications, that you're aware of, that have reviewed the state of macro-level scholarship on firearms ownership and suicide, and reached a similar conclusion to the one you reach in your 2019 paper, that the credible studies show that gun ownership is not associated with higher rate of total suicide?

A. I don't know.

Q. Are you aware of any?

A. As I sit here, I can't think -- none come to mind.

Q. Sitting here today, do you know of any scholars or social scientists who have reached the same conclusion as you in your 2019 paper on macro-level research?

A. Again, I don't know.

G. KLECK

Q. Who in the field agrees with you, if anyone, on this issue?

A. I don't know, and to me it's a matter of indifference.

Q. You don't know of anyone in the field who agrees with you and the conclusions of this paper?

A. Anybody who did a valid review would arrive at the same conclusion if they were being objective and assessing the evidence in an objective manner.

Q. That is not exactly what I asked you, though.

Sitting here today, you can't identify any other scholar or academic in the field who agrees with the conclusion in your 2019 paper?

A. For what it's worth, no. Since I didn't devote any thought to it or any effort, no, I couldn't.

Q. You fault Dr. McCourt's report for opining about the relationship between gun ownership and firearm -- excuse me, between gun ownership -- let me start the whole

G. KLECK

question over.

You fault Dr. McCourt's report for opining about the relationship between gun ownership and both firearm and total suicide rates based on state level macro analyses. Do you remember that part of your opinion?

A. No. That's not quite what I said. I said there was no justification for only looking at the state level evidence, and that it slanted the results of the review by only focusing on state level analyses, because most of the other studies not done at the level of states drew the opposite conclusion, that there was no relationship between gun ownership rates and total suicide rates.

Q. Is there anything that's inappropriate about relying on or drawing on state-level macro analyses --

A. Yes.

Q. -- in this issue?

A. Yes.

Q. What is that?

A. Well, it would apply to virtually any analysis of larger macro-level units. The

G. KLECK

bigger they get, the more heterogeneous they tend to get. That is, there are some sub-areas that are -- that have some characteristics and other sub-areas that are very different. For example, within states, there will be places with very high suicide rates and other places with very low suicide rates. And the same is true of gun ownership. Generally speaking, there's very little gun ownership in big cities and lots more gun ownership in rural areas and small towns.

Q. So --

A. So the issue becomes one of, you know, whether or not it's the sub-areas where high gun ownership prevails, that are also the ones that have high firearms to suicide rates.

So in short, the bigger the macro-level unit, the less you're able to answer that question; that is, the question of whether or not high suicide rates are occurring in the same sub-areas where there's high gun ownership.

Q. So by your view, then, country level macro analyses would be the least reliable?

G. KLECK

A. That's correct. Including my own.

Q. I was going to get there. You also fault macro analyses -- no, let me back up.

When you make a statement in your report about finding that 15 of 29 macro-level analyses found no significant association between gun ownership and firearms and overall suicide rates, some of those 15 analyses you're referring to are macro analyses at the state level; is that correct?

A. Yes.

Q. Why are you able to draw conclusions based on macro analyses at the state level, but it's inappropriate for other to do so?

A. It's only inappropriate if they only draw conclusions based on the state level analyses, which is something I did not do, but McCourt did.

Q. So if state level macro analyses are supported by other research that is not a state level macro analysis, then the conclusion would be more credible?

A. Yes.

Q. You also fault macro analyses that

G. KLECK

study indubitably large -- I'm sorry, we covered this already.

Do some of the macro-level analyses in your 15 out of 29, referred to in your report, that support your opinion, constitute indubitably large heterogenous areas, like states or larger?

A. Well, again, there's no particular cut off. It's just that the larger the unit, the more you have this problem of heterogeneity within the area, and the less certain you can be about the areas with high gun ownership being the same ones with high suicide rates. And there's apriori evidence to suggest that, indeed, is a problem, precisely because we know gun ownership tends to be higher in the areas where suicide rates are lower.

Q. You also fault macro analyses that study extremely small samples of areas. What does that mean?

A. Well, they've didn't have many -- let's say you study the regions of the United States. Well, there's only nine of them. I

G. KLECK

mean, the census makes distinctions, it divides the country up into nine regions. There are no more other regions. Or their analyses of Canadian suicide rates, where they have a number of provinces, I forget how many. The most extreme example is somebody who did a study of, I think it was four regions of Australia. They were studying a sample of four cases. Well, that's ridiculous. I mean, you get incredibly unstable results as a result of using very, very small samples. You're kind of stuck with the fact that there are -- there tend not to be a large number of macro-level units, but that doesn't force you to go out and look for the very worst examples where there are really, really tiny numbers of those macro-level units, which is what happens when people choose to study nine census regions within the U.S. or four divisions of Australia.

Q. By that standard, doesn't that criticism apply to at least 5 out of the 15 studies on which you draw conclusions about the state of macro-level research on this

G. KLECK

issue?

A. I'm sure it does. I wouldn't dispute it for a second.

Q. I want to turn for a minute to your report, page 4, where you speak about lethality of suicide, of various methods.

A. Page 4?

Q. Of your report, yes. And so that's Exhibit 3, page 4, I believe.

MR. PENNAK: Counsel, can we put it up on the screen?

MR. MILLER: Yeah, we're working on it. Here it comes.

A. Okay.

Q. I've got to find it in my report. I believe you say, you write that the best available national data indicates that there's no significant difference, and then the quote ends. But between the case fatality rate of firearm suicide attempts and hanging attempts. I'm not putting my finger exactly on where that is in your report.

So look at lines 17 through 19. When you refer to the best available national

G. KLECK

data, there at lines 17 through 19, what are you referring to there as the best available national data?

A. The analysis reported in Kleck 2019 A, pages 317 to 320.

Q. Specifically, that's your book chapter in Gun Studies; is that right?

A. Yes.

Q. In your book chapter, which is Exhibit 6, and we can put it up, although I don't know if it will be super helpful. How did you determine case fatality rates in your book chapter?

A. Well, the case fatality rate is the number of fatal suicides, that is, completed suicides where the victim died, divided by the total number of known suicide attempts, which is the number of completed suicides plus the nonfatal attempts added in. We have comprehensive counts from the vital statistics system based on death certificates of the number of failed suicides, but we have to rely on estimates for the number of nonfatal attempts. And the best available data on that

                              G. KLECK

comes from emergency room data, where people come in to an emergency department and they have an injury, and then it's -- upon further questioning, it's found it was connected to a suicide attempt.

Q. So let me -- let me try to break this down. To determine case fatality rates, you took data on completed suicides, and that came from the CDC's Wonder System; is that right?

A. Yes.

Q. And then you have to add that number to the number of uncompleted suicide attempts; is that right?

A. Correct. That's the denominator.

Q. And that form is your denominator. And so the information on uncompleted suicide attempts comes from a survey of emergency departments at hospitals?

A. Yes. A sample of emergency departments.

Q. Is that the national -- sorry. Is that the National Electronic Injury Surveillance System-Firearm Injury

G. KLECK

Surveillance Study?

A. Well, I don't know about the latter part, but it's the NEISS System, certainly.

Q. Okay. Is that referred to just by the initials, typically, in the field, NEISS, or --

A. Yeah, it's an awfully long expression if you don't abbreviate. Usually people pronounce it as NEISS; the NEISS System.

Q. I'll refer to it as the NEISS System, then.

You say the NEISS System, that is not a nationwide count of attempted suicides; is that correct?

A. Not a direct count, but the emergency departments are selected in a way to be representative of all of the departments. So the idea is, you're attempting as best you can to get an estimate that would be the same if they could get data from every single emergency department. So it's analogous to the gallop pole selecting a representative sample of U.S. voters to find out, you know,

G. KLECK

who they're going to vote for in the next election.

Q. How do you get from the sample count in the NEISS System to a nationwide count? Like, what's the process?

A. Well, they have -- for each individual emergency department that's part of a system, they have a count of, in this case, nonfatal suicide attempts, whether by firearms or hanging or whatever. And that emergency department, in turn, accounts for a certain fraction of the total number of emergency department cases. And so, you know, if it were, I don't know, say, a half of 1 percent of all of the emergency department cases, then you would multiply the number of nonfatal suicide attempts by 200. In other words, you'd extrapolate up to what it would be if you had data on the full population.

Q. Do experts in the field caution against using the NEISS System to estimate a nationwide count of attempted suicides of a given type or in total?

A. I'd have to know what context that

reason for caution is. I don't know that it concerns this particular issue.

Q. Are you aware of whether or not this particular methodology you've described of essentially multiplying the NEISS counts by a, you know, weighted proportion to arrive at a national figure, is an accurate and credible result?

A. I'm not aware of any serious alternative to doing it that way, if that's what you're getting at.

Q. That was not -- that was not my question. Are you aware of any concerns or criticism in this field, or concerns about using the NEISS System to generate a nationwide estimate of counts?

A. No.

Q. Are you aware of any concern that given idiosyncrasies in a given hospital's caseload from year to year or a given hospital being added or dropped from the NEISS System in a given year, that that produces high uncertainty as to the nationwide count when you apply the method you've just described?

G. KLECK

A. It certainly could introduce some uncertainty. I don't know whether -- I don't have any basis for thinking that it's a lot of uncertainty. Because it's not based on just, you know, 5 or 10 emergency departments where the results from a single emergency department has a huge effect on the total results. It's instead based on hundreds of emergency departments, and so no one of them, or irregularities in any one of them, would have a profound effect on the total results.

Q. Are you familiar with any other method of estimating nationwide attempted suicide counts?

A. Yes.

Q. What is that?

A. Well, there are even more deeply flawed ones. For example, you have a database that counts up the number of hospital discharges. And so some of those discharges are, you know, discharges in connection with a nonfatal suicide attempt. And the problem with that is, you can't be discharged from a hospital unless you were admitted in the first

G. KLECK

place. Only admitted patients can be discharged, otherwise, the concept -- the discharge is meaningless. But that's a problem because if your data only concerned discharged patients, and thus only concerned admitted patients, you've already got a biased sample of cases because only a little over half of all, at least firearms injury cases, are admitted to the hospital, which means you miss most of them if you only count hospital admissions cases, which is what you're doing when you only use hospital discharge data.

And furthermore, it's not -- it's not random, it's related to the seriousness of the injury. So the injuries that are more likely to result in death, the more serious injuries, are the ones that are more likely to result in admission to the hospital, and thus to become qualified for a discharge later on. So the discharge data are essentially useless for the purpose of calculating the case fatality rates.

Q. Are you aware of any other credible or reliable method for calculating the total

G. KLECK

count of attempted suicides nationwide?

A. No.

Q. Are you familiar with HCUP, Healthcare Cost and Utilization Project data that can be used to calculate nationwide attempted suicide counts?

A. I recall looking at that at one point, but I can't really say why it is that I rejected that, the use of those data, at this late date.

Q. The portion of your opinion that we've been talking about, which concerns whether or not firearm suicide is a uniquely lethal method of suicide, appears to rest on an assumption that if a firearm is unavailable, many of the individuals who would have died by suicide -- by firearm suicide, will substitute an alternative method of suicide, like hanging, jumping from a high place, or poisoning; is that correct?

A. Yes. But I wouldn't describe it as just an assumption. It's also what's based on evidence. That is to say, suicidal attempt -- I'm sorry, suicidal intent or the lethality of

G. KLECK

suicidal intent is closely related to whether or not people make repeated efforts to killing themselves, and thus might well make a repeated effort using a method different from that which they originally used.

Q. Why is this part of your opinion important to the overall opinion? Why, in your view, is it important to know whether someone would substitute an alternative method for suicide if a firearm was unavailable?

A. It's important because it tests what the intervening mechanism is supposed to be that translates access to guns into a greater risk of suicide. Invariably, those who assert there's a connection say the reason is because the suicide method of shooting is more lethal than whatever methods are likely to be substituted. There isn't any widespread disagreement with the proposition that other methods would be substituted. Rather, the issue is, well, are these substitute methods going to be equally lethal. If you believe public opinion on this issue, it's clear what the general public thinks. So the question

                            G. KLECK

is, does scholarly evidence support public opinion that people would just substitute another lethal method.

And so what scholarly evidence indicates is that people who use guns are more seriously intent on killing themselves, according to a variety of indicators, and they're more likely, therefore, to make another effort or an alternative effort to kill themselves if a gun were not available.

Q. What is the basis for your opinion in your report that if a firearm is unavailable, a suicidal person will simply die by an alternative method?

A. Well, I'm not sure if it's in the report or if it's in the studies on which the report is based. But in one of those two locations, I point out that the suicidal intent, or lethality of intent, is very strongly related to whether or not people used guns. And there's direct tests of that proposition in studies where they created an index of the lethality or seriousness of intent to kill themselves among people. So,

G. KLECK

you know, it's indicators like, did they manage -- did they make efforts to isolate themselves from any possible interveners, or had they been planning it for a while. And so they create these numerical indexes of suicidal intent of how seriously people wanted to die, and the suicidal intent and scores are just off the charts for people who use firearms compared to other methods. So there's a very strong intent to kill among people who use guns. And so that's a strong foundation for the proposition that those individuals, not suicide attempters in general, but suicide attempters with guns, would adopt another method and still make an attempt to kill themselves.

Q. Do you cite that research in your report?

A. I'd have to look at it again, but I can tell you pretty quickly.

Q. Yeah, if you can turn back to page 3 of your report -- sorry, Exhibit 3, which is your report, and we can put up the bibliography.

G. KLECK

A. Yeah, it's probably in the 2019 book chapter, The Effect of Firearms on Suicide, which I think is one of your exhibits, as well.

Q. I want to know whether it's in your report presently. That's what the question is.

A. I don't think so. Yeah, it's in the book chapter in Gun Studies.

Q. So it's cited in the book chapter, but not cited as one of the materials you relied on in your report?

A. Well, not directly. But since I say I relied on the book chapter in Gun Studies and it's in my references for the report, yeah, indirectly. So in the book chapter in Gun Studies from pages 321 to 323, that's where the evidence is reviewed concerning the proposition that people who use shooting as a suicide method have stronger intent to kill themselves than people who use other methods.

MR. MILLER: I think we should take a quick pause off the record, for a quick break.

G. KLECK

MR. PENNAK: Fine.

THE VIDEOGRAPHER: The time is 2:56 and we are now off the record.

(Recess was taken.)

THE VIDEOGRAPHER: The time is 3:07. This is the beginning of Session Number 5, and we are now back on the record.

BY MR. MILLER:

Q. Dr. Kleck, are you familiar with a 2020 study published in the New England Journal of Medicine by David Studdert and a number of other authors, titled Handgun Ownership and Suicide in California?

A. Sounds vaguely familiar.

Q. What, if anything, do you know about this study?

A. I couldn't tell you a thing at this point.

Q. Have you read it?

A. I believe I did.

Q. In what context do you believe you read it?

A. I couldn't tell you that either.

Q. Did you read it in connection with

G. KLECK

preparing this expert report?

A. Possibly. I mean, if it was cited by -- I keep forgetting the guy's name, one of the two experts for the defendants. If it was cited by him, then that might be a reason why I read it.

Q. Do you know whether you considered this study in forming your opinion in this case?

A. Well, I would consider additional studies only to the extent that they improved on the existing research that I did review. I mean, if it's simply yet another study that makes the same mistakes previous studies did, then it wouldn't inform my opinion; it would tend to reinforce it.

Q. I'm going to show you what's been marked as Exhibit 57. It should be in the binder as 57, as well.

(Exhibit 57, Handgun Ownership and Suicide in California, marked for identification, as of this date.)

Q. Do you recognize the document that's been marked Exhibit 57?

G. KLECK

A. Yeah, I believe this is the one I've read before.

Q. When did you read this?

A. I couldn't tell you.

Q. Is the document you're looking at in your binder at tab 57 the same as the one that's on the screen here as Exhibit 57?

A. Yes.

Q. And this is a study by David Studdert and a number of other people in the New England Journal of Medicine?

A. Yes.

Q. Is the New England journal of medicine a peer reviewed journal?

A. Yes.

Q. Is it a reliable authority in this field?

A. No, unfortunately.

Q. Why not?

A. Medical journals in general are unreliable as sources of information in the connection between violence and gun ownership.

Q. How about in connection with suicide?

G. KLECK

A. I mean, any form of violence. It's simply unreliable on the issue of the relationship between guns and violence.

Q. So this is not a reliable authority -- the New England Journal of Medicine is not a reliable authority as it relates --

A. It's a reliable authority on all sorts of traditional medical topics. It's not a reliable source of information on the connection between firearms and violence because there's a pronounced ideological bias among editors and contributors to the journal on that particular topic. It's a blind spot for them.

Q. It's your testimony that the New England Journal of Medicine is biased as it relates to firearms?

A. Yes.

Q. Biased how?

A. Well, let me -- let me expand on that. It's not that medical journal in particular; it's medical journals in general. No more so for the New England Journal of

                              G. KLECK

Medicine than for the average medical journal.

Q. And when you say that medical journals in general, including this one, are biased as it relates to firearms, what do you mean by that?

A. Well, I mean, among other things, they regularly accept for publication research that simply doesn't meet minimal scientific standards. In particular, the New England Journal of Medicine once published a study which had exactly two cases in it; two, and compared two cities, one Canadian city with one U.S. city, it did not have any controls for other variables, and because the city in the U.S. had a higher gun ownership and higher violence rates, the article concluded, well, therefore, it was a higher gun ownership that was responsible for the higher violence rates. And that was not a scientifically acceptable study no matter how lenient your standards of methodological adequacy one might impose.

Q. Do you think that you are biased on the issue of firearms?

A. No.

                        G. KLECK

Q. Not at all?

A. No. Or if I had any biases, it would be, to be sympathetic to the proposition that more guns leads to more violence. It was the view I started with when I began my career and first researched this topic. But I'm certainly not biased against that proposition.

Q. So you think your bias, if any, on the issue of firearms, would be to think that they are connected to violence?

A. Yeah. As a personal bias, it's the one I began with. But soon I set aside my personal biases in the face of credible evidence that indicated the opposite, including my own research.

Q. This study lists -- I'm not even sure how many -- more than half a dozen authors. Do you recognize any of those authors?

A. Yes, I recognize Warren -- Garen J. Wintemute, and Matthew Miller.

Q. What about Studdert?

A. I think prior to reading his studies, I had never heard of the guy.

                                G. KLECK

Q. Are these authors all academics, M.D.s, or social scientists?

A. I wouldn't be qualified to say. As I say, I only know something about the last two authors, Wintemute and Miller.

Q. What do you know about those two authors?

A. I know they're fanatically biased, in favor of the proposition that more guns reads to more violence, as indicated by their prior research publications. They draw conclusions that support that hypothesis despite the fact that the evidence does not credibly support their conclusions.

Q. Is this Studdert 2020 study a case control study?

A. No.

Q. It's a longitudinal cohort study; isn't that right?

A. Correct.

Q. What is a longitudinal cohort study, to your knowledge?

A. Longitudinal means that the observations are at multiple points in time.

G. KLECK

So in this case, they might be measuring acquisitions of handguns at multiple points in time and suicides at multiple points in time.

And the fact that it's a cohort study usually means, in some sense, you start out with the same sort of -- same set of cases, which you then follow through time. So in this case, it's persons whose acquired a handgun in California through a purchase of a retail dealer, who are followed through time to see if they show up in the suicide data.

Q. This study followed more than 676,000 cohort members who acquired one or more handguns; is that right?

A. That's right.

Q. And it compared that nearly 700,000 strong cohort to a study sample of more than 26.3 million people living in California at the same time; is that right?

A. Correct.

Q. And in doing so, it concluded that handgun ownership, and I quote here, "Handgun ownership is associated with a greatly elevated and enduring risk of suicide by

G. KLECK

firearm." That's at page 2220, which I believe is the cover page.

Do you agree or disagree with that finding?

A. What -- what page are you referring to?

Q. 2220. Specifically the conclusion at the bottom of the page. That should be the very first page of the study, I believe.

A. Okay, I see it. Yeah, I see it. As -- as phrased, it's accurate. If you stress the phrase associated with, that is, it's making simply a statistical association, and that statement does not make an assertion about causation, which is of course the only reason why anybody would care about this. So they carefully evade committing themselves to the proposition that handgun ownership causes an elevated risk of suicide.

And the second thing to note about that statement is, it's a risk of suicide by firearm. Well, that's virtually a tautology. Of course you have to have a firearm in order to commit a suicide with a firearm. Again,

G. KLECK

it's evading the issue of whether or not it's more likely people will kill themselves, period, regardless of how they do it, if that's related to gun ownership.

Q. Do you agree with or disagree with the first sentence in this study, "Research has consistently identified firearm availability as a risk factor for suicide"?

A. Again, only if you assume that what they mean by risk factor is correlate. But when you read assertions about gun ownership as a risk factor in context, in medical journals like this one, what they're clearly hinting at, if not explicitly saying, is they think it's a causal factor. So they kind of evade having to do what is necessary to establish causality by simply saying, well, it's a correlate. Well, I don't dispute that it's a correlate. Of course you'd have to have a gun in order to commit a gun suicide. It's certainly a correlate. And, in fact, that's what all the research indicates. Where there's more guns, there are more gun suicides; there just aren't more total

G. KLECK

suicides.

Q. If I can direct you to the results paragraph on that page. "This study concluded that male handgun owners were 3.34 times more likely to die by suicide than male nonowners, and that female handgun owners were 7.16 times more likely to die by suicide than female nonowners."

Do you see that result?

A. I do.

Q. Do you agree with or disagree with that result?

A. As a simple statistical association, I agree with it. Or I don't doubt it; I mean, I've seen the data. But yes, I would assume that that's valid. It just doesn't indicate anything about whether or not having a gun causes a higher risk of suicide.

Q. So you -- you agree with the proposition that firearms ownership and firearms access is a risk factor for suicide if risk factor is used to mean a correlate?

A. Yes. If it means nothing more than a correlate and not a causal assertion about

G. KLECK

causality, then yes.

Q. And you agree with the statement that handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm?

A. Well, I have only this study to say it's an enduring effect. But again, as long as one understands that this is simply a statement of statistical correlation, then yes, I would agree with it.

Q. I want to turn us to page 2226 of this study, and specifically Table 3. This study found -- at Table 3 the results are reported that suicide risk for handgun owners peaked immediately after their first acquisition of a handgun, but then remained elevated for as long as 12 years afterwards.

Do you see that?

A. Yes.

Q. So, for example, 90 days to a year after purchase, new handgun owners still had more than a 12 times risk of firearm suicide from nonowners?

A. Yes.

G. KLECK

Q. And from years one to three, they still had a 5.35 times greater risk of dying by firearm suicide than nonowners?

A. Yes.

Q. Do you agree with or disagree with those findings?

A. I have no basis for disputing the near statistical association since gun ownership is correlated with a lot of factors that really do have a causal effect on suicide. So these are exactly the results I would expect, even if access to a firearm has zero effect on whether or not people kill themselves.

Q. Do these results indicate that suicidal intent does not and cannot explain the enduring disparity in firearm suicide rates between nonowners and owners of handguns?

A. They most certainly do not.

Q. Why?

A. Because the authors didn't measure suicidal intent. They have no way of knowing what suicidal intent was of those who own guns

G. KLECK

versus those who didn't. And therefore, they have no reason to -- no basis for ruling out differences in suicidal intent, as the explanation of these enduring differences in suicide rates among owners versus nonowners.

Q. How could high suicidal intent drive the purchase of a handgun and then a five-year delay, followed by a firearm suicide, in your view?

A. People are frequently ambivalent about whether they want to kill themselves. Environmental circumstances that are transitory will give them a transitory impulse to kill themselves. It may go away after a while, and then new environmental stresses come on later on, and they trigger a suicide attempt, and it could be years later. A person could be depressed for their entire life, but then they only get divorced or left by their spouse 5 or 10 years after the acquisition of a firearm.

Q. In that case -- in the hypotheticals you just described, suicidal intent does not appear to be driving the suicide and the gun

purchase.

A. On the contrary. Suicidal intent could be closely related to it. But suicidal intent is not a constant; it varies over time.

Q. And sometimes, I believe you used this phrase, it can be transitory.

A. Could be.

Q. When suicidal intent is transitory, do the lethal means that are readily at hand affect the person's risk of suicide?

A. Not if the methods available are equally lethal.

Q. I am -- I am asking you, when somebody has a transitory suicidal intent, isn't it true that their risk of suicide is dependent on the lethal means that are readily available to them?

A. And I'm answering your question that yes, it would, but there are invariably and without exception, lethal means available to everybody who have such a lethal motivation. I mean, we are, in effect, surrounded by alternative methods of suicide which are highly lethal, most of which are more widely

G. KLECK

available than firearms.

Q. So is it your opinion that someone who has a transitory suicidal intent and has access to a firearm is no more likely to die by suicide than somebody who has transitory suicidal intent and yet no access to a firearm? Is that your testimony?

A. They're more likely to kill themselves with a gun, certainly, than a person who doesn't have a gun. But are they more likely to kill themselves at all? No. And, of course, the issue that's significant from a public health standpoint is not whether they immediately kill themselves, but whether they kill themselves, period. We want to save lives. We don't just want to delay when they kill themselves.

Q. You criticized this study a moment ago for failing to control for suicidal intent, I believe. Is that accurate?

A. Well, that would be one flaw.

Q. Do you have any others?

A. Yeah. The fact that most other known -- or likely confounders are controlled.

                              G. KLECK

Q. And specifically, you're referring to the confounders in your -- listed in your report and book chapter?

A. Yeah.

Q. The authors of this study wrote, concerning suicidal intent, that, quote, "While suicidal intent probably explains at least part of the spike in suicides by firearms soon after acquisition, intent is less plausible as an explanation for the elevated risk of suicide by firearm among owners over the longer term, when most occurred."

Do you agree with or disagree with that statement about suicidal intent?

A. It's possible that the statement in its limited form is valid. But it's kind of missing the point, what's persistent about people is not just their suicidal intent, which, as I said, varies over time. But many of the attributes that make people more at risk of suicidal are enduring, and in fact, gun ownership is less enduring than attributes like having a depressed personality or being

                              G. KLECK

socially isolated. And so, virtually, any of the confounding factors I mentioned in my chapter in Gun Studies, which are enduring, would also explain this enduring risk of suicide without it being attributable to gun ownership, which is actually less enduring as an attribute. People come and go in a status of owning guns. And by the way, this study did not actually measure gun ownership. It measured gun acquisition. The authors had no idea whether -- you know, which people possessed guns at any one time. They only knew they had acquired a gun from a retail dealer in California at a particular time. So [audio interference] ownership, as they claim.

Q. The authors did however, track when someone divested themselves of a firearm, didn't they?

A. Only on some forms of divestment. If you, let's say illegally transferred a gun to another person you were not supposed to transfer it to, they would have no record of that. They would have no way of knowing.

G. KLECK

Q. And so in your view, records of firearm transfers cannot be used to credibly estimate the rate of firearms ownership in California?

A. I'd say it's a deeply flawed way. It ought to be described for what it is, which is a measure of acquisition of firearms from a retail dealer in California. That's all they measured. You know, they're doing a little, you know, tricky, two step inference or guesstimate as to whether or not people still owned a gun at any one particular point in time.

Q. You mentioned that you don't believe this study controlled for confounding variables. Did they not control for age, sex, and race?

A. Yes, they did. I didn't say they didn't control for anything. I said there were a lot of confounders that they did not control for, and that statement is correct.

Q. But you would agree they did, in fact, control for age, sex, and race?

A. Yup, I do.

G. KLECK

Q. And they also controlled for drug abuse and alcoholism, specifically by using proxy measures of death by endocarditis and alcoholic liver disease. Would you agree that they also controlled for drug abuse and alcoholism via those two proxies?

A. I agree that they used those proxies, but they're very poor proxies since most alcoholics don't die of alcohol-related diseases like an alcoholic liver and so on. And so it's a measure of alcoholism or drug abuse, but it's not a very good one. And again, so it's a very imperfect control, even for the limited number of variables that they did control for.

Q. The authors also discuss mental illness as a confounder. They observe that, quote, "Several national studies have found that gun owners or people with access to guns and nonowners have similar rates of depression, suicidal ideation, and suicide attempts."

Do you agree with that statement by the authors?

                         G. KLECK

A. Yes.

Q. So you agree that gun owners and nonowners have similar rates of depression?

A. Yes.

Q. That they have similar rates of suicidal ideation?

A. Yes.

Q. And that they have similar rates of suicide attempts?

A. Yes.

Q. And yet, you maintain that gun owners, nonetheless, have higher suicidal intent than nonowners?

A. Yes.

Q. Why?

A. Because they have other factors that make them want to kill themselves, such as social isolation, disruptions of valued social relationships, like divorce and abandonment. And so there are other factors that affect suicide that happen to be more common among those who kill themselves, and there are risk factors -- there are genuine risk factors in the causal sense for suicide, and they happen

G. KLECK

to be correlated with gun ownership. They just don't happen to include depression. That's not a confounder. Whereas, for example, the few confounders -- genuine confounders the authors really did control for were age, sex, and race. They really are confounders. But depression is not, and therefore, controlling for depression is not controlling for a confounder and it isn't helping your estimate of the effect of guns on suicide.

Q. Am I not understanding, though, that you believe that depression, suicidal ideation, and suicide attempts, all three of those are less closely associated with suicidal intent than, for example, social isolation, which you mentioned as another confounder? Is that what you're saying?

A. No, that's not what I'm saying.

Q. Why are the equivalence in rates of depression, suicidal ideation, and suicide attempts between gun owners and nonowners a powerful argument that suicidal intent isn't also the same or similar in terms of rate

between those two populations?

A. They simply don't bear on the issue. They're simply irrelevant. The issue is whether there are other factors for suicide that are more common among gun owners than among non-gun owners.

The fact that some variables don't differ between gun owners and non-gun owners, like rates of depression, is neither here nor there. It's simply not relevant to the question of whether there are still other factors which do differ between gun owners and non-gun owners, and therefore are confounding factors because they are correlated with gun ownership.

Q. So do you believe that depression, suicidal ideation, and suicide attempts do not bear on suicidal intent?

A. No, quite the contrary, I think they're very related to suicidal intent. But they're not confounders because they're not related to gun ownership, as you just yourself said.

Q. Do you have any evidence that

G. KLECK

suicidal intent is a confounder for gun ownership and suicide, over and above the effects of depression, suicidal ideation, or suicide attempts?

A. I don't know that anybody has controlled for all of those latter factors and then seen what the remaining relationship is between a suicidal attempt and gun ownership. So I couldn't really say anything authoritative on that.

Q. So you would be speculating to assert that there is, in fact, any remaining effect of suicidal attempt -- intent beyond those three factors, which we've just discussed are equivalent between firearms owners and nonowners?

A. No, I would say you've got it backwards. You know, the -- the association between gun ownership and direct measures of suicidal intent is so strong that the burden of proof is on those showing that that's not a causal relationship and that, you know, somehow when you control for those other three factors you mentioned, you would no longer

G. KLECK

find a relationship.

Q. But you specifically --

A. There's a reason to have strong apriori beliefs about the relationship between gun ownership and suicidal intent.

Q. Are you referring specifically to the Brent studies as your support for that statement?

A. Not just them, but other studies more recent, which directly address the issue of use of guns in suicide attempts, which of course can only be done among those who have access to guns, and direct measures of suicidal intent. They are cited in the Gun Studies chapter.

Q. I want to show you what's been marked as Exhibit 55 now.

(Exhibit 55, study by Miller, et al., 2022, marked for identification, as of this date.)

Q. This is a study by Miller, et al., dated 2022, titled Suicide Deaths Among Women in California Living With Handgun Owners vs Those Living With Other Adults in Handgun-Free

G. KLECK

Homes, 2004 to 2016. Do you see that exhibit?

A. I do.

Q. And is the one in your binder the same as the that's one being displayed on the screen as the exhibit?

A. It is.

Q. Is this study published in the Journal of the American Medical Association of Psychiatry?

A. Yes.

Q. Is that a peer reviewed journal?

A. I believe so.

Q. Is that a reliable authority in this field?

A. No.

Q. Why not?

A. It's, again, a medical journal.

Q. And no medical journal, in your opinion, is a reliable authority in --

A. No, that's not what I said. Medical journals in general, not universally, but in general, show a distinct bias to accept almost any piece of research, no matter how flawed, that concludes that, you know, more guns equal

G. KLECK

more violence.

Q. So in your view, JAM of Psychiatry, this journal, is biased against firearms?

A. On average, if it's a typical medical journal, yes, that's a -- that's a safe beginning presumption. And if somehow, you could show that they really did publish good quality research and rejected poor quality research and it didn't appear in their pages, then you'd have a case for saying, no, they don't fit that generalization. But I don't think you do, and certainly this is not an example of good quality research.

Q. So in your review, JAM of Psychiatry publishes poor quality research on firearms and suicide?

A. Yes, yes.

Q. Are the authors of this paper all M.D.s, academics, or social scientists?

MR. PENNAK: Objection.

A. Well, I don't really know what their Ph.D.s are in. Again, the only ones I'm familiar with are Matthew Miller and Garen Wintemute. And Wintemute does not have a

Ph.D., but he's a medical person. And Matthew Miller is both a Ph.D. and a medical person.

Q. Are you familiar with this study?

A. No.

Q. Have you ever read this study?

A. Until I just glanced at it, no.

Q. And you didn't cite this study in your report?

A. No. It just appeared a few months ago.

Q. Did it appear before you published your report -- I'm sorry, before you submitted your report?

A. I think it appeared -- it was published two months before I did the report.

Q. So this is very recent research on this topic?

A. Yes.

Q. More recent than, essentially, any of the research you had cited previously in your books, which come from the '80s and '90s?

A. Yes.

Q. And you didn't consider this study even though Dr. McCourt cited it in his

G. KLECK

report?

A. It wouldn't have made any difference. It's -- it has the exact same flaws that the previous research on the topic did; that is, primarily the obvious lack of any serious effort to control for confounders.

Q. Doctor, two questions ago you said you've never read this study. How do you know what you just said?

A. Because I just glanced through it.

Q. You can tell at a glance that this study is poorly put together and has all the flaws you've identified in your report?

A. I'll tell you exactly what I did. I looked -- I glanced at table 1 on page 585, and it show what is they controlled for in the way of controls for confounders. And you can see at a glance, you don't have to read the whole study to see that they controlled for maybe a half dozen variables, many of which are not confounders at all, like the number of household adult residents.

Q. And so just at a glance, you can set this aside as an unreliable study. Is that

G. KLECK

your testimony?

MR. PENNAK: Asked and answered.

Q. I'm sorry. Your answer, sir?

A. Yes.

Q. This is a study of nine and a half million women in California who were not themselves gun owners, but all of whom lived in a gun-free household at baseline, and that study concluded, I'm going to quote you from page 586, "The rate of death by suicide increased significantly after an adult cohabitant lawfully acquired a handgun. This excess suicide rate accounted for by a four-fold increased in suicide by firearm persisted throughout the 12-year follow-up period."

Do you see where that is at the bottom of page 586?

A. I do.

Q. It also found that, "Exposed and unexposed women," which I take to mean women living with gun owners versus those not living with gun owners, "did not have substantively different rates of suicide by other methods."

G. KLECK

Do you see that finding?

A. Yes.

Q. Do you agree with those findings?

A. I have no reason to doubt them.

Q. The women that were being studied in this paper were not themselves gun owners; is that correct?

MR. PENNAK: The document speaks for itself.

A. As far as I know, yes, that's correct.

Q. Because what was being studied here was whether the acquisition of a firearm by their cohabiting adult, presumably a husband or other adult in the household, impacted their suicide risk. Is that what you understand?

A. Yes.

Q. Does that finding not indicate that suicidal intent is not, in fact, a confounder for this finding, because the women themselves are not the ones who were driven to purchase a gun because it was somebody else that bought the gun and brought it into the household?

G. KLECK

A. No, it does not.

Q. Why not?

A. Because spouses tend to resemble one another. Like attracts like. And so whatever attributes there are that are confounders regarding the individual that acquired a gun, let's say the husband or boyfriend, are more likely to be attributes that characterize the spouse or girlfriend, as well.

Q. So, I'm sorry, you're saying that the suicidal intent of the husband or boyfriend in these cohabiting situations can somehow be imputed to the women for whom there was an elevated suicide risk observed?

A. No, not at all.

Q. Okay. What are you saying, then?

A. I'm saying they're correlated. I'm saying whatever it is that actually affects risk of suicide is more similar among cohabiting adults, let's say a husband and wife or boyfriend and girlfriend, than it is between two randomly selected unrelated individuals.

Q. What's your basis for that

G. KLECK

statement?

A. I wasn't prepared to discuss that for the purposes of this report, but it's common knowledge and undisputed amongst social scientists.

Q. Can you point me to any research on this topic?

A. No, not as I sit here. But if you gave me, like, an hour on the internet, yeah, I could.

Q. So you're telling me that you believe that the suicidal intent of Person A somehow translates to the suicidal intent of Person B, and then to that Person B's risk of suicide?

MR. PENNAK: Objection. Mischaracterizes and argumentative.

A. Yeah, you're misconstruing what I said. And it's not a -- you know, you keep using the term "suicidal intent" as if that's the only thing that affects whether or not people kill themselves or it's the only risk factor, it's the only causal factor. And that's not the issue. The issue I'm pointing

G. KLECK

out is there are many other things that make a person more likely to commit suicide besides the ones we've explicitly discussed, and some of them are related to gun ownership, and among the ones that are related to gun ownership, they're often things that are more similar between two individuals who live together than between two randomly selected individuals. So in that sense, characteristics of the wife tend to reflect many of the characteristics of the husband, including, some of those characteristics, including risk factors for suicide.

Q. Suicidal intent, though, that's the risk factor you list first in both your book chapter and your report, correct?

A. Yes, but not the only one. It's the first of many.

Q. And it's the risk factor that you chose to devote the most page space and time to in both your book chapter and report; isn't that correct?

A. Yes, but only because the focus was on, what's the effect of guns on suicide. If

G. KLECK

I had a broader focus on whatever causes suicide, it wouldn't be -- it wouldn't show as much emphasis on the notion of suicidal intent, because there's solid evidence that suicidal intent is very strongly related to choice of method of suicide.

Q. And when we spoke earlier about the confounding factors you believe had the strongest confounding effect, you began that discussion by listing suicidal intent, didn't you?

A. Began, but did not stop with that one.

Q. So your explanation of the finding in Miller 2022 is that the excess suicide rate for women cohabiting with gun owners is attributed to some sort of suicidal intent of the gun owner shared with the woman cohabitant?

A. No, it's some factor that affects suicide, whatever that may be. And there's nothing in the study that actually indicates what it would be. It's just generically speaking, cohabiting adults would have many

G. KLECK

resemblances between the two of them other than suicidal intent, and some of those would include factors that affect whether or not a person commits suicide.

Q. So this study controlled for gender. Would you agree with that?

A. Yes.

Q. And perhaps you don't know because you've only just seen the study, but it controls for race, urban/rural location, also by virtue of being a study of cohabiting individuals, for whether they live alone, it also examines death rates for alcoholic liver disease as an estimate of heavy drinking. In your view, are those confounders of the relationship between firearms access and risk of death by suicide?

A. Yes. I'm not sure about alcoholic liver disease in particular, but the general notion of alcoholism, yeah, that would be a confounder.

(Exhibit 61, 1990 study by Garen Wintemute, marked for identification, as of this date.)

G. KLECK

Q. I want to show you a study that's in the binder as 61. While we pull it up on the screen here, do you recognize the study that's at tab 61 of your binder, that's been pre-marked Exhibit 61?

A. Yes.

Q. This is a 1990 study by Garen Wintemute and others published in the New England Journal of Medicine titled Mortality among Recent Purchasers of Handguns?

A. Yes.

Q. Have you read this study before?

A. Yes.

Q. When?

A. I couldn't tell you. Years ago.

Q. You read this study before you did your opinion in this case?

A. Yes.

Q. And before you wrote your 2019 book chapter?

A. Yes.

Q. Is the New England Journal of Medicine a peer reviewed journal?

A. Yes.

G. KLECK

Q. I think I asked about the other one. Like the two studies we just discussed, this is also not a case control study, is it?

A. That's correct, it's not. It's a longitudinal cohort study.

Q. And in particular, this longitudinal cohort study compared the population of handgun purchasers in California in a given year to the general population of that state?

A. Yes.

Q. This is not a study that you cited in your report, is it?

A. That's correct.

Q. And this is not a study that you cited in your 2019 book chapter that's copied as part of your report, is it?

A. That's correct. It neither fits into the category of a macro-level study, because it's a study of individual persons, and nor is it a case control study.

Q. And so because your discussions in both the book chapter and macro -- I'm sorry, book chapter and report were relating to specifically macro-level and case control

G. KLECK

studies, you felt it was unnecessary to cover this one?

A. Well, that and other reasons. I mean, the study is just silly, basically. I mean, the notion that it has some bearing on the issue of whether or not access to guns increases the risk of suicide is ludicrous.

Q. So this study concludes that the purchase of a handgun is associated with a substantial increase in the risk of suicide by firearm and in the risk of suicide generally. That's from page 1583, the first page. What is -- is that what you would describe as a silly conclusion?

A. Absolutely.

Q. What is silly about that conclusion?

A. All the study does is it's focused on timing. It notes that, you know, if somebody purchases a handgun and commits suicide, that it tends to be fairly soon after they acquired the handgun. And you know, this comes into the category of what my kids once would have said, duh. You know, I mean, if you want to commit suicide with a gun and you

                        G. KLECK

don't already have one and you have to go out and get a gun, then you're very likely to commit suicide fairly soon after that. But it doesn't indicate that it's having a gun that caused you to commit suicide. It's rather, acquiring the gun at time X is what explains why you committed a suicide with a gun shortly after time X.

Q. So --

A. Timing has nothing to do with the issue of whether there's a causal effect of gun ownership on risk of suicide.

Q. But does the timing have -- shed any light on whether suicidal intent that, in your view, might have driven a gun purchase is, in fact, a confounder for the person's risk of suicide when the risk of suicide remains elevated for a period of up to six years, as this study finds?

A. Yeah, because the people who at time X have a higher than average suicidal intent, they're also going to have a higher average intent to commit suicide 5 or 10 years later, simply because they have the attributes that

                        G. KLECK

make people more intent on committing suicide. If it's depression we're talking about or it's being socially isolated, then of course, those tend to be persistent attributes. And so they don't have just a transitory effect at time X. The have an affect at time X, but they also have an effect at later times, as well.

Q. So I believe a moment ago you testified that in many cases, suicidal intent is transitory. Are you contradicting yourself now?

A. No, it's absolutely, 100 percent consistent. It varies over time, that much is true, and yet it's also true that people who are more suicidally intent in, say, 2020, are going to be more likely to be suicidally intent in 2025.

Q. Would you agree that people who have a high suicidal intent are more likely to attempt suicide? Full stop.

A. Not necessarily, no. They're more likely to commit a completed suicide. But whether they're more likely to attempt suicide, I don't know.

G. KLECK

Q. And so when you agreed with me previously that gun owners and nonowners have similar rates of suicide attempts, you don't believe that undercuts the notion that gun owners nonetheless have higher suicidal intent than nonowners?

A. Not at all. They're completely consistent assertions.

Q. I want to show you a study that's 56 in your binder.

(Exhibit 56, Kvisto, et al., study, 2021, marked for identification, as of this date.)

Q. This is a study by Kvisto, K-V-I-S-T-O, et al., in 2021 titled Adolescent Suicide, Household Firearm Ownership, and the Effects of Child Access Prevention Laws. Do you see that document marked as Exhibit 56?

A. Yes.

Q. And can you confirm that that document in front of you is also being displayed on the screen as 56?

A. I can.

Q. Are you familiar with this study?

G. KLECK

A. No.

Q. Have you ever read it before?

A. No.

Q. This was published in September 2021 in the Journal of the American Academy of Child and Adolescent Psychiatry. Do you see that?

A. Yes.

Q. Is that a peer reviewed journal?

A. As far as I know.

Q. Is that a reliable authority in this field?

A. I don't know about that specific one, but it's a medical journal, and so the biases of the editors and reviewers are likely to be the same as for most medical journals.

Q. You are not familiar with this particular journal, but you nonetheless believe it is biased?

A. No, I believe that the averages or the odds are it shows a similar level of bias, as is the case with the editors and reviewers of other medical journals.

Q. And that's based on nothing other

G. KLECK

than your perception of medical journals generally?

A. No. Other people have also looked into the issue. In fact, the late Don Kates wrote an extended law review article on it, citing instance after instance of wild bias in the medical literature, and he basically characterized the entire public health literature on guns and violence as junk science, and I came to agree with him. It's a fair assessment.

Q. Is this study junk science, in your view?

A. Well, I can't say. I haven't read this one in particular.

Q. What about the Studdert study?

A. Yeah, junk science.

Q. And what about --

A. That is to say, it's methodologically inadequate and aimed at drawing a predetermined conclusion.

Q. And what about the Miller study, Miller 2022 we just showed you as Exhibit 55, is that also junk science, in your view?

G. KLECK

A. I may have to go back and look at that one.

Q. That was the California women cohabiting with --

A. Yeah. Yeah, I characterized it as junk science for the same reasons. I mean, Miller has made it pretty clear what conclusions he likes to draw regardless of what the evidence indicates in a wealth of prior studies, and this was a study whose methods are too weak to just [audio interference] ownership on suicide.

MR. MILLER: I lost the last half of that answer; I don't know if anyone else did. It did not come across clearly.

MR. PENNAK: I also lost it. So if you could repeat your answer.

A. I guess the last part of it was that the Miller study was a weak study and characterized as junk science for the same reasons as the other studies, to which I would attach the label, that is to say, its methods are not sufficiently strong to justify the conclusions, and Miller's prior conduct in

                                        G. KLECK

drawing conclusions from his research amply indicates what his personal biases are.

Q. Directing your attention back to the Kvisto study that is Exhibit 56, so you said you have not read this study before; is that correct?

A. That's correct.

Q. And so this was not a study that you considered in forming your opinion?

A. That is correct, I did not consider it in forming my opinion.

Q. This is also not a case control study. Would you agree with that?

A. Yes.

Q. I believe this study self describes as an ecological time series cross-sectional design using state-level data. That is not a case control study, is it?

A. No, it is not.

Q. When you wrote your book chapter on case control studies and rendered your opinion os case control studies, you didn't look outside of the body of case control studies to try to find other research on this issue, did

G. KLECK

you?

MR. PENNAK: Asked and answered.

A. Did I look at studies that weren't case control studies to draw conclusions about studies that were case controlled? No, of course not.

Q. On the first page of this study, it concludes that, quote, "Each 10 percentage point increase in states firearm ownership was associated with a 39.3 percent increase in firearm suicide," and this is among the age group study which is adolescents 14 to 18, "which in turn contributed to a 6.8 percent increase in all cause suicide." That's in the results section on the first page.

Do you agree with or disagree with those findings?

A. As a trivial statistical association, I have no reason to dispute it.

Q. You don't dispute the finding that a 10 percentage point increase in firearm ownership in the state was associated with a nearly 40 percent jump in firearm suicide, in the studied population and with a nearly

G. KLECK

7 percent increase in all cause of suicide?

A. It might well be associated with it, without having any causal effect whatsoever.

Q. Does that finding lead you to question your opinion?

A. Not at all.

Q. Why not?

A. It has no bearing on it. If you have yet another study that makes the same errors as previous studies, then you have no reason to change your conclusions. If you had a study that improved on the methods of prior studies and arrived at a different conclusion, that would be a different matter. That would be a reason for changing your opinions. But this is the same old junk science.

Q. I want to show you another study that is 58 in your binder. It's pre-marked Exhibit 58. It's a study by Briggs, B-R-I-G-G-S, and Tabarrok, probably not pronouncing the name correctly, but that's T-A-B-A-R-R-O-K.

(Exhibit 58, Briggs and Tabarrok study, marked for identification, as of

                          G. KLECK

this date.)

Q. Do you see the document that's been marked Exhibit 58 in your binder and on the screen?

A. I do.

Q. And can you confirm the document on the screen matches what's in your binder?

A. It does.

Q. Are you familiar with this study?

A. Yes.

Q. This is published in the International Review of Law and Econ? At the top of page 1. I'll repeat the question, I'm not sure you heard the question --

A. Was that a question? I'm sorry, I thought you were making a statement.

Q. I'm confirming with you, this is a journal, this published in the International Review of Law and Economics, correct?

A. Correct.

Q. And that is a peer reviewed journal?

A. Yes.

Q. It is not a medical journal, is it?

A. Correct.

G. KLECK

Q. Is it, therefore, a reliable authority to you?

A. That by itself means nothing. I mean, what journal it's published in is not definitive evidence as to whether or not it's reliable or unreliable. You can only determine that by examining the methods of using the -- of the individual study.

Q. In what capacity, or when, more simply, have you read this study before?

A. I read it relatively, you know, soon after it was published, and then I sort of forgot about it when I did my macro-level review and inadvertently omitted it. But I had read it prior to that. So I'm roughly familiar with it.

Q. Is this study germane to your macro-level review?

A. Yes.

Q. How so?

A. Well, it is a macro-level study. It's a study of U.S. states, so -- and it did concern the relationship between firearms prevalence and suicide rates.

                           G. KLECK

Q. It's not cited in your report, is it?

A. That's right. As I say, I inadvertently omitted it even though it was relevant.

Q. And it's not cited in your 2019 book chapter either; is that correct?

A. That's correct.

Q. Is it relevant to that book chapter?

A. Yeah, to the parts that concern macro-level studies, which in turn, those parts of the report were based on that Social Science Quarterly review. So what was omitted from the Social Science Quarterly review would necessarily be omitted from any discussion in either the book chapter or my report that concerned macro-level relationships between firearms and suicide.

Q. So this study, which you've omitted in all three of these different writings, concludes that, "We find strong evidence that increases in gun prevalence cause an increase in firearm suicides. Despite substantial substitution of methods, we also see strong

                         G. KLECK

evidence that increased gun prevalence causes an increase in overall suicide. The magnitude of this result is not trivial." That's at page 187, the conclusion of the study.

Do you agree with or disagree with those findings?

A. I disagree. Well, I should say I agree with the first part and disagree with the second part.

Q. What's --

A. There's no doubt at all that firearms prevalence effects how many people kill themselves with firearms. So it certainly affects the firearm suicide rate. I would disagree with the part about it having a causal effect on the total suicide rate.

Q. So you agree that an increase in gun prevalence causes an increase in firearms suicides?

A. Yes.

Q. There is a causal relationship between gun access and firearm suicide?

A. Yes.

Q. Sorry. Is that what you're

G. KLECK

testifying?

A. Yes.

Q. But you disagree with which statement or statements in this conclusion?

A. I disagree with the assertion that firearms prevalence rates affect the total suicide rate.

Q. What's the basis for your disagreement with that finding?

A. Well, I would have to review the study in detail. So, you know, I can't glance at the study right now and recall what it is that cast doubt on it. But I can say generally speaking, the usual reason for doubt about this kind of conclusion is, again, the failure to control for confounding factors, which in this case means attributes of aggregates, like states that are correlated with both gun ownership rates and that affects suicide rates.

Q. How do you know they didn't do that sort of analysis or control in this study?

A. Well, because, you know, as I say, I had read this before. I mean, before now and

                              G. KLECK

even before I had done that 2019 review of macro-level research. So I was aware of how the study was done, and so this is not new information that they didn't control for many confounding factors. It's only a matter of which ones they did control for that I would have to review the article in order to know that.

Q. Sure. I'm going to direct you to two locations in here; page 182 first, and then a bit later page 184. So they list under 3.2, Other Controls, controlling for population. Do you see that?

A. I do.

Q. Poverty rate, do you see that?

A. I do.

Q. Unemployment rate, do you see that?

A. Yup.

Q. Percent urban/land area, do you see that?

A. Yes.

Q. And urban population?

A. Yeah.

Q. They also control for household

                          G. KLECK

income inequality, do you see that?

A. Yes.

Q. They also controlled for the prevalence of drug and/or alcohol abuse or dependents. Do you see that?

A. I do.

Q. And they also controlled for the prevalence of frequent mental distress. Do you see that? It's at the conclusion of the same paragraph.

A. Yes.

Q. And then they go on to explain that they controlled for, what they term, groups at high risk of suicide, including, percent of males age 65 and older, so age and sex, and also percent white, so race. Do you see where they reference controlling for those?

A. I do.

Q. And then slightly later in that paragraph, "We control for regional variation using census region fixed effects." So they controlled for region, as well; is that correct?

A. Correct.

G. KLECK

Q. And then we can flip to 184. At the top of the second column there's a list of other controls, including household income again. Do you see that?

A. Yes.

Q. Percent of children living in a single mother family. Do you see that?

A. Yes.

Q. Percent of divorced adults, so marriage. Do you agree with that?

A. They did control for it.

Q. So to summarize here, this study controlled for, among other things, age. Do you agree?

A. Yes. I agree with all of the things you listed before.

Q. So to sum that up, that's at least age, sex, race, region, marital status, income, population, alcoholism, drug use, and social connectedness. Do you agree with that?

A. Yes.

Q. That's ten of the confounders that you identified? Isn't it?

A. Yes.

G. KLECK

Q. And despite controlling for ten of the confounders, they found, quote, "Strong evidence that the increase in gun prevalence causes both an increase in firearm suicide and in overall suicide," adding, "The magnitude of this result, after controlling for all ten of those confounders, is not trivial."

Do you still disagree with this finding?

A. Yes.

Q. This study controlled for more confounders than any other study you have listed in either your report or your book chapter; isn't that right?

A. Yes.

Q. And so by your measures of reliability, this is the most reliable and credible study on this issue that you have seen?

A. On that one attribute.

Q. I'm sorry. Is this or is this not the most credible and reliable study you are aware of, on whether an increase in gun prevalence causes an increase in both firearm

G. KLECK

suicides and total suicides to a magnitude that is not trivial?

A. No. It's only better than the other studies with regard to one attribute; that is, the number of aggregate level possible confounders controlled, and it turns out their own evidence, at least within this body of data, indicates that most of them turn out to be not confounders because they show no significant association with total suicide rates.

And the better their models, the more they controlled for the factors that are confounders, the less likely they were to support the proposition that total suicide rates were affected by gun ownership rates.

Q. Do you think the authors of this study, marked as Exhibit 58, are biased?

A. I have no idea.

Q. Do you think they're biased against firearms?

A. I have no idea.

Q. Despite writing a book chapter and a report that focuses in large part on

                              G. KLECK

confounding variables between the relationship of gun access and firearm suicide, you didn't include this study, which you agree controls for at least ten out of the 15 possible confounders you've identified?

MR. PENNAK: Argumentative.

A. As I said, I inadvertently excluded it, but it wouldn't have altered my conclusions because it tends to support my conclusions. You're only partially reporting the author's personal opinions about what the findings indicated rather than focusing on the findings themselves are, which are not the same thing. When you focus on the results that are based on the methods that I've laid out as being the most relevant and valid methods, it indicates there was no significant association between gun ownership and total suicide rates, and therefore the author's conclusions didn't really comport with their empirical findings.

Q. You think that Briggs and Tabarrok are misstating their findings in the language I've been quoting to you?

G. KLECK

A. Yes.

Q. How so?

A. Maybe they were honestly mistaken. They sort of, you know, worked hasty in writing a paper; I don't know. I have no reason. I draw my conclusions on the basis of their actual findings, not what they say in the text, and the findings are reported in the tables, and in particular Table 3.

Q. And what is it in Table 3 that you believe undercuts the author's conclusion?

A. When you focus on the most reliable measures of gun ownership and the estimated effect of gun ownership on total suicide, which are the findings reported in the last column, and you focus on the instrumental variables methods, which the authors themselves characterize as the more statistically suitable methods, what you find is there's no significant association at the conventional 5 percent level between gun ownership and suicide. That is, to say, there's no -- according to conventional statistical standards, there's no reliable

                                          G. KLECK

evidence for believing there is this association that the authors insist is so profound. Instead, they have this kind of borderline significant result which does not even reach the level of 5 percent significance.

MR. PENNAK: I can't hear you.

THE WITNESS: I can't either.

MR. PENNAK: You're on mute.

MR. MILLER: Thank you. I am on mute. I apologize. My brilliant question is not going to show up on the record now.

Q. Are you familiar with the study that's marked as Exhibit 59?

A. Yes.

(Exhibit 59, Injury Prevention study, marked for identification, as of this date.)

Q. This is a study published in the journal Injury Prevention?

A. Yes.

Q. Is that a peer reviewed journal?

A. Possibly, although the uniformly poor quality of studies published in that journal don't really tend to support that.

G. KLECK

But as far as I know, it's peer reviewed.

Q. Is this a medical journal?

A. It's a public health journal, yeah, so it's closely related.

Q. Is it biased, in your view?

A. Oh, yes, most definitely.

Q. How so?

A. Injury Prevention is a journal that would publish literally anything, no matter how primitive, if it drew the conclusion that more guns leads to more violence, the proof being what they have published.

Q. What are the standards for Social Science Quarterly?

A. I couldn't tell you. I only know that it's not a medical public health journal, and so they don't share the biases that are endemic to medical and public health journal editors and reviewers.

Q. Is this study marked Exhibit 59 a case control study?

A. No.

Q. This is a quasi-experimental study; isn't it?

                                        G. KLECK

A. Yeah, although the term quasi-experimental is not really, particularly meaningful. It's just nonexperimental, simple as that. That is, there's no researcher manipulation of the causal factor.

Q. How would you describe the type of study that this is?

A. I'm not sure that it fits into any recognized research design category. I mean, it seems to be just cherry-picking bits and pieces of evidence here and there, that can be interpreted as indicating a relationship between household firearms ownership and rates of suicide.

Q. You said you've read this study before?

A. Yes.

Q. When or in what capacity did you read it before?

A. Years and years ago, and I don't know in what capacity.

Q. This was not a study you cite in your report or in your book chapter; is that correct?

G. KLECK

A. That's correct.

Q. Why not?

A. Well, it certainly isn't relevant to the case control design because it's not a case control study. And I probably didn't include it in the macro-level research, if I did not, I'm not sure about that, but if I didn't, precisely because it doesn't really fit any scientific research design. Instead, it's just -- it's a propaganda article in which, you dress up propaganda conclusions with the appearance of scientific evidence. And the fact that they had to go down to the dregs of journals like Injury Prevention to get it published suggests they weren't able to get it published in reputable journals.

Q. This study found, and I'll direct you to page 178, I think that's the first page, that, "Each 10 percent decline in household firearms ownership was associated with declines in the rates of both firearms suicide and overall suicide."

Do you see where that's discussed in the results?

G. KLECK

A. Yes.

Q. Have I accurately summarized that portion of the results?

A. You have. They made a purely statistical assertion.

Q. Do you agree with or disagree with those findings?

A. As a statistical association, trivial though it may be, yeah, as far as I know, it's an accurate description.

Q. And this study controlled for age, unemployment, alcohol consumption, poverty, and region?

A. Yeah, it controlled -- yes, as long as you understand these are macro-level attributes. It didn't control for whether individuals were unemployed, which would be relevant to suicide. It controlled for unemployment rates of aggregates, and that's not a confounder in macro-level studies. There's no relationship between unemployment rates and suicide rates, though you might expect it to be the case.

Q. So they controlled for, would you

G. KLECK

agree, at least four confounders that are macro confounders, specifically age, alcohol consumption, poverty, and region?

A. Yeah, I -- no, I -- no, I wouldn't necessarily agree with that either, because the macro-level correlates are not necessarily the same as the individual level correlates. So, as I say, unemployment rates aren't really related to suicide rates, even though unemployment as a status of individuals is related to whether they commit suicide. Specifically losing your job is a stressful event that makes it more likely people will commit suicide.

Q. Is it possible --

A. Alcohol consumption, I don't think is related to suicide rates; not at the macro-level.

Q. Is it possible to control at the macro-level for unemployment or alcoholism?

A. Yeah. The question is not whether it's possible. The question is whether it's a good thing to do that, because if they're not confounders in macro-level data, then there

G. KLECK

isn't any point to doing so. So is it possible? Yes. Does it serve the interests of estimating the effect of gun ownership rates on suicide rates? No.

Q. Didn't you previously testify that when asked what are the confounders for macro-level studies on this topic, that it is essentially the same list as described for case control studies?

A. Well the key word being essentially. It was qualified. Some are and some are not. But many of the individual level confounders have macro-level analogies which also serve as confounders at the macro-level. Unemployment just doesn't happen to be one of them. As far as I know, per capita alcohol consumption is not either.

Q. So the subset of confounders at the macro-level is smaller than the subset of confounders at the case control level?

A. No, it's just not the same. It could be larger, it could be smaller, but it's not the same, because each individual level confounder does not necessarily have a

G. KLECK

corresponding macro-level status as a confounder. And I should point out the same about this Miller study, as with the last one, in many cases once they estimated the effect of each of these variables on the suicide rate, they found they didn't have a significant relationship with the suicide rate, in which case they weren't confounders. Well, the Miller study is even worse. They don't even report whether any of their control variables were related to the suicide rate, so we don't actually have any basis for thinking that any of their control -- their confounders were controlled. Not a one. They just expect you to not notice the fact that they don't present any results for the effects of their control variables on suicide rates. As far as we can tell from what they do report, they didn't control for any confounders at all. They just control for a lot of irrelevant variables.

Q. If -- if a study -- if a case control study -- let me -- let's talk about this for a moment in the abstract. If a case

G. KLECK

control study on the issue of firearms access and suicide controls for a number of variables and finds that none of them are significant confounders for the association being studied, if a later group of researchers were to study the same association, need they concern themselves with controlling for those five variables?

A. Well, you shouldn't draw conclusions on the basis of a single study. If there are -- if in your hypothetical situation there's one study, case control study, that did not find those proposed confounders to be related to suicide, but there were five other studies that said, yeah, they were related, then that's a strong reason to think I ought to measure and control for those variables because maybe they are confounders, they just didn't happen to show that relationship in that one body of data studied in the original article.

Q. But you would agree, would you not, that if several studies have examined a given variable and whether or not it's a significant

G. KLECK

confounder on the relationship between gun access and suicide, and all of those studies have found it's not, in fact, a significant confounder, that it's probably not a significant confounder?

A. Yeah, it's less likely to be one. I wouldn't make any statement about probably not, but it's less likely. But when in doubt, when the literature is mixed on whether or not it's a confounder, it's prudent to control for, because it may be these study that said yeah, it's a confounder, that were correct. Maybe they had better data, maybe they had more representative samples, maybe they had better measures of their variables. And so it's always a matter of a majority opinion. It may be the technically soundest studies indicated A, B, and C were confounders, and so subsequent studies should control for A, B and C.

Q. I want to direct your attention to Exhibit 60.

(Exhibit 60, 2004 study by Webster, marked for identification, as of this

G. KLECK

date.)

Q. Exhibit 60 is a 2004 study by Webster and others, called the Association Between Youth-Focused Firearm Laws and Youth Suicides. Are you familiar with this study?

A. I think so. Let's see. Yeah, I'm pretty sure I've read it before.

Q. Did you read this study in order to write your report?

A. No.

Q. Did you read this study in order to prepare your 2019 book chapter?

A. No.

Q. Did you consider this study in drafting your report? It sounds like the answer is no.

A. No -- I mean, yes, the answer is no.

Q. Let me ask that question better. Did you consider this study when forming your opinions in this matter?

A. No.

Q. And you didn't review this even though it's cited in Dr. McCourt's opinion?

A. No.

G. KLECK

Q. Among other things, this study concludes that state firearms access -- excuse me. Among other things, this study concludes that, "State filed access prevention laws, or cap laws for firearms, are associated with an 8.3 percent reduction in overall suicides among 14 to 7 year olds and an 11 percent reduction in firearm suicide among this population, but no change in suicide by other means."

Do you agree or disagree with those findings?

A. If you interpret them as mere statistical associations, then I have no reason to doubt them. But if you interpret them as assertions about causal effect, then I disagree.

Q. How would you develop an opinion about causal effect other than by reviewing statistical data like this?

A. Well it's on the basis of statistical evidence like this that I draw the conclusion their findings have no sound foundation. Their own findings indicated that

G. KLECK

their control variables are not confounders, that they didn't serve the purpose of helping to isolate the effect of gun ownership.

Q. They controlled in this study for, among other things, alcohol consumption, percentage of population living in rural areas, income, unemployment rates, education level, race. This is on page 596.

A. Yes, and in each case, their own results indicates those are not confounders because they have no significant relationship between suicide rates and in this case, these firearms laws. They're not related to suicide rates, so they can't be confounders, and so it doesn't help to control for them. They might as well just pick random variables out of thin air, measured in control for them, and it doesn't improve the estimate of the effect of guns on violence. The only kinds of control variables that will help are variables that are significantly related to suicide and also correlated with some gun ownership levels, or in this case, firearms laws.

Q. But I guess what I'm struggling with

                                                    G. KLECK

is, you seem to maintain in your report and your book chapter that a list of 15, or maybe it's 19, or maybe it's 13, confounders must, in all instances, be controlled for, otherwise you can't trust the results.

MR. PENNAK: Mischaracterizes his testimony.

Q. And yet here, when a study does control for some of those, you say it's not worth controlling for them. Help me understand the distort between those two positions.

A. First of all, the context in which I listed those confounders was the case control literature. It wasn't a macro-level study like this one by Webster, et al. So no, it doesn't have any bearing on the issue of which variables need to be controlled. And secondly, I didn't say that they absolutely had to control for all of them. The implication was simply that the more of those you control for, the more reliable your conclusions about the effect of guns on suicide. And what the results in this

G. KLECK

particular macro-level study indicate is, what the authors were controlling for were not confounders. Their own evidence indicates that. So you don't even have to doubt their evidence. Their evidence says they weren't isolating the effect of, in this case, firearms laws because they weren't controlling for confounders.

Q. In your report you assert that, quote, "Having a stronger suicidal intent caused the high risk of suicide and also caused a higher likelihood of gun ownership to provide the means for committing suicide." And as support for this statement, you cite two studies by Brent.

Do you recall that portion of your report? We can bring it up on the screen, if necessary.

A. Yeah, would you do that, please?

Q. It's your report page 6, lines 6 and 7, if we can get them both on.

MR. PENNAK: Did you say Exhibit 3?

MR. MILLER: I believe so.

A. What line?

G. KLECK

Q. So it's Exhibit 3, it's page 6, and I believe it starts around 16 and then goes onto the top of the next page. It's assertions about suicidal intent being a confounder in the case control literature.

A. Oh, yeah. Yeah. Okay. I see what you're talking about. Yeah. That was -- that was in connection with one particular confounder, suicidal intent.

Q. Yeah.

A. So in some studies, that's a relevant consideration. And in the Brent studies it was relevant, basically, because they were studying the distinction between attempted versus completed suicides, and suicidal intent is very much a confounder there because it affects, you know, how likely it is somebody to actually carry things through to the point where they kill themselves.

Q. So let me unpack what you just said. Suicidal intent is a confounder in some studies, but not all studies?

A. Well, certainly in the Brent study.

                              G. KLECK

In the Brent study, because it concerned what makes a suicide fatal rather than an attempt that doesn't result in a death.

Q. Do all studies that examine the relationship between gun access and suicide need to control for suicidal intent?

A. Well, it wouldn't be relevant to macro-level studies, but at least all of the individual level studies that I can think of as I sit here, yes, they should control for suicidal intent if they could, but they're usually not in a position to measure them, therefore they can't control for it. Brent happened to do it, though.

Q. Yeah, Brent did by interviewing, individually, all of these psychiatric patients and forensically interviewing their surviving family members; is that right?

A. Yes, but other researchers have done it in other ways, including doing what they call psychological autopsies where it's, in effect, something they can accomplish even with people who killed themselves. They can do it after the fact by talking to surviving

G. KLECK

relatives, by studying the circumstances of the suicide and so on.

Q. So you believe, based on the Brent studies, that suicidal intent is a confounder in the case control literature for the relationship between gun access and suicide -- and death by suicide, I should say?

A. Well, definitely in the Brent studies. I wouldn't be prepared to say it's invariably for all individual level studies, a confounder. But I would say the presumption should be that, yeah, I mean, how can suicidal intent not be related to the outcome of a suicide attempt. How can wanting to commit suicide not have any effect on whether you, in fact, do commit suicide.

Q. When you were asserting in your report and book chapter that having a stronger suicidal intent causes the higher risk of suicide and causes the higher likelihood of gun ownership, was the Brent study the best -- the Brent studies, I should say, the best evidence you could marshal for that?

A. It's not only the best, but the only

                        G. KLECK

evidence, with respect to a study where the outcome measure is whether the suicidal attempt was fatal or not fatal. I mean, basically it's the only study I know of like that where they measured and controlled for suicidal intent.

Q. Weren't the Brent studies relatively small? And we're talking, in one instance -- and these were overlapping populations. They used control groups of 65 individuals in one study and 94 in the other?

A. That's correct, but it's the best available evidence we have on the topic.

Q. Those are relatively small control groups, though; is that right?

A. Yeah.

Q. And those Brent studies both made comparisons between completed suicides, that is, fatal suicide attempts, against a control group made up of people who were at risk of suicide among a psychiatric population; isn't that right?

A. Yes.

Q. How can you then generalize, based

G. KLECK

on a control group comprised exclusively of psychiatric patients, to suicidal intent about the general public?

A. Well, I wish I had better evidence. But again, all you can do is go with the best available evidence, and this was and remains the best available evidence.

Q. Doesn't Brent say himself in a 1993 follow-up study, that you can't analogize from his findings about psychiatric patients to make generalizations about suicidal intent among the general population?

A. I believe he did.

Q. In fact, Brent in 1993, the author of these two studies you rely on about suicidal intent, wrote, "In previous reports we have indicated that storing a gun loaded had, at best, a modest impact on the propensity for the use of a fireman in suicide. However, in these previous studies, almost all of the suicide victims and comparison groups were psychiatrically ill. It may be that, in the absence of significant psychopathology, a loaded gun is a

G. KLECK

particularly important risk factor for suicide." In other words, a loaded gun might pose a different risk for individuals without psychiatric problems, i.e. the general population.

Isn't that what Brent is saying here?

A. It certainly is what he said.

Q. How can you rely on Brent's 1988 and 1991 studies, concerning psychiatric patients, to make pronouncements about the general population when Brent himself said there are significant differences between these populations, and therefore not to draw precisely the conclusion you draw.

A. Because that's not what he said. In fact, he was only speculating that the relationship between guns and suicide is any different in the general population than it is in a psychiatric population. He might be true, but that's all it was, he was just guessing. And I suspect part of the reason he may have been making that point is because his colleagues, who were pro-control, didn't quite

                        G. KLECK

like him minimizing the significance of guns, and in particular saying that once you control for suicidal intent, there wasn't any relationship. So maybe ex post facto he's kind of revising his assessment of the evidence. But I draw my conclusions solely on the basis of the evidence, not the author's speculations about, you know, what the results may be generalized to.

Q. What is your evidence that Brent was somehow influenced by, what you title pro-control colleagues, when he qualified the findings of his earlier studies in a way that undercuts your conclusion?

A. I offered that just as a speculation, as nothing more. So asking about -- for evidence of a speculation doesn't make any sense. I mean, speculations are not based on evidence, they're speculations.

Q. So, in other words, you're making that up?

A. No, I'm not just making it up out of nowhere. I'm basing it on the bias that's evident in medical journals, including

G. KLECK

psychiatric journals, evidence by the conclusions that authors draw in contradiction to the evidence that they can present.

Q. Is this evidence that Brent developed between his 1991 study, which you support, and his 1993 study, which you dispute?

A. I don't know that there was any difference or contradiction at all between those results -- those studies. He was before citing a speculation that he had stated later on. That's -- [audio interference].

Q. Can you hear me clearly? You cut out there.

A. I can hear you just fine.

MR. PENNAK: I did not hear the last part of his answer.

Q. Can you repeat the last part of that?

A. What I said was, I thought you were asking about Brent's 1993 speculation, and that's what I said, I said it's a speculation.

THE WITNESS: Can we have a brief bathroom break for those of us with older

G. KLECK

kidneys?

MR. MILLER: Let's do that. Now's a good time.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 4:44 and we're now off the record.

(Recess was taken.)

THE VIDEOGRAPHER: The time is 4:50 and we are now back on the record.

BY MR. MILLER:

Q. So I want to direct your attention to your book chapter, the 2019 book chapter, which is 6, I believe. One moment. Yeah, 6. And specifically to the table that summarizes the results of various studies, including Brent.

Okay. So I'm showing you a page out of Exhibit 6 now. It's in your book chapter, Table 17.1. It's the table that lists Miller and several studies by Brent and it looks like a couple others on there. Do you see where that is, either on the exhibit or in your binder in front of you?

A. I see it in both.

G. KLECK

Q. So Brent, in 1993, studied the relationship between gun access and suicide again, right?

A. I don't know what you mean by again.

Q. So he had studied it in 1998 and 1991 -- excuse me, I misspoke there. He had studied it previously in 1988 and 1991, which we know because those are the two Brent studies you rely on for your opinion about suicidal intent as a confounder. You follow me?

A. Yes.

Q. And then he studied gun access and suicide again in a 1993 study, which is also reported a bit lower on your table. Do you see that?

A. I do.

Q. And in that study, Brent did not use psychiatric patients as a control group, did he?

A. No, I don't recall. I'd have to look at the study again.

Q. And in that 1993 study, Brent found a significant -- a statistically significant

G. KLECK

odds ratio of suicide indicating a rather robust connection between gun access and suicide; is that correct?

A. Yes. But in that case, he did not control for suicidal intent anymore.

Q. And in his 1993 study, Brent indicated that the fact that his previous studies involved comparison groups that were all psychiatrically ill individuals meant that -- may have had a significant impact on his findings there.

A. Yes, that's something he speculated.

Q. And you don't think that's a significant limitation for using the Brent 1988 and 1991 studies, to make pronouncements about suicidal intent among the general population?

A. Well, the results really aren't comparable between those earlier studies in 1988 and '91. When he controlled for suicidal intent in the later studies, I vaguely recall he couldn't control for suicidal intent because he didn't have those measures for both groups, or they weren't relevant for both

G. KLECK

groups. And so they're not -- they're not comparable results. So he has no way in 1993 studies of knowing why exactly he got different results, because one reason is, it could be, as he speculates, that now he had a different control group. But it's also possible that it wasn't the nature of the sample at all, but rather the fact that he couldn't control or didn't control for suicidal intent. So that's why it's something of a guess on his part, as to why he would have gotten different results.

Q. Is it also a guess on your part whether you can take the finding, as you interpret it from his 1988 and '91 studies involving exclusively psychiatric patients, and generalize that to a statement about the mental health of the general population?

A. I don't think so, because, you know, it's not a speculation that it matters whether you control for suicidal intent. The only speculative issue here is whether or not this relationship between guns and suicide would differ with psychiatric patients versus, you

                              G. KLECK

know, the other, the general adolescent population control group. That's speculative. I mean, Brent was just guessing on that. What you would need to actually test it in a way that wasn't speculative was, you'd have two studies that somehow could control for the exact same variables, only the difference was the difference in samples and the difference in the kind of control groups used, and Brent was not in a position to do that.

Q. But doesn't the conclusion that you draw from 1988 and 1991 Brent studies, isn't that necessarily evidence only of the fact that suicidal intent is a confounder, as between control group and populations comprised of psychiatric patients?

A. It's possible, but that's all it is. It's a possibility. It's not something we know for a fact.

Q. You don't know either way?

A. No. You have to go on what you do know and not based on speculation, and we don't have any affirmative evidence that the effective controlling for suicidal intent

G. KLECK

would be any different if you had a study sample not composed of psychiatric patients. All we know is, within the group that -- where that issue was studied, it did make a decisive effect --

Q. So you're saying --

A. -- and a huge difference.

Q. Am I correct here in saying we don't know whether suicidal intent -- the suicidal intent finding among psychiatric patients can be generalized to the general population. Is that fair?

A. I'd say no, it's kind of an odd way to phrase it. The correct way to phrase it is to say, based on what we do know, it matters a huge difference whether you control for suicidal intent, and then to go on and speculate, well, maybe it would be different with a different kind of study sample. And it might --

Q. What we do know is limited to the population of psychiatric patients; isn't that correct?

A. That much is correct.

                              G. KLECK

Q. And so whether we can analogize or not from that population to the general population is something you don't know and nobody else knows. Is that accurate?

A. No, that's just an odd way of phrasing it. It's kind of a distorted way of saying it. You go on the basis of what we do know, and what we do know is that it makes a difference to control for suicidal intent, and no, we don't have any affirmative reason to think it would be any different in a nonpsychiatric sample. That's just guesswork.

Q. Are there not sound theoretical reasons to think that the population of psychiatric patients might have different relationships with suicide at intent than the general population?

A. No, quite the contrary. I would think suicidal intent would be every bit as important as a confounding factor in the general population sample as it would be among the psychiatric patients.

Q. What was the age --

A. So there's no earthly reason why

G. KLECK

suicidal intent would be unrelated to suicide in a general population sample, even though it's related in a psychiatric patient sample.

Q. You rely on the 1991 and 1988 Brent studies to make an assertion, and I'll quote here from your report, "Having a stronger SI caused the higher risk of suicide and also caused a higher likelihood of gun ownership."

What was the age group that Brent studied in his 1988 and 1991 studies?

A. Adolescents.

Q. These are individuals age 19 and younger, correct?

A. I believe so, yeah.

Q. Can adolescents, age 19 and under, legally purchase a firearm at the time Brent did his study?

MR. PENNAK: Calls for a legal conclusion.

Q. You can answer.

A. I don't know about the distinction in Pennsylvania law versus other states, but certainly there were states where persons of that age could purchase firearms.

G. KLECK

Q. Could they purchase handguns?

A. If they were 18 -- well, let's see. We're talking 1980s? Probably not. I mean, at least not from a retail dealer.

Q. So the population that Brent studied probably could not purchase handguns at the time Brent did the study. Is that a fair assessment?

A. Legally, but they could acquire guns, and that's what's more relevant to whether or not they had access to a gun. I mean, access doesn't imply anything about either ownership or the legality of the acquisition.

Q. So you are analogizing from a study involving minors, for the most part, who could not legally purchase a gun to make a statement about the likelihood of gun ownership?

MR. PENNAK: Mischaracterizes his testimony.

Q. Is that accurate?

A. No, it is not.

Q. What's wrong with that statement?

A. Virtually everything. I mean, first

G. KLECK

of all, what's legally possible in the way of ownership or acquisition is irrelevant to whether adolescents have assess to gun. They don't have to own them and they don't have to legally acquire them. Your question is basically, you know, it's raising an irrelevancy. Could these individuals have acquired handguns? Yes. Could they have acquired them legally? No.

Q. Well, that's not what your report says, though, is it?

A. Well, my report doesn't address the issue of the legality of their access to firearms or their acquisition. It simply doesn't say anything on the topic one way or the other.

Q. Well, your report does say that we can use these studies to assess that suicidal intent causes a higher likelihood of gun ownership. Isn't that what your report says?

A. What it says is that, based on the best available evidence we had, which was the Brent studies, it makes a huge difference whether you control for suicidal intent. It

G. KLECK

doesn't go beyond that in saying, well, we know for certain that this is universally true in all subsets of the population. It doesn't address that one way or the other. But in the absence of any evidence, based on general population samples, I'd say this is the best we have going and, you know, there's strong reason to believe the effective controlling for suicidal intent would be any different in a general population sample than in a psychiatric sample.

Q. I appreciate your statement that the Brent studies are the best available evidence you have that suicidal intent is a confounder in this relationship. I'm trying to explore some of the limitations, and it seems to me that the limitation, that Brent studied a population who could not legally purchase the firearms that are used in those suicides is a pretty significant limitation. Do you agree or disagree with that assessment?

A. I disagree.

Q. In your 2019 book chapter, the values in the table that are displayed here,

G. KLECK

accrued OR and adjusted OR, what's the source of those? Who calculated them?

A. The original authors.

Q. And so these do not reflect your calculations, or reanalysis of any of the data?

A. Correct.

MR. MILLER: Let's pull up Brent '91.

Q. I'm going to direct your attention to 53 in the binder.

A. Okay.

(Exhibit 53, Brent 1991 study, marked for identification, as of this date.)

Q. And I specifically want to take you to page 2993. Let me see if I can -- let me get my copy. I'm just looking for the quote I want to read to you here.

Okay. In the paragraph under the heading Adjusted ORs, it reads, about two or three sentences in, "After controlling for a diagnosis of effective disorder and suicidal intent, the presence of a gun in the home was

G. KLECK

more likely in the completers," that is suicide completers, "relative to attempters, finding an odds ratio of 2.1."

Do you see that finding?

A. I do.

Q. Any reason to believe that's an inaccurate finding?

A. I'm not sure which subset of his sample they're referring to in this case. Let's see.

Q. This is the A subset identified on your table, at least, and it's the same adjusted odds ratio, I believe.

A. Well, I can't tell which table he's alluding to in this case.

Q. Is it fair to say, though, that Brent in 1991 concluded that even after adjusting for suicidal intent, presence of a gun in the home was statistically significantly related to a completed suicide with an odds ratio of more than 2?

A. I think so, but I'd have to look at it a lot longer than this to be sure about my statement.

G. KLECK

Q. So is it fair to characterize Brent's 1991 study as showing that suicidal intent is a significant confounder when he, in fact, finds a robust relationship, even after controlling for suicidal intent?

A. No, it would not. That wouldn't follow.

Q. I want to bring your attention to Brent's 1993 study, which is -- should be 51, I think, at 1066.

Sorry. I want to bring your attention, not to 51, but to 50. I apologize.

(Exhibit 50, Brent 1993 study, marked for identification, as of this date.)

Q. And in the results section on this first page, so I'm looking under Measurements and Results, Brent's finding just two years later, "Even after adjusting for differences in rates of psychiatric disorders between suicide victims and controls, the association between suicide and both any gun and handgun in the home were both highly significant."

What does that finding mean?

G. KLECK

A. Well, in statistics, highly significant doesn't mean very important. It means it's unlikely to be due to random chance. So a very unimportant, weak affect can be statistically highly significant. And so what he's saying is, this association is very unlikely to be entirely attributable to random chance or coincidence as, for example, with random error in measuring some of the variables.

Q. So after controlling for psychiatric disorders in his 1993 study, involving a control drawn from the general population, would you agree that Brent found a statistically significant association between both gun access, and in particular, handgun access, and suicide?

A. That's what he reports.

Q. I want to direct your attention to page 35, tab 32. I'm sorry, 33. And to the exhibit, we'll show it, that's been pre-marked 33.

(Exhibit 33, 2011 study by Betz, Barber, and Miller, marked for

G. KLECK

identification, as of this date.)

Q. Do you see the document that's been marked as Exhibit 33 on the screen, and does it match your binder?

A. It does.

Q. This is a 2011 study by Betz, Barber and Miller; is that correct?

A. It is.

Q. And this is published in the American Association of Suicidology?

A. It is.

Q. Or I'm sorry, in the journal titled Suicide and Life-Threatening Behavior, which is that American Association of Suicidology's journal.

A. I understand.

Q. Have you read this study?

A. Yes.

Q. When did you read this study, or in what capacity?

A. Many years ago, and I don't know in what capacity.

Q. You didn't review this study to form the opinions in your report?

G. KLECK

A. No. Not directly, anyway.

Q. In the abstract on 384, this study concludes that, quote, "Similar proportions of those with and without a home firearm reported suicidal thoughts, plans, and attempts. Among respondents with suicidal plans, the odds of reporting a plan involving a firearm were over seven times greater among those with firearms at home, compared to those without firearms at home. The results suggests people with home firearms may not be more likely to be suicidal, but when suicidal, they may be more likely to plan suicide by firearm."

Do you see that portion of the abstract?

A. I do.

Q. And turning your attention to page 390, this study, authors write, "We found that people in homes with firearms were no more likely to attempt suicide and not significantly more likely to consider suicide, than people in homes without firearms."

Do you see that?

A. I do.

                        G. KLECK

Q. Do you agree or disagree with those findings?

A. Not at all. In fact, I can't imagine how they could turn out any differently.

Q. So you agree with those findings?

A. Well, that the people who have guns they could use in a suicide attempt are more likely to plan to use a gun in a suicide attempt? Well, yeah, of course.

Q. Well, what about the finding that similar proportions of both gun owners and nonowners, or homes with firearms and homes without firearms, report suicidal thoughts, plans, and attempts. Do you agree or disagree with that finding in particular?

A. I agree. It's consistent with what other studies have indicated.

Q. Is it not inconsistent with the notion that gun owners have higher suicidal intent?

A. No, it is not inconsistent. It's 100 percent consistent and compatible.

Q. So your view is that gun owners have

G. KLECK

a higher rate of suicidal intent, and yet, not higher likelihood of suicidal thoughts, plans, or attempts?

A. Yeah, but again, you're using the suicidal intent thing rather loosely. I get the impression from context, you're using it to refer to anything that could affect people's likelihood of committing suicide.

Q. How were you using --

A. The larger point to be made is that, yes, gun owners are more likely to be characterized by those attributes that make it more likely to commit suicide. That's why you need to control for those attributes, otherwise you won't be able to isolate the affect of having a gun.

Q. What does suicidal intent mean, in your view?

A. Well, suicidal intent is something that's relevant to individual attempt. It's not necessarily a lasting attribute of the person, unlike, for example, alcoholism or a depressive personality. A suicidal intent would be -- it would be characteristic of

G. KLECK

whether or not when people made an attempt, it was a serious attempt where they wanted to die versus a less serious attempt, where they merely wanted to make a suicidal gesture or communicate their suffering to people around them.

Q. But suicidal intent, as you define it, can change over time?

A. Yes, absolutely.

Q. Sometimes it's higher and sometimes it's lower?

A. Yes.

Q. If suicidal intent fluctuates like that, how can it confound -- how can it both drive the decision to purchase a gun and also the decision to use that gun to commit suicide, in instances where there's a temporal distance between them; weeks, years, months?

A. Well, that's exactly what you would expect. I mean, people who are more intent on killing themselves, who believe, correctly or not, that firearms are especially effective ways of killing themselves, would be more likely to acquire a gun for that purpose. And

                              G. KLECK

when it came time to attempt suicide, among all of the methods available to them, they would be more likely to choose what they believe to be a more lethal method because their intentions are very lethal at that point, despite the fact that the lethality of their suicidal intent might well change over time.

Q. Are social scientists supposed to measure for a person's suicidal intent at the moment of gun purchase in order to control for it? Because if it changes over time, at what point in time is it relevant to the analysis? Like when would you even feed that information into your model?

A. Well, it's not feasible to measure it at the time of gun purchase, because of course at that point there's no reason to believe that that person is relevant to suicide study. The vast majority of people who acquire a gun would not commit suicide or attempt suicide. It wouldn't be a relevant consideration. So it's after the fact measurements that are possible. And so no,

G. KLECK

you can't measure it at the point of gun acquisition. You can only measure it at some later point, like using psychological autopsy measures after some people have committed suicide, to measure how likely it is they had a serious intent to kill themselves. So yes, it's feasible to measure and control for. It's just not feasible to measure it at the point of gun acquisition.

Q. Are you familiar with a 2009 study by Miller, Barber, Hemenway, and Molnar, titled Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: Findings from the National Comorbidity Study Replication?

A. I believe so, but I'd have to see the study to be sure.

Q. Can you turn to 34 in the binder? I'll put it up on the screen.

A. Yes, I've seen that study before.

(Exhibit 34, 2009 study by Miller, Barber, Hemenway, and Molar, marked for identification, as of this date.)

Q. Have you read this study?

G. KLECK

A. Yes, I have.

Q. Are you aware that this study was cited in both Dr. McCourt's report and Dr. Kalyanaraman's report?

A. No, but I'll take your word for it.

Q. Did you consider this study in rendering your own opinions?

A. Well, in the sense that I thought it was irrelevant, no. I mean, it doesn't bear on the conclusion I drew.

Q. This study concludes, among other things, and I'll direct you to page 183, the abstract. "The previously reported association between household firearm ownership and heightened risk of suicide is not explained by a higher risk of psychopathology among gun owning families. People living in a home with firearms were no more or less likely than people in homes without firearms to have recent, past year, anxiety disorders, mood disorders, or substance dependence, and/or abuse. Past suicidal ideation and suicide planning were also not associated with living in households

G. KLECK

with firearms."

Do you agree or disagree with those findings?

A. I agree.

Q. Do those findings indicate to you whether or not any of the conditions indicated are or are not confounders for the relationship between firearms access and suicide?

A. They indicate they're not confounders.

Q. Does the fact that past year suicidal ideation and suicide planning are not confounders and are not associated with living in households with firearms cause you to reconsider your opinion that suicidal intent is a confounder for this relationship?

A. Not at all. They have no bearing whatsoever on that relationship.

Q. Your 2019 book chapter points to the Brent studies to assert that when authors controlled for suicidal intent, what had been previously reported as accrued OR decreased from 4.5 to NS; and this you assert is

G. KLECK

evidence that suicidal intent is a confounder, that if not controlled for will skew results to erroneously suggest a link between gun ownership and suicide. Is that accurate?

A. Yes.

Q. Is the converse also true? So, for example, if after controlling for various variables, a previously reported accrued OR, in fact, increases when it's an adjusted OR, would we not draw the conclusion that these variables are not, in fact, confounders?

A. No, it could still be a confounder, or it's a special kind of confounder. It's called a distorter variable. If the relationship actually changes -- I mean, it can even strengthen as a result of controlling for what is a confounder. So you can take a genuine confounder and find that the relationship is strengthened. And so there's -- you've got a better estimate of the effect, because you controlled for confounders, and maybe that better estimate is a stronger effect.

Q. So let me try to be more precise

G. KLECK

with the question, then. If in the studies reported in your table, after controlling for various confounders, the adjusted OR is greater than accrued OR, should we conclude that the event of these variables, when uncontrolled, is to erroneously diminish or depress the connection between gun ownership and suicide?

A. It's possible, sure.

Q. I mean, you draw the opposite conclusion when accrued OR drops in the context of the Brent study; is that right?

A. I draw the conclusion that now it's more likely there's no significant effect gun access on suicide.

Q. Enough that control for suicidal intent, because otherwise, it will skew the results to suggest an association when there, in fact, is not a robust one?

A. Yes, in that particular study where the outcome measure was whether it was an attempted suicide or a completed suicide.

Q. So you report in, for example, the Kung, et al., 2003 study, which is on your

G. KLECK

table --

MR. MILLER: We should go back to -- I don't want the study itself, I want the table, which I think is 6. I don't think the page is numbered, but it's in Table 17.1 of Exhibit 6, which we'll pull up. We'll rotate it.

Q. Can you confirm that we're looking at the same page that's shown on the exhibit here? We'll rotate it so you can see it better.

A. Yes.

Q. Okay. The Kung study controls for six, or five, what you term significant confounders. Isn't that right?

A. Yes.

Q. And in doing so, the odds ratio changes for men from 2.59 to 6.05; is that right?

A. Yes.

Q. And for females, it changes from 2.71 to 6.99?

A. Yes.

Q. And should we not conclude, based on

G. KLECK

that, that the five confounders controlled for, and I believe that's sex, race, alcohol use, marijuana, and is it depression? I'm assuming it's depression.

A. That's correct.

Q. That a failure to control for those variables, rather than erroneously showing a connection between gun access and suicide where one doesn't exist, would, in fact, do the opposite?

A. That's correct, for those variables in this particular study, and that particular sample.

Q. And we could draw the same conclusion about any other confounder you list in this table where the adjusted odds ratio increases after the variable or variables are controlled for?

A. Well, it's possible, because it's -- but not certain, because in some studies, the sample you're basing the estimate on changes. It's not just the variables being controlled. You may not have had data on those variables for some subsets of the sample, so you had to

G. KLECK

drop [audio interference] -- the authors handle the missing data. But usually it results in either dropping cases altogether from the sample or producing some estimate for the missing information, which may be unreliable.

Q. Are you saying we can't draw a general conclusion about how a given variable will confound the relationship between gun access and suicide --

A. Well, you can draw a conclusion -- I'm sorry.

Q. Are you saying we can't draw a general conclusion about the relationship between gun access -- let me rephrase this question. I'm getting mixed up.

Are you saying that we cannot draw a general conclusion that particular variables are confounders for the relationship between gun access and death by suicide because the populations of various study groups differ, or are you only saying that's the case when the confounding variables appear to hurt the contentions in your report?

G. KLECK

MR. PENNAK: Compound.

A. Well, I'll say what I think is a responsive answer. You tell me if it is. Yeah, whether or not you can generalize to the population as a whole, from a given study, will be a function of the extent to which the study sample was representative of a larger population, and that would also apply to the effect of controlling for various confounders.

However, within a given study, if the samples differ in terms of, you know, when you estimated your model of suicide for one sub-sample versus another, the fact that you get different results may be attributable to the differences in sub-samples, rather than the differences in which variables you're controlling for.

Q. So, in effect, though, confounders, even their existence is specific to the populations being studied. It's hard to generalize between, as you term it, subgroups; is that correct?

A. Well, if you find the same confounders again and again in multiple

G. KLECK

studies, even though each study pertained to a different kind of sample, it has a cumulative significance to it. The idea of things is to have one whopping big sample that's representative of the entire population. If you're lucky enough to have that, then yes, you can directly infer conclusions about the general population as a whole.

Q. But when you put together this 2019 book chapter, you tried to canvas the entire universe of case control literature on this relationship, didn't you?

A. That's correct. And some case control studies pertained only to very small, tiny, unrepresentative subsets of the population, and some pertain to much more generalizable samples of population.

Q. Is adolescent psychiatric patients in Pennsylvania what you would characterize as a small sub-sample, or is that a generalizable one?

A. Small sub-sample.

MR. MILLER: Do you have tab 65 in your binder, counsel and witness? You

G. KLECK

should. I think it's the last one, maybe.

THE WITNESS: I do.

MR. MILLER: Great.

Q. I want to direct your attention to what's been pre-marked Exhibit 65 and which should be in your binder as 65.

(Exhibit 65, 2006 study by Miller, Swanson, and Azrael, marked for identification, as of this date.)

Q. Are you familiar with this study, and does it match what you see on the screen here?

A. No, I'm not familiar with it. Yes, it matches what's on the screen.

Q. In 2016, in a study published in Epidemiologic Reviews, Miller, Swanson and Azrael undertook to reanalyze a number of case control studies to quantify how strongly a confounder -- how strong a confounder would need to be -- let me back this up. I'm butchering the question. Strike the question.

In 2016, Azrael, Miller and Swanson undertook to reanalyze a number of case control studies to quantify how strongly a

G. KLECK

confounder would need to be related to both firearm availability and suicide to explain the relationships observed in past studies.

Were you aware of that?

A. Aware of the existence of this study? No.

Q. Yes. That analysis seems like it's pretty on point for your opinion in this report, isn't it?

A. No, it is not.

Q. They tried to analyze what quantitative characteristics a confounder for the relationship between firearm access and suicide would need to have in order to explain away the observed relationships and render a null result, and that's not relevant to your opinion?

A. No, it is not.

Q. Why not?

A. Well, because my opinion pertained to an entire long list of confounding variables, not any one of them. And, in fact, I think I explicitly said no one of these factors would completely account for the

                                                    G. KLECK

associations found in this study. In other words, I deliberately laid out why this kind of silly analysis is meaningless, because nobody has asserted that there's just one confounder that, all by itself, would completely account for these huge associations. In fact, the huge associations are not even just attributable to failure to control for confounders. They're also attributable in many cases simply to mis-measure of who had guns and who did not.

Q. So Miller, Swanson, Azrael, they quantified or attempted to quantify what attributes a confounder would need to have in order to render a null result, but that's not something you've ever done, is it?

A. I haven't done it because it would be pointless, just as their statement was pointless. It's, in effect, testing a hypothesis that nobody has proposed or would seriously propose, the hypothesis that just one confounder would, all by itself, account for the observed associations between guns and suicide. The idea is ridiculous.

                        G. KLECK

Q. And you don't know of any such, as you put it, ridiculous confounder, that would explain away the results that have been observed in study after study linking firearms access to suicide?

A. No, except under the most peculiar circumstances, like in the Brent study where they were specifically looking at simply why some suicide attempts are fatal versus those that are not fatal, and that's not what is usually studied in the case control studies. So leaving aside that kind of study, no, no one confounder would account for all or probably even most of the observed association. Rather, it's the cumulative effect of failing to control for numerous confounders, many of which I explicitly listed in my chapter in Gun Studies, and that was by no means a comprehensive list. As I pointed out at the time, that's -- it's sort of the beginning of a plausible list of likely confounders.

Q. So in your view, the Miller, Swanson, Azrael study is silly because it

                        G. KLECK

fails to address the criticism that multiple confounders together could explain this?

A. Well, that among other things. I don't know that it's flaws are limited to that because, as I say, I haven't read the study.

Q. So --

A. Whether it has anything to contribute, even with respect to specific confounders, is a function of whether or not they actually looked at true confounders rather than simply variables that have been controlled in previous analyses. For example, in previous analyses by Miller and Azrael, they routinely control for variables that are not confounders. In fact, most of the variables they control for are not confounders. So it's, you know, it's meaningless to demonstrate that non-confounders don't have any effect on the results. Well, of course they don't have any results -- effects on the results; they're not confounders.

Q. I want to direct your attention to page 67 of this study, which I think is just

G. KLECK

the next page. And on there, Miller, et al., writes, "Even if multiple sorts of unmeasured confounding were at play, the additional impact of considering these factors jointly would depend upon the extent to which these purportedly distinct sources of unmeasured confounding were not only orthogonal to known measured confounders, but were also orthogonal to one another."

Do you see where they wrote that?

A. I do.

Q. What are they saying there?

A. They're saying something that's incorrect, statistically. The factors that go uncontrolled, whether they are orthogonal to one another, which basically in this case means they're not colinear --

Q. Yes.

A. -- or correlating with one another. It would still be the case that failing to control for multiple confounders could completely account for getting the erroneous associations between guns and suicide that many of these studies have --

                            G. KLECK

Q. Dr. Kleck --

A. It doesn't really rely on an assumption of orthoganality among the alleged confounders.

Q. Aren't Miller, et al. here, saying that you can't just add up the confounders; you can only add them if they, in fact, have overlapping effects?

A. No.

Q. Let me rephrase that. I think I got that wrong.

Aren't they saying here that confounders only -- are only additive in terms of the error rate, to the extent they have separate and distinct impacts on the firearms access and suicide relationship?

A. As long as they have some distinctive effect that's not already incorporated into the other variables's control, then they can still have a distorting effect if they fail to control for such a variable. Almost all of these alleged confounders are, indeed, colinear; they're coordinating with one another. That is, in

G. KLECK

Miller's terms, they're not orthogonal, and yet there still can be a cumulative effect of many uncontrolled confounders, each of which has only a modest effect on the results.

Q. So you're saying that they are incorrect, that controlling for confounders is only necessary to the extent they separately contribute to the confounding effect on the relationship being studied?

A. I don't understand your question.

Q. Where is your analysis showing that the various confounders you propose have sufficiently distinct impacts from one another such that they could, in fact, have the cumulative effect you hypothesize?

A. I have no way of knowing, and nobody would, including Miller and his colleagues, unless you measured and controlled for those factors. And especially if you added them in as control variables one at a time, then you would be able to see what marginal increase in the effect of the confounders occurred when you added another variable on top of other confounders, with which it was correlated.

                    G. KLECK

And so nobody can address that issue until the research is actually done, and that was more my point, the research has not been done. And so Miller and his colleagues would merely be guessing as to what the consequences of controlling for all of those multiple confounders would be.

Q. Are you also guessing that the confounders you propose, in fact, add up to the cumulative effect you hypothesize?

A. I'm saying -- no, I don't hypothesize an effect. I'm saying you don't know. And you're speculating that you don't know because you don't know, because the analyses have not been done and this is not anything subject to serious dispute.

Q. I'm not asking --

A. This has not been done.

Q. I'm not asking what I know or what Miller and Azrael and others know. I'm asking what you know. Do you know whether the cumulative effect of the confounders you identify do, in fact, explain away the results that have been identified in study after study

G. KLECK

after study?

A. I know that we don't know, in study after study after study.

Q. You're not answering my question. Do you know whether or not the cumulative effect of all of the confounders you've identified, in fact, explain away the results of all of the studies we've gone over, and others we haven't, such that they would render a null result?

A. No, I don't know, nor does anyone else know. And conversely, nobody knows that they would not completely account for the associations observed. We just don't know.

Q. And so the answer is, among other things, you yourself do not know?

A. Well, again, I can't accurately tell you what I think except to say I know -- any other way of phrasing it would be misleading.

Q. You cut out in the middle of that after I know.

A. I know we don't know, and to phrase it any other way would be misleading.

Q. You have a hypothesis about how each

G. KLECK

of these supposed confounders you've identified affects the relationship between gun access and suicide; is that correct?

A. Yes.

Q. You don't know if that hypothesis is, in fact, correct; is that true?

A. I have strong evidence to believe that it's correct. That, at least, part of the association between guns and violence can be accounted for by these factors I've listed as confounders. And it's not speculation that they would have an effect, that controlling for them or not controlling for them would have an effect on the results, because I cite empirical evidence that they are both factors that influence suicide rates and are correlated with gun ownership.

That's not speculation. The only thing we don't know is whether cumulatively controlling for all of them would completely eliminate the observed association between guns and violence.

And one point of my comment, my overall assessment of the case control

G. KLECK

research is that we really haven't begun serious research. Serious research begins when somebody makes an effort to seriously identify, in advance, as many of the likely confounders as possible, among others, the ones that I listed, but not limited to those, and does a study devoted to measuring and controlling for them. Instead what we have is people who find an association between guns and suicide and then they stop, and they're not interested in challenging or really testing a hypothesis. Or they do some minimal controls for variables that either aren't confounders or are, at best, a very small, partial list of confounders.

Q. Thank you, Professor. Are you finished?

A. I am.

MR. MILLER: Let's take a quick break. We'll be back in, let's say, ten minutes, 5:55, and I think we have about 25 minutes left.

THE VIDEOGRAPHER: The time is 5:46 and we're now off the record.

G. KLECK

(Recess was taken.)

THE VIDEOGRAPHER: The time is 5:58. This is the beginning of Session Number 7 and we are now back on the record.

BY MR. MILLER:

Q. Professor Kleck, I wanted to get into your opinion where you reference the scientific evidence that you content contradicts the brochure's factual statements. And in particular, I want to direct your attention to your 2021 paper, which is in the binder as Exhibit 8. I'll put it up on the screen here.

(Exhibit 8, Kleck 2021 study paper, marked for identification, as of this date.)

Q. What were your measures of gun ownership in this -- sorry, let's get the study up first.

So do you see the study that's in your binder as Exhibit 8?

A. Yes.

Q. That is your 2021 metaanalysis of Country Wide Gun Ownership and Suicide Rates?

G. KLECK

A. It is not a metaanalysis, no.

Q. Excuse me. A macro analysis.

A. A macro analysis, yes.

Q. And does the document in your binder that's Exhibit 8 match what's shown as Exhibit 8 on the screen?

A. Yes.

Q. All right. What were your measures of gun ownership in this study?

A. There were three measures, one of which was the percent of suicides committed with guns; one was an estimate based on all sorts of miscellaneous indicators of the number of guns per thousand population; and another one was for a subset of nations in the European Union, direct survey measures of gun ownership.

Q. So among other measures, you used PSG, or percentage of suicide with guns, as one of your measures of gun ownership?

A. I did.

Q. And you did that even though you have criticized other researchers for doing exactly that?

G. KLECK

A. I did, indeed.

Q. And held that their results are unreliable as a consequence of using that measure for gun ownership?

A. I'm sorry, is that a question about what I said about previous studies?

Q. About -- your criticism of other studies that use PSG to measure gun ownership is that it likely produces unreliable results. Is that accurate?

A. Yes.

Q. And does it do the same in your own study?

A. Could be.

Q. One of the other measures was national surveys of gun ownership, you said were conducted in European countries; is that right?

A. Yes.

Q. And your study here states that these are, quote, "clearly not a representative sample." That's on page 2. Is that accurate?

A. Yes, it is.

G. KLECK

Q. What do you mean that they are clearly not a representative sample?

A. They're not a representative sample of all the world's nations because they're primarily more affluent, developed nations, and of course that excludes undeveloped nations in the third world.

Q. So it's hard to draw worldwide conclusions based on this sample size of solely developed European countries?

A. There's no direct basis for inferring something about the entire population of all nations just based on European union nations.

Q. The third measure, which I believe is the Small Arm Survey, or SAS, is that what the third measure was?

A. Yes.

Q. You wrote about that measure, quote, "The SAS measure may not be comparable across nations." That's on page 7 of your study. What did you mean by that?

A. It's compiled out of different, separate indicators. So, for example, many of

G. KLECK

the estimates start with a government registry. They have -- for some nations, they have firearms registries, that's a measure of legal ownership of firearms. Those who compile the SAS figures acknowledge that, no, that's not a complete estimate, and so they extrapolate from legal gun ownership by various multiplication factors to gun ownership overall, the total number of guns rather than just those that are legally owned. But other nations don't have registration systems, so they can't start with that method for estimating gun ownership. So they'll be based on other indicators.

And in some cases it seems to be based on guesses by government officials. They don't quite say guesses, but they refer to it as expert opinions and so on, and the SAS compilers don't elaborate any further. And so again, in some nations they didn't base their estimates on that, on that kind of, so-called expert opinion. So again, it's not the same indicators being used to estimate the number of guns in private hands in each

G. KLECK

nation.

Q. So among other issues, the SAS is not a standardized calculation among the various 190-odd countries in the world?

A. It's not the same procedure for every nation.

Q. And among other issues, the SAS is, in some instances, a little more than guesswork by country officials?

A. Yes. That seems to be a major component of the SAS computations; for some nations and not for others.

Q. You also say on page 7 of this study, "No variables were controlled in this analysis." Is that accurate?

A. That's accurate.

Q. And you say no variables were controlled, even though it's possible, is it not, that an uncontrolled confounder in a study like yours could produce a false negative result?

A. If you mean a false null result, yes. Negative could be a negative correlation, but --

G. KLECK

Q. I appreciate the precision. A false null result could be produced by an uncontrolled confounder in a study like this. Is that accurate?

A. It's possible, but it's unlikely because the confounders that have been proposed for macro-level studies generally don't have that effect. What would produce a null effect that's erroneous would be a variable that has opposite sign effects on gun ownership and suicide --

Q. So -- go ahead.

A. -- and we don't know of any such confounders. And so we don't know that there are there any control variables that if you controlled for them, it would result in finding a significant association between guns and suicide rates.

Q. Did you consult the social science literature to attempt to identify potential confounders that could have given you an erroneous null result? Is that what you say by -- is that a fair assessment of how you attempted to address this?

G. KLECK

A. Yes, except that it's incomplete in that, I considered all confounders, whether they would have that particular result, influence on the results or not.

Q. So is it reliable methodology, in your view, for somebody who's trying to control for potential confounding, to consult the body of academic literature that identifies confounders?

A. It is.

Q. And that is, in fact, what you did?

A. Yes.

Q. Did you check whether any of the potential variables that you identified as confounders could have had cumulative effects, the way you proposed such cumulative effects in your 2019 book chapter?

A. Cumulative effects, yes. But cumulative effects such that it produces a null result, no.

Q. So you didn't check whether more than one variable added together could have collectively produced a null result, even if a variable alone could not have?

G. KLECK

A. No, I checked that and did not find any known confounders that have that characteristic. So there's no issue of cumulative effects if no one of them has any effect, and cumulating a bunch of no effect non-confounders wouldn't have any further effect. I mean, you've got to have some effects whereby an association between gun ownership rates and suicide rates are suppressed or made lower as a result of failing to control for that variable. You can't have cumulative effects when each of the individual effects doesn't exist.

Q. Got it.

You published this in a journal called the Archives of Suicide Research?

A. Yes.

Q. Is that a reliable source in this, or is this a biased source the way you've described other journals?

A. I wouldn't know one way or the other. I wasn't really familiar with the journal.

Q. Why did you choose to publish there?

G. KLECK

A. There aren't really that many suicide related journals, so it was one of, like, three that I could have submitted it to.

Q. Someone published a rebuttal to this paper in the same journal, just in June of this year; is that right?

A. Correct.

Q. Does that happen very often, where someone publishes a paper rebutting someone else's methodology and findings in the very same journal?

A. I couldn't say.

Q. Has that ever happened to you before?

A. No. It's usually the other way around; somebody publishing an article and I write a response to it and then it's published. So no, I don't think that had happened to me before this one, where somebody writing a response was immediately published in the same issue as my original article.

Q. Have you ever published a response, like you're describing, in the very same journal as a paper you're disputing?

                    G. KLECK

A. Yes.

Q. This 2022 paper by Lane that critiques your work starts by critiquing your 2019 macro studies analysis; isn't that right?

A. Yes.

Q. And they, among other things, criticize that it's not a systematic review because it does not make the methods that it used to identify and select relevant research explicit in the paper, in order for peer social scientists to evaluate the quality of the research and its conclusions.

A. That was his claim, yes.

Q. Did you, in fact, put your methodology for identifying and selecting macro studies for analysis in that 2019 paper?

A. No, nor do most of the people who report a brief review in literature. It's something that you can do if you have ample space, more or less, unlimited space in the journal or wherever the outlet is. But otherwise, no, people would rarely do that.

Q. And this critique of your work in 2022 by Lane also identified at least 13

G. KLECK

different studies that both, predate your 2019 analysis, but that your 2019 analysis overlooked. Isn't that correct?

A. That's what he claimed, but it was a false claim.

Q. Why was that a false claim?

A. Well, it was false for two reasons. I mean, for one example, he was simply falsifying when the study was available. It wasn't, in fact, published until after I had done the review. So that was false just on the basis of the chronology. But most of the other cases where he falsely says I omitted them were cases where I should not have included them in the analysis. They were correctly omitted because they were not relevant to the review.

In one case -- in fact, it happens to be the Tabarrok study, or Briggs and Tabarrok, I should have included it. It was a genuine omission; it was an inadvertent omission. It was relevant and it was available for the end of my review period, and so I should have included it, but it was just,

                         G. KLECK

you know, an accidental oversight.

Q. I see one paper listed in this criticism by Anestis and Houtsma dated 2018. Is that the paper that you're contenting was not available until after you went to publication?

A. I'm not sure. I would have to see the list of studies again.

Q. The next most recent paper listed is dated 2014. Are you contending that a 2014 paper was unavailable to you when you published this macro review in 2019?

A. Of course not.

Q. So then is it fair to say, at least 12 of the different studies predated your analysis?

A. Predated, but not necessarily relevant. I mean, the bulk of the studies that Lane cited simply weren't relevant to my review and they should not have been included.

Q. There was at least one relevant study in there.

A. In fact, yes. There certainly was, as I say, the Briggs and Tabarrok.

G. KLECK

Q. Was there more than one?

A. I think there might have been two or three. Not enough to alter my conclusions from the review. But yeah, there were genuine omissions, in some cases published in some extremely obscure journals, or their titles, in abstract, didn't really indicate that they were relevant to the review, but it turned out they were.

Q. Turning to your 2021 Paper, Lane wrote that they tried to reproduce your results using the same data and same methodology as you, but that instead of replicating your findings, they reached the opposite findings. Is that what happened?

A. No, that's false.

Q. Lane specifically wrote a finding, "Results" -- and this is a quote, "Results based on the most robust methods did not reproduce, showing instead a significant and positive association between a nation's firearm availability and suicide rate." That's in the Lane study at page 12.

Do you dispute that contention?

G. KLECK

A. Yes, that assertion was false.

Q. On what basis is that false?

A. Because the study described as using that their -- the measure of gun ownership that he described as the most robust one was not the most robust one. He's referring to the measure, the SAS measure that isn't even comparable across nations, never mind if it is invalid as an indication of gun prevalence.

Q. But the other two measures were PSG, which you fault other people for using, and a survey that's limited to highly developed European countries. You're contending those are better measures of gun ownership than SAS?

A. The latter was, definitely, probably the most -- in fact, it's so widely agreed that direct survey measures are the most robust measure of gun ownership, that that's usually used as the criterion for evaluating other measures. It's sort of the gold standard against which you compare whatever measures you happen to propose in a given study.

G. KLECK

Q. Do you --

A. And research based on that highly robust measure of gun ownership directly contradicted what Lane asserts; that is, it found no association between gun ownership and suicide rates. So Lane's statement was flat wrong.

Q. Do you dispute Lane's finding that SAS had a significant and positive association with overall suicide rate?

A. It's impossible to know. He didn't explain why he thought he got the different results. If he offered an explanation, then you'd have some possibility of evaluating that explanation. But he didn't offer it. We, in fact, don't know that he used the exact same methods, the exact same sample, and so on, because he didn't detail what it is -- what he used for his methods that could have accounted for his different results. There's -- there's no real difference in the calculation of statistical association. They were simply bivariant correlations, and everybody confused those are the same way. What may have

G. KLECK

accounted for the difference was he arbitrarily added in sort of non- nations into a sample of, what were otherwise, genuine nations. He seems to, for example, have taken countries and divided them up into multiple parts and treated each of the parts as if they were an autonomous nation, so that the sample he was estimating results on was not a genuine sample of nations and it was not the same sample that I used, the more appropriate sample of what actually were autonomous nations. But nobody can be sure of that because he didn't present the results in a way where you could directly compare my results with his results.

Q. Let's turn to your opinion about whether shooting is a lethal or uniquely lethal method of suicide. Do you dispute that a firearm is a lethal weapon?

A. Yes -- I mean, no, I don't dispute it. I agree with that.

Q. Do you dispute that a firearm is a highly lethal method of suicide?

A. Do I dispute that? No.

G. KLECK

Q. And you don't dispute, either, that firearm suicide has a high case fatality rate?

A. No, I do not dispute that.

Q. It's at least among the highest, if not the highest case fatality rate among suicide methods?

A. Yes.

Q. I want to read you a quote from the NSSF's website. They state as follows: Quote, "According to AFSP, there is very strong evidence that when those who are suicidal do not have access to a chosen method for suicide, most do not typically shift to a different method. In most cases, they will not go on to make an attempt or end their life."

Do you agree or disagree with that statement on the NSSF's website?

A. It's true as far as it goes and basically misleading in the irrelevant, because the relevant question is whether any of that applies to, specifically, people who use a gun, or if one were available, would use a gun to attempt suicide. That's the only

                                          relevant subset of suicide attempters you care about with regard to the substitution argument. And so the statement is based largely on what has been found for people who did not use guns for self protection, and thus the statement is essentially irrelevant.

Q. So the NSSF website also states, and this is again a quote, "By separating a suicidal person from their firearm through secure storage or even temporary removal of the firearm from the home, you increase their chances for survival. If they do attempt, they may be more likely to choose a less lethal method if their firearm is not readily available. One of the most important factors is giving a suicidal person time, time for the person to move out of the crisis moment and regain their usual healthier ways of coping, to receive help, for the attempt to be interrupted, or for the person to change their mind."

Do you agree or disagree with that statement on the NSSF website?

A. I disagree with it. They're

G. KLECK

simply -- they're simply repeating what David Hemenway has said on his Harvard public health website. It's more or less just a paraphrase of what he said. And there's no foundation in the scientific literature for those assertions.

Q. In your view, does the NSSF have a reason to provide gun owners and gun industry members with erroneous information about gun suicide?

A. I'd say it's not always in their interest to provide accurate information or to check the accuracy of what they assert. Instead, financial considerations may predominate in their decisions as to what information they choose to disseminate.

Q. One of the other views you're well-known for is your opinion that more guns do not lead to more gun violence. Is that accurate?

A. I think the net effect of gun ownership rates on both homicide rates and suicide rates is essentially zero, or indistinguishable from zero.

                        G. KLECK

Q. You've written and testified about this numerous times, correct?

A. Yes.

Q. And your view, as I think you've just stated, is that gun ownership, or more guns, is not equated with a number of different types of gun violence, including gun homicide, gun suicide, gun accidents. Are there other forms of gun violence that I'm overlooking?

A. Robbery rates are not related, aggravated assault rates are not related, sexual assault or rape rates are not related to gun ownership rates.

Q. So is it fair to say that any study that finds that access to a firearm increases a risk of suicide is inconsistent with your broader view that you're well-known for, that gun access is not equated with gun violence?

A. Yes.

Q. Now, we've looked today at a large number of studies that come to different, often strikingly different conclusions, than the opinion you've offered in this case. Is

G. KLECK

that fair?

A. Yes.

Q. And those are papers that are published by dozens of different authors in various academic disciplines. Is that fair?

A. I don't know about the dozens because there's considerable overlap among the studies, a large number of them having been done by Matthew Miller and David Hemenway. But it could be in the dozens.

Q. And these are papers that have been published in numerous different publications and journals. Is that fair to say, as well?

A. They're published overwhelmingly in medical and public health journals.

Q. Just stepping back, do you have an overarching explanation for why, in your opinion, so many studies and so many people and so many different journals have gotten this wrong, and that you are the only person to get it right?

A. I don't claim I'm the only person who got it right. But as to why people would draw conclusions from their research that

                    G. KLECK

really weren't justified on the basis of findings, it's just a familiar phenomenon to criminologists, in fact social scientists in general. Nobody really even quibbles with the notion that personal bias can result in distorted conclusions, use of inappropriate methods, drawing conclusions that didn't really follow from the evidence. And so I merely apply that general insight to this specific area of research, especially as it's published in medical and public health journals. That is to say, there are people, who by virtue of being in the social class and is occupations that they are, let's say college professors, they mostly have liberal political views that are very congenial and sympathetic to gun control as one solution to violence problems. So they have a political inclination to accept even the most superficial, badly conducted studies if they draw the conclusion that more guns lead to more violence.

MR. MILLER: Professor, we have no further questions.

G. KLECK

MR. PENNAK: I have no questions.

THE VIDEOGRAPHER: The time is 6:24 and we are now off the record.

(Time noted: 6:24 p.m.)

MARYLAND SHALL ISSUE v. ANNE ARUNDEL COUNTY

9/29/2022 - GARY KLECK

ACKNOWLEDGEMENT OF DEPONENT

I, GARY KLECK, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________________ ________________

GARY KLECK Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

___________________________

NOTARY PUBLIC

-------------------I N D E X--------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| GARY KLECK | MR. MILLER | 5 |

--------------------EXHIBITS--------------------

| KLECK EXHIBITS | | PAGE |
|---|---|---|
| Exh 1 | Deposition notice | 34 |
| Exh 2 | Firearms and Suicide Prevention Pamphlet | 38 |
| Exh 66 | Listing of previous depositions and legal cases | 56 |
| Exh 3 | Expert Report of Gary Kleck | 94 |
| Exh 6 | Kleck 2019 book chapter in Gun Studies | 109 |
| Exh 7 | 2019 Social Science Quarterly | 159 |
| Exh 57 | Handgun Ownership and Suicide in California | 191 |
| Exh 55 | Study by Miller, et al., 2022 | 214 |
| Exh 61 | 1990 study by Garen Wintemute | 225 |
| Exh 56 | Kvisto, et al., study, 2021 | 231 |
| Exh 58 | Briggs and Tabarrok study | 237 |
| Exh 59 | Injury Prevention study | 250 |
| Exh 60 | 2004 study by Webster | 259 |

--------------------EXHIBITS--------------------

| KLECK EXHIBITS | | PAGE |
|---|---|---|
| Exh 53 | Brent 1991 study | 284 |
| Exh 50 | Brent 1993 study | 286 |
| Exh 33 | 2011 study by Betz, Barber, and Miller | 287 |
| Exh 34 | 2009 study by Miller, Barber, Hemenway, and Molar | 294 |
| Exh 65 | 2006 study by Miller, Swanson, and Azrael | 304 |
| Exh 8 | Kleck 2021 study paper | 16 |

C E R T I F I C A T E

STATE OF NEW YORK )

) SS.:

COUNTY OF SUFFOLK )

I, KRISTI CRUZ, a Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of October 2022.

_________________________

KRISTI CRUZ

MARYLAND SHALL ISSUE v. ANNE ARUNDEL COUNTY

9/29/2022 - GARY KLECK

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

________________________________________ ___________________

GARY KLECK Date

**&**

**&**   58:15

**0**

**00865**   1:14 3:21

**1**

**1**   3:14 34:10,12
34:13,15,21,22
39:24 53:22
159:7,7 160:7
181:15 218:16
238:14 341:9
**1,000**   59:20
**10**   36:6 183:6
203:21 229:24
236:9,22 253:20
**10,000**   59:22
**100**   230:13
290:24
**10017**   2:14
**1015**   1:6 2:6
**1066**   286:11
**108-21**   11:16,21
11:24 12:6,8,16
**109**   341:16
**10:39**   53:21
**10:45**   53:18
**11**   261:8
**11:55**   101:15,22
**12**   157:23,24
201:18,23
219:16 328:16
329:24
**122**   3:21
**12:02**   102:2
**13**   263:4 326:25
**14**   236:13 261:8

**15**   114:17 118:5
145:23 146:4
174:6,9 175:5
176:23 248:5
263:3
**1583**   228:13
**159**   341:17
**16**   23:10 108:25
265:3 342:12
**17**   177:24 178:2
**17.1**   110:8 299:7
**17.1.**   273:20
**178**   253:19
**18**   163:23 236:13
281:3
**182**   243:11
**183**   295:13
**184**   243:12 245:2
**187**   241:5
**19**   177:24 178:2
263:4 280:13,16
**190**   321:5
**191**   341:19
**1980s**   281:4
**1988**   148:15
270:10 274:8
275:16,21
276:16 277:13
280:5,11
**1990**   225:23
226:8 341:21
**1990s**   111:11,14
111:17,21,25
**1991**   148:15
270:11 272:6
274:7,8 275:16
277:13 280:5,11
284:14 285:18

286:3 342:4
**1993**   269:9,15
272:7,22 274:2
274:15,24 275:7
276:3 286:10,14
287:13 342:5
**19939**   343:24
**1998**   274:6
**1:22**   1:14

**2**

**2**   36:5 38:9,11,12
38:16,17,25 40:4
40:4,6,7,8 92:23
93:9 101:23
137:12,16
285:22 318:23
341:10
**2.1.**   285:4
**2.59**   299:19
**2.71**   299:23
**20**   64:23 74:7,10
93:7 112:5
148:23 340:15
**200**   181:18
**2000**   70:2
**2003**   298:25
**2004**   110:15,18
111:3 215:2
259:24 260:3
341:25
**2006**   304:8
342:10
**2009**   294:11,22
342:8
**2011**   287:24
288:7 342:6

**2013**   60:18
**2014**   328:11,11
**2016**   70:24,25
215:2 304:16,23
**2017**   161:18
**2018**   73:18
105:24 328:4
**2019**   72:21 73:9
73:16 80:10
81:14,15 99:7
102:9,23 103:12
103:25 104:9,25
105:9,19,22,25
107:2,3 108:5,19
108:22,24
109:10,23 112:4
114:2 119:18
139:7 140:11,23
141:9 144:5
145:8 159:15,22
160:23 161:3
162:3,6 168:10
170:4,13,24
171:18 178:5
189:2 226:20
227:16 240:7
243:2 260:13
273:13 283:24
296:21 303:10
323:18 326:5,17
327:2,3 328:13
341:15,17
**2020**   190:11
196:16 230:16
**2021**   231:13,16
232:5 316:12,15
316:24 329:11
341:22 342:12

**2022** 1:17 3:4
11:18 214:20,23
224:16 233:24
326:3,25 341:20
343:22
**2025** 230:18
**21** 57:10,21
**21234** 2:7
**21234-2150** 1:7
**214** 341:20
**21401** 1:12
**22** 62:8,9 70:8
**2220** 198:2,8
**2226** 201:12
**225** 341:21
**23** 63:14
**231** 341:22
**237** 341:23
**25** 93:7 315:23
**250** 341:24
**259** 341:25
**26** 158:2,8 167:2
**26.3** 197:19
**27** 160:16,18
**284** 342:4
**286** 342:5
**287** 342:7
**29** 1:17 3:4
157:25 158:8,24
159:3 160:2,5,13
174:6 175:5
**294** 342:9
**2993** 284:18

**3**

**3** 40:6,8 94:14,16
94:20 95:2
102:3 145:18,21

148:13 151:9,9
151:11 157:23
177:10 188:22
188:23 201:13
201:14 249:10
249:11 264:23
265:2 341:14
**3.2** 243:13
**3.34** 200:5
**30** 112:5 148:23
149:8 157:19
**304** 342:11
**311** 144:21
145:12
**317** 178:6
**32** 158:2,8
287:21
**320** 178:6
**321** 189:18
**323** 189:18
**33** 287:21,23,24
288:4 342:6
**34** 294:19,22
341:9 342:8
**35** 287:21
**350** 22:17,19,21
23:4 59:8,10
**38** 341:11
**384** 289:3
**39.3** 236:11
**390** 289:19
**3:07** 190:6

**4**

**4** 36:5,24 37:3
40:23 151:9,12
177:6,8,10

**4.5** 296:25
**40** 149:8 157:19
236:24
**400** 22:14,16,19
23:4 59:4,10
**44** 1:11
**450** 2:13
**4th** 343:21

**5**

**5** 36:5 37:8
66:16 71:4
176:23 183:6
190:7 203:21
229:24 249:22
250:6 341:4
**5,000** 59:24 60:5
**5.35** 202:3
**50** 157:9 167:3
286:13,14 342:5
**51** 286:10,13
**53** 284:12,14
342:4
**55** 214:18,19
233:24 341:20
**56** 231:10,12,19
231:23 235:5
341:13,22
**57** 191:19,20,21
191:25 192:7,8
341:18
**58** 237:19,20,24
238:4 247:19
341:23
**585** 218:16
**586** 219:11,19
**59** 250:14,16
251:21 341:24

**596** 262:9
**5:55** 315:22
**5:58** 316:3

**6**

**6** 36:5 109:8,10
109:15,16 110:3
144:20 145:9
148:8,9,13
178:11 264:21
264:21 265:2
273:14,14,19
299:5,7 341:15
**6.05** 299:19
**6.8** 236:14
**6.99** 299:23
**60** 259:23,24
260:3 341:25
**61** 225:23 226:3
226:5,6 341:21
**65** 244:16 268:11
303:24 304:6,7,8
342:10
**66** 55:23 56:2,6
73:3 341:12
**67** 308:25
**676,000** 197:14

**7**

**7** 148:8,10,13
159:9,12,14,15
159:19 160:7,14
161:4 168:11
237:2 261:8
264:22 316:4
319:22 321:14
341:17
**7.16** 200:7

**700,000** 197:17

**8**

**8** 36:5 316:13,15 316:22 317:6,7 342:12
**8.3** 261:7
**80s** 217:22

**9**

**9** 145:19,22
**9/29/2022** 340:2 344:2
**90** 201:21
**90s** 65:18 217:22
**91** 275:21 276:16 284:10
**94** 268:12 341:14
**9613** 1:6 2:6
**97** 141:25
**9:39** 1:17 3:3

**a**

**a.m.** 1:17 3:3
**abandonment** 210:20
**abbreviate** 180:9
**ability** 12:22 13:2
**able** 7:15,16 8:24 47:21 57:14 58:4 102:13 121:9 151:12 173:19 174:13 253:16 291:16 311:22
**absence** 156:19 269:24 283:6
**absolutely** 48:4 105:3 228:16 230:13 263:20 292:10
**abstract** 161:8 257:25 289:3,16 295:14 329:8
**abuse** 44:10 209:3,6,13 244:5 295:23
**academic** 37:18 67:24 106:3 171:16 323:9 337:6
**academics** 196:2 216:20
**academy** 232:6
**accept** 194:8 215:23 338:20
**acceptable** 194:20
**access** 41:8 43:10,23 44:2,4 47:24 76:15 77:5,19 78:25 80:2 82:10 83:23 84:11 87:12,16,19,23 88:12,19 89:16 90:6,13 91:12,15 91:20 92:13,20 94:7,10 96:10 98:4,24 101:8 103:22 112:7 117:16 118:11 119:9 124:2 125:19 126:22 129:11 138:22 139:4,10 140:13 140:22 141:7 142:16 143:8,9 143:15,18,23,25 148:20 154:11 155:20 156:15 167:21 186:14 200:22 202:13 205:5,7 209:20 214:14 225:17 228:7 231:18 241:23 248:3 258:2 259:3 261:3,5 266:6 267:7 274:3,14 275:3 281:12,13 282:14 287:17 287:18 296:9 298:16 300:9 301:11,16,21 305:14 307:6 310:17 314:4 333:13 336:17 336:20
**accessible** 139:2
**accidental** 328:2
**accidents** 66:8 67:7 163:16 336:9
**accomplish** 266:23
**account** 305:25 306:7,23 307:14 309:23 313:14
**accounted** 219:14 314:11 331:20 332:2
**accounts** 181:12
**accrued** 284:2 296:24 297:9 298:5,12
**accumulates** 141:3
**accuracy** 52:3 53:10 335:14
**accurate** 7:7 29:20 30:8 41:18 49:18 87:9 112:6 125:20 162:17 182:8 198:12 205:21 254:11 279:5 281:22 297:5 318:11,24 321:16,17 322:5 335:13,21
**accurately** 6:16 7:4 12:23 13:3 132:21 254:3 313:18
**acknowledge** 320:6
**acknowledge...** 340:3
**acquire** 281:10 282:6 292:25 293:22
**acquired** 197:9 197:14 207:14 219:13 221:7 228:22 282:9,10
**acquiring** 229:7
**acquisition** 48:16 201:17 203:22 206:10 207:11 208:8 220:14 281:15 282:3,15 294:3

294:10
**acquisitions**
  197:3
**action**   4:6
  343:17
**activities**   18:24
**actual**   249:8
**add**   58:9,12
  122:12 125:15
  179:13 310:7,8
  312:10
**added**   122:5
  160:17 161:13
  178:20 182:22
  311:20,24
  323:23 332:3
**adding**   246:6
**addition**   32:13
  154:23
**additional**   85:21
  114:11 123:11
  123:15,17
  129:15,19
  161:22 162:2
  191:11 309:4
**additions**   340:6
**additive**   310:14
**address**   214:11
  282:13 283:5
  308:2 312:2
  322:25
**addressed**   18:5
  76:19 83:7 89:5
**adequacy**   194:22
**adequately**
  162:12
**adjusted**   284:2
  284:22 285:14

297:10 298:4
  300:17
**adjusting**   285:19
  286:20
**administer**   4:4
**admission**
  184:19
**admissions**
  184:12
**admitted**   183:25
  184:2,7,10
**adolescent**
  231:16 232:7
  277:2 303:19
**adolescents**
  236:13 280:12
  280:16 282:4
**adopt**   188:16
**adult**   89:7,11
  218:23 219:12
  220:15,16
**adults**   88:20
  90:4 214:25
  221:21 224:25
  245:10
**advance**   27:7
  73:10 315:5
**advertise**   74:2
**advice**   18:7
  24:19,23 25:8
  75:2 87:22
**advisory**   67:17
  67:20
**advocacy**   21:22
  27:3,12,15
**advocate**   27:17
  27:19,22 31:14
  32:12

**advocates**   20:19
  32:24
**affect**   12:21 13:2
  34:7 45:20
  50:23 85:18
  92:9,10 115:7,9
  117:19 129:19
  129:20 135:16
  204:11 210:21
  225:4 230:7
  242:7 287:5
  291:8,17
**affectable**   46:22
**affiliate**   61:15
  68:4,18
**affiliations**   4:12
**affirmative**
  156:16 277:24
  279:11
**affluent**   319:6
**afsp**   20:3 26:7
  26:15 27:13,15
  28:3,5,14,24
  29:3 30:24
  31:12 39:9
  333:11
**afsp's**   26:25
**age**   208:17,24
  211:7 236:12
  244:16,16
  245:14,19
  254:12 255:3
  279:24 280:10
  280:13,16,25
**agencies**   165:11
**agency**   166:17
**aggravated**
  336:13

**aggregate**   157:5
  247:6
**aggregates**
  242:19 254:20
**aggregation**
  157:12
**ago**   22:24 27:11
  39:10 46:9
  65:17 70:9 87:6
  157:19 205:20
  217:11 218:8
  226:16 230:9
  252:21 288:22
**agree**   3:12 7:10
  11:4,12,23 12:5
  12:14 28:7,12
  31:2 32:20
  39:17 42:2
  46:14 87:25
  88:9 89:12
  111:9 149:11
  167:10,13 198:4
  199:6 200:12,15
  200:20 201:3,11
  202:6 206:15
  208:23 209:5,8
  209:24 210:3
  220:4 225:7
  230:19 233:11
  235:14 236:17
  241:6,9,18
  245:11,15,16,21
  248:4 254:7
  255:2,6 258:23
  261:12 283:21
  287:15 290:2,7
  290:16,18 296:3
  296:5 332:22

333:18 334:23
**agreed** 231:2 330:18
**agreeing** 147:17
**agrees** 103:25 104:8,24 105:9 105:18 171:2,7 171:17
**ahead** 117:20 126:15 322:13
**ahold** 65:25 142:5
**aim** 54:23
**aimed** 233:21
**air** 262:18
**ajani** 2:20
**al** 1:5 3:18 110:15 148:14 214:19,22 231:12,16 263:17 298:25 309:2 310:6 341:20,22
**alcohol** 12:20 209:10 244:5 254:13 255:3,17 256:17 262:6 300:3
**alcoholic** 209:5 209:11 225:14 225:19
**alcoholics** 209:10
**alcoholism** 128:4 128:14 209:3,7 209:12 225:21 245:20 255:21 291:23
**align** 32:22 33:4 33:5,7,7,8
**alike** 33:2
**alive** 101:3
**alleged** 310:4,23
**alluded** 166:14
**alluding** 285:16
**alter** 329:4
**altered** 248:9
**alternative** 51:18 182:11 185:19 186:10 187:10,15 204:24
**altogether** 301:4
**ambiguity** 86:12
**ambiguous** 44:17 46:5 50:9
**ambivalent** 203:11
**amend** 22:14
**american** 26:7 29:10 215:9 232:6 288:11,15
**amount** 73:13 122:20
**ample** 326:20
**amply** 235:2
**analogies** 256:14
**analogize** 269:10 279:2
**analogizing** 281:16
**analogous** 180:23
**analyses** 158:3 158:18,21,22 172:6,12,19 173:25 174:4,7,9 174:10,14,18,20 174:25 175:4,20 176:5 308:13,14 312:16
**analysis** 105:21 110:12,19 114:11,12 157:4 158:13 162:2 172:25 174:22 178:5 242:23 293:14 305:8 306:4 311:12 317:3,4 321:16 326:5,17 327:3,3 327:16 328:17
**analyst** 127:17
**analyze** 110:16 151:2 305:12
**analyzed** 108:8 111:10 161:3
**andrew** 81:9 99:16 111:5
**anestis** 328:4
**annapolis** 1:12
**anne** 1:10 2:20 2:22 3:18 4:18 5:3,6,20 11:17 12:8 340:1 344:1
**answer** 8:16,17 10:19,20,24 18:11 26:3 31:6 32:2 77:18,22 79:5,9 80:7 81:22 82:2 83:17 105:4 117:17 120:21 120:25 121:17 126:13 156:14 173:20 219:4 234:15,18 260:17,18 272:18 280:21 302:4 313:16
**answered** 38:3 65:2 88:15 102:24 104:11 105:2 143:19 219:3 236:3
**answering** 77:24 84:17 105:15 204:19 313:5
**answers** 7:8,17 8:3 10:12,13 76:21 140:9
**antecedent** 48:24
**anthony** 3:24
**antiquated** 157:15
**anxiety** 295:22
**anybody** 21:20 66:11 75:18 106:11 171:9 198:17 213:6
**anymore** 63:4 275:6
**anyway** 165:18 289:2
**apologize** 250:11 286:13
**appear** 131:12 203:25 216:10 217:12 301:24

**appearance** 4:10 253:13
**appearances** 4:12
**appeared** 217:10 217:15
**appears** 10:6 131:24 185:15
**appended** 340:7
**application** 100:24
**applies** 117:18 333:23
**apply** 46:23 61:25 169:22 172:24 176:23 182:25 302:9 338:10
**appraise** 107:13 107:24
**appreciate** 283:13 322:2
**approaching** 124:16
**appropriate** 332:11
**approval** 70:8
**apriori** 128:11 146:12 175:15 214:5
**arbitrarily** 332:3
**arbitrary** 169:20
**archives** 324:17
**area** 13:9 78:10 125:23 130:6 138:19 175:12 243:20 338:11
**areas** 26:23 32:23 152:3 165:15 173:4,5 173:12,15,22 175:7,13,18,21 262:8
**argument** 153:15 211:24 334:4
**argumentative** 33:3 104:10 222:18 248:7
**arisen** 72:7
**arm** 319:17
**arms** 69:21
**array** 85:3
**arrive** 95:8 97:3 101:6 151:21 171:10 182:7
**arrived** 139:23 151:25 237:14
**arrives** 97:15,16
**article** 21:12,21 67:24 80:12 81:15 99:12,14 102:21 104:24 105:9 106:5,8 140:24 160:23 161:4 162:4,7 168:10 194:17 233:6 243:8 253:11 258:22 325:17,22
**articles** 37:12,13 37:15,17,18 80:25 82:7,13 95:11 99:15,16 99:25 100:2,3,8 100:11 102:15 103:8 161:7
**artificial** 135:11 136:14
**artificially** 136:10
**arundel** 1:10 2:21,23 3:18 4:18 5:3,6,20 11:17 12:8 340:1 344:1
**aside** 62:6 70:14 100:7 195:13 218:25 307:13
**asked** 7:21 15:3 15:7 21:12,18,25 23:17 35:25 38:3 65:2,10 73:24 79:13 88:15 102:24 104:10 105:2 130:16 141:15 143:19 171:13 219:3 227:2 236:3 256:7
**asking** 8:15 15:9 22:3 26:2 105:7 126:13 139:15 204:14 271:17 272:22 312:18 312:20,21
**asks** 29:16 30:16 36:25
**aspect** 107:18,20 147:11
**assault** 58:21 166:19,25 167:9 336:13,14
**assert** 150:15 156:20 186:15 213:13 264:10 296:22,25 335:14
**asserted** 86:18 306:5
**asserting** 94:10 267:18
**assertion** 16:21 16:24 17:9 50:6 52:5 90:9 92:19 94:3 138:6,6 148:6,18,24 149:13 198:15 200:25 242:6 254:6 280:6 330:2
**assertions** 199:12 231:9 261:17 265:5 335:7
**asserts** 331:5
**assess** 112:4 169:19 282:4,19
**assessed** 76:24 98:23
**assessing** 171:11
**assessment** 21:14 77:14 98:11 103:9 107:8 233:12 271:6 281:9 283:22 314:25 322:24
**associated** 45:14 70:11 90:18 91:21 131:14

132:25 133:10 134:3 146:18 170:15 197:24 198:13 201:4 211:16 228:10 236:11,23 237:3 253:21 261:6 295:25 296:15
**association** 20:12 44:22 48:10,22,25 57:3 58:16 60:20 62:11,18 67:21 109:2 114:19 116:4 118:10,20 119:7,15 125:8 125:19 126:4,21 127:3,6 128:8 129:10 131:19 134:13,24 135:20 139:16 145:25 148:19 150:2 155:20 174:7 198:14 200:14 202:9 213:19 215:10 236:20 247:11 248:19 249:21 250:3 254:9 258:5,7 260:4 286:22 287:7,16 288:11,15 295:15 298:19 307:16 314:10 314:22 315:10 322:18 324:9 329:22 331:6,10 331:23
**associations** 127:15 144:10 146:8 261:15 306:2,8,8,24 309:24 313:15
**assume** 8:9 17:9 24:22 73:17 74:14 76:10 199:10 200:16
**assumed** 87:16
**assuming** 70:5 300:5
**assumption** 185:16,23 310:4
**attach** 234:23
**attached** 12:17
**attempt** 78:20 78:22 79:24 82:8 84:3,9 86:6 99:19 100:9 119:2 151:2 153:8,9,14,25 155:4 179:6 183:23 185:24 188:17 203:18 213:9,14 230:21 230:24 266:3 267:15 268:4 289:21 290:9,11 291:21 292:2,3,4 293:2,23 322:21 333:16,25 334:13,20
**attempted** 86:14 107:6 118:8 119:6 124:14 153:11,15 180:15 181:23 183:14 185:2,7 265:16 298:23 306:14 322:25
**attempter** 87:17 124:21
**attempters** 188:14,15 285:3 334:2
**attempting** 97:11 180:20
**attempts** 44:8 86:10,20 149:19 154:8,9 177:21 177:21 178:18 178:20,25 179:14,19 181:10,18 209:23 210:10 211:15,23 212:18 213:5 214:12 231:4 268:20 289:6 290:16 291:4 294:14 307:10
**attention** 14:7 34:19 40:3 49:21 51:20 53:3 85:6 92:22 110:7 131:17 139:6 235:4 259:22 273:12 284:11 286:9,13 287:20 289:18 304:5 308:24 316:12
**attorney** 4:14 5:19
**attorneys** 2:5,12 36:21 73:22 75:19
**attracts** 221:5
**attributable** 207:6 287:8 302:15 306:9,11
**attribute** 100:23 147:2 207:8 246:21 247:5 291:22
**attributed** 224:18
**attributes** 114:24 164:16 206:22,24 221:6 221:9 229:25 230:5 242:18 254:17 291:13 291:15 306:15
**attributing** 97:19
**audio** 3:10 6:2 31:4 90:21 98:15 132:11 166:20 207:16 234:12 272:13 301:2
**australia** 176:9 176:21
**author** 26:6 45:8 107:25 269:15
**author's** 248:12 248:20 249:12 271:8
**authored** 52:20 99:6,9,12,14

**authoritative**
85:14 213:11
**authority** 26:19
27:2 192:17
193:6,7,9 215:14
215:20 232:12
239:3
**authorized** 4:4
52:24
**authors** 47:22
94:9 98:22
190:13 195:19
195:20 196:2,6,8
202:23 206:6
207:11,18
209:17,25 211:6
216:19 247:18
249:18 250:3
264:3 272:3
284:4 289:19
296:22 301:2
337:5
**autonomous**
332:8,12
**autopsies** 266:22
**autopsy** 294:4
**availability** 74:2
199:9 305:3
329:23
**available** 52:12
98:15 99:3,23
143:13 151:17
151:23 177:18
177:25 178:3,25
187:11 204:12
204:18,21 205:2
268:14 269:7,8
282:23 283:14

293:3 327:10,24
328:6 333:24
334:16
**avenue** 2:13
**average** 60:7,10
119:2 194:2
216:5 229:22,23
**averages** 232:21
**avoiding** 33:14
**award** 69:22,25
70:6,11
**awards** 69:17
**aware** 12:25
14:12,23 26:4
45:24 46:3
55:10 75:17
85:20,21 110:22
110:25 111:6
149:2,16 150:13
150:21 152:20
170:10,18 182:4
182:10,14,19
184:24 243:3
246:24 295:3
305:5,6
**awfully** 70:4
180:8
**azrael** 304:9,18
304:23 306:13
307:25 308:14
312:21 342:11

**b**

**b** 110:16 122:7,9
122:16,17,19,21
146:7 222:15
237:21,23
259:19,20

**b's** 222:15
**back** 34:8 53:25
56:20 61:24
65:17 80:5
92:22,24 98:12
101:13,14 102:3
105:22 108:24
120:25 132:19
137:5,10,12
139:6 140:25
141:25 142:4,22
144:5 174:4
188:22 190:8
234:2 235:4
273:10 299:3
304:21 315:21
316:5 337:17
**backwards**
213:19
**bad** 18:15 66:12
137:22
**badly** 338:21
**ballpark** 60:3
**baltimore** 1:7
2:7
**bandwidth** 6:19
**banning** 58:21
**banton** 2:20 5:2
5:3
**barbara** 62:2,6
62:21 63:4
**barber** 287:25
288:7 294:12,23
342:6,8
**barely** 141:20
**base** 34:5 170:2
320:21

**based** 4:17 48:7
57:13 74:25
130:18 162:15
172:6 174:14,17
178:22 183:5,9
185:23 187:18
232:25 240:13
248:16 267:4
268:25 271:20
277:23 278:16
282:22 283:6
299:25 317:13
319:10,14
320:15,17
329:20 331:3
334:4
**baseline** 219:9
**bases** 85:3
**basic** 14:10
164:8
**basically** 100:4
136:15 142:25
146:24 154:17
157:12 228:5
233:8 265:14
268:5 282:7
309:17 333:21
**basing** 271:24
300:22
**basis** 42:5 63:22
78:17 87:7
152:13 164:3
183:4 187:12
202:8 203:3
221:25 242:9
249:7 257:13
258:11 261:22
271:8 279:8

319:12 327:13 330:3 338:2
**bathroom** 272:25
**bear** 69:21 83:6 93:13 212:3,19 295:10
**bearing** 83:2 103:21 228:6 237:9 263:18 296:19
**becerra** 57:24 58:24 59:3,6
**began** 195:6,13 224:10,13
**beginning** 4:13 56:23 78:18 102:2 190:7 216:7 307:22 316:4
**begins** 315:3
**begun** 315:2
**behalf** 56:22 61:15,16 62:4,10
**behavior** 18:24 44:25 288:14
**belief** 113:16
**beliefs** 214:5
**believe** 5:24 15:12 21:11 27:7 28:21 31:11 35:5 40:23 41:17 47:11 48:15 50:15,22 51:4 54:6,11 55:20 56:18 59:19 61:2 62:25 64:22 65:3 67:16 77:4 82:24 87:5 88:11,17 99:8 108:25 111:22 121:2 130:12 133:23 143:14 144:4 147:22 151:16 154:24 154:25 155:9 156:9,14 177:10 177:17 186:23 190:21,22 192:2 198:3,10 204:6 205:21 208:15 211:14 212:17 215:13 222:13 224:9 230:9 231:5 232:20,21 235:16 249:12 264:24 265:3 267:4 269:14 273:14 280:15 283:9 285:7,14 292:22 293:5,20 294:17 300:3 314:8 319:16
**believed** 84:14
**believing** 47:5 146:12 154:15 250:2
**bell** 61:5 64:6
**benefit** 51:15 123:15,17
**beretta** 64:5
**best** 59:15 60:4 76:24 165:25 166:6 177:17,25 178:3,25 180:20 267:22,23,25 268:13 269:6,8 269:19 282:23 283:7,14 315:15
**better** 48:5 77:3 96:9 134:20 168:7 169:3 247:4,13 259:14 259:16 260:19 269:5 297:21,23 299:12 330:16
**betz** 287:24 288:7 342:6
**beyond** 13:16 17:25 25:20 32:17 37:24 67:11 80:3 82:5 84:11 100:12 114:12 162:3 163:6 213:14 283:2
**bias** 193:13 195:9,12 215:23 232:22 233:7 271:24 338:6
**biased** 184:7 193:18,21 194:5 194:23 195:8 196:9 216:4 232:20 247:19 247:21 251:6 324:20
**biases** 195:3,14 232:16 235:3 251:18
**bibliographic** 161:5
**bibliographies** 161:12
**bibliography** 37:21 188:25
**big** 124:9 173:11 303:5
**bigger** 173:2,18
**bill** 11:16,21,24 11:25 12:6,8,16 59:12
**billed** 59:16 60:13 74:5
**binder** 10:5,7 34:13,22 38:11 38:16,23 55:21 55:23 92:25 95:3 110:2 191:20 192:7 215:4 226:3,5 231:11 237:19 238:4,8 273:24 284:12 288:5 294:19 303:25 304:7 316:13,22 317:5
**binders** 9:8
**bit** 12:13 125:12 154:22 243:12 274:16 279:20
**bits** 252:11
**bivariant** 331:24
**blank** 112:21 119:11
**blind** 193:15
**blood** 343:17
**body** 101:7 235:24 247:8 258:21 323:9

**book** 81:14 99:8 102:9,23 103:12 104:2,9,25 105:9 105:19 106:2,9 107:2 108:5,12 108:19,22 109:7 109:10,22,23 110:9 111:7,10 112:4,10 114:2,7 114:13,16 115:24 119:18 130:10,12 139:7 139:8 140:11 141:10 144:5,19 145:8 150:25 165:4 178:7,10 178:14 189:2,10 189:11,15,17 206:4 223:16,22 226:20 227:16 227:23,24 235:21 240:7,10 240:17 246:14 247:24 252:24 260:13 263:3 267:19 273:13 273:13,19 283:24 296:21 303:11 323:18 341:15
**books** 112:21 217:22
**borderline** 250:5
**bore** 80:25
**bottom** 56:17 198:9 219:19
**bought** 220:24
**box** 9:11,13,15 9:17
**boyfriend** 221:8 221:13,22
**brain** 41:24
**break** 10:22 53:16,17 101:16 101:19 144:7 179:7 189:25 272:25 315:21
**brent** 124:25 125:11 148:14 150:6,10 214:8 264:16 265:13 265:25 266:2,14 266:16 267:4,9 267:22,23 268:8 268:18 269:9,15 270:7,13 271:11 272:5 273:17,21 274:2,9,19,24 275:7,15 277:4 277:10,13 280:5 280:10,17 281:6 281:8 282:24 283:14,18 284:9 284:14 285:18 286:14 287:15 296:22 298:13 307:8 342:4,5
**brent's** 270:10 272:22 286:3,10 286:19
**brief** 272:24 326:19
**briggs** 237:20,24 248:23 327:20 328:25 341:23
**brilliant** 250:11
**bring** 40:5 264:18 286:9,12
**bringing** 10:2 32:9
**broad** 73:23 138:5
**broader** 224:2 336:19
**brochure** 28:20 29:2,7 38:8 39:19,24 41:21 52:21 53:12 54:4 79:14 137:11,16 138:2
**brochure's** 316:10
**brought** 31:18 220:25
**bulk** 328:19
**bunch** 324:6
**burden** 213:21
**bureau** 165:10 166:16
**butchering** 304:22
**buying** 25:22 33:24

**c**

**c** 1:6 2:2,6 3:21 5:12 6:12 122:17,19,22 137:6 259:19,21 343:2,2
**calculate** 185:6
**calculated** 284:3
**calculating** 184:22,25
**calculation** 321:4 331:22
**calculations** 284:6
**california** 58:15 58:20 60:23 190:14 191:22 197:10,19 207:15 208:5,9 214:24 219:7 227:9 234:4 341:19
**call** 8:24 25:4 95:5 100:14 112:12 128:23 153:20 266:22
**called** 5:13 95:13 260:4 297:15 320:23 324:17
**calls** 15:21 85:11 280:19
**calvert** 1:11
**camera** 3:7
**canada** 62:3,22 63:3,12
**canadian** 62:4 63:2,12 176:5 194:13
**candidates** 128:11 161:14
**canvas** 303:11
**cap** 261:6
**capable** 96:23
**capacity** 21:16 61:10 68:10 71:14 239:10

252:19,22
288:21,23
**capita** 256:17
**captured** 160:23
**care** 198:17
334:2
**career** 195:6
**carefully** 79:16
198:18
**carlson** 106:14
**carry** 265:19
**case** 3:21 11:4
12:18 14:13,15
16:4 24:4 27:6
32:7 37:2 45:11
56:21,21,23 57:7
57:16,23,25 58:8
58:14 59:5,9,13
59:17 60:5,18
61:2,7 62:3,7,23
63:7 64:8,9,9
65:11,21 66:5,6
66:21,24 67:24
72:15,24 73:6,23
73:24 74:6,13
75:7,10,14 81:11
85:19 86:9 87:3
94:24 96:3
97:24 100:14,17
100:19 101:5,7
102:10 103:12
104:2,17 106:25
107:3 108:7,11
108:17,25
110:10,17,25
112:13,18,24
117:8,25 124:12
125:4,10,18

126:10,25
134:11,21
139:21 141:18
142:9,23 145:4
147:24 154:8
155:13,17,18,24
156:6,8 157:3,11
164:10 168:2
169:15,19
177:20 178:13
178:15 179:8
181:9 184:22
191:10 196:16
197:2,9 203:23
216:11 226:18
227:4,21,25
232:23 235:13
235:19,22,23,24
236:5,6 242:18
251:22 253:5,6
254:24 256:10
256:21 257:9,23
257:25 258:13
262:10,13,24
263:15 264:7
265:6 267:6
275:5 285:10,16
301:23 303:12
303:14 304:18
304:24 307:12
309:17,21
314:25 327:19
333:3,6 336:25
**caseload** 182:21
**cases** 56:3,9
57:12 61:12,18
61:20 62:8,9
63:14,18,20,20

64:7,10,17,21,23
66:10,23 67:2,11
68:11 72:22
82:15 98:23
119:10 127:5,15
176:10 181:14
181:16 184:8,9
184:12 194:12
197:8 230:10
257:5 301:4
306:11 320:16
327:14,15 329:6
333:15 341:13
**cast** 242:14
**catch** 120:21
**category** 227:19
228:23 252:10
**causal** 44:23,24
45:9,15,18 46:11
47:6,12 48:9,18
49:3 50:11
88:20,21 90:8,9
91:17 92:2,7
94:3 113:20
115:9,11,14,20
115:22 116:8
154:15 199:16
200:25 202:11
210:25 213:23
222:24 229:12
237:4 241:17,22
252:6 261:17,20
**causality** 199:18
201:2
**causation**
198:16
**cause** 44:21 47:2
101:4 115:21

136:10 236:15
237:2 240:23
296:16
**caused** 89:22
91:22 229:6
264:12,13 280:8
280:9
**causes** 86:2 87:8
87:12 90:14
91:8,15 94:10
113:17 115:18
136:9 140:13
198:19 200:19
224:2 241:2,19
246:5,25 267:20
267:21 282:20
**caution** 181:21
182:2
**cdc's** 42:9
179:10
**census** 165:10,11
166:16 176:2,19
244:22
**century** 149:9
**certain** 58:21
156:8 165:24
175:13 181:12
283:3 300:21
**certainly** 17:11
26:22 30:10
31:16 38:21
52:24 76:22
79:11 84:20
96:25 119:4
127:23 128:2,10
137:18 153:18
168:24 180:4
183:2 195:8

199:22 202:21
205:10 216:13
241:15 253:4
265:25 270:9
280:24 328:24
**certificates**
178:22
**certify** 343:9,15
**challenge** 7:18
57:19 58:20
**challengers** 58:3
**challenges** 64:18
**challenging** 57:8
61:9 63:15
64:12,24 65:12
315:12
**chance** 90:15
91:9,16 92:13
93:25 287:5,9
**chances** 334:13
**change** 22:23
237:12 261:10
292:9 293:8
334:21 344:4,7
344:10,13,16,19
**changed** 110:23
111:14,16,24
142:11
**changes** 117:23
118:16 293:13
297:16 299:19
299:22 300:22
340:6
**changing** 237:16
**chapter** 81:14
95:12 99:8
101:10 102:9,23
103:12 104:2,9

104:25 105:19
105:23 106:2,9
107:2 108:5,13
108:19,22,24
109:8,10,20,22
109:23 110:9,11
111:7,11 112:4
112:11 114:2,8
114:13,16
115:24 119:12
119:18 130:10
130:12 139:7,8
140:11 141:10
144:6,19 145:8
150:25 165:4
178:8,10,14
189:3,10,11,15
189:17 206:4
207:4 214:16
223:17,22
226:21 227:16
227:23,24
235:21 240:8,10
240:17 246:15
247:24 252:24
260:13 263:3
267:19 273:13
273:13,19
283:24 296:21
303:11 307:19
323:18 341:15
**chapter's** 105:10
**character** 81:4
135:7 155:18
**characteristic**
100:21 132:22
291:25 324:4

**characteristics**
93:24 173:5
223:11,12,13
305:13
**characterization**
126:24
**characterize**
221:9 249:19
286:2 303:20
**characterized**
233:9 234:6,21
291:13
**charged** 60:4
**charging** 59:7
**charts** 188:9
**check** 323:14,22
335:14
**checked** 324:2
**cherry** 108:2
252:11
**chicago** 65:9,10
65:24 66:20,24
**child** 65:22,25
66:8 231:18
232:7
**childhood** 44:9
**children** 88:4,6,7
88:20,23 89:2,5
89:9,12,16 90:5
245:7
**children's** 88:12
**choice** 150:5
224:7
**choose** 9:7
176:19 293:4
324:25 334:14
335:17

**chose** 223:21
**chosen** 333:13
**chronic** 41:23
**chronological**
56:19
**chronology**
327:13
**circa** 161:18
**circumstances**
13:2 135:11
203:13 267:2
307:8
**citations** 84:12
**cite** 100:8 144:14
148:13,23
188:18 217:8
252:23 264:15
314:15
**cited** 37:15
72:15 74:17
80:9 81:14,18
82:13,16 101:9
111:4 148:17
159:5 189:11,12
191:3,6 214:15
217:21,25
227:12,16 240:2
240:7 260:24
295:4 328:20
**cities** 164:11
165:8 167:2
173:11 194:13
**citing** 233:7
272:12
**citizens** 69:20
**city** 60:20 65:10
157:7 194:13,14
194:15

**civil** 63:21
**claim** 89:19 91:14,17 95:5 137:24 143:21 151:15 152:7,14 152:19,21 153:13 155:10 156:10 207:17 326:14 327:6,7 337:23
**claimed** 327:5
**clancy** 64:4,8
**class** 338:14
**clear** 8:6 10:11 134:9 135:5 186:24 234:8
**clearly** 8:9 9:2 81:24 91:2,5 121:6,9,12 199:14 234:16 272:14 318:22 319:3
**clinic** 62:2,7,22 63:5
**closely** 186:2 204:4 211:16 251:5
**coauthored** 52:20
**cob** 129:10
**coefficient** 119:17
**cohabitant** 219:13 224:20
**cohabiting** 220:15 221:13 221:21 224:17 224:25 225:12 234:5
**cohort** 196:19,22 197:5,14,18 227:6,8
**coincidence** 287:9
**coincidental** 44:22 48:12,18
**coincidentally** 45:14 47:25 85:5 103:20
**colinear** 119:24 120:3,7,13,15 122:2,17 123:3,7 123:8,9,19 128:19 129:22 309:18 310:24
**colleague** 8:21
**colleagues** 4:20 74:15 124:25 270:25 271:13 311:18 312:5
**collectively** 118:18 323:24
**college** 338:16
**colt** 64:4
**column** 41:7,20 42:18 44:7 46:20 94:5 245:3 249:17
**combination** 113:22 126:21 129:9
**come** 71:2 85:5 101:14 139:11 139:13 142:3 169:17 170:20 179:3 203:17 207:8 217:22 234:16 336:23
**comes** 48:6 58:8 77:3 177:14 179:2,19 228:23
**commemorative** 62:2,7,22 63:5
**comment** 21:12 21:19,25 23:17 314:24
**commit** 15:16 32:4 81:3 86:3,5 88:23 89:3,13 94:12 113:18 127:14 137:21 155:4 198:25 199:21 223:3 228:25 229:4,6 229:24 230:23 255:12,15 267:15,17 291:14 292:17 293:22
**commits** 50:24 92:21 225:5 228:20
**committed** 100:25 115:3 162:25 229:8 294:5 317:12
**committee** 69:21
**committing** 45:21 50:12 113:21 198:18 230:2 264:14 291:9
**common** 92:8 153:20 157:20 210:22 212:6 222:5
**communicate** 292:6
**communicated** 102:18
**communication** 75:19
**comorbidity** 294:16
**company** 67:5
**comparable** 275:20 276:3 319:21 330:9
**compare** 79:20 330:23 332:15
**compared** 79:17 100:22 108:25 188:10 194:13 197:17 227:8 289:10
**comparing** 100:25
**comparison** 269:23 275:9
**comparisons** 268:19
**compatible** 290:24
**competent** 96:21
**competently** 97:10,18
**compile** 320:6
**compiled** 319:24
**compilers** 320:20
**complaint** 12:18

**complete** 166:9 320:7 340:9
**completed** 8:17 86:10 124:15,19 127:4 153:10,16 178:16,19 179:9 230:23 265:16 268:19 285:21 298:23
**completely** 127:3 231:8 305:25 306:7 309:23 313:14 314:21
**completers** 285:2,3
**component** 321:12
**comport** 248:21
**composed** 278:3
**compound** 302:2
**comprehensive** 84:15,19 100:5 166:3 178:21 307:20
**comprehensiv...** 136:17 163:22
**comprised** 269:2 277:17
**computations** 321:12
**computer** 6:4
**conceivably** 77:2
**concentrate** 40:22
**concept** 164:8 184:3
**concern** 40:11 49:11,25 51:23 53:7 63:18 67:2 83:23,24 88:7,13 88:22 182:19 239:24 240:11 258:7
**concerned** 16:20 16:24 26:14 32:3,6,8 34:5 62:25 83:25 138:21 158:14 158:16 184:5,6 240:18 266:2
**concerning** 42:9 42:15 101:7 152:3 189:19 206:7 270:11
**concerns** 77:15 182:3,14,15 185:13
**conclude** 78:7 98:4 132:12 298:5 299:25
**concluded** 85:24 194:17 197:22 200:4 219:10 285:18
**concludes** 215:25 228:9 236:9 240:22 261:3,4 289:4 295:12
**conclusion** 15:25 22:4 45:10 48:4 76:25 78:17 83:13 87:8 91:11 95:9 97:14,16,17 102:8,22 103:11 103:18,25 104:9 105:14,18 108:3 110:24 116:7 120:15 122:4 132:17 139:12 139:14 140:6,12 140:16 141:5 142:8,10 150:14 151:25 153:7 155:19 168:9,15 170:13,23 171:10,17 172:14 174:23 198:8 228:15,17 233:22 237:14 241:5 242:5,16 244:10 249:12 251:11 261:24 270:16 271:15 277:12 280:20 295:11 297:11 298:12,14 300:16 301:9,12 301:15,19 338:22
**conclusions** 83:3 83:5 85:9,18 104:25 105:10 116:23 118:7 130:7 139:20 155:16 167:19 167:22 168:5 170:3 171:7 174:13,17 176:24 196:13 196:15 234:9,25 235:2 236:5 237:12 248:10 248:11,21 249:7 253:12 258:10 263:24 271:7 272:3 303:8 319:10 326:13 329:4 336:24 337:25 338:7,8
**conditions** 41:23 41:24 93:25 296:7
**conduct** 84:2 110:18 234:25
**conducted** 3:6 3:22 97:18 318:18 338:21
**conducting** 7:14 7:19 8:13
**conference** 69:9 69:12
**confined** 43:22
**confirm** 9:21 10:7 34:14,20,23 38:15 103:9 110:4 159:12 231:21 238:7 299:9
**confirming** 96:18 146:19 238:18
**conflict** 71:24 72:8
**confound** 292:15 301:10
**confounder** 112:12 113:2,3,9 113:22 115:10

115:17,19 116:12 118:3 120:15 123:12 124:8,10 125:5,6 126:20 127:7 129:21 131:18 148:7,19 149:14 150:16,18,24 151:6 209:18 211:4,10,19 213:2 220:21 225:22 229:17 254:21 256:25 257:3 259:2,5,6 259:11,13 265:6 265:10,17,23 267:5,12 274:11 277:15 283:15 286:4 296:18 297:2,13,14,18 297:19 300:16 304:20,20 305:2 305:13 306:6,15 306:23 307:3,14 321:20 322:4

**confounder's** 135:4

**confounders** 100:16 112:12 112:16 113:6,23 113:24 114:17 116:4,13,16,25 117:3,12 118:4,5 118:9,21 119:8 119:24 120:6,13 123:2,16,24 125:16,24 126:3 126:9,21 127:21 127:22 128:12 128:18,21 129:4 129:17 130:11 130:14,18,20,22 131:11 133:9,14 135:6,24 136:4,8 136:18 144:7,8 144:12,13 145:24 146:4,8 146:13,14,16,16 146:20,24 147:19 156:2 165:25 168:13 169:3,24 205:25 206:3 208:21 211:5,6,8 212:22 218:7,18,22 221:6 225:16 245:23 246:3,8 246:13 247:7,10 247:15 248:6 255:2,3,25 256:7 256:13,15,19,21 257:9,14,20 258:5,14,19 259:19 262:2,11 262:15 263:4,15 264:4,9 296:8,12 296:15 297:12 297:23 298:4 299:16 300:2 301:20 302:10 302:19,25 306:10 307:18 307:23 308:3,10 308:11,16,18,20 308:23 309:9,22 310:5,7,14,24 311:4,7,13,23,25 312:8,10,23 313:7 314:2,12 315:6,15,16 322:7,15,22 323:3,10,16 324:3,7

**confounders's** 130:24

**confounding** 48:15 96:4 98:2 98:6,21 103:5 122:21 162:13 164:4,5,6,16,24 165:21 167:13 169:7,13,18 207:3 208:16 212:14 224:9,10 242:17 243:6 248:2 279:21 301:24 305:22 309:4,8 311:9 323:8

**confused** 331:24

**congenial** 338:17

**conjunction** 37:2

**connect** 147:18

**connected** 179:5 195:11

**connectedness** 245:21

**connection** 3:8 6:5 22:10 31:19 38:2 58:23 60:18 67:23 74:13 81:20,21 82:5 121:2 140:8,22 183:22 186:16 190:25 192:23,24 193:12 265:9 275:3 298:8 300:9

**connotations** 157:17

**consequence** 44:21 318:4

**consequences** 49:4 129:2 312:6

**consider** 37:25 75:3 85:8 92:12 97:22 99:5,9 101:6 191:11 217:24 235:11 260:15,20 289:22 295:7

**considerable** 337:8

**consideration** 265:13 293:24

**considerations** 335:15

**considered** 37:19 72:12 79:22 83:4 85:3 110:11 191:8 235:10 323:3

**considering** 309:5

**consistent** 143:12 230:14 231:9 290:18,24

**consistently** 199:8

**constant** 111:21 204:5
**constitute** 37:11 175:6
**constitutes** 13:15
**consult** 21:23 57:13 58:5,10 322:20 323:8
**consultant** 67:9 68:8
**consulted** 58:12 66:25
**consulting** 66:17 67:14,19 68:16 72:22
**consumer** 34:5
**consumption** 254:13 255:4,17 256:17 262:6
**contact** 14:24 19:17
**contacted** 14:14 36:22 73:22
**contains** 9:11 160:2
**contemporary** 149:12 151:3
**contend** 133:11
**contending** 125:14 328:11 330:15
**content** 19:8,9 316:9
**contenting** 328:5
**contention** 135:13 329:25
**contentions** 301:25
**contents** 9:14,18 17:4 30:9,11
**context** 15:6 16:3,8,12,15 44:23 51:9 164:6 181:25 190:22 199:13 263:14 291:7 298:13
**continue** 3:11
**continued** 137:8
**contradict** 152:8
**contradicted** 151:17,23 152:14 331:5
**contradicting** 230:11
**contradiction** 272:3,10
**contradicts** 152:18,21 155:9 156:9 316:10
**contrary** 204:3 212:20 279:19
**contribute** 308:9 311:9
**contributed** 32:11 236:14
**contributes** 147:9
**contribution** 141:13,14
**contributors** 193:14
**control** 24:16 28:5 96:8 98:5,9 100:14,15,17,19 101:5,7 102:10 103:4,12 104:2 104:17 107:3 108:7,11,18,25 110:10,17,25 112:24 116:24 117:7,8,10,21 118:4 120:9,11 121:19 122:5,6 122:12,16 124:12 125:18 125:24 126:2,10 129:16,17 131:22,23 132:6 133:19 134:11 134:12,15,22,22 135:4,7,15,18,24 135:25 136:3,7 136:17,19 141:18 150:3 155:13,18,24 156:2,8 162:13 164:4 165:20 166:11,18 167:12,15 169:19,24 196:17 205:20 208:17,20,22,24 209:14,16 211:6 213:24 218:7 227:4,21,25 235:13,19,22,23 235:24 236:5 242:17,23 243:5 243:7,25 244:21 245:12 251:22 253:5,6 254:17 255:20 256:10 256:21 257:11 257:14,18,20,21 257:24 258:2,13 258:18 259:11 259:20 262:2,16 262:18,20 263:10,15,21,23 265:6 266:7,11 266:14 267:6 268:11,15,20 269:2 270:25 271:3,13 274:20 275:6,23 276:7 276:10,10,22 277:3,7,10,16 278:17 279:10 282:25 287:14 291:15 293:12 294:8 298:17 300:7 303:12,15 304:19,25 306:10 307:12 307:17 308:15 308:17 309:22 310:21,22 311:21 314:25 322:16 323:8 324:12 338:18
**controlled** 98:3 98:8,22 116:23 120:18 122:8,8 122:18 123:14 123:19 125:3,7 129:22 142:23 164:25 168:12 169:2,14 205:25 208:16 209:2,6 213:7 218:17,20 225:6 236:6

244:4,8,14,23
245:14 246:12
247:7,14 254:12
254:15,19,25
257:15 262:5
263:5,19 268:6
275:21 296:23
297:3,22 300:2
300:19,23
308:13 311:19
321:15,19
322:17
**controlling**
118:14 120:8
121:21 122:2,10
123:11,15 124:7
124:10 125:5
127:2,17 129:13
129:14 131:21
133:14,17 136:7
136:8 156:4
165:24 211:9,10
243:13 244:18
246:2,7 258:8
263:11 264:3,8
277:25 283:9
284:23 286:6
287:12 297:8,17
298:3 302:10,18
311:7 312:7
314:13,14,21
315:9
**controls**  118:17
120:14 126:15
194:14 218:18
225:11 243:13
245:4 248:4
258:3 286:22

299:14 315:14
**controversial**
26:23 39:23
**conventional**
249:22,24
**converse**  297:7
**conversely**
313:13
**convert**  10:14
**convey**  17:7 18:7
**conveyed**  15:13
**conveying**  138:3
**conveys**  15:12
15:19 16:11
18:4
**convincing**  48:8
142:16
**coordinating**
310:25
**copied**  114:4,7
114:13 227:16
**copies**  9:6,12
12:17
**coping**  334:19
**copy**  108:21
113:25 162:6
284:19
**correct**  13:6,10
13:11 15:2 20:3
20:12 28:13
32:5 35:7 37:22
39:25 40:18
42:10,16 43:25
55:17 56:14
57:5,10 73:10,11
77:10,13 78:8
79:7 86:9 90:9
91:18 109:4

113:7,13 114:5,8
116:17 122:4,22
123:20 134:10
135:22 140:14
140:15,18 143:4
144:4 152:7
160:15 174:2,11
179:16 180:16
185:21 196:21
197:21 208:22
220:8,12 223:17
223:23 227:5,14
227:18 235:7,8
235:11 238:20
238:21,25 240:8
240:9 244:24,25
252:25 253:2
259:13 268:13
275:4 278:9,15
278:24,25
280:14 284:8
288:8 300:6,12
302:23 303:14
314:4,7,9 325:8
327:4 336:3
340:8
**corrections**
340:6
**correctly**  36:8
55:2 132:3
135:18 237:22
292:22 327:17
**correlate**  44:20
96:7 113:4,18
199:11,19,20,22
200:23,25
**correlated**  92:6
112:14 115:4,15

115:17 116:11
121:24 123:13
127:10,11 146:5
166:5 202:10
211:2 212:15
221:18 242:19
262:23 311:25
314:18
**correlates**  47:3
112:20 119:12
255:7,8
**correlating**
128:21 309:20
**correlation**  45:6
48:10 78:15,24
91:25 119:16
120:5 201:10
321:24
**correlations**
127:8 331:24
**correspondence**
36:9,14,18
**corresponding**
257:2
**cost**  185:5
**coughing**  114:9
**counsel**  3:16
4:10,18 8:2,4
9:10 10:17
56:14 75:21
76:12 121:8
177:11 303:25
**count**  37:5 62:8
158:8,20 160:18
180:15,17 181:4
181:5,9,23
182:24 184:11
185:2

counted 98:20
counterproduc... 139:3
counties 164:11 165:8
counting 158:20
countries 318:18 319:11 321:5 330:15 332:6
country 173:24 176:3 316:25 321:10
counts 178:21 182:6,17 183:15 183:20 185:7
county 1:10 2:21 2:23 3:19 4:19 5:4,7,20 11:17 12:9 60:20 157:7 340:1 343:5 344:1
couple 4:20 22:24 63:23 101:13 273:22
course 8:16 45:12 50:19 75:13 88:22 142:18 161:15 198:16,24 199:20 205:13 214:13 230:4 236:7 290:11 293:19 308:21 319:7 328:14
court 1:2 3:20 4:2 7:25 60:22 65:12 120:24 121:14
courtesy 9:5,12
cover 198:3 228:2
coverage 84:15
covered 13:19 85:2 155:11 175:3
covering 100:5
covers 119:12
create 48:24 188:6
created 187:23
credibility 97:19 156:19 169:5
credible 22:5 26:19 95:6,18,19 95:23 96:13,23 97:5 98:14,15 99:3,23 114:25 115:3,5 139:16 143:20 167:23 168:5,17,23 170:14 174:23 182:8 184:24 195:14 246:19 246:23
credibly 196:15 208:3
crime 138:19 166:19,23,25 167:8,12
crimes 167:6
criminal 138:25
criminologists 338:4
criminology 70:18
crisis 334:18
criteria 96:15
criterion 330:21
critical 85:14 97:25
critically 107:13
criticism 176:23 182:15 308:2 318:8 328:4
criticize 326:8
criticized 205:19 317:24
critique 164:2 326:24
critiques 162:11 162:18 326:4
critiquing 326:4
cross 159:9 235:17
crucial 154:10
cruz 1:21 4:3 343:7,25
cumulating 324:6
cumulative 58:9 118:9,17 303:3 307:16 311:3,16 312:11,23 313:6 323:16,17,19,20 324:5,13
cumulatively 314:20
currently 68:16
customers 29:13 30:4 39:6
cut 81:23 175:10 272:14 313:21
cv 1:14

d

d 110:16 341:2
dahlberg 110:15 110:18 111:3
dangerous 138:4
data 154:5 167:8 177:18 178:2,4 178:25 179:2,9 180:22 181:20 184:5,13,21 185:5,10 197:12 200:16 235:18 247:9 255:25 258:21 259:14 261:21 284:7 300:24 301:3 329:13
database 183:19
databases 161:6 161:7
date 34:17 38:14 56:4 74:6 94:18 109:12 149:7 159:17 185:11 191:23 214:21 225:25 231:14 238:2 250:18 260:2 284:16 286:16 288:2 294:24 304:10 316:17 340:12 344:24
dated 214:23 328:4,11
david 124:25 190:12 192:10

335:2 337:10
**day** 340:15 343:21
**days** 201:21
**deadly** 153:9
**dealer** 61:16 62:12 68:14 197:11 207:15 208:9 281:5
**dealers** 31:24
**deals** 72:17
**death** 76:15 77:6 77:20 78:25 86:15,23 87:13 89:23 90:15,19 101:8 102:11 103:13 112:7 117:16 118:11 118:21 124:2 125:20 126:22 129:11 131:20 133:12 136:12 140:14,23 148:20 178:22 184:17 209:4 219:11 225:14 225:18 266:4 267:8 301:21
**deaths** 29:9 113:13 214:23
**decades** 66:10
**december** 60:18
**decided** 63:3
**decision** 292:16 292:17
**decisions** 335:16
**decisive** 78:5 118:6 278:5
**declare** 70:6 340:4
**decline** 253:20
**declines** 253:22
**decrease** 131:15 132:25
**decreased** 296:24
**deemed** 340:6
**deeply** 183:18 208:6
**default** 142:14
**defect** 63:22
**defectless** 64:6
**defend** 32:13
**defendant** 1:13 2:12 3:16 4:18 24:8 64:3
**defendant's** 34:25 81:10
**defendants** 191:5
**defender** 70:3
**defending** 5:20
**defends** 32:25
**defense** 52:11,18 139:2
**define** 292:8
**defined** 11:5
**defining** 107:10
**definitely** 25:17 251:7 267:9 330:17
**definition** 115:16
**definitive** 48:5 76:21 78:5 239:6
**definitively** 66:9
**degree** 116:12
**delay** 203:9 205:17
**deliberately** 169:12 306:3
**demand** 35:19
**demographics** 111:13,23
**demonstrate** 308:19
**denominator** 179:16,17
**department** 62:5 63:12 65:9,24 179:3 180:23 181:8,12,14,16 183:7
**departments** 179:20,22 180:18,19 183:6 183:10
**depend** 309:6
**dependence** 295:23
**dependent** 164:21 204:17
**dependents** 244:6
**depends** 3:7
**deponent** 340:3
**deposed** 56:10 62:4 65:14
**deposition** 1:21 3:5,15,22 7:14 7:19 9:8 10:11 13:13,16 14:4 34:12,15 35:2,7 35:10 341:9 343:10,12
**depositions** 56:3 341:12
**depress** 298:8
**depressed** 203:19 206:25
**depression** 47:9 209:22 210:4 211:3,8,9,14,22 212:10,17 213:4 230:3 300:4,5
**depressive** 291:24
**descending** 56:18
**describe** 16:17 20:14 66:21 108:5 114:17 129:5 144:12 185:22 228:14 252:7
**described** 39:10 63:9 79:4 144:9 161:17 182:5,25 203:24 208:7 256:9 324:21 330:4,6
**describes** 29:5 29:24 30:14 235:16
**describing** 87:6 129:20 132:21 147:11 157:20 325:24
**description** 28:2 29:19,20 30:8 64:21 145:24

254:11
**design** 155:18 235:18 252:10 253:5,10
**desired** 108:2
**despite** 196:14 240:24 246:2 247:24 293:7
**detail** 107:19 242:12 331:19
**details** 66:10
**determine** 178:13 179:8 239:8
**determined** 76:18 153:22
**develop** 58:11 114:12 261:19
**developed** 29:11 272:6 319:6,11 330:14
**developing** 30:25 31:13 54:6,14
**devise** 78:4
**devising** 79:6
**devisors** 30:22
**devote** 171:20 223:21
**devoted** 315:8
**diagnosis** 284:24
**die** 86:6 92:14 124:21 187:14 188:8 200:6,8 205:5 209:10 292:3
**died** 54:8 101:3 178:17 185:18
**differ** 212:9,13 276:25 301:22 302:12
**difference** 119:17 154:7 177:19 218:4 272:10 277:8,9,9 278:8,17 279:10 282:24 331:22 332:2
**differences** 203:4,5 270:14 286:20 302:16 302:17
**different** 80:19 97:3,16 108:25 133:8 155:5 163:23 169:17 173:6 186:5 219:25 237:14 237:15 240:21 270:4,20 276:5,7 276:13 278:2,19 278:20 279:12 279:16 283:10 302:15 303:3 319:24 327:2 328:16 331:13 331:21 333:15 336:8,23,24 337:5,13,20
**differently** 290:6
**difficult** 10:14
**diminish** 298:7
**direct** 34:18 49:6 49:21 51:20 93:4 109:7 110:7 131:16 167:4 180:17 187:22 200:3 213:20 214:14 243:10 253:18 259:22 273:12 284:11 287:20 295:13 304:5 308:24 316:11 317:17 319:12 330:19
**directing** 40:3 235:4
**direction** 132:12
**directly** 51:25 149:3 189:14 214:11 289:2 303:8 331:4 332:15
**disagree** 28:12 39:17,21 41:13 41:16 42:2 126:23 150:22 198:4 199:6 200:12 202:6 206:15 236:17 241:6,8,9,16 242:4,6 246:9 254:7 261:12,18 283:22,23 290:2 290:16 296:3 333:18 334:23 334:25
**disagreed** 150:17,20
**disagreeing** 42:5
**disagreement** 186:20 242:10
**disagrees** 104:5
**disappear** 126:4
**disappeared** 64:17 125:9
**disappears** 150:2
**discharge** 184:4 184:13,20,21
**discharged** 183:24 184:3,6
**discharges** 183:21,21,22
**disciplines** 337:6
**disclosures** 71:25
**discourage** 25:14,18,21 33:9 33:17,24 52:17
**discover** 124:8
**discuss** 102:12 125:11 209:17 222:3
**discussed** 96:16 144:7 213:16 223:4 227:3 253:24
**discussing** 108:13
**discussion** 52:15 144:6 165:4 224:11 240:16
**discussions** 227:22
**disease** 209:5 225:15,20
**diseases** 209:11
**disorder** 284:24

**disorders** 286:21 287:13 295:22 295:22
**disparity** 202:18
**display** 8:22 109:9 151:12
**displayed** 8:25 9:2 39:14,24 55:24 93:5 215:5 231:23 283:25
**displaying** 93:8
**dispute** 40:13,17 40:18 42:21,25 43:5,10,14 44:3 44:11 49:14 50:4,14,25 52:3 53:10 62:23 177:4 199:19 236:20,21 272:8 312:17 329:25 331:9 332:19,21 332:23,25 333:2 333:4
**disputing** 86:19 202:8 325:25
**disruptions** 210:19
**disseminate** 335:17
**distance** 292:19
**distinct** 215:23 309:7 310:16 311:14
**distinction** 86:8 87:14,19 90:3,6 169:16 265:15 280:22

**distinctions** 176:2
**distinctive** 310:19
**distort** 263:12
**distorted** 6:3,6 279:7 338:7
**distorter** 297:15
**distorting** 310:21
**distress** 244:9
**distributed** 12:16 31:23
**district** 1:2,3 3:20,20 60:22,22
**divested** 207:19
**divestment** 207:21
**divided** 178:17 332:6
**divides** 176:3
**divisions** 176:20
**divorce** 210:20
**divorced** 203:20 245:10
**dix** 64:5,9
**doctor** 218:8
**document** 8:22 8:24 9:2,9 18:9 19:21 34:20,21 34:24 35:3 38:15,16,24 39:3 52:22 53:2 55:5 55:19 56:5,8 67:12 68:12 75:3 94:19,21 109:17 110:5 145:17 191:24

192:6 220:9 231:19,22 238:3 238:7 288:3 317:5
**documented** 114:19,21 115:25 125:18 144:10
**documents** 8:21 9:6,22 13:17,23 36:24 52:25 74:12,23
**doing** 16:3 29:18 30:18 71:3 122:13 166:7,8 182:11 184:12 197:22 208:10 256:2 266:21 299:18 317:24
**don** 233:5
**double** 134:16
**doubt** 57:18 200:15 220:5 241:12 242:14 242:15 259:9 261:16 264:5
**doubtful** 59:23
**downward** 132:8,11
**dozen** 195:18 218:21
**dozens** 95:25 100:3 337:5,7,11
**dr** 6:13 10:4 34:18 54:3 84:12 102:6 109:14 159:18 171:22 172:3

190:10 217:25 260:24 295:4,5 310:2
**draft** 58:7 76:2
**drafted** 150:25 161:20
**drafting** 16:13 140:17,23 260:16
**draw** 15:25 45:10 78:17 130:7 132:17 139:19 140:5 142:7 167:18,22 168:17 174:13 174:17 176:24 196:12 234:9 236:5 249:7 258:10 261:23 270:15,16 271:7 272:3 277:13 297:11 298:11 298:14 300:15 301:8,12,14,18 319:9 337:25 338:22
**drawing** 76:25 116:8 168:9 172:18 233:22 235:2 338:8
**drawn** 105:13 141:4 287:14
**dregs** 253:15
**dress** 253:12
**drew** 83:3 142:8 155:19 172:14 251:11 295:11

**drinking** 128:4 225:15
**drive** 203:7 292:16
**driven** 220:23 229:16
**driving** 203:25
**drop** 301:2
**dropped** 182:22
**dropping** 301:4
**drops** 298:12
**drug** 128:5,14 209:2,6,12 244:5 245:20
**drugs** 12:21 41:9 43:11,14,18 44:4 94:8 165:17
**dubious** 66:11 165:17
**due** 287:4
**duh** 228:24
**duly** 5:13 343:11
**duplicate** 9:8 84:23
**dying** 91:9,16,22 139:10 143:10 143:17,24 202:3

**e**

**e** 2:2,2 5:12 6:12 110:16 137:2,2,6 341:2 343:2,2 344:3,3,3
**earlier** 22:16 111:11 137:13 141:4 161:15 224:8 271:14 275:20
**early** 63:20 105:24 166:22
**earthly** 279:25
**easier** 38:22 110:3
**eastern** 1:17
**ecologic** 157:13
**ecological** 235:17
**ecologically** 157:18
**econ** 238:13
**economics** 238:20
**editors** 106:10 106:12 141:12 193:14 232:16 232:23 251:20
**education** 262:8
**effect** 44:25 45:16 47:6,12 48:9 49:3 50:11 79:19 80:10,13 88:21,21 92:2,8 96:10 101:10 115:11,14,20,22 116:3,8,22 117:11,14,20 118:5,9 120:14 120:19 121:20 122:3,10,13,19 122:21 123:11 123:24 124:5,5 124:10 125:5,10 126:17 127:18 127:19 129:16 130:13 131:18 131:21 132:9,10 132:14 133:15 133:16,17,20 135:9,20 136:2,5 136:6,8 140:6,18 153:4 154:15 156:18,20 183:8 183:12 189:3 201:8 202:11,14 204:23 211:11 213:14 223:25 224:10 229:12 230:6,8 237:4 241:17 249:15 256:4 257:5 261:17,20 262:4 262:19 263:24 264:7 266:23 267:16 278:6 297:22,24 298:15 302:10 302:19 306:20 307:17 308:20 310:19,22 311:3 311:5,9,16,23 312:11,13,23 313:7 314:13,15 322:9,10 324:6,6 324:8 335:22
**effective** 117:22 277:25 283:9 284:24 292:23
**effects** 90:4 94:4 115:6 118:16 119:3 125:15 130:24 213:4 231:18 241:13 244:22 257:17 308:22 310:9 322:11 323:16 323:17,19,20 324:5,9,13,14
**effort** 78:11,13 98:10 103:16 104:12 105:12 117:9 122:25 125:24 156:2 171:20 186:5 187:10,10 218:7 315:4
**efforts** 186:3 188:3
**eight** 23:7,8
**either** 11:12 12:5 22:10,18 38:19 59:9 61:13 62:11 66:2 77:16 81:18 87:16 88:18,19 101:2 122:21 128:25 130:4 131:3 132:8,15 148:9 161:7 165:9 190:24 240:8,17 246:14 250:8 255:6 256:18 273:23 277:21 281:14 301:4 315:14 333:2
**elaborate** 320:20
**election** 181:3
**electronic** 179:24
**elevated** 197:25 198:20 201:5,18 206:12 221:15

229:19
**elevating** 132:10
**eliminate** 46:2 46:16,17 63:8 127:3 314:22
**eliminated** 45:25 46:12 47:14,19
**eliminating** 45:13
**else's** 325:11
**emails** 14:18 36:10
**emergency** 179:2,3,19,21 180:18,23 181:8 181:11,13,16 183:6,7,9
**emeritus** 71:11
**emphasis** 224:4
**emphasize** 155:23 168:6
**empirical** 95:17 107:8 114:22 126:5,8 147:24 248:22 314:16
**empirically** 114:18,21 115:25 124:9 125:4 144:9 147:23
**employed** 24:13
**encourage** 29:15 30:6
**endemic** 251:19
**endocarditis** 209:4
**endorsed** 25:16
**ends** 177:20
**enduring** 197:25 201:5,8 202:18 203:5 206:23,24 207:4,5,7
**engage** 147:5
**engaged** 73:20
**engagement** 23:13 60:8 65:20 68:2
**engagements** 22:11,19 23:3,17 55:15 59:2 66:14
**england** 190:11 192:12,14 193:6 193:18,25 194:10 226:10 226:23
**ensuing** 88:12
**ensure** 8:5 107:25
**entire** 52:21 61:12 203:19 233:9 303:6,11 305:22 319:13
**entirely** 52:9 287:8
**environmental** 42:19,22 94:6 203:13,16
**epidemiologic** 304:17
**equal** 143:16 215:25
**equally** 143:6 155:5 186:23 204:13
**equated** 336:7 336:20
**equivalence** 165:5 211:21
**equivalent** 129:14 166:15 213:16
**eric** 2:16 4:22
**errata** 340:7
**erroneous** 85:10 97:13 309:23 322:10,23 335:10
**erroneously** 132:16 297:4 298:7 300:8
**error** 287:10 310:15
**errors** 139:24 142:19 237:11
**especially** 7:15 24:16 26:24 72:6 292:23 311:20 338:11
**esq** 2:8,15,16
**essentially** 16:14 81:4 125:9 182:6 184:21 217:20 256:9,11 334:7 335:24
**establish** 78:14 125:4 140:8 199:18
**established** 139:21 142:9 147:8
**establishing** 150:4 169:23
**estimate** 59:15 60:4 117:19 118:15 132:7 162:15 180:21 181:22 182:17 208:4 211:11 225:15 262:19 297:21,23 300:22 301:5 317:13 320:7,24
**estimated** 117:22 119:3 124:5 127:18 132:14 133:16 249:14 257:5 302:13
**estimates** 178:24 320:2,22
**estimating** 183:14 256:4 320:14 332:9
**et** 1:5 3:18 110:15 148:14 214:19,22 231:12,16 263:17 298:25 309:2 310:6 341:20,22
**european** 317:17 318:18 319:11 319:15 330:15
**evade** 198:18 199:17
**evading** 199:2
**evaluate** 79:13 80:8,15 87:11 90:17 91:20 92:12 95:17

100:9 326:12
**evaluated** 86:23
  87:7 89:19 90:8
  91:7,14 93:3,17
**evaluating** 79:6
  91:17 330:21
  331:15
**event** 69:6
  255:14 298:6
**events** 42:22
**everybody**
  204:22 331:24
**everybody's**
  26:22
**everytown** 2:11
  2:24 4:16,23,25
  5:19
**everytown.org**
  2:17
**evidence** 47:8
  48:6,8 77:3,15
  77:15 85:4 95:7
  95:10,15,16,17
  95:18,21 96:12
  96:22 97:22
  98:17,18 99:3,5
  99:10,20,24
  100:10 103:3,3
  104:17 114:25
  115:3,5 128:7
  137:25 139:9,19
  139:20 140:12
  140:21 141:2,3,6
  142:13,16
  143:13,20 147:8
  147:23 149:5,9
  149:12,19,23
  151:18,24

152:13,18,20
153:12,17,23
154:14 155:9,14
156:8 167:3,5
171:11 172:10
175:15 185:24
187:2,5 189:19
195:15 196:14
212:25 224:5
234:10 239:6
240:22 241:2
246:4 247:8
250:2 252:12
253:13 261:23
264:4,6,6 267:24
268:2,14 269:5,7
269:8 271:7,8,11
271:18,20 272:2
272:4,5 277:14
277:24 282:23
283:6,14 297:2
314:8,16 316:9
333:12 338:9
**evident** 271:25
**ex** 271:5
**exact** 218:4
  277:8 331:17,18
**exactly** 124:3
  132:3 171:13
  177:22 194:12
  202:12 218:15
  276:4 292:20
  317:25
**examination**
  5:16 137:8
  341:3
**examine** 109:2
  139:18 153:2

266:5
**examined** 5:14
  161:11 258:24
**examines** 225:14
**examining** 152:2
  239:8
**example** 46:20
  47:6 78:13
  85:16 88:4
  127:9 131:17
  133:10 165:12
  166:12 173:6
  176:7 183:19
  201:21 211:5,17
  216:14 287:9
  291:23 297:8
  298:24 308:13
  319:25 327:9
  332:5
**examples** 43:2
  64:23 176:16
**exception** 204:21
**excess** 219:14
  224:16
**excluded** 248:8
**excludes** 319:7
**exclusively**
  269:2 276:17
**excuse** 30:15
  40:6 43:23 84:6
  89:21 90:13
  95:9 98:14 99:7
  109:13 114:9
  115:7 116:2
  122:16 130:10
  145:16 166:7
  171:24 261:3
  274:7 317:3

**exh** 341:9,10,12
  341:14,15,17,18
  341:20,21,22,23
  341:24,25 342:4
  342:5,6,8,10,12
**exhibit** 34:9,10
  34:12,15,21,22
  35:13,15,17,22
  35:25 38:6,9,12
  38:17,25 40:4,8
  55:23 56:2,6
  73:3 92:23 93:9
  94:16,20 109:10
  109:15,16
  137:12,16
  144:20 145:9,18
  145:21 148:13
  157:23 159:12
  159:14,15,19
  160:7,14 161:4
  168:11 177:10
  178:11 188:23
  191:19,21,25
  192:8 214:18,19
  215:2,6 225:23
  226:6 231:12,19
  233:24 235:5
  237:20,24 238:4
  247:19 250:14
  250:16 251:21
  259:23,24 260:3
  264:23 265:2
  273:19,23
  284:14 286:14
  287:22,24 288:4
  294:22 299:7,10
  304:6,8 316:13
  316:15,22 317:6

317:7
**exhibits** 144:17 189:4 341:7,8 342:2,3
**exist** 300:10 324:14
**existence** 302:20 305:6
**existing** 63:2 191:13
**expand** 162:21 193:22
**expect** 127:17 143:3 202:13 254:24 257:15 292:21
**experience** 166:18
**experimental** 251:24 252:3
**expert** 13:14,20 13:24 14:2 15:10,14 16:4,13 16:21 17:2,3 18:5 24:3,14 27:9 36:25 37:10 44:5 47:4 55:15,16 56:22 57:18,24 58:15 58:19 59:12,16 60:8 61:8 62:10 65:4 66:14,18 70:14 71:2 72:22 73:25 74:3,17 75:4 80:20,20,23 94:16 106:25 112:17 113:25 191:2 320:19,23 341:14
**expertise** 24:10 24:12 25:2,3,5,7 26:15
**experts** 79:23 80:18,20 81:10 106:23 181:21 191:5
**expiration** 149:6
**explain** 164:22 202:17 207:5 244:13 305:3,15 307:4 308:3 312:24 313:8 331:13
**explained** 295:17
**explains** 206:8 229:7
**explanation** 30:11 203:5 206:11 224:15 331:14,16 337:18
**explicit** 107:12 107:15,22 326:11
**explicitly** 18:21 199:15 223:4 305:24 307:18
**exploration** 78:19
**explore** 283:16
**exposed** 219:21
**exposure** 43:5
**expressed** 104:19,20
**expression** 180:9
**extended** 233:6
**extension** 165:3
**extent** 25:15 32:21 37:9 91:24 95:20 103:19 113:3 128:8 129:4,7 167:11 191:12 302:7 309:6 310:15 311:8
**extrapolate** 181:19 320:8
**extreme** 176:7
**extremely** 104:17 135:10 175:21 329:7

**f**

**f** 137:2 343:2
**face** 195:14
**fact** 18:18 25:6 42:7 51:4 104:16 108:21 110:5 114:4 123:18,25 125:17 126:10 130:15,16 134:13 140:11 143:16 146:18 146:20 158:10 176:13 196:14 197:5 199:22 205:24 206:23 208:24 212:8 213:13 220:21 229:17 233:5 253:14 257:16 259:4 266:25 267:17 269:15 270:18 275:8 276:9 277:14,20 286:5 290:4 293:7,24 296:13 297:10,12 298:20 300:10 302:14 305:23 306:8 308:16 310:8 311:15 312:10,24 313:8 314:7 323:12 326:15 327:11 327:19 328:24 330:18 331:17 338:4
**facto** 271:5
**factor** 17:24 18:2,13 25:17 43:3,8,12,15,19 43:25 44:15,24 45:4,9,9,15,18 45:19,22 47:8 52:14 113:5,19 113:20 115:2,6 115:17 116:24 117:21,24 118:25 121:23 124:7 139:10 199:9,11,13,16 200:22,23 222:24,24 223:16,20 224:21 252:6 270:2 279:21
**factors** 29:14 30:5 41:22 42:3

42:7,8,12,13,19
42:22 44:8,10,12
44:12 45:24
46:10,18,24 47:2
47:9,12,13,18
48:15,24 49:5
77:13 92:9
93:22,24 94:7
96:5,9 98:2,6,21
103:6 112:23
114:23 117:8
118:15 121:18
124:17 127:20
130:21 146:22
147:2 202:10
207:3 210:17,21
210:24,24 212:5
212:13,15 213:7
213:15,25
223:14 224:9
225:4 242:17
243:6 247:14
305:25 309:5,15
311:20 314:11
314:16 320:9
334:16
**facts** 45:17
**factual** 53:10
  77:6,7,8,16
  102:16 103:2
  104:14 316:10
**factually** 39:23
  41:17 49:18
**fail** 136:19
  162:12 310:22
**failed** 140:8
  178:23

**failing** 100:15
  129:16 131:22
  131:23 132:6
  133:19 134:15
  135:7,15 205:20
  307:17 309:21
  324:12
**fails** 103:7
  134:11 308:2
**failure** 118:4
  135:18 242:17
  300:7 306:9
**failures** 136:3
**fair** 8:6,11,12,18
  8:19 20:18
  73:13,17 75:24
  108:10,16 111:9
  134:10,21
  146:15 233:12
  278:13 281:8
  285:17 286:2
  322:24 328:15
  336:16 337:2,6
  337:14
**fairly** 22:15
  84:15 228:21
  229:4
**false** 95:7 321:21
  321:23 322:2
  327:6,7,8,12
  329:17 330:2,3
**falsely** 327:14
**falsify** 78:11,20
**falsifying** 327:10
**familiar** 11:6,16
  20:5 24:16
  25:24 26:8
  27:24 28:9

58:22 71:24
72:4 82:17
183:13 185:4
190:10,15
216:24 217:4
231:25 232:18
238:10 239:17
250:13 260:6
294:11 304:11
304:14 324:23
338:3
**families** 54:8
  295:18
**family** 44:9 46:2
  47:7 245:8
  266:19
**fanatically** 196:9
**far** 59:6 85:13
  144:3 150:8
  154:3 155:23
  220:11 232:11
  251:2 254:10
  256:16 257:18
  333:20
**fashion** 142:22
**fatal** 163:16
  178:16 266:3
  268:4,4,20
  307:10,11
**fatality** 154:7,8
  156:6 177:20
  178:13,15 179:8
  184:23 333:3,6
**fault** 100:13
  171:22 172:3
  174:4,25 175:20
  330:13

**favor** 196:10
**fbi** 167:7
**feasible** 293:17
  294:8,9
**feature** 8:23
  107:10
**fedex** 9:13
**feed** 293:15
**feels** 165:13
**felt** 228:2
**female** 158:17
  200:7,8
**females** 127:13
  127:14 299:22
**fewer** 23:7
**field** 103:25
  104:5 107:11
  171:2,7,17 180:6
  181:21 182:15
  192:18 215:15
  232:13
**figure** 182:8
**figures** 320:6
**filed** 3:19 261:5
**final** 48:4 53:11
  76:21 116:23
**financial** 20:16
  70:10 335:15
**financially** 4:6
**find** 29:15 30:6
  61:3 96:6 107:6
  124:4 177:16
  180:25 214:2
  235:25 240:22
  249:20 258:14
  297:19 302:24
  315:10 324:2

**finding** 174:6 198:5 220:2,20 220:22 224:15 236:21 237:5 242:10 246:10 276:15 278:11 285:4,5,8 286:19 286:25 290:12 290:17 322:18 329:18 331:9
**findings** 118:10 122:4 125:16,17 135:17 136:10 155:15 156:17 168:23 169:4 202:7 220:4 236:18 241:7 248:13,14,22,24 249:8,9,16 254:8 261:13,24,25 269:11 271:14 275:12 290:3,7 294:15 296:4,6 325:11 329:15 329:16 338:3
**finds** 229:20 258:4 286:5 336:17
**fine** 38:23 53:19 190:2 272:16
**finger** 177:22
**finish** 8:15
**finished** 163:7 315:18
**firearm** 18:20 20:11 24:19 25:2,11,22 29:9 33:6 47:25 48:9 50:7,13,16,16,18 51:7,12,16 52:5 52:15 54:9 55:9 65:23,23 84:5 89:13 90:18,20 91:8 116:4 138:4 143:8,10 143:15,18 153:17 155:2,4,6 162:15 163:10 171:24 172:5 177:21 179:25 185:14,16,18 186:11 187:13 198:2,23,24,25 199:8 201:6,23 202:4,13,18 203:9,22 205:5,8 206:12 207:19 208:3 219:15 220:14 228:12 231:17 236:10 236:12,22,24 240:24 241:15 241:23 246:5,25 248:3 260:5 261:9 280:17 289:5,8,14 295:15 305:3,14 329:23 332:20 332:23 333:3 334:10,12,15 336:17
**firearms** 18:25 19:5,6,11 20:10 20:17,20,20 21:5 21:13 24:10,17 24:21,23 25:9,16 27:23 29:12,16 30:3,7,16 31:15 31:18,24 32:4,10 32:18,24 33:17 33:24,25 38:12 39:5 41:8 43:11 43:23,24 44:2 48:16 49:2,3 50:9,23 51:22 52:17 57:9,21 61:14,15 62:11 62:12 63:2 67:4 67:6,20 68:3,20 69:3,6,9,11,14 71:15,18,22 72:16,18 76:15 77:5,19 78:25 80:2,10,13 82:10 83:23 86:13,15 87:8,11 88:5,8 88:12,19,23 89:3 89:11,20,21,22 90:6,7,14 91:12 91:15,21 92:12 92:20 94:7,8,10 98:4,24 101:8,11 102:10 103:13 103:22 104:3 106:24 109:3 112:7 115:12 117:15 118:11 119:8,9 124:2 125:19 126:22 129:11 131:13 131:19,25 132:23 133:11 134:14,25 135:21 136:12 137:19 138:16 139:10 140:13 140:22 148:20 152:6 154:9 155:2 161:9,10 162:23 163:16 163:16,20 168:19,25 170:11 173:17 174:8 181:10 184:9 188:10 189:3 193:12,19 194:5,24 195:10 200:21,22 205:2 206:10 208:4,8 213:16 216:4,16 225:17 239:24 240:19 241:13 241:14,19 242:7 247:22 252:14 253:21,22 258:2 261:3,6 262:14 262:24 264:8 280:25 282:15 283:20 289:9,10 289:12,20,23 290:14,15 292:23 294:15 295:19,21 296:2 296:9,16 307:5 310:16 320:4,5 341:10
**fireman** 269:20
**firemans** 90:4
**firm** 4:3,16 36:22 73:22
**first** 14:12,19 20:7 39:13,18

40:22 41:20 51:2 61:24 93:19 97:10 98:19 114:17 122:7 126:24 139:11 149:10 151:25 162:12 183:25 195:7 198:10 199:7 201:16 223:16 223:19 228:13 236:8,16 241:9 243:11 253:19 263:14 281:25 286:18 316:20
**fit** 216:12 253:10
**fits** 227:18 252:9
**five** 53:17 101:18 122:11 129:4 130:13 149:23 203:8 258:8,15 299:15 300:2
**fix** 134:10
**fixed** 244:22
**flag** 8:4
**flat** 331:7
**flaw** 135:3 205:22
**flawed** 168:8 183:19 208:6 215:24
**flaws** 218:5,14 308:5
**flip** 245:2
**florida** 13:6 57:8 57:20 70:17,18 71:9
**fluctuated** 111:18,21,22
**fluctuates** 292:14
**focus** 17:17,18 136:6 223:24 224:2 248:15 249:13,17
**focused** 17:22 19:9 28:6 228:18 260:5
**focuses** 247:25
**focusing** 172:12 248:13
**fold** 219:15
**follow** 95:3 148:11 197:8 219:16 269:10 274:11 286:8 338:9
**followed** 97:8,10 97:12 197:11,13 203:9
**following** 49:22
**follows** 5:15 29:7 95:21 96:20 137:7 333:10
**force** 176:15
**foregoing** 340:5
**forensically** 266:18
**forewarned** 31:25
**forget** 176:6
**forgetting** 191:4
**forgot** 239:14
**form** 179:17 193:2 206:18 288:24
**formality** 34:9
**former** 150:19
**forming** 191:9 235:10,12 260:20
**forms** 207:21 336:10
**forth** 343:11
**found** 113:4 161:12 163:8,24 174:7 179:5 201:14 209:19 219:21 246:3 253:18 257:7 259:4 274:24 287:15 289:19 306:2 331:6 334:5
**foundation** 26:7 29:10 47:5 85:25 88:17 92:19 126:5,8 146:12 188:13 261:25 335:5
**founders** 129:10
**four** 37:6 72:21 122:11 176:8,10 176:20 219:15 255:2
**fraction** 167:5 181:13
**francisco** 60:19 60:21
**frankly** 16:20
**free** 214:25 219:9
**frequency** 111:19
**frequent** 244:9
**frequently** 203:11
**fresh** 84:24
**front** 231:22 273:24
**frozen** 5:25 6:20
**full** 85:3,8 122:21 181:20 230:21
**function** 302:7 308:10
**funded** 72:15
**funding** 72:4
**furnished** 56:13
**further** 140:25 142:4 179:4 320:20 324:7 338:25 343:15
**furthermore** 184:14
**future** 48:6 77:2 148:4

**g**

**g** 5:1,12 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1

38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1,16
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1

135:1 136:1
137:1,6 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1

211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1,21,21
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1

286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
**gallop**   180:24
**gang**   128:9,15
**garen**   195:22
216:24 225:23
226:9 341:21
**gary**   1:21 3:15
6:12 94:16
340:2,4,12 341:4
341:14 344:2,24
**gender**   127:9,17
128:2,14 225:6

**general** 24:20
25:10 121:25
130:19 169:22
186:25 188:15
192:21 193:24
194:4 215:22,23
225:20 227:10
269:4,13 270:5
270:12,20
275:17 276:19
277:2 278:12
279:3,18,22
280:3 283:6,11
287:14 301:9,15
301:19 303:9
338:5,10
**generalizable**
303:18,21
**generalization**
216:12
**generalizations**
269:12
**generalize**
268:25 276:18
302:5,22
**generalized**
271:10 278:12
**generally** 122:23
173:10 228:12
233:3 242:15
322:8
**generate** 182:16
**generated** 95:21
166:23
**generically**
224:24
**generous** 169:12

**genetic** 47:7,9
**genuine** 210:24
211:5 297:19
327:22 329:5
332:4,9
**genuinely** 54:17
**germane** 239:18
**gesture** 292:5
**getting** 6:3,18
138:22 144:14
182:12 301:17
309:23
**girlfriend**
221:10,22
**give** 7:7 10:12
138:10,15 168:8
203:14
**given** 85:9 97:3
121:21 181:24
182:20,20,21,23
227:9 258:24
301:9 302:6,11
322:22 330:24
340:9 343:13
**giving** 334:17
**glance** 218:12,19
218:24 242:12
**glanced** 217:7
218:11,16
**go** 3:12 61:24
73:5 94:5
101:12 117:20
126:15 132:8
136:20 137:10
140:25 145:13
176:16 203:15
207:8 229:2
234:2 244:13

253:14 269:6
277:22 278:18
279:8 283:2
299:3 309:15
322:13 333:16
**goal** 30:21,25
**goals** 27:5
**goes** 91:3 265:3
333:20
**going** 33:9 34:10
34:11 40:21
55:21,24 56:21
58:3 66:11
90:21,24 109:9
109:14 151:11
160:19 174:3
181:2 186:23
191:18 219:10
229:23 230:17
243:10 250:12
283:8 284:11
**gold** 330:22
**good** 3:2 4:15,22
4:24 5:2,5 53:15
84:20,21 138:10
138:15 169:11
169:25 209:13
216:9,14 255:24
273:4
**gosh** 65:16 74:7
**gotcha** 160:19
**gotten** 55:20
276:13 337:20
**government**
165:11 166:17
320:2,17
**granted** 169:4

**graphic** 43:6
**great** 9:24 304:4
**greater** 60:5
143:10,16 168:9
186:14 202:3
289:9 298:5
**greatly** 197:24
201:5
**green** 157:18,19
**greg** 5:8
**ground** 10:10
**group** 27:3,12,16
57:4 61:14 68:3
69:3 158:3,19,25
236:13 258:6
268:21 269:2
274:20 276:7
277:3,16 278:4
280:10
**groups** 244:14
268:11,16
269:23 275:9,25
276:2 277:10
301:22
**guess** 15:23 46:6
66:21 153:20
169:12,21
234:19 262:25
276:12,14
**guesses** 320:17
320:18
**guessing** 23:5
59:18 60:12,16
65:16 270:23
277:4 312:6,9
**guesstimate**
208:12

**guesswork**
279:13 321:10
**gun** 15:15,16
17:10,23 18:2,13
18:16,24 19:10
19:15 20:24,24
24:16 25:14,18
28:5,15 32:13,16
32:21,21,25,25
33:12,12 52:11
55:9 57:4 58:16
61:17 62:13,17
62:18,19 63:9,16
63:16,18,21,25
64:12,25 65:5
66:2,8 67:10,14
68:6,13 69:18
70:2,12 72:22
77:17 78:2,15
79:19 80:11
81:2 84:11 86:2
87:17,18 88:18
89:2 95:13 96:8
96:10 101:11
109:11,20
111:24 112:15
112:20 113:4,11
113:19 114:19
115:4,14,18
116:11 117:19
118:15 119:12
127:8,10,11
128:9 132:17
133:7,16 134:3
138:7,8,10,12,16
138:18 141:7
143:3,23,25
144:10 146:5,9

149:25 150:11
152:25 153:7,13
154:11,16
158:15,17 161:9
162:14 163:3,9
163:12,20,23
164:13,19,19
166:5 167:20
168:14 170:14
171:23,25 172:4
172:15 173:9,10
173:11,16,23
174:8 175:14,17
178:8 187:11
189:10,15,18
192:23 194:16
194:18 199:5,12
199:21,21,24
200:18 202:9
203:25 205:10
205:11 206:24
207:4,6,10,11,14
207:22 208:13
209:20 210:3,12
211:2,23 212:6,7
212:9,9,13,14,15
212:23 213:2,9
213:20 214:6,15
219:8,9,23,24
220:7,24,25
221:7 223:5,6
224:17,19
228:25 229:3,5,7
229:8,13,16
231:3,5 240:23
241:2,18,23
242:20 246:4,24
247:17 248:3,19

249:14,15,22
256:4 259:2
262:4,23 264:13
266:6 267:7,22
269:18,25 270:3
274:3,14 275:3
280:9 281:12,18
281:19 282:4,20
284:25 285:20
286:23 287:17
290:10,13,21,25
291:12,17
292:16,17,25
293:12,18,22
294:2,10 295:18
297:4 298:8,15
300:9 301:10,16
301:21 307:19
314:4,18 316:18
316:25 317:10
317:17,21 318:5
318:9,17 320:8,9
320:14 322:11
324:9 330:5,10
330:16,20 331:4
331:6 333:24,25
335:9,9,10,20,22
336:6,8,8,9,9,10
336:15,20,20
338:18 341:16
**guns** 15:15 33:10
48:25 51:18
52:10 112:22
117:22 119:11
124:6 125:8
127:4,13,19
132:7,13,14
133:21 135:9

136:5 138:11,20
138:25 139:4
142:2,16 145:25
149:20,20
153:25 155:20
156:15,18,20
162:25 163:12
186:14 187:6,22
188:12,15 193:4
195:5 196:10
199:24 202:25
207:9,13 209:20
211:11 214:12
214:14 215:25
223:25 228:7
233:10 251:12
262:20 263:24
270:19 271:2
276:24 281:11
290:8 306:12,24
309:24 314:10
314:23 315:10
317:13,15,20
320:10,25
322:18 334:6
335:19 336:7
338:22
**guy** 195:25
**guy's** 80:21
191:4

**h**

**h** 62:22 110:16
344:3
**half** 158:13,16
181:15 184:9
195:18 218:21
219:6 234:14

**hamilton** 2:22 5:5
**hand** 78:9 97:25 138:23 149:24 204:10 343:21
**handful** 99:21 141:24 155:17 169:2
**handgun** 190:13 191:21 197:10 197:23,23 198:19 200:5,7 201:4,15,17,22 203:8 214:24,25 219:13 227:9 228:10,20,22 286:23 287:17 341:18
**handguns** 197:3 197:15 202:20 226:11 281:2,7 282:9
**handle** 301:3
**hands** 320:25
**handwritten** 37:7
**hang** 40:5
**hanging** 154:9 154:19 177:21 181:11 185:20
**happen** 210:22 210:25 211:3 256:16 258:20 325:9 330:24
**happened** 85:5 266:15 325:14 325:20 329:16
**happens** 176:18 327:19
**hard** 302:21 319:9
**harford** 1:6 2:6
**harold** 106:15
**harvard** 335:3
**hasty** 249:5
**hate** 6:17
**hcup** 185:4
**head** 10:13,13
**header** 40:23 93:9
**heading** 40:4 53:5 146:23 284:22
**headline** 51:22
**health** 17:8,12 17:15 41:22,23 41:24 44:18 45:5,7 47:17 78:14 87:21 88:7,13,22 205:14 233:9 251:4,17,19 276:19 335:3 337:16 338:12
**health's** 42:14
**healthcare** 185:5
**healthier** 334:19
**hear** 7:15,16,20 8:2 81:24 91:2,4 91:6,10 121:5,7 121:9,11 250:7 272:14,16,17
**heard** 3:9 6:25 8:9 195:25 238:15
**heavy** 128:4 225:15
**heightened** 295:16
**held** 71:13 140:20 318:3
**help** 19:18 29:12 29:15,18 30:3,6 30:18 49:22 50:8,16 76:2 83:13 92:3 262:16,21 263:11 334:20
**helpful** 96:25 178:12
**helping** 211:11 262:3
**helps** 107:17
**hemenway** 294:12,23 335:3 337:10 342:9
**hereinbefore** 343:11
**hereto** 340:8
**hereunto** 343:21
**heterogeneity** 175:12
**heterogeneous** 173:2
**heterogenous** 175:7
**hey** 31:23 140:6
**high** 169:23 173:7,16,17,21 173:23 175:13 175:14 182:23 185:20 203:7 230:20 244:15 264:12 333:3
**higher** 33:20 134:2 143:24 154:3 169:9 170:15 175:18 194:16,16,18,19 200:19 210:13 229:22,23 231:6 264:13 267:20 267:21 280:8,9 282:20 290:21 291:2,3 292:11 295:17
**highest** 333:5,6
**highly** 204:25 286:24 287:2,6 330:14 331:3 332:24
**hinting** 199:15
**historical** 44:7 44:10,12 46:18 46:24 47:2,11,13 47:18
**histories** 44:9
**history** 25:25 46:2 47:7
**hmq** 62:3
**hold** 71:8 109:8 145:15
**home** 65:23 88:4 148:12 284:25 285:20 286:24 289:5,10,11,11 295:19 334:12
**homes** 52:10 215:2 289:20,23 290:14,14 295:20

**homicide** 167:8 335:23 336:9
**honestly** 60:15 249:4
**honorary** 71:12
**hood** 44:25
**hopes** 96:9
**hospital** 182:21 183:20,25 184:10,11,13,19
**hospital's** 182:20
**hospitals** 179:20
**hosted** 29:4
**hour** 22:14,16,17 22:20 23:4 59:4 59:8,10 222:10
**hourly** 58:25
**hours** 23:2,7,8 23:10 74:5,10
**household** 33:21 87:18 89:8,11 218:23 219:9 220:16,25 231:17 243:25 245:4 252:14 253:21 295:15
**households** 294:14 295:25 296:16
**houtsma** 328:4
**huge** 118:3 129:25 183:8 278:8,17 282:24 306:7,8
**hundred** 163:18
**hundreds** 95:25 183:9
**hunters** 163:18
**hunting** 163:17
**hurricane** 13:9
**hurt** 301:24
**husband** 220:15 221:8,12,21 223:12
**hypothesis** 77:25 78:2,6,7,12,21 78:22 79:5 85:15 98:10 99:18 107:9 139:21 143:4 152:11,25 154:10 158:12 196:13 306:21 306:22 313:25 314:6 315:13
**hypothesize** 311:16 312:11 312:13
**hypothetical** 143:5 258:12
**hypotheticals** 203:23

**i**

**i.e.** 270:5
**idea** 84:20,21 95:17 138:10,15 180:20 207:12 247:20,23 303:4 306:25
**ideas** 84:24
**ideation** 209:22 210:7 211:15,22 212:18 213:4 295:24 296:14
**identification** 34:16 38:14 56:4 94:17 109:11 159:16 191:23 214:20 225:24 231:13 237:25 250:17 259:25 284:15 286:15 288:2 294:24 304:10 316:16
**identified** 113:24 116:3 117:2,3,12 118:21 119:8 123:24 127:21 133:9 146:16 147:19 168:3 199:8 218:14 245:24 248:6 285:12 312:25 313:8 314:3 323:15 326:25
**identifies** 323:10
**identify** 79:24 82:8 83:9 84:4,9 97:21 98:17 99:19 100:9 102:20 103:16 104:8,23 105:7,8 105:13,17 107:12,23 108:6 112:16 122:25 151:2 156:3 161:2,23 166:3 171:16 312:24 315:5 322:21 326:10
**identifying** 326:16
**ideological** 193:13
**idiosyncrasies** 182:20
**illegal** 165:17
**illegally** 207:22
**illicit** 128:5,14
**illness** 209:18
**images** 40:7
**imagine** 143:6 290:5
**immediate** 52:13
**immediately** 201:16 205:15 325:21
**impact** 42:22 126:20 129:9 269:19 275:11 309:5
**impacted** 220:16
**impacts** 13:8 310:16 311:14
**imperfect** 165:15 209:14
**implication** 18:15 33:19 263:22
**implicit** 18:12 19:13
**implied** 18:16,17 32:17
**implies** 45:18 48:13 50:10
**imply** 45:9 47:7 281:13

**important** 7:6 7:15 8:14 84:18 86:7 117:24 186:8,9,12 270:2 279:21 287:3 334:16
**importantly** 28:4
**impose** 194:22
**impossible** 118:12 134:18 331:12
**impression** 291:7
**improve** 262:19
**improved** 191:12 237:13
**impulse** 203:14
**imputed** 221:14
**inaccessible** 52:12
**inaccurate** 39:23 285:8
**inadequate** 233:21
**inadvertent** 327:22
**inadvertently** 61:4,7 239:15 240:5 248:8
**inappropriate** 172:18 174:15 174:16 338:7
**inclination** 338:20
**include** 211:3 225:4 248:4 253:7
**included** 118:24 327:16,21,25 328:21
**including** 4:11 36:10 41:8,22 43:11,24 52:21 52:25 94:8 107:21 112:21 166:24 174:2 194:4 195:16 223:13,14 244:15 245:4 266:21 271:25 273:16 311:18 336:8
**income** 70:15 71:2,5 133:24,24 134:2,12,23 135:16 136:9 244:2 245:4,20 262:8
**incomplete** 52:4 52:7,8 323:2
**inconsistent** 152:10 290:20 290:23 336:18
**incorporated** 3:18 310:20
**incorrect** 309:15 311:7
**increase** 86:3 93:25 94:11 131:14,16 132:25 154:12 228:11 236:10 236:11,15,22 237:2 240:23 241:3,18,19 246:4,5,24,25 311:22 334:12
**increased** 87:9 87:13 89:22 90:15,19 91:8,15 91:22 140:13 147:20 219:12 219:15 241:2
**increases** 15:16 17:10 76:15 77:5,19 78:2 98:5 103:22 137:20 141:7 142:17 150:12 156:15 228:8 240:23 297:10 300:18 336:17
**incredibly** 176:11
**independent** 91:13 158:11 161:22,25
**index** 187:24
**indexes** 128:24 188:6
**indian** 80:22
**indicate** 74:22 152:4 156:17 200:17 202:16 220:20 229:5 264:2 296:6,11 329:8
**indicated** 195:15 196:11 248:13 259:19 261:25 269:18 275:8 290:19 296:7
**indicates** 26:13 142:25 149:19 154:6 177:18 187:6 199:23 224:23 234:10 235:3 247:9 248:18 262:11 264:4
**indicating** 114:25 252:13 275:2
**indication** 163:19 330:10
**indicators** 128:23,24 187:8 188:2 317:14 319:25 320:15 320:24
**indifference** 171:5
**indirect** 146:25
**indirectly** 189:17
**indistinguisha...** 154:18 335:25
**individual** 46:23 58:16 61:17 62:13 105:13 143:14,17,23,25 155:13 157:11 158:21 164:9 181:8 221:7 227:20 239:9 255:8 256:13,24 266:10 267:11 291:21 324:14
**individually** 266:17

**individuals**
24:13 32:3 54:8
57:9 62:16
106:19 138:11
155:3 157:5
185:17 188:14
221:24 223:8,10
225:13 254:18
255:11 268:11
270:4 275:10
280:13 282:8
**indubitably**
175:2,7
**industry** 20:20
24:20,24 25:10
28:5 33:2,25
54:20,20,25 55:9
61:14 62:11,17
62:18 64:2,2
68:3 69:9,12,15
69:18 70:12
71:15,18,22
72:16,23 335:9
**industry's** 20:11
**inequality** 244:2
**inexcusable**
166:10
**infer** 47:21
303:8
**inference** 208:11
**inferences**
168:18
**inferring** 319:13
**influence** 47:6
48:16 77:14
314:17 323:5
**influenced**
271:12

**influences**
113:20
**inform** 191:16
**information**
17:8 19:17,24
35:20,22,25 36:4
49:12,15,18 50:5
53:8,11 67:6
76:23,23 138:9
138:14 149:7
165:15 179:18
192:22 193:11
243:5 293:15
301:6 335:10,13
335:17
**informing** 47:17
**initials** 11:10
180:6
**injuries** 184:16
184:18
**injury** 41:25
179:4,24,25
184:9,16 250:16
250:20 251:9
253:15 341:24
**insight** 338:10
**insist** 250:3
**instance** 92:11
98:19 233:7,7
268:9
**instances** 64:10
263:5 292:18
321:9
**institute** 42:14
**instructs** 10:19
**instrumental**
249:17

**insurance** 67:5
**intended** 30:23
30:25 50:14
**intent** 15:23
16:15 125:2,7
127:2,23,24
128:14 148:6,18
149:14,22 150:3
150:4,16,23
151:4 154:3
166:12 185:25
186:2 187:7,20
187:20,25 188:7
188:8,11 189:21
202:17,24,25
203:4,7,24 204:3
204:5,9,15 205:4
205:7,21 206:7,8
206:10,16,20
210:14 211:17
211:24 212:19
212:21 213:2,14
213:21 214:6,15
220:21 221:12
222:13,14,21
223:15 224:5,6
224:11,18 225:3
229:15,22,24
230:2,10,16,18
230:20 231:6
264:11 265:5,10
265:17,23 266:7
266:12 267:5,14
267:20 268:7
269:3,12,17
271:4 274:11
275:6,17,22,23
276:11,22

277:15,25
278:10,11,18
279:10,17,20
280:2 282:20,25
283:10,15
284:25 285:19
286:4,6 290:22
291:2,6,18,20,24
292:8,14,21
293:8,11 294:7
296:17,23 297:2
298:18
**intentions**
124:22 293:6
**interaction**
147:6
**interest** 20:19
31:15 32:13,21
32:25 33:12,13
71:25 72:9
100:21,22
335:13
**interested** 4:6
27:5 54:17
149:25 160:20
315:12 343:18
**interests** 20:16
32:14,16,16,18
256:3
**interference**
31:4 98:16
132:11 166:20
207:16 234:13
272:13 301:2
**international**
238:13,19
**internet** 3:8 6:4
222:10

**interpret** 261:14 261:16 276:16
**interpretation** 46:15,19
**interpreted** 252:13
**interrupt** 6:18 163:7
**interrupted** 334:21
**interveners** 188:4
**intervenes** 153:3
**intervening** 154:13 186:13
**interviewing** 266:16,18
**introduce** 4:20 183:2
**introduced** 73:23
**introduces** 93:22
**introducing** 118:16
**invalid** 162:22 330:10
**invariably** 153:4 186:15 204:20 267:11
**inverse** 131:12 131:25 132:23
**inversely** 133:5 134:7
**investigation** 78:19
**invitation** 141:12
**involve** 149:21
**involved** 28:5 77:23 121:22 275:9
**involvement** 24:7 65:14
**involving** 50:9 276:17 281:17 287:13 289:8
**irregularities** 183:11
**irrelevancy** 282:8
**irrelevant** 83:15 83:21 103:2 104:21 105:6 212:4 257:21 282:3 295:10 333:21 334:7
**isolate** 147:15 188:3 262:4 291:16
**isolated** 147:12 207:2 230:4
**isolating** 96:9 264:7
**isolation** 147:7,9 210:19 211:18
**issue** 1:5 2:4 3:17 5:10 11:7 11:13 25:2 38:8 50:20,20 51:9 52:9 79:14,15 81:23 83:7 89:4 91:13 97:7,25 98:25 102:16 103:2,21 113:15 120:22 124:13 124:16 131:9 142:6 150:18 171:3 172:21 173:14 177:2 182:3 186:22,24 193:3 194:24 195:10 199:2 205:13 212:3,4 214:11 222:25 222:25 228:7 229:12 233:5 235:25 246:19 258:2 263:18 276:23 278:5 282:14 312:2 324:4 325:22 340:1 344:1
**issues** 24:10,14 26:16 57:12 68:20 72:18 106:24 321:3,8
**item** 41:7 94:6
**items** 58:13

**j**

**j** 195:22
**jam** 216:3,15
**james** 2:15 4:16
**january** 11:18 12:9
**jed** 5:18 9:21
**jedmiller** 2:17
**jennifer** 106:14
**job** 9:25 166:8,9 255:13
**jog** 70:3
**joined** 4:19
**joint** 20:2 39:8
**jointly** 309:5
**journal** 21:21 37:12,17 106:3 170:6 190:12 192:12,14,15 193:6,14,18,23 193:25 194:2,11 215:9,12,18,19 216:4,6 226:10 226:23,24 232:6 232:10,15,19 238:19,22,24 239:5 250:20,22 250:25 251:3,4,9 251:17,19 288:13,16 324:16,24 325:6 325:12,25 326:22
**journals** 192:21 193:24 194:4 199:14 215:22 232:17,24 233:2 253:15,17 271:25 272:2 324:21 325:3 329:7 337:14,16 337:20 338:13
**jump** 157:22 236:24
**jumping** 185:20
**june** 325:6
**junk** 233:10,13 233:18,25 234:7 234:21 237:17
**justice** 62:5 63:13

**justification**
31:5,10,12,21
172:9
**justified**  142:13
338:2
**justify**  234:24

**k**

**k**  5:12,12 6:12
6:12 137:6,6
231:16 237:23
**kalyanaraman**
81:10
**kalyanaraman's**
84:13 295:5
**kates**  233:5
**keep**  52:10 69:21
138:18 191:4
222:20
**keeping**  50:7
137:19
**kept**  65:23
**key**  161:10
256:11
**kidneys**  273:2
**kids**  228:23
**kill**  78:3 153:23
154:2 187:11,25
188:11,17
189:21 199:3
202:14 203:12
203:15 205:9,12
205:15,16,18
210:18,23
222:23 241:14
265:20 294:7
**killed**  55:8
266:24

**killing**  17:11
25:19 51:14,17
186:3 187:7
292:22,24
**kind**  19:24 95:22
157:15 165:3
176:13 199:16
206:18 242:16
250:4 271:6
277:10 278:14
278:20 279:7
297:14 303:3
306:3 307:13
320:22
**kinds**  262:20
**kit**  29:2,6,11,25
30:3,14
**kleck**  1:21 3:15
5:1,18 6:1,12,13
6:13 7:1 8:1,6
9:1 10:1,4 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1,18
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1,3 55:1
56:1 57:1 58:1
59:1 60:1 61:1

62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1,16
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1,17 95:1
96:1 97:1 98:1
99:1,7 100:1
101:1 102:1,6
103:1 104:1
105:1 106:1
107:1 108:1
109:1,10,14
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1,10
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1,20
146:1 147:1

148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1,18
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1,5 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1,10 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1

224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1,2 311:1
312:1 313:1
314:1 315:1
316:1,7,15 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
340:2,4,12 341:4
341:8,14,15
342:3,12 344:2
344:24

**knew** 207:14

**know** 6:6 7:9,11
7:23 9:3,14 15:8
22:24 23:23
24:22 25:5,12
27:25 28:10,17
29:15 30:6
31:14,20 32:15
33:19 36:15
37:5 42:17
55:11 57:11
59:14,25 60:6
66:25 67:3 70:4
70:6,7 78:16
85:12 89:7 91:5
102:14,25
103:15 104:4,6
106:18 117:6,6
117:11,18 124:3
124:16,20 126:5
126:14,16,19,25
127:5 128:17,24
129:3,7 130:4,8
130:15,20,23
131:3,10 132:2
136:15 137:17
138:12 139:15
141:24 142:2,3,4
146:2,11,23
147:3,25 149:6
149:18 150:8
151:10 156:11
157:16,17
158:13 163:18
165:12,13
166:22 170:17
170:21,25 171:4
171:6 173:15
175:17 178:12
180:3,25 181:14
181:15,25 182:2
182:7 183:3,6,22
186:9 188:2
189:6 190:16
191:8 196:5,7,9
207:12 208:10
208:11 213:6,19
213:23 215:25
216:22 218:9
220:11 222:20
225:9 228:19,22
228:24 230:25
232:11,14
234:15 239:12
242:12,22,24
243:8 249:5,6
251:2,16 252:22
254:11 256:17
265:18 268:5
271:9 272:9
274:5,9 276:20
277:2,20,21,23
278:4,10,16,22
279:4,9,9 280:22
282:7 283:3,8
288:22 302:12
307:2 308:5,18
312:14,15,15,20
312:21,22,22
313:3,3,6,12,13
313:15,17,19,22
313:23,23 314:6
314:20 322:14
322:15 324:22
328:2 331:12,17
337:7

**knowing** 140:3
202:24 207:25
276:4 311:17

**knowledge** 20:23
21:6 24:18 25:9
26:2,3,4,22,23
27:2,20,23 39:22
48:7 49:17
52:16,19 62:24
64:9 65:19
76:13,16 102:6
103:24 196:23
222:5

**known** 20:24
21:3 25:13,20
28:14 146:5,6,8
146:14 147:2
165:25 166:4
178:18 205:25
309:8 324:3
335:19 336:19
**knows** 279:5
313:13
**kristen** 106:14
**kristi** 1:21 4:3
343:7,25
**kung** 298:25
299:14
**kvisto** 231:12,15
235:5 341:22

**l**

**l** 5:12 6:12
110:16 137:6
**lab** 9:23
**label** 234:23
**lack** 164:4 218:6
**laid** 248:16
306:3
**land** 243:20
**lane** 326:3,25
328:20 329:11
329:18,24 331:5
**lane's** 331:7,9
**language** 248:24
**lap** 129:6
**large** 53:4 61:10
120:8,10 126:3
131:4,7,8 132:9
152:3 175:2,7
176:14 247:25

336:22 337:9
**largely** 334:5
**larger** 172:25
175:8,10 256:23
291:11 302:8
**lasting** 291:22
**late** 185:11
233:5
**law** 2:11,20,22
2:24 4:16,23,25
5:3,19 11:17
57:8,20 58:20
64:19 65:12
233:6 238:13,20
280:23
**lawfully** 219:13
**laws** 24:16
231:18 260:5
261:5,6 262:14
262:24 264:8
**lawsuit** 5:21
11:19 12:2,10
14:8 60:21
62:16 65:20
**lawsuits** 31:17
31:19 32:9
33:15 54:8,22
55:6,10,12,17
63:23,24
**lay** 135:10
**lead** 97:13
127:16 237:5
335:20 338:22
**leading** 153:2
**leads** 40:5 195:5
251:12
**leaves** 52:8

**leaving** 307:13
**left** 52:14 129:21
203:20 315:23
**legal** 24:14,15
56:3,9 67:24
68:11 280:19
320:5,8 341:13
**legality** 281:14
282:14
**legally** 280:17
281:10,18 282:2
282:6,10 283:19
320:11
**legitimate** 149:9
**length** 112:11
**lenient** 194:21
**leslie** 2:24 4:24
4:25
**lesser** 130:13
146:11
**lethal** 41:8 43:10
43:15,19,24 94:7
155:3,5 185:15
186:17,23 187:4
204:10,13,17,21
204:22,25 293:5
293:6 332:18,19
332:20,24
334:15
**lethality** 124:22
124:23 125:2,6
154:19 177:7
185:25 187:20
187:24 293:7
**level** 80:13
142:24 152:2,16
154:6,23 156:5
156:25 157:2,14

157:20,25
158:10,24 159:3
160:2 161:2,4,21
161:23 162:2,10
162:11,18 163:3
164:3,7,9,10,13
164:15 165:2,5,6
165:8,21 166:12
166:15 167:16
167:19 168:4,16
170:11,24 172:6
172:10,12,13,19
172:25 173:19
173:24 174:6,11
174:14,17,20,22
175:4 176:15,18
176:25 227:19
227:25 232:22
235:18 239:14
239:19,22
240:12,18 243:3
247:6 249:22
250:6 253:7
254:16,21 255:7
255:8,19,21,25
256:8,13,14,15
256:20,21,24
257:2 262:9
263:16 264:2
266:9,10 267:11
322:8
**levels** 168:14
262:23
**lexington** 2:13
**liability** 54:24
63:22 64:6,17
**liberal** 338:16

**licensed** 163:17
**life** 42:21 49:23
  94:2 203:20
  288:14 333:17
**lifestyle** 51:22
**light** 18:25 19:7
  19:11 229:15
**likeliest** 154:17
**likelihood** 15:16
  17:10 31:17
  45:21 50:11
  78:3 86:3 94:11
  103:23 113:20
  132:18 137:20
  141:8 150:12
  156:15 264:13
  267:21 280:9
  281:19 282:20
  291:3,9
**likes** 234:9
**limit** 107:19
**limitation** 135:4
  275:15 283:18
  283:21
**limitations**
  107:19 283:17
**limited** 26:24
  34:4,6 206:18
  209:15 278:22
  308:5 315:7
  330:14
**limits** 26:21,21
  26:25
**line** 145:23
  264:25 344:4,7
  344:10,13,16,19
**linear** 142:22

**lines** 19:18
  177:24 178:2
  264:21
**link** 86:13,14
  297:4
**linked** 47:25
**linking** 307:5
**list** 56:9,11,13
  58:7,9,11 61:12
  72:24 82:25
  101:10 110:10
  113:24,25
  114:13 117:2,13
  119:23 131:12
  135:5 161:13
  166:3 223:16
  243:12 245:3
  256:9 263:3
  300:16 305:22
  307:20,22
  315:16 328:9
**listed** 37:24
  41:21,23 42:8,13
  43:2 47:2 61:2
  61:18 67:12
  68:11 75:4
  82:20 94:6
  112:17 113:23
  123:2 130:10,11
  146:5,7 160:7
  206:3 245:17
  246:14 263:15
  307:18 314:11
  315:7 328:3,10
**listing** 56:2
  160:2 224:11
  341:12

**lists** 42:18 44:7
  113:2 195:17
  273:20
**literal** 145:4
**literally** 118:6
  251:10
**literature** 12:15
  44:18 45:5,8
  80:24 84:16,19
  87:15 96:6
  100:6,14,18
  101:7 106:21
  107:4,21 166:2
  233:8,10 259:10
  263:16 265:6
  267:6 303:12
  322:21 323:9
  326:19 335:6
**litigation** 66:18
  67:13
**little** 97:19
  125:12 154:22
  166:21 173:10
  184:8 208:10
  321:9
**live** 89:10 138:23
  223:8 225:13
**lived** 219:8
**liver** 209:5,11
  225:14,20
**lives** 28:6 29:18
  30:19 51:14
  205:17
**living** 197:19
  214:24,25
  219:23,23 245:7
  262:7 295:19,25
  296:15

**loaded** 52:10
  269:18,25 270:3
**lobbying** 20:8
  57:4
**local** 61:9 168:25
**located** 13:5
**location** 38:20
  106:6 225:11
**locations** 187:19
  243:11
**locked** 138:19
**logic** 95:16
**long** 65:17 80:22
  180:8 201:8,18
  254:15 305:22
  310:18
**longer** 206:13
  213:25 285:24
**longitudinal**
  196:19,22,24
  227:6,7
**look** 23:23
  112:25 119:11
  176:16 177:24
  188:20 234:2
  235:23 236:4
  274:23 285:23
**looked** 218:16
  233:4 308:11
  336:22
**looking** 157:23
  172:10 185:8
  192:6 284:19
  286:18 299:9
  307:9
**looks** 273:21
**loosely** 291:6

**losing** 255:13
**lost** 234:14,17
**lot** 23:6 78:10 124:17 157:16 183:4 202:10 208:21 257:21 285:24
**lots** 104:19 142:2 173:11
**low** 6:19 138:19 173:8
**lower** 93:23 132:15 136:10 175:19 274:16 292:12 324:11
**lucky** 303:7
**ludicrous** 228:8
**lunch** 136:24

**m**

**m** 62:22
**m.d.s** 196:3 216:20
**machine** 142:5
**macro** 80:13 142:24 152:2,16 154:6,23 156:5 156:25 157:2,14 157:20,25 158:10,24 159:3 160:2 161:2,4,21 161:23 162:2,11 162:18 163:3 164:3,7,10,13,15 165:2,5,6,21 166:12,15,20 167:16,19 168:4 168:16 170:11 170:24 172:6,19 172:25 173:19 173:25 174:4,6 174:10,14,20,22 174:25 175:4,20 176:15,18,25 227:19,23,25 239:14,19,22 240:12,18 243:3 253:7 254:16,21 255:3,7,19,21,25 256:8,14,15,20 257:2 263:16 264:2 266:9 317:3,4 322:8 326:5,17 328:13
**madam** 121:14
**magazines** 61:10
**magnitude** 241:3 246:6 247:2
**main** 52:9 137:15,17
**maintain** 210:12 263:2
**major** 52:14 321:11
**majority** 15:24 133:13 135:5 259:17 293:21
**making** 10:11 72:12 117:9 137:24 138:5,6 138:25 198:14 238:17 270:24 271:21,23
**male** 113:7,17 127:9 158:15 200:5,6
**males** 127:12 244:16
**manage** 188:3
**mandatory** 79:11
**mangled** 90:23
**manipulation** 252:6
**manner** 50:13 171:12
**manners** 50:22 138:17
**manufacturer** 61:16 62:12 63:21 64:2 68:7
**manufacturers** 20:7,9,17,21 31:15,18,21 32:10,14,19,22 33:14
**manufacturing** 24:17
**marginal** 311:22
**marijuana** 300:4
**marital** 131:17 131:24 132:6 133:4,18,24 134:4,12,23 135:15 136:9 245:19
**mark** 2:8 5:9 36:19,20 73:21 74:14 76:10 121:8
**marked** 34:16 38:9,13 53:8 55:22 56:3,6 94:17,20 109:11 109:15,16 137:16 145:8,12 145:18,21 159:12,16,19 191:19,22,25 214:18,20 225:24 226:6 231:13,19 237:19,25 238:4 247:19 250:14 250:17 251:21 259:25 284:15 286:15 287:22 287:25 288:4 294:23 304:6,9 316:16
**marriage** 245:11 343:17
**married** 133:4
**marshal** 267:24
**maryland** 1:3,5 1:7,10,12 2:4,7 3:17,19,21 4:19 5:10,21 11:7,13 340:1 344:1
**marylandshalli...** 2:9
**match** 288:5 304:12 317:6
**matches** 238:8 304:15
**material** 79:17
**materials** 14:22 37:11,25 74:16 81:17 100:7 189:12
**matter** 3:17 16:15 66:4,6,18

73:20 76:19
77:16 85:23
97:6 98:7 103:7
104:14,15,18
116:9 167:23
169:13,15 171:5
194:21 215:24
237:15 243:6
251:10 259:17
260:21 343:19
**matters** 96:19
97:17 276:21
278:16
**matthew** 195:22
216:24 217:2
337:10
**maximum** 23:10
**mccourt** 81:9
82:13 99:13,14
99:16,21 100:11
111:5 174:19
217:25
**mccourt's** 82:14
84:12 171:22
172:3 260:24
295:4
**mean** 11:13
16:23 25:4
35:15 36:15
39:20 44:19
59:25 66:9
67:11,13 74:24
75:2 81:16
85:13 86:6 88:2
89:5 92:3 95:14
95:16 96:15
100:17 107:4
114:21,22 115:5

115:7 116:2,7,19
116:20 118:6,17
119:10 120:2,7
126:14 138:12
141:2 144:17
145:10 147:12
149:7 150:9
152:9,10 155:14
163:6 165:19
175:22 176:2,10
191:3,14 193:2
194:6,7 199:11
200:15,23
204:23 219:22
228:5,6,24 234:7
239:5 242:25
252:10 260:18
267:13 268:4
271:19 274:5
277:4 281:4,13
281:25 286:25
287:3 291:18
292:21 295:10
297:16 298:11
319:2,23 321:23
324:8 327:9
328:19 332:21
**meaning** 107:6
132:4,10,24
150:17
**meaningful**
252:4
**meaningless**
136:15 184:4
306:4 308:19
**means** 41:8
43:11,15,19,24
44:23 50:21,24

51:19 94:9 96:5
98:9 120:4
184:10 196:24
197:6 200:24
204:10,17,21
239:4 242:18
261:11 264:14
287:4 307:20
309:18
**meant** 275:10
**measure** 96:8
98:24 116:10
117:7,10,21,23
118:8,19 119:6
119:15 162:22
163:2,2,12
168:25 202:23
207:10 208:8
209:12 258:18
266:13 268:3
293:11,17 294:2
294:3,6,8,9
298:22 306:12
318:5,9 319:16
319:18,20,21
320:4 330:5,8,8
330:20 331:4
**measured** 98:2
125:2 162:14
165:8,9 207:11
208:10 262:18
268:6 309:9
311:19
**measurements**
286:18 293:25
**measures** 46:4
157:4 163:3,9,14
163:15,23

166:17 168:14
209:4 213:20
214:14 246:17
249:14 259:16
275:24 294:5
316:18 317:9,11
317:17,19,21
318:16 330:12
330:16,19,22,24
**measuring**
118:14 124:6
156:4 197:2
287:10 315:8
**mechanism**
153:3 154:13
186:13
**media** 3:14
**medical** 192:21
193:10,23,24
194:2,3 199:13
215:9,18,19,21
216:6 217:2,3
232:15,17,24
233:2,8 238:24
251:3,17,19
271:25 337:16
338:12
**medication**
12:21
**medicine** 190:12
192:12,15 193:7
193:18 194:2,11
226:10,24
**meet** 96:15
194:9
**member** 62:17
68:22,24 69:2

**members** 24:19 24:23 25:9 28:4 197:14 266:19 335:10
**membership** 128:9,15
**memory** 57:14 66:12 70:3
**men** 113:10 299:19
**mental** 41:22 42:14 209:17 244:9 276:19
**mentioned** 80:16 81:8 112:24 126:25 152:16 156:5 163:10 207:3 208:15 211:18 213:25
**mere** 261:14
**merely** 45:13 115:14 292:5 312:5 338:10
**message** 16:11 16:18 137:16,18 137:18 138:3
**metaanalyses** 170:9
**metaanalysis** 316:24 317:2
**method** 124:19 149:20 150:5 153:22 154:17 155:3,6 156:7 182:25 183:14 184:25 185:15 185:19 186:5,10 186:17 187:4,15 188:16 189:21 224:7 293:5 320:13 332:19 332:24 333:13 333:15 334:15
**methodological** 97:25 194:22
**methodologica...** 156:12 233:21
**methodology** 96:17 100:24 107:18 155:24 182:5 323:6 325:11 326:16 329:14
**methods** 97:12 107:12,22 108:6 111:20 124:23 154:4 177:7 186:18,21,22 188:10 189:22 204:12,24 219:25 234:12 234:23 237:13 239:8 240:25 248:16,18 249:18,20 293:3 326:9 329:20 331:18,20 333:7 338:8
**middle** 41:7 94:5 110:9 144:20 145:14 157:25 313:21
**midline** 161:6
**miller** 2:15 4:15 4:16 5:17,19 6:8 6:21 9:19,24 10:3 38:5 53:15 54:2 68:10 101:12,18 102:5 105:3 120:23 121:8,13 134:19 136:20 137:9 145:6 148:9 177:13 189:23 190:9 195:22 196:6 214:19,22 216:24 217:3 224:16 233:23 233:24 234:8,14 234:20 250:10 257:4,10 264:24 273:3,11,20 284:9 287:25 288:8 294:12,22 299:3 303:24 304:4,8,17,23 306:13 307:24 308:14 309:2 310:6 311:18 312:5,21 315:20 316:6 337:10 338:24 341:4,20 342:7,8,10
**miller's** 234:25 311:2
**million** 197:19 219:7
**mind** 50:7 170:20 330:10 334:22
**minimal** 194:9 315:13
**minimize** 46:17
**minimizing** 33:15 271:2
**minors** 281:17
**minute** 14:9 27:11 46:9 53:17 87:5 101:18 137:11 152:17 156:24 177:5
**minutes** 101:13 315:22,23
**mirror** 42:7
**mis** 306:12
**miscellaneous** 317:14
**mischaracterizes** 88:14 89:25 222:18 263:7 281:20
**misconstruing** 222:19
**misery** 128:23 128:25 129:2,2
**misleading** 157:17 313:20 313:24 333:21
**missing** 206:19 301:3,6
**mission** 20:15 26:12 27:8
**misspoke** 274:7
**misstating** 248:24
**mistaken** 249:4
**mistakes** 191:15
**mitigated** 46:12 47:14,19

**mixed** 259:10 301:17
**model** 293:16 302:13
**models** 247:13
**modest** 123:18 123:21 269:19 311:5
**molar** 294:23 342:9
**molnar** 294:12
**moment** 9:23 38:22 39:10 121:3 205:19 230:9 257:25 273:14 293:12 334:18
**momentarily** 34:19
**moniker** 159:2
**month** 70:3
**months** 217:10 217:16 292:19
**mood** 295:22
**morning** 3:2 4:15,22,24 5:2,5
**mortality** 226:11
**mother** 245:8
**motivation** 204:22
**motives** 47:22
**move** 334:18
**mpennak** 2:9
**msi** 11:10,13 75:12,15,18,21 75:23
**multiple** 119:3 158:11 196:25 197:3,4 302:25 308:2 309:3,22 312:7 332:6
**multiplication** 320:9
**multiply** 181:17
**multiplying** 182:6
**mute** 250:9,11

**n**

**n** 2:2 137:2,2,2 341:2
**name** 3:24 5:18 5:23 6:10 80:21 80:22 99:13 111:5 191:4 237:22
**named** 70:9
**narrow** 60:2
**nation** 321:2,7 332:8
**nation's** 329:22
**national** 42:14 57:3 166:22 177:18,25 178:4 179:23,24 182:8 209:19 294:16 318:17
**nations** 157:10 317:16 319:5,6,8 319:14,15,22 320:3,12,21 321:13 330:9 332:3,5,10,13
**nationwide** 180:15 181:5,23 182:17,24 183:14 185:2,6
**nature** 48:19,20 66:7 89:12 106:16 133:24 276:8
**near** 202:9
**nearly** 9:6 29:8 197:17 236:24 236:25
**necessarily** 27:4 33:8 91:21 96:14 107:16 115:21 230:22 240:16 255:6,7 256:25 277:14 291:22 328:18
**necessary** 199:17 264:19 311:8 340:7
**need** 10:22 96:13 96:23 164:18 258:7 263:19 266:7 277:5 291:15 304:21 305:2,15 306:15
**needs** 115:11 148:4
**negate** 139:3
**negative** 102:14 132:16 134:17 149:15 321:22 321:24,24
**negatively** 133:5 134:3,6
**neiss** 180:4,6,10 180:10,12,14 181:5,22 182:6 182:16,22
**neither** 28:12 97:17 212:10 227:18
**net** 335:22
**neutral** 139:17
**never** 51:8 65:12 65:13 76:20 87:20 125:25 165:23,23 195:25 218:9 330:9
**new** 1:23 2:14,14 4:17,17 190:11 192:12,14 193:6 193:17,25 194:10 201:22 203:16 226:10 226:23 243:4 343:3,8
**nexus** 127:4
**nice** 9:25
**nilesh** 81:9
**nine** 157:10 175:25 176:3,19 219:6
**nod** 10:14
**non** 212:7,9,14 308:19 324:7 332:3
**noncausal** 48:10 90:19
**noncontrovers...** 49:19
**nonexperimental** 100:20 252:4
**nonfatal** 178:20 178:24 181:10 181:17 183:23

**nonowners** 200:6,9 201:24 202:4,19 203:6 209:21 210:4,14 211:23 213:17 231:3,7 290:14
**nonpsychiatric** 279:13
**nonverbal** 10:13
**noon** 101:14
**normally** 89:6
**northern** 60:22
**notary** 1:22 5:14 340:13,19 343:7
**note** 3:5 110:14 198:21
**noted** 104:15 137:3 339:5 340:7
**notes** 36:25 37:2 37:6,7 228:19
**notice** 6:3,18 34:12,15,25 35:14 257:16 341:9
**noticing** 4:14
**notion** 18:13 25:16 130:8 149:18,25 150:23 224:4 225:21 228:6 231:5 290:21 338:6
**notwithstanding** 7:17
**now's** 273:3
**nra** 56:23,25 57:2,7,19 59:2,4 59:13,16 61:14 68:4,18,18,24 73:7
**ns** 296:25
**nssf** 20:3,11,23 21:7,8,16,18,25 23:3,13,20 24:4 24:9,18,25 25:8 25:13,21 28:2,4 28:8,20,23 29:3 29:5,9,16,19,24 30:15,24 31:12 31:14 32:2,12,24 33:23 39:9 52:16,20 54:14 67:22 68:19,22 334:8,24 335:8
**nssf's** 20:14 29:4 30:13 33:16 54:5,7,23 333:10 333:19
**null** 305:17 306:16 313:11 321:23 322:3,10 322:23 323:21 323:24
**nullifies** 126:16
**nullify** 125:17 126:10
**number** 3:21 34:10 36:24 37:8 41:21 50:8 53:22 55:16 101:23 102:3 109:6 110:3 126:3 144:8 160:20 162:11 169:6,23 176:6 176:14 178:16 178:18,19,23,24 179:13,14 181:13,17 183:20 190:7,13 192:11 209:15 218:22 247:6 258:3 304:18,24 316:4 317:15 320:10,25 336:7 336:23 337:9
**numbered** 299:6
**numbers** 19:17 36:5 60:10 163:17 176:17
**numerical** 188:6
**numerous** 166:14 307:17 336:3 337:13

**o**

**o** 137:2,2,2 231:16 237:23
**oath** 4:4 6:14 7:3
**obeyed** 96:19
**object** 10:18
**objection** 216:21 222:17
**objections** 4:8
**objective** 127:16 139:18 171:11 171:12
**objects** 43:7
**obscure** 329:7
**observations** 196:25
**observe** 209:18
**observed** 136:11 221:15 305:4,16 306:24 307:5,15 313:15 314:22
**obtains** 143:7
**obvious** 218:6
**obviously** 7:13 45:25 73:13 141:3
**occasions** 21:10 21:11 23:22
**occupations** 338:15
**occur** 84:25 112:25
**occurred** 206:14 311:23
**occurring** 33:21 45:2 173:22
**october** 343:22
**odd** 278:14 279:6 321:5
**odds** 232:22 275:2 285:4,14 285:22 289:7 299:18 300:17
**offer** 58:19 331:16
**offered** 56:22 57:18 108:11,17 130:18 153:5,6 271:16 331:14 336:25
**offhand** 130:17
**office** 2:20,22 5:3
**officer** 65:22

**officers** 60:19
**officials** 320:17 321:10
**oh** 35:15,15 65:16 66:16 74:7 144:22 161:18 251:7 265:7
**okay** 35:15 38:19 40:2 61:24 62:6 91:4 91:14 93:8,16 101:20 121:17 144:22 145:7 148:5 159:10 177:15 180:5 198:11 221:17 265:7 273:5,18 284:13,21 299:14
**old** 112:5 148:23 167:2,3 237:17
**older** 244:16 272:25
**oldest** 56:20
**olds** 261:8
**omission** 327:22 327:23
**omissions** 136:3 329:6
**omitted** 61:3,7 85:13 239:15 240:5,14,16,20 327:14,17
**once** 150:2 151:13 153:15 194:11 228:23 257:5 271:3
**ones** 135:12,25 136:19 146:7 156:3 173:17 175:14 183:19 184:18 216:23 220:23 223:4,6 243:7 315:7
**operators** 29:13 30:4
**opining** 171:23 172:4
**opinion** 16:19 17:2,3 37:20,20 38:2 39:15 40:10 41:4,11 43:21,22 44:5 47:24 49:11,25 51:10,23 53:7 67:23 76:17 77:9 86:11,12,13 87:6 89:15 90:5 92:16,18 93:3 95:9 97:23 98:7 100:13 101:6 102:19 104:15 104:20,21 106:25 108:10 108:12,16,18,22 112:10 125:14 137:15 138:2,9 138:15 140:20 142:11 143:9,22 144:6 151:21 153:19 165:19 172:7 175:6 185:12 186:7,8 186:24 187:3,12 191:9,16 205:3 215:20 226:18 235:10,12,22 237:6 259:17 260:24 261:19 274:10 296:17 305:9,18,21 316:8 320:23 332:17 335:19 336:25 337:19
**opinions** 37:10 85:22 87:2 104:13 237:16 248:12 260:21 288:25 295:8 320:19
**opposed** 10:12 51:18 124:23 160:9
**opposing** 79:23
**opposite** 116:15 135:6 150:14 172:14 195:15 298:11 300:11 322:11 329:16
**options** 29:16 30:7
**order** 8:21 36:16 56:19 58:10 80:7,15 82:11 99:22 101:6 110:18 198:24 199:21 243:8 260:9,12 293:12 305:15 306:16 326:11
**ordinance** 11:24 12:7 39:6 61:9
**organization** 11:7 20:8 21:22 24:7,11 25:25 26:9 27:6,25 28:10,18 54:20 54:21 67:10,15 68:19 69:23 70:2 72:17
**organization's** 24:12 26:12 28:23
**organizations** 20:6
**original** 82:7 258:21 284:4 325:22
**originally** 186:6
**ors** 284:22
**orthoganality** 310:4
**orthogonal** 309:8,9,16 311:2
**os** 235:23
**ought** 156:3 208:7 258:17
**outcome** 4:7 125:8 153:9 267:14 268:3 298:22 343:18
**outlet** 326:22
**outline** 73:23
**output** 22:2
**outside** 68:11 235:24
**outward** 128:23 128:24
**overall** 59:13 174:8 186:8

241:3 246:6 253:23 261:7 314:25 320:10 331:11
**overarching** 16:18 337:18
**overestimation** 135:8
**overlap** 129:5 337:8
**overlapping** 268:10 310:9
**overlooked** 327:4
**overlooking** 336:11
**overrepresented** 113:10,12,14
**oversight** 328:2
**overstate** 134:13
**overstating** 135:2
**overwhelmingly** 337:15
**owned** 87:17,18 208:13 320:11
**owner** 62:19 224:19
**owners** 18:24 19:6,10 32:13,17 32:21,25 33:12 33:13 58:17 61:17 62:13 88:8 89:2,6,8,10 89:17,20,21 113:11 138:10 138:16 200:5,7 201:15,22 202:19 203:6 206:13 209:20 210:3,13 211:23 212:6,7,9,9,13 212:14 213:17 214:24 219:8,23 219:24 220:7 224:17 231:3,6 290:13,21,25 291:12 335:9
**ownership** 15:15 25:14 28:16 33:17 48:17 49:4 77:17 78:2 78:15 79:19 86:14,15 87:8,12 87:15,24 88:18 89:22 90:7,14,18 91:8,13 96:8,10 102:10 103:13 104:3 109:3 111:24 112:15 112:20 113:4,19 114:20 115:4,12 115:14,18 116:5 116:11 117:20 119:9,13 127:8 127:10,12 131:13,19 132:2 132:24 133:7,11 133:16 134:3,14 134:25 135:21 136:12 143:3 144:10 146:6,9 150:12 152:6,25 154:16 158:15 158:17 161:9,10 162:14,23 163:4 163:9,12,20,24 164:14,19 166:5 170:12,15 171:24,25 172:5 172:16 173:9,11 173:12,16,23 174:8 175:14,17 190:14 191:21 192:23 194:16 194:18 197:23 197:24 198:19 199:5,12 200:21 201:4 202:10 206:24 207:7,10 207:16 208:4 211:2 212:16,23 213:3,9,20 214:6 223:5,7 229:13 231:17 234:13 236:10,23 242:20 247:17 248:19 249:14 249:15,23 252:14 253:21 256:4 262:4,23 264:13 267:22 280:9 281:14,19 282:3,21 295:16 297:5 298:8 314:18 316:19 316:25 317:10 317:18,21 318:5 318:9,17 320:5,8 320:10,14 322:12 324:10 330:6,16,20 331:4,6 335:23 336:6,15 341:18
**owning** 17:23 18:2,13 25:22 81:2 86:2 132:17 137:19 207:9 295:18
**owns** 89:11

**p**

**p** 2:2,2
**p.m.** 136:24 137:3 339:5
**page** 35:14 38:20 39:13,18,24 40:2 40:4,20,22,25 41:3,10 46:18 49:6,7,9,12,15 49:18,22,23 50:2 50:5 51:21,21,24 52:2,21,25 53:4 53:8,11 56:16 60:24 61:22,25 64:13 73:4,5 93:4,6,7,8,11,13 93:14,15,16,19 95:2 144:21 145:3,5,7,10,12 145:14,19,22 151:9 157:23,24 157:25 177:6,8 177:10 188:22 198:2,3,6,9,10 200:4 201:12 218:16 219:11 219:19 223:21 228:13,13 236:8 236:16 238:14 241:5 243:11,12 253:19,20 262:9

264:21 265:2,4
273:18 284:18
286:18 287:21
289:18 295:13
299:6,10 308:25
309:2 318:23
319:22 321:14
329:24 341:3,8
342:3 344:4,7,10
344:13,16,19
**pages** 37:6 40:6
40:7,11,14,21
110:9 148:8,13
151:13 178:6
189:18 216:11
**paid** 22:9,13
23:13 69:5,8
71:14,17,21
72:22
**pain** 41:24
**pair** 148:14
**pamphlet** 14:7
14:13 15:12,19
16:3,8,11 17:5,7
17:14,19 18:3,4
18:7,18 19:16
20:2 29:21 30:2
30:9,15,20 31:2
31:13 33:17,23
38:8,13 39:7
40:15 47:23
49:7 54:6,15,24
79:14,17 80:8,15
86:18 92:23
93:2,2 94:9
151:16,22
341:11

**pamphlet's**
16:18
**pamphlets** 12:13
12:14 14:13,20
14:24 15:4,8
17:2 19:25 26:6
30:12 31:23
39:4
**paper** 99:8
105:18 106:6
110:18 159:23
160:14 163:21
169:8 170:4,14
170:24 171:8,18
216:19 220:7
249:6 316:12,15
325:6,10,25
326:3,11,17
328:3,5,10,12
329:11 342:12
**papers** 84:4,12
99:6,11 170:9
337:4,12
**paragraph** 200:4
244:11,21
284:21
**paralegal** 2:24
**paraphrase**
335:4
**parents** 89:7
**part** 29:2,7 30:2
30:2,15 31:9
40:10 55:4
72:16 79:12
100:13 107:16
156:14,21
162:20 172:7
180:4 181:8

186:7 206:9
227:17 234:19
241:9,10,16
247:25 270:23
272:18,19
276:12,14
281:17 314:9
**partial** 30:11
315:16
**partially** 120:11
122:9 123:8
248:11
**participant** 24:8
**participants** 3:8
**participate**
29:17 30:17
**participation**
66:22
**particular** 27:10
48:14 51:15
63:20 97:24
100:23 116:24
137:19 141:16
168:15 169:21
175:9 182:3,5
193:15,24
194:10 207:15
208:13 225:20
227:7 232:19
233:16 249:10
264:2 265:9
271:3 287:17
290:17 298:21
300:13,13
301:19 316:11
323:4
**particularly**
8:14 252:3

270:2
**parties** 3:12
343:16
**partly** 84:22,23
84:25
**partnership** 28:3
28:23 39:9
**parts** 240:11,13
332:7,7
**party** 4:5 24:5
63:8,11,15 64:11
64:24 65:5
75:13
**passed** 11:17
12:8
**passes** 78:6
**patient** 280:4
**patients** 184:2,6
184:7 266:18
269:3,11 270:11
274:20 276:17
276:25 277:17
278:3,11,23
279:16,23
303:19
**pause** 189:24
**payment** 70:11
**peaked** 201:16
**peculiar** 307:7
**peer** 96:13 102:7
106:8 170:5,8
192:15 215:12
226:24 232:10
238:22 250:22
251:2 326:11
**pending** 10:25
**pennak** 2:8 5:8,9
9:10,20,21,25

10:17 14:14,21
14:25 15:9,21
18:9 19:21 33:3
36:19,20 38:3
46:5 52:22
53:19 65:2 68:8
73:21 74:14
75:12,20 76:10
85:11 88:14
89:24 101:16,20
102:24 104:10
105:2 121:11
134:16 136:21
143:19 145:4
177:11 190:2
216:21 219:3
220:9 222:17
234:17 236:3
248:7 250:7,9
263:7 264:23
272:17 280:19
281:20 302:2
339:2
**pennsylvania**
280:23 303:20
**pension** 70:16
71:6
**people** 25:5,21
31:24 33:9,19,24
40:23 41:14
42:3 47:18
51:14 52:9
57:21 93:9,20
100:20,25 101:2
101:2,3 102:18
104:13,19
113:17 115:2
124:17 132:12

143:6 147:6,14
149:21 153:14
153:21,25 154:4
169:24 176:19
179:2 180:10
186:3 187:3,6,21
187:25 188:7,9
188:12 189:20
189:22 192:11
197:19 199:3
202:14 203:11
206:20,22 207:8
207:12 208:12
209:20 222:23
229:21 230:2,15
230:19 233:4
241:13 255:14
266:24 268:21
289:11,20,23
290:8 292:2,6,21
293:21 294:5
295:19,20
315:10 326:18
326:23 330:13
333:23 334:5
337:19,24
338:13
**people's** 45:20
77:14 291:9
**percent** 66:13,16
70:25 71:4
162:25 163:11
165:13,16
181:15 230:13
236:11,14,24
237:2 243:20
244:15,17 245:7
245:10 249:22

250:6 253:20
261:7,8 290:24
317:12
**percentage**
236:9,22 262:7
317:20
**percentages**
119:17
**perception** 233:2
**perfect** 166:9
**perfectly** 123:12
**perform** 105:21
**performed**
114:12
**period** 50:24
86:21 199:4
205:16 219:17
229:19 327:24
**permission** 70:7
**persisted** 219:16
**persistent**
206:19 230:5
**person** 37:21
66:12 78:3 81:3
91:9,16,22 92:21
94:2,11 97:2
157:6,11 187:14
203:19 205:11
207:23 217:2,3
222:13,15,15
223:3 225:5
291:23 293:20
334:10,17,18,21
337:21,23
**person's** 42:23
43:6 204:11
229:17 293:11

**personal** 195:12
195:14 235:3
248:12 338:6
**personality**
206:25 291:24
**persons** 139:5
157:12 197:9
227:20 280:24
**pertain** 24:17
303:17
**pertained** 91:12
303:2,15 305:21
**pertains** 164:10
**pertinent** 99:17
**ph.d.** 106:22
217:2,3
**ph.d.s** 216:23
**phenomenon**
338:3
**philosophical**
77:11
**phone** 19:17
**phrase** 44:16
45:4 95:15
115:25 132:3,23
161:8 198:13
204:7 278:15,15
313:23
**phrased** 198:12
**phrases** 161:10
**phrasing** 279:7
313:20
**piccirilli** 3:24
**pick** 262:17
**picking** 108:2
252:11
**piece** 23:24
215:24

**pieces** 36:13,17
  252:12
**pistol** 58:15
**pivot** 55:14
**place** 3:12 80:23
  138:24 141:22
  149:10 184:2
  185:21
**places** 29:4
  143:2 148:8
  173:7,8
**plain** 15:24
  16:16
**plaintiff** 75:13
**plaintiff's** 9:9
  10:17 11:19
  12:17 14:8
**plaintiffs** 1:8 2:5
  5:10 56:14 75:7
  75:10
**plan** 289:8,14
  290:10
**planning** 188:5
  295:24 296:14
**plans** 289:6,7
  290:16 291:3
**plausible** 64:20
  109:6 147:10
  206:11 307:22
**play** 160:19
  309:4
**please** 3:5 4:9
  5:22 6:11 7:10
  7:22 8:4 9:3,17
  10:23 40:3
  64:14 72:25
  90:22 101:19
  108:15 121:14

264:20
**plural** 99:15
**plus** 100:11
  178:19
**point** 15:13
  16:25 112:21
  119:11 139:15
  139:22 140:4,5
  144:3 168:14
  185:9 187:19
  190:19 206:19
  208:13 222:7
  236:10,22 256:2
  257:3 265:20
  270:24 291:11
  293:7,14,19
  294:2,4,10 305:9
  312:4 314:24
**pointed** 155:25
  307:20
**pointing** 55:13
  222:25
**pointless** 306:19
  306:20
**points** 141:4
  196:25 197:3,4
  296:21
**poisoning**
  185:21
**pole** 180:24
**police** 60:19 65:9
  65:22,24
**policies** 27:19,22
**policy** 27:7,9,10
**political** 77:12
  338:17,19
**politics** 28:6

**poor** 126:7 166:8
  209:9 216:9,16
  250:24
**poorly** 218:13
**population** 67:8
  113:11,12 157:6
  157:7 165:13,16
  167:5 181:20
  227:8,10 236:25
  243:14,23
  245:20 261:10
  262:7 268:22
  269:13 270:6,13
  270:20,21
  275:18 276:19
  277:3 278:12,23
  279:3,4,15,18,22
  280:3 281:6
  283:4,7,11,19
  287:14 302:6,9
  303:6,9,17,18
  317:15 319:14
**populations**
  152:4 164:11
  212:2 268:10
  270:15 277:16
  301:22 302:21
**portion** 161:20
  185:12 254:4
  264:17 289:15
**portions** 108:21
  162:6
**pose** 270:4
**position** 28:15
  71:8,12,13
  139:17 140:3
  142:15 156:21
  266:13 277:11

**positions** 263:13
**positive** 132:9,15
  147:11 329:22
  331:10
**positively** 133:6
  133:10 134:2,5
**possessed**
  207:13
**possessing** 25:22
**possession** 15:15
  21:4 28:15
  32:23 61:10
  114:20 128:9
**possibility** 54:16
  55:7,13 61:6
  96:4 138:24
  277:19 331:15
**possible** 30:22
  51:11 61:11
  70:8 79:9 85:9
  102:15 119:5
  123:6,9 124:7
  146:3 151:10,11
  160:16 161:13
  165:20 166:3,21
  167:11,15,18
  188:4 206:17
  247:6 248:5
  255:16,20,23
  256:3 276:8
  277:18 282:2
  293:25 298:10
  300:20 315:6
  321:19 322:6
**possibly** 23:18
  64:5 73:19
  191:3 250:23

**post** 271:5
**potential** 23:10 34:5 113:3 127:7 133:14 322:21 323:8,15
**poverty** 243:16 254:13 255:4
**powerful** 211:24
**practices** 52:6
**pre** 38:9 55:22 56:6 94:20 109:15,16 226:6 237:19 287:22 304:6
**preceded** 85:15
**preceding** 90:25
**precise** 65:10 297:25
**precisely** 175:17 253:9 270:16
**precision** 322:2
**predate** 327:2
**predated** 328:16 328:18
**predetermined** 233:22
**predict** 164:22
**predictable** 121:20 122:14
**predominate** 335:16
**premised** 46:21 130:8
**premises** 90:10
**preparation** 13:15,18 14:4 82:24
**prepare** 13:12 76:6 82:11 260:13
**prepared** 9:5 36:10 60:9 222:3 267:10
**preparing** 191:2
**presence** 284:25 285:19
**present** 2:19 4:11 48:7 257:17 272:4 332:14
**presently** 9:15 13:5 71:10 101:15 147:17 189:7
**preservation** 62:25
**president** 75:21
**presumably** 220:15
**presumption** 216:7 267:12
**pretty** 24:2 188:21 234:8 260:8 283:21 305:9
**prevails** 173:16
**prevalence** 80:14 152:5 161:10 162:23 168:25 239:25 240:23 241:2,13 241:19 242:7 244:5,9 246:4,25 330:11
**prevent** 13:9 45:11,12 51:12 51:12 54:7,22
**preventible** 51:2 51:5,7
**preventing** 26:14 51:14,16 51:17 54:18 139:4
**prevention** 26:8 26:17 27:6,17 29:6,10,11,25 30:17 38:13 42:10,15 231:18 250:16,20 251:9 253:15 261:5 341:10,24
**previous** 44:8 56:2 60:24 100:3 104:15 112:20 117:17 139:24,25 146:4 191:15 218:5 237:11 269:17 269:21 275:8 308:13,14 318:7 341:12
**previously** 35:4 141:18 145:18 217:21 231:3 256:6 274:8 295:14 296:24 297:9
**primarily** 32:6,8 218:6 319:6
**prime** 127:9
**primitive** 251:11
**principle** 119:4 169:22
**prior** 14:24 55:14,16 90:2 91:6 106:8 140:23 195:24 196:12 234:11 234:25 237:13 239:16
**private** 320:25
**prize** 70:11
**prizes** 69:18
**pro** 270:25 271:13
**probably** 12:13 23:11 36:15 48:3 58:2 59:4 59:21 62:14 64:16 74:7 83:25 95:7 96:2 105:24 121:18 141:12 149:23 160:12 161:18 162:8,9 189:2 206:8 237:21 253:6 259:5,8 281:4,7 307:15 330:17
**problem** 7:22 8:4 118:3 130:6 175:11,16 183:23 184:5
**problematic** 163:13,14
**problems** 168:3 168:22 270:5 338:19

**procedure** 321:6
**proceeding** 4:9
**proceedings** 3:1 4:1
**process** 79:3,12 181:6
**produce** 22:6 35:19,21,24 36:3 36:24 321:21 322:9
**produced** 36:11 37:4 107:8 322:3 323:24
**produces** 182:23 318:10 323:20
**producing** 82:7 301:5
**product** 22:7 34:7 39:8 64:6 64:16
**production** 20:2
**professor** 5:18 70:17,21 71:11 109:13 137:10 145:20 315:17 316:7 338:24
**professors** 338:16
**profound** 125:9 127:18 183:12 250:4
**program** 29:17 30:18
**progression** 142:21
**prohibiting** 61:9
**project** 185:5
**prolonged** 42:25
**promotes** 20:19
**promoting** 20:24 21:3
**prompted** 141:9
**pronounce** 180:10
**pronounced** 193:13
**pronouncements** 270:12 275:16
**pronouncing** 237:22
**proof** 213:22 251:12
**propaganda** 253:11,12
**propensity** 269:20
**proportion** 162:15 182:7
**proportions** 289:4 290:13
**propose** 306:22 311:13 312:10 330:24
**proposed** 119:23 120:6 258:14 306:21 322:8 323:17
**proposition** 78:4 81:2 86:2,8 88:18 126:2,9 141:6 153:18,24 156:13 186:20 187:23 188:13 189:20 195:4,8 196:10 198:19 200:21 247:16
**prospective** 33:12
**protect** 20:16
**protecting** 32:16 32:18
**protection** 52:13 138:20 334:6
**protective** 46:4
**prove** 102:14 149:15
**proverbial** 145:2
**provide** 19:16,20 21:13 24:19,23 25:8 31:20 39:6 41:4,11 60:17 67:5 76:22 87:22 107:20 264:14 335:9,13
**provided** 39:14 62:10,15 64:11 65:8
**provides** 76:20
**provinces** 176:6
**proxies** 209:7,9 209:9
**proxy** 209:4
**prudent** 259:11
**psg** 317:20 318:9 330:12
**psychiatric** 266:17 268:22 269:3,11 270:5 270:11,21 272:2 274:20 276:17 276:25 277:17 278:3,11,23 279:16,23 280:4 283:12 286:21 287:12 303:19
**psychiatrically** 269:23 275:10
**psychiatry** 215:10 216:3,15 232:7
**psychological** 266:22 294:4
**psychopatholo...** 269:25 294:13 295:18
**public** 1:22 5:14 17:7,11,14 24:20 25:10 44:18 45:4,7 47:17 78:14 87:21 88:6,13,22 153:19 186:24 186:25 187:2 205:14 233:9 251:4,17,19 269:4 335:3 337:16 338:12 340:19 343:7
**publication** 55:5 102:21 106:9 194:8 328:7
**publications** 79:25 80:6,10,17 81:7,9,18 82:14 84:5 85:8 99:21 99:22 102:7 103:17 170:9 196:12 337:13
**publish** 29:3 216:8 251:10 324:25

**published** 21:21 37:12 67:25 72:9,20 73:9 79:18,21 95:11 99:17 100:5 101:11 103:11 105:22 106:3,5 107:7 109:21 110:17 111:2,7 112:8,21 141:25 160:11,17 161:19 190:11 194:11 215:8 217:12,16 226:9 232:5 238:12,19 239:5,13 250:19 250:24 251:13 253:16,17 288:10 304:16 324:16 325:5,19 325:21,23 327:11 328:13 329:6 337:5,13 337:15 338:12
**publishes** 216:16 325:10
**publishing** 31:2 31:12 33:23 54:5,15,24 325:17
**pull** 94:14 137:12 226:3 284:9 299:7
**purchase** 21:4 32:23 57:9,20 143:8 197:10 201:22 203:8 204:2 220:23 228:10 229:16 280:17,25 281:2 281:7,18 283:19 292:16 293:12 293:18
**purchasers** 138:16 226:11 227:9
**purchases** 228:20
**purchasing** 138:11
**pure** 85:19
**purely** 113:15 254:5
**purportedly** 32:11 309:7
**purpose** 29:5,24 30:23 47:16,17 54:7,14 184:22 262:3 292:25
**purposes** 54:5 82:7 93:17 139:2 222:4
**pursuant** 35:9
**push** 132:7,11,14
**pushing** 27:5
**put** 42:3 55:20 55:21 72:24 144:24,25 168:7 177:11 178:11 188:24 218:13 294:20 303:10 307:3 316:13 326:15
**putting** 45:17 177:22

**q**

**qualifications** 106:20
**qualified** 25:23 49:20 169:11,25 184:20 196:4 256:12 271:13
**quality** 3:6,7 126:6 142:21 169:4 216:9,10 216:14,16 250:24 326:12
**quantified** 306:14
**quantify** 116:3 304:19,25 306:14
**quantitative** 117:11 126:19 305:13
**quantitatively** 116:10
**quarterly** 80:12 81:15 95:12 159:6,16,23 170:5 240:14,15 251:15 341:17
**quasi** 251:24 252:3
**question** 6:9,24 7:7,9,16,21 8:5,8 8:16,18 10:19,24 12:4 19:4 29:23 37:8 46:5,7,8,21 76:14,17,17,21 77:4,7,7,8,9,12 77:18,24 79:10 80:8 81:25 83:17,18 84:7,18 90:23,25 91:6,10 92:17 93:14 103:2 105:4,15 108:14 120:24 121:15,23 126:13 133:4 140:10 141:13 147:2 172:2 173:20,20 182:14 186:25 189:7 204:19 212:12 237:6 238:14,15,16 250:11 255:22 255:23 260:19 282:6 298:2 301:17 304:22 304:22 311:11 313:5 318:6 333:22
**questioning** 39:10 179:5
**questions** 10:18 14:11 167:20 218:8 338:25 339:2
**quibbles** 338:5
**quick** 53:16 134:20 189:24 189:24 315:20
**quickly** 188:21
**quite** 12:13 24:15 85:16 121:11 123:18 123:21 130:24 131:4,5,7,8,8 140:10 172:8

212:20 270:25
279:19 320:18
**quote**  28:3 30:18
95:5 107:2
145:15,24
177:19 197:23
206:7 209:19
219:10 236:9
246:3 264:11
280:6 284:19
289:4 318:22
319:20 329:19
333:9,11 334:9
**quoting**  248:25

**r**

**r**  2:2 5:12 6:12
110:16 137:2,6
237:21,23,23
343:2 344:3,3
**race**  208:18,24
211:7 225:11
244:17 245:19
262:9 300:3
**raised**  150:18
**raises**  25:18
**raising**  282:7
**random**  48:13
92:5,6 184:15
262:17 287:4,9
287:10
**randomly**
221:23 223:9
**range**  29:12 30:4
132:16
**ranges**  29:17
30:16

**rape**  336:14
**rarely**  87:14
326:23
**rate**  22:23 48:9
58:25 111:23
161:9 163:15,17
164:14,15
168:25 170:15
177:20 178:15
208:4 211:25
219:11,14
224:16 241:15
241:17 242:8
243:16,18 257:7
257:9,12 291:2
310:15 329:23
331:11 333:3,6
**rates**  67:8 80:14
111:16 152:6
154:7,8 156:7
157:8 158:15,15
158:17,18
164:20 166:24
167:8 172:6,16
172:16 173:8,9
173:17,21 174:9
175:15,18 176:5
178:13 179:8
184:23 194:17
194:19 202:19
203:6 209:21
210:4,6,9 211:21
212:10 219:25
225:14 231:4
239:25 242:7,20
242:21 247:12
247:17,17
248:20 252:14

253:22 254:20
254:23,23 255:9
255:10,18 256:5
256:5 257:18
262:8,13,15
286:21 314:17
316:25 322:19
324:10,10 331:7
335:23,23,24
336:12,13,14,15
**ratio**  275:2
285:4,14,22
299:18 300:17
**rationale**  55:4
169:21
**rd**  1:6
**reach**  103:17
140:11 170:13
250:6
**reached**  85:22
102:8,22 140:17
168:15 170:12
170:23 329:15
**reaches**  150:14
**reaching**  49:22
**read**  11:21 14:19
15:3,7 16:2,7
79:16 82:3,12
120:24 121:15
121:16 151:16
190:20,23,25
191:7 192:3,4
199:12 217:6
218:9,19 226:13
226:17 232:3
233:15 235:6
239:11,12,16
242:25 252:16

252:20 260:8,9
260:12 284:20
288:18,20
294:25 308:6
333:9 340:5
**reader**  18:14,19
46:3,17
**readers**  15:12,20
15:25 16:7,12,18
17:8 18:4,8
19:18 45:24
138:3
**readily**  204:10
204:17 334:15
**reading**  16:12
130:19 195:24
**reads**  49:7 93:7
93:24 151:14
196:11 284:22
**real**  78:12
331:22
**realistically**
165:22 167:14
**really**  13:16
16:20 17:16
24:22 29:22
47:23 50:19
51:8,10 59:25
61:5 63:18 66:8
66:12 97:6,7,14
103:7 116:6
117:5,18 124:21
125:25 127:5,11
131:10 141:11
149:24 153:22
154:2 155:24
165:7 176:17,17
185:9 202:11

211:6,7 213:10 216:8,22 248:21 250:25 252:3 253:9 255:9 275:19 310:3 315:2,12 324:23 325:2 329:8 338:2,5,9
**reanalysis** 284:6
**reanalyze** 304:18,24
**reason** 46:10 47:11 48:14 52:9 54:21 92:8 97:19 115:15 147:22 153:3,5,5 154:15 162:22 182:2 186:16 191:6 198:17 203:3 214:4 220:5 236:20 237:12,16 242:15 249:7 258:17 261:16 270:23 276:5 279:11,25 283:9 285:7 293:19 335:9 344:6,9,12 344:15,18,21
**reasons** 31:8 100:15 102:12 118:12 228:4 234:7,22 279:15 327:8
**rebuttal** 325:5
**rebutting** 325:10
**recall** 17:6,16 18:3 19:8,23 22:18 24:6 57:15 58:5 61:8 72:11 80:21 83:16 141:15,23 185:8 242:13 264:17 274:22 275:22
**recalling** 66:10
**recap** 128:13
**receive** 69:25 70:16,19,20 334:20
**received** 9:13,22 69:17,22 70:10
**recess** 53:23 101:24 136:24 190:5 273:8 316:2
**recognize** 38:24 56:5 94:21 109:17 159:19 191:24 195:19 195:21 226:4
**recognized** 252:10
**recognizing** 29:8
**recollection** 17:21 60:14
**recommend** 19:5
**recommendation** 18:16
**recommendati...** 18:23
**recommending** 19:10
**reconsider** 296:17
**record** 3:3,13 4:13 5:23 6:11 8:6 10:11 53:22 53:25 75:20 82:3 101:12,23 102:4 121:16 134:9 136:20,23 137:5 189:24 190:4,8 207:24 250:12 273:7,10 315:25 316:5 339:4 343:13
**recorded** 1:20 3:10,15
**recording** 3:7,11 6:20
**recordings** 37:9
**records** 21:23 57:13 58:6,10,12 208:2
**reduce** 31:17 50:8,16,18,20
**reduced** 120:16 122:20 132:17
**reduces** 122:3 126:16
**reducing** 133:15
**reduction** 261:7 261:9
**refer** 11:3,23 12:13 45:5 86:19 158:4,5 159:2 177:25 180:12 291:8 320:18
**reference** 27:12 86:23 101:10 113:6 157:24 158:24 159:9 168:11 244:18 316:8
**referenced** 13:24 37:20 160:13
**references** 189:16
**referred** 11:9 86:20 99:7 160:3 175:5 180:5
**referring** 11:25 12:7,15 55:6 63:24 93:11 99:4 109:23 138:17 151:14 151:15 159:23 174:10 178:3 198:6 206:2 214:7 285:10 330:8
**refers** 11:13 12:6 107:2 158:9 160:22
**reflect** 37:10 223:11 284:5
**regain** 334:19
**regard** 88:19 247:5 334:3
**regarded** 148:3 156:13 169:3
**regarding** 150:15 221:7
**regardless** 90:24 102:17 155:15 199:4 234:9
**region** 244:22,23 245:19 254:14

255:4
**regional** 244:21
**regions** 157:10 175:24 176:3,4,8 176:20
**registration** 63:2 320:12
**registries** 320:4
**registry** 320:3
**regularly** 194:8
**regulation** 63:16 64:12,25 65:6 67:3
**regulations** 20:24 63:9,19 65:25
**reinforce** 191:17
**reinforced** 93:23
**rejected** 83:5 185:10 216:9
**relate** 24:10 26:16 27:23 65:20 166:4
**related** 4:5 29:14 30:5 68:20 69:6 72:18 133:6,6 134:4,6,7,7 138:8 141:16 146:6 147:7 150:5 164:12,13 164:14,18 184:15 186:2 187:21 199:5 204:4 209:10 212:21,23 223:5 223:6 224:6 251:5 255:10,12 255:18 257:12 258:15,16 262:14,22 267:14 280:4 285:21 305:2 325:3 336:12,13 336:14 343:16
**relates** 87:23 193:8,19 194:5
**relating** 32:23 41:11 118:10 161:21 227:24
**relationship** 46:11 48:21 68:17 112:7 117:15 123:25 131:12,25 132:23 135:2 136:11 146:21 146:25 152:5 158:14,16 168:18 171:23 172:4,15 193:4 213:8,23 214:2,5 225:17 239:24 241:22 248:2 252:13 254:22 257:8 258:20 259:2 262:12 266:6 267:7 270:19 271:5 274:3 276:24 283:16 286:5 296:9,18,20 297:16,20 301:10,15,20 303:13 305:14 310:17 311:10 314:3
**relationships** 210:20 240:18 279:17 305:4,16
**relative** 156:6 285:3
**relatively** 100:4 167:23 168:7,8 239:12 268:8,15
**relatives** 267:2
**relevant** 15:14 17:11,14 30:2 33:6 76:22 83:13,14 84:16 85:4 88:2 91:25 95:10,22 96:3 97:7,14 98:25 107:13,24 116:6 116:7 119:13 212:11 240:6,10 248:17 253:4 254:19 265:13 265:14 266:8 275:25 281:11 291:21 293:14 293:20,23 305:17 326:10 327:18,23 328:19,20,22 329:9 333:22 334:2
**reliability** 246:18
**reliable** 139:9 140:12 173:25 184:25 192:17 193:5,7,9,11 215:14,20 232:12 239:2,7 246:18,23 249:13,25 263:23 323:6 324:19
**reliance** 147:10
**reliant** 147:4 165:14
**relied** 37:19 189:13,15
**religious** 77:12
**reluctant** 24:11 66:9
**rely** 37:14 147:5 147:12,13 178:23 269:16 270:10 274:10 280:5 310:3
**relying** 172:18
**remainders** 130:21
**remained** 111:20 112:6 201:17
**remaining** 17:4 62:8,9 64:10,23 130:9,11,21,24 135:14 213:8,13
**remains** 139:25 229:18 269:7
**remember** 54:9 58:18 172:7
**remiss** 117:9
**remotely** 3:23 4:11 7:14,19 8:14
**removal** 334:11
**removing** 45:21
**render** 89:15 305:16 306:16

313:10
**rendered** 87:3 235:22
**rendering** 295:8
**rent** 22:15
**repeat** 6:8 31:8 88:16 90:22 97:2 108:14 142:19 234:18 238:14 272:19
**repeated** 186:3,5
**repeating** 335:2
**rephrase** 46:7 134:20 152:15 301:16 310:11
**replicate** 97:12
**replicating** 329:15
**replication** 96:24 294:16
**report** 13:14,20 13:21,24 14:2,9 15:14 16:13 21:12,19,19,22 22:2 23:18 37:15 57:16 65:8,11 66:6 67:25 72:15 74:17,25 75:4 76:3,6,9 81:20 81:21 82:5,11,21 82:25,25 83:7 93:18 94:13,16 94:23 95:4 99:4 100:17 108:11 108:17 112:17 113:25 114:8,14 114:16 115:24 119:21 123:3 127:22 145:16 145:17,22 148:2 148:7 151:8 157:22,24 160:3 160:22 161:21 162:7,10,19 171:22 172:3 174:6 175:6 177:6,9,16,23 187:13,17,18 188:19,23,24 189:7,13,16 191:2 206:4 217:9,13,14,16 218:2,14 222:4 223:17,22 227:13,17,24 240:2,13,17 246:14 247:25 252:24 257:11 257:19 260:10 260:16 263:2 264:10,18,21 267:19 280:7 282:11,13,18,21 288:25 290:15 295:4,5 298:24 301:25 305:10 326:19 341:14
**reported** 178:5 201:15 249:9,16 274:16 289:5 295:14 296:24 297:9 298:3
**reporter** 1:22 4:2 7:25 120:24 121:14
**reporting** 248:11 289:8
**reports** 80:17 84:13 167:8 269:17 287:19
**represent** 5:9
**representation** 112:6
**representative** 180:19,24 259:15 302:8 303:6 318:23 319:3,4
**representing** 3:25 5:6
**reproduce** 329:12,21
**reputable** 253:17
**request** 15:7 16:4 36:3 37:3
**requested** 35:22 35:24
**required** 6:15 7:3 12:16 39:5 65:24 340:13
**requirement** 10:23
**reread** 81:25
**research** 71:17 71:20 72:2,5 78:10 79:10 80:13 81:4 82:9 87:20 89:5 95:20,23 96:17 96:20,21 97:8,9 103:6 107:14,20 107:24 108:18 126:6 140:2,21 141:19 142:20 142:22,24,25 146:17 147:18 150:14 151:3 152:2,3,17 154:24,24,25 155:13 158:3 161:4,22 164:3,9 165:2,7,22 167:16,19 168:4 168:17 170:24 174:21 176:25 188:18 191:13 194:8 195:16 196:12 199:7,23 215:24 216:9,10 216:14,16 217:17,21 218:5 222:7 235:2,25 243:3 252:10 253:7,10 312:3,4 315:2,3,3 324:17 326:10,13 331:3 337:25 338:11
**researched** 148:4 195:7
**researcher** 104:8 139:18 252:5
**researchers** 78:14 98:2,21 113:16 117:8 125:23 130:5 131:9 136:16 146:10 168:3 258:6 266:20 317:24

**resemblances**
  225:2
**resemble**  221:4
**residents**  218:23
**residual**  122:20
  129:20,24
**resolve**  86:12
**resources**  19:17
  53:5,8
**respect**  28:15
  80:17 89:16
  134:5 268:2
  308:9
**respond**  8:8
**respondents**
  289:7
**response**  21:14
  36:24 46:9
  325:18,21,23
**responsible**
  31:22 194:19
**responsive**  37:3
  302:4
**rest**  64:21
  185:15
**restate**  90:24
**restricted**
  135:11
**restricting**  57:8
  57:20
**restriction**  63:16
**restrictions**
  20:25 21:4
  63:19
**result**  118:16
  125:3 126:25
  129:8 132:5
  133:20 134:15

135:19 137:22
137:23 143:22
153:16 154:20
176:12 182:9
184:17,19
200:10,13 241:4
246:7 250:5
266:4 297:17
305:17 306:16
313:11 321:22
321:23 322:3,17
322:23 323:4,21
323:24 324:11
338:6
**results**  79:7 97:4
  112:5 126:10
  135:8 172:11
  176:11 183:7,8
  183:12 200:3
  201:14 202:12
  202:16 236:16
  248:15 253:25
  254:4 257:17
  262:11 263:6,25
  271:9 272:11
  273:16 275:19
  276:3,5,13
  286:17,19
  289:11 297:3
  298:19 301:4
  302:15 307:4
  308:21,22,22
  311:5 312:24
  313:8 314:15
  318:3,10 323:5
  329:13,19,19
  331:14,21 332:9
  332:14,15,16

**resume**  53:18
**resumed**  137:7
**retail**  31:24
  197:11 207:14
  208:9 281:5
**retailers**  29:12
  29:16 30:3,16,16
  39:5
**retain**  63:5
  149:8
**retire**  70:23
**retired**  70:22
**retrieve**  9:18
**retrieved**  10:7
**reverse**  118:6
**reversing**  142:14
**review**  13:17,21
  13:23 14:9,18
  37:14,25 38:19
  38:23 54:4
  74:18,23 75:3
  76:8 79:25 81:6
  81:13,17 82:4,6
  82:9 84:2,4,10
  84:19 106:17,20
  107:3,5,11 110:4
  112:19,22
  141:22 161:14
  161:15 166:2
  168:4 171:9
  172:11 191:13
  216:15 233:6
  238:13,20
  239:15,19
  240:14,15
  242:11 243:2,8
  260:23 288:24
  326:8,19 327:12

327:18,24
328:13,21 329:5
329:9
**reviewed**  35:13
  74:13 80:3,7,24
  81:5,16,19 82:14
  82:15,24 83:22
  95:10 96:13,18
  102:7 103:21
  106:8,10,11,13
  118:23 141:18
  163:22 170:5,8
  170:10 189:19
  192:15 215:12
  226:24 232:10
  238:22 250:22
  251:2
**reviewers**
  232:16,23
  251:20
**reviewing**  79:10
  141:21 261:20
**reviews**  96:6
  100:2 107:21
  304:17
**revised**  77:2
**revising**  271:6
**ridiculous**
  176:10 306:25
  307:3
**rifle**  57:3 58:15
**right**  10:5 14:6
  16:5,8 20:25
  35:11 39:11
  69:21 75:24
  93:6,23 101:17
  108:3 109:24
  130:14 137:23

144:2,18 147:16
148:21 178:8
179:11,15
196:20 197:15
197:16,20 240:4
242:13 246:15
266:19 268:16
268:23 274:4
298:13 299:16
299:20 317:9
318:19 325:7
326:5 337:22,24
**rights** 67:10,15
70:2
**rigorous** 169:23
**ring** 64:6
**ringing** 61:5
**risk** 17:24 18:2
18:13,25 19:7,11
19:14 25:16,19
29:13 30:4 32:3
33:15,20 40:24
41:14 42:3,23
43:3,8,12,15,19
43:24 44:12,15
45:4,8,18,22,24
46:10 76:15
77:6,20 87:9,13
87:23 88:5,13
89:22 90:19
91:22 93:10,21
93:22,24 98:5
102:11 103:13
112:14,23,23
113:5,19 118:25
139:10 140:14
142:17 143:6,10
143:16,24 147:2

147:20 154:12
186:15 197:25
198:20,22 199:9
199:11,13
200:19,22,23
201:5,15,23
202:3 204:11,16
206:12,23 207:5
210:23,24
220:17 221:15
221:20 222:15
222:23 223:14
223:16,20
225:17 228:8,11
228:12 229:13
229:17,18
244:15 264:12
267:20 268:21
270:2,4 280:8
295:16,17
336:18
**risks** 67:6
**road** 2:6
**robbery** 336:12
**robust** 275:3
286:5 298:20
329:20 330:6,7
330:20 331:4
**room** 179:2
**rotate** 299:8,11
**roughly** 239:16
**routinely** 308:15
**rule** 54:16 96:3
**rules** 10:10
95:22,24,25 96:2
96:17,21 97:8,9
**ruling** 203:3

**rupp** 57:23 58:2
58:14,24 59:3,6
59:9
**rural** 173:12
225:11 262:7

**s**

**s** 2:2 137:2,2,2
231:16 237:21
344:3
**safe** 216:7
**safety** 25:2,11
138:8,13,14
**sag** 1:14 3:21
**sake** 67:8
**salary** 70:20
**sale** 64:5
**sales** 34:7
**sample** 176:9
179:21 180:25
181:4 184:8
197:18 276:9
278:3,20 279:13
279:22 280:3,4
283:11,12
285:10 300:14
300:22,25 301:5
302:8,14 303:3,5
303:21,23
318:23 319:3,4
319:10 331:18
332:4,8,10,11,12
**samples** 175:21
176:12 259:15
277:9 283:7
302:12,16
303:18

**san** 60:19,21
**sas** 319:17,21
320:6,20 321:3,8
321:12 330:8,16
331:10
**satisfy** 96:16
**save** 29:18 30:19
49:22 51:13
205:16
**saving** 28:6
**saying** 31:22
34:2 36:7 45:6
46:13 125:21,22
125:22 142:15
144:22 162:21
199:15,18
211:19,20
216:11 221:11
221:17,18,19
270:7 271:3
278:7,9 279:8
283:2 287:7
301:8,14,18,23
309:13,14 310:6
310:13 311:6
312:12,13
**says** 264:6
282:12,21,22
327:14
**scenario** 135:9
136:14
**schlifer** 62:2,7
62:21 63:5
**scholar** 21:21
27:4 103:10
104:24 105:8,17
171:16

**scholarly** 102:21 187:2,5
**scholars** 76:24 106:22 153:6 170:22
**scholarship** 170:11
**science** 71:25 76:18,20,20 80:12 81:15 82:9 84:10 95:12 146:17 147:18 159:6,15 159:22 161:6 167:15 170:5 233:11,13,18,25 234:7,21 237:17 240:14,15 251:15 322:20 341:17
**sciences** 84:17
**scientific** 48:4 85:25 87:7 88:17 92:19 95:6,15 96:12,22 97:22 98:11,14 98:15,17,18 99:3 99:5,10,20,24 100:10 114:22 137:25 139:9 151:18,24 152:12,18,19 155:8 194:9 253:10,13 316:9 335:6
**scientifically** 194:20
**scientist** 77:21 85:7
**scientists** 79:5 80:2 107:23 170:22 196:3 216:20 222:6 293:10 326:12 338:4
**scores** 188:8
**screen** 3:10 6:4 8:22 34:11,19,21 38:10,17 55:22 55:24 92:24 94:15 95:4 137:13 144:25 144:25 151:13 177:12 192:8 215:6 226:4 231:23 238:5,8 264:18 288:4 294:20 304:12 304:15 316:14 317:7
**sealed** 9:15
**search** 81:6 104:12 161:16
**searched** 161:5
**sec** 159:9
**second** 42:18 56:16 57:23 64:13 73:4,5 97:11 133:23 145:15 162:13 177:4 198:21 241:10 245:3
**secondly** 263:20
**section** 236:16 286:17
**sectional** 235:17
**secure** 29:15 30:6 50:7,15 334:11
**security** 70:19
**see** 5:8 6:21 8:24 9:2 40:7,25 42:19 49:8,23 53:5 61:22 94:7 117:21 118:15 134:19 144:22 145:23 148:2,15 151:19 154:21 158:9,19 160:5 197:12 198:11 198:11 200:10 201:19 215:2 218:19,20 219:18 220:2 231:19 232:7 238:3 240:25 243:14,16,18,20 244:2,6,10,17 245:5,8 253:24 260:7 265:7 273:22,25 274:17 281:3 284:18 285:5,11 288:3 289:15,24 294:17 299:11 304:12 309:11 311:22 316:21 328:3,8
**seeking** 63:8 65:5
**seeks** 35:6
**seen** 3:9 35:3 95:11 147:4 200:16 213:8 225:10 246:20 294:21
**segment** 34:4 148:2
**select** 107:13,24 108:7 326:10
**selected** 74:12 74:17 180:18 221:23 223:9
**selecting** 180:24 326:16
**self** 52:10,13,17 138:20 139:2 147:4,10 165:14 235:16 334:6
**sensationalized** 43:7
**sense** 27:15 45:19,23 46:19 47:10 87:22 118:23 197:6 210:25 223:10 271:19 295:9
**sensible** 52:5 138:18
**sent** 9:8 14:21 36:9
**sentence** 51:2 95:14 151:14 199:7
**sentences** 284:23
**separate** 158:22 310:16 319:25
**separated** 146:3
**separately** 158:2 311:8

**separating** 334:9
**september** 1:17
  3:4 232:5
**series** 235:17
**serious** 41:23
  78:11,12,20,21
  98:10 117:9
  125:24,25
  137:25 156:2
  182:10 184:17
  218:7 292:3,4
  294:7 312:17
  315:3,3
**seriously** 49:8
  131:10 187:7
  188:7 306:22
  315:4
**seriousness**
  184:15 187:24
**serve** 15:10 16:4
  58:14 73:25
  256:3,14 262:3
**served** 24:3
  66:17 67:9
**service** 30:21
  70:17
**serviced** 57:24
**services** 59:13
  59:16
**session** 53:21
  101:22 102:2
  190:7 316:4
**set** 85:8 169:6,9
  169:17 195:13
  197:7 218:24
  343:11,21
**setting** 62:6 67:8
  150:6,10

**seven** 36:16
  99:16 289:9
**sex** 127:8 133:10
  208:17,24 211:7
  244:16 245:19
  300:3
**sexual** 166:19,25
  167:9 336:14
**shake** 10:13
**shapiro** 106:15
**share** 8:23 103:5
  104:13 251:18
**shared** 224:19
**shed** 229:14
**sheer** 57:14
**shield** 54:25
**shift** 333:14
**shooting** 29:12
  30:3 149:20
  154:20 186:17
  189:20 332:18
**short** 87:12,24
  173:18
**shorthand** 11:4
**shortly** 14:21
  229:8
**shot** 66:2
**show** 8:20 9:7
  34:8,10,11 38:9
  55:19 60:24
  61:21,22 64:13
  69:15 92:23
  94:13 109:14
  139:9 140:13
  145:11,16 148:9
  159:11 170:14
  191:18 197:12
  214:17 215:23

216:8 218:17
  224:3 226:2
  231:10 237:18
  247:10 250:12
  258:20 287:22
**showed** 161:14
  233:24
**showing** 73:3
  94:19 109:15
  145:7,20 146:17
  147:8 154:25
  159:18 213:22
  273:18 286:3
  300:8 311:12
  329:21
**shown** 34:20
  38:17 114:23
  299:10 317:6
**shows** 232:22
**si** 280:7
**sic** 94:8
**side** 53:4
**sign** 322:11
**signature** 343:24
**significance**
  250:6 271:2
  303:4
**significant** 88:6
  103:5 138:24
  154:7 168:12
  174:7 177:19
  205:13 247:11
  248:18 249:21
  250:5 257:8
  258:4,25 259:4,6
  262:12 269:24
  270:14 274:25
  274:25 275:11

275:15 283:21
  286:4,24 287:3,6
  287:16 298:15
  299:15 322:18
  329:21 331:10
**significantly**
  111:15 219:12
  262:22 285:21
  289:22
**signs** 29:14 30:5
  49:8
**silly** 228:5,15,17
  306:4 307:25
**similar** 8:3 23:19
  37:18 42:8,13
  102:8,22 103:18
  140:20 170:12
  209:21 210:4,6,9
  211:25 221:20
  223:8 231:4
  232:22 289:4
  290:13
**simple** 200:14
  252:4
**simply** 11:24
  12:6 45:5 63:21
  78:14 80:22
  98:9 102:17
  104:21 107:25
  113:14 120:4
  142:19 147:10
  155:5 167:14
  187:14 191:14
  193:3 194:9
  198:14 199:18
  201:9 212:3,4,11
  229:25 239:11
  263:22 282:15

306:11 307:9 308:12 327:9 328:20 331:23 335:2,2
**simply's** 44:22
**simultaneously** 120:18 121:19
**sincerely** 54:17
**single** 64:19 100:2 140:4 180:22 183:7 245:8 258:11
**sir** 219:4
**sit** 85:20 130:16 170:19 222:9 266:11
**sitting** 83:8 104:7,23 105:17 126:18 128:17 129:3 170:21 171:15
**situation** 258:12
**situations** 221:13
**six** 36:16 99:15 149:23 229:19 299:15
**size** 319:10
**skew** 297:3 298:18
**slanted** 172:11
**slightest** 104:18
**slightly** 244:20
**slow** 121:2
**small** 130:2,25 131:5,9 173:12 175:21 176:12 268:9,15 303:15 303:21,23 315:15 319:17
**smaller** 256:20 256:23
**social** 70:19 71:25 76:18,20 77:20 79:4,25 80:12 81:15 82:9 84:10,17 85:7 95:12 107:23 146:17 147:7,8,14,18 159:6,15,22 161:6 167:15 170:4,22 196:3 210:19,19 211:17 216:20 222:5 240:13,15 245:21 251:14 293:10 322:20 326:12 338:4,14 341:17
**socially** 147:12 207:2 230:4
**sole** 115:21
**solely** 78:17 271:7 319:11
**solid** 224:5
**solution** 338:18
**solve** 168:3,22
**somebody** 25:19 50:12,23 51:17 117:6 150:22 157:8 176:7 204:15 205:6 220:24 228:20 265:19 315:4 323:7 325:17,20
**soon** 195:13 206:10 228:21 229:4 239:12
**sorry** 12:3 31:6 66:5 81:22 88:11 90:21 106:24 132:13 134:17 163:6 175:2 179:23 185:25 188:23 217:13 219:4 221:11 227:23 238:16 241:25 246:22 286:12 287:21 288:13 301:13 316:19 318:6
**sort** 23:23 34:9 48:13 52:4 64:5 119:2 128:22,25 129:22 132:21 142:14 149:5 197:7 224:18 239:13 242:23 249:5 307:21 330:22 332:3
**sorts** 193:10 309:3 317:14
**sound** 85:25 147:21 261:24 279:14
**soundest** 259:18
**sounds** 58:22 64:20 70:5 109:6 126:12 165:20 167:10 190:15 260:16
**source** 193:11 284:2 324:19,20
**sources** 70:15 81:7 129:2 192:22 309:7
**space** 107:19 223:21 326:21 326:21
**speak** 14:3 69:5 69:8 75:6,15,17 177:6
**speaking** 75:22 75:23 122:23 173:10 224:25 242:15
**speaks** 18:9 19:21 52:22 220:9
**special** 297:14
**specific** 12:15 17:18 21:24 24:6 54:21 70:5 83:17 232:14 302:20 308:9 338:11
**specifically** 20:20 30:24 31:19 33:22 39:8 41:6 44:2 90:12 91:7,17 139:7 145:19,22 151:9 159:25 160:6 178:7 198:8 201:13 206:2 209:3 214:3,7 227:25 255:3,13 273:15 284:17 307:9

329:18 333:23
**specifics** 19:23
  58:4
**speculate** 54:12
  55:3 278:19
**speculated**
  275:13
**speculates** 276:6
**speculating**
  213:12 270:18
  312:14
**speculation**
  15:21 32:8
  85:11,19 271:17
  271:18 272:12
  272:22,23
  276:21 277:23
  314:12,19
**speculations**
  271:9,19,20
**speculative**
  276:23 277:3,6
**spell** 5:22 6:10
**spend** 66:14
  73:13
**spike** 206:9
**spoke** 54:4 75:16
  224:8
**spoken** 10:12
  69:11,14 75:9
**sport** 163:19
**spot** 193:15
**spouse** 203:21
  221:10
**spouses** 221:4
**spurious** 48:22
**ss** 343:4

**staff** 24:15
**stand** 96:14
**standard** 176:22
  330:23
**standardized**
  321:4
**standards**
  194:10,21
  249:25 251:14
**standpoint** 87:21
  205:14
**start** 139:14,17
  150:19 168:17
  171:25 197:6
  320:2,13
**started** 54:3
  195:6
**starting** 139:15
**starts** 265:3
  326:4
**state** 1:23 4:9,12
  5:22 6:10 61:15
  68:4,18 69:2
  70:16,18 95:4
  140:21 170:10
  172:6,10,12,19
  174:11,14,17,20
  174:22 176:25
  227:10 235:18
  236:23 261:3,5
  333:10 343:3,8
**stated** 272:12
  336:6
**statement** 17:19
  17:22,23,25
  18:19 28:7 31:3
  41:13,18 50:10
  50:25 72:9

93:17 98:13
  99:2,11,23 139:8
  140:17 144:20
  151:11,19,22
  152:13 162:17
  162:21 174:5
  198:15,22 201:3
  201:10 206:16
  206:17 208:22
  209:24 214:9
  222:2 238:17
  242:5 259:8
  264:15 276:18
  281:18,24
  283:13 285:25
  306:19 331:7
  333:19 334:4,7
  334:24
**statements** 17:14
  39:18 40:13
  72:5 93:2
  104:16 242:5
  316:10
**states** 1:2 28:3
  157:9,9 164:11
  172:14 173:6
  175:8,25 236:10
  239:23 242:19
  280:23,24
  318:21 334:8
**statistical**
  113:15 198:14
  200:14 201:10
  202:9 236:19
  249:25 254:6,9
  261:15,21,23
  331:23

**statistically**
  249:20 274:25
  285:20 287:6,16
  309:15
**statistician**
  48:23
**statistics** 178:21
  287:2
**status** 54:19
  131:17,24 132:6
  133:4,18,25
  134:5,12,23
  135:16 136:9
  207:8 245:19
  255:11 257:2
**ste** 1:6
**stenographic**
  1:22
**step** 208:11
**stepping** 337:17
**steps** 77:23
  79:15 97:2
**stipulate** 60:25
**stop** 78:16
  120:20 224:13
  230:21 315:11
**storage** 29:16
  30:7 50:7,13,16
  50:22 51:22
  52:5,15 138:18
  334:11
**storing** 269:18
**street** 1:11
**strength** 118:20
  119:7,15 127:24
**strengthen**
  297:17

**strengthened** 297:20
**stress** 43:2 155:14,22 198:13
**stresses** 203:16
**stressful** 42:21 255:13
**stretches** 110:8
**strictly** 71:12
**strike** 27:20 45:3 84:7 304:22
**strikingly** 336:24
**strong** 47:8 116:9 127:6,8,16 127:22 128:8,11 129:5 130:13,22 155:14,16 188:11,12 197:18 213:21 214:4 234:24 240:22,25 246:3 258:17 283:8 304:20 314:8 333:12
**stronger** 116:13 117:4 130:17 149:21 189:21 264:11 267:19 280:7 297:24
**strongest** 130:20 224:10
**strongly** 127:11 187:21 224:6 304:19,25
**struggling** 262:25
**stuck** 176:13
**studdert** 190:12 192:11 195:23 196:16 233:17
**studied** 220:6,13 236:25 258:5,21 274:2,6,8,14 278:5 280:11 281:6 283:18 302:21 307:12 311:10
**studies** 37:18 72:14 80:9,11 81:13 82:16,18 82:20,23 83:2,4 83:9,12,17,22 95:13 98:3 100:19,20 101:5 101:9,11 102:10 103:4,12,20 104:2,17 108:2,7 108:12 109:2,11 109:20 110:10 110:15,23 111:2 111:4,6,10 112:5 112:24 114:23 118:24 119:4 124:13 125:18 126:11 141:25 142:3,19 148:14 148:24 150:21 155:17 156:6,6,8 156:12,17,19,25 157:21 158:2,3 158:10,20,25,25 159:3 160:3,5,5 160:6,13,17 161:3,21,23 162:2,11,18 168:6,11,21 169:4,10,11,14 169:19 170:2,14 172:13 176:24 178:8 187:17,23 189:10,15,18 191:12,15 195:25 207:4 209:19 214:8,10 214:16 227:3 228:2 234:11,22 235:22,23,24 236:4,5,6 237:11 237:14 240:12 247:5 250:24 254:21 256:8,10 258:16,24 259:3 259:18,20 264:16 265:12 265:14,24,24 266:5,9,10 267:5 267:10,11,23 268:8,18 269:16 269:21 270:11 271:14 272:11 273:16,21 274:10 275:9,16 275:20,22 276:4 276:16 277:7,13 280:6,11 282:19 282:24 283:14 290:19 296:22 298:2 300:21 303:2,15 304:19 304:25 305:4 307:12,19 309:25 313:9 318:7,9 322:8 326:5,17 327:2 328:9,16,19 336:23 337:9,19 338:21 341:16
**study** 85:21 97:3 97:4,11,11,17 98:20,22 104:8 107:7,7 110:15 110:17 111:3 120:13 124:11 124:13 125:2,11 134:11,22 135:19 139:23 139:25 140:7 155:15 157:2,3,8 158:14,21 161:12,14 164:7 166:12 168:24 169:25 175:2,21 175:24 176:8,19 180:2 190:11,17 191:9,14 192:10 194:11,21 195:17 196:16 196:17,19,22 197:6,13,18 198:10 199:7 200:4 201:7,13 201:14 205:19 206:6 207:9 208:16 214:19 214:22 215:8 217:4,6,8,24 218:9,13,20,25 219:6,10 224:23 225:6,10,12,23 226:2,4,8,13,17

227:4,6,8,12,15 227:19,20,21 228:5,9,18 229:20 231:10 231:12,15,25 233:13,17,23 234:11,20,20 235:5,6,9,14,16 235:19 236:8,13 237:10,13,18,20 237:25 238:10 239:9,11,18,22 239:23 240:20 241:5 242:12,13 242:23 243:4 245:13 246:12 246:13,19,23 247:19 248:4 250:13,17,19 251:21,22,24 252:8,16,23 253:6,18 254:12 257:4,10,23,24 258:2,6,11,13,13 259:12,24 260:3 260:6,9,12,15,20 261:2,4 262:5 263:9,16 264:2 265:25 266:2 267:22 268:2,5 268:12 269:10 272:6,7 274:15 274:19,23,24 275:7 278:2,20 280:18 281:8,16 284:14 286:3,10 286:14 287:13 287:24 288:7,18 288:20,24 289:3 289:19 293:21 294:11,16,18,21 294:22,25 295:3 295:7,12 298:13 298:21,25 299:4 299:14 300:13 301:22 302:6,8 302:11 303:2 304:8,11,16 305:7 306:2 307:5,5,8,13,25 308:6,25 312:25 312:25 313:2,3,4 313:4 315:8 316:15,20,21 317:10 318:14 318:21 319:22 321:15,21 322:4 327:10,20 328:23 329:24 330:4,25 336:16 341:20,21,22,23 341:24,25 342:4 342:5,6,8,10,12

**study's** 135:17

**studying** 176:9 265:15 267:2

**sub** 173:4,5,15 173:22 302:14 302:16 303:21 303:23

**subgroups** 67:7 302:22

**subject** 11:18,25 12:10 14:8 66:4 66:6 79:18,23 98:10 104:14 141:15 312:17

**submit** 73:10,12

**submitted** 73:16 76:11 94:23 217:13 325:4

**subpoena** 35:6

**subscribed** 340:14

**subsection** 146:7

**subsequent** 259:20

**subset** 256:19,20 285:9,12 317:16 334:2

**subsets** 283:4 300:25 303:16

**substance** 295:23

**substantial** 228:11 240:24

**substantively** 219:24

**substitute** 153:21 154:17 155:5 185:19 186:10,22 187:3

**substituted** 186:19,21

**substitution** 156:7 240:25 334:3

**succinct** 154:22

**succinctly** 84:8

**sue** 55:9

**suffering** 292:6

**sufficiently** 234:24 311:14

**suffolk** 343:5

**suggest** 55:3 131:4,6,7 175:16 297:4 298:19

**suggested** 46:9

**suggestion** 19:14

**suggestions** 148:3

**suggests** 32:2 253:16 289:11

**suicidal** 127:2,23 127:24 128:13 148:6,18 149:14 149:21 150:4,15 150:23 151:3 154:3 166:11 185:24,25 186:2 187:14,19 188:7 188:8 202:17,24 202:25 203:4,7 203:24 204:3,4,9 204:15 205:4,7 205:20 206:7,8 206:16,20,23 209:22 210:7,13 211:14,17,22,24 212:18,19,21 213:2,4,9,14,21 214:6,15 220:21 221:12 222:13 222:14,21 223:15 224:4,6 224:11,18 225:3 229:15,22 230:10,20 231:6 264:11 265:5,10 265:17,23 266:7 266:12 267:5,13

267:20 268:3,7 269:3,12,17 271:4 274:11 275:6,17,21,23 276:11,22 277:15,25 278:10,10,18 279:10,20 280:2 282:19,25 283:10,15 284:24 285:19 286:3,6 289:6,7 289:13,13 290:15,21 291:2 291:3,6,18,20,24 292:5,8,14 293:8 293:11 294:13 295:24 296:14 296:17,23 297:2 298:17 333:13 334:10,17

**suicidally** 230:16,17

**suicide** 15:17 16:22,24 17:24 18:2,14,14 19:2 19:7,12,15 25:17 26:8,14,16,17 27:6,18 29:6,9 29:10,11,14,25 30:5,14,17 32:4 32:9,11 33:6,20 34:6 38:12 40:5 40:24 41:15 42:4,9,15,23 43:3,6,7,8,12,16 43:20,25 44:8,9 44:13 45:11,12 45:14,21 46:2 47:2,7,10,12,18 48:2,9,11,17 49:2,4 50:12,17 50:19,20,21,24 51:2,4,7,12,13 51:16 54:9,18 76:16 77:6,16,20 78:16,25 79:19 80:2,11,14,23 81:3 82:10 83:23 84:6,11 86:4,5,6,6,10,14 86:16,20,20,24 87:9,13,23 88:5 88:13,24 89:3,13 89:23 90:15,20 91:9,16,23 92:14 92:21 93:10,21 94:12 95:5 96:7 96:11 98:5 100:25 101:4,8 101:11 102:11 103:14,23 104:3 106:23 109:3 111:13,16,20 112:8,14,23 113:5,12,16,18 113:21 114:20 115:3,8,12,18,22 115:23 116:5 117:16,23 118:11,22,25 119:14 124:2,6 124:14,15,15,18 124:20 125:20 126:22 127:4,4,7 127:14,19 128:10 129:11 131:13,20,20 132:2,8,10,15,18 132:24 133:6,12 133:16,21 134:4 134:14,25 135:9 135:21 136:5,12 137:21 138:7 139:11 140:14 140:23 141:8,16 142:17 143:2,7 143:11,17,24 144:11 145:25 146:6,9,11,19 147:3,9,20 148:20 149:19 150:2,3,12 151:15 152:6,14 152:19,21 153:2 153:8,10,11,14 153:16,25 154:4 154:5,8,9,12,16 154:18 155:2,3,4 155:10,21 156:9 156:16,18,20 157:8 158:15,17 161:9 163:10,11 164:14,19,20,23 166:4 167:21 168:19 170:12 170:16 172:5,16 173:7,8,17,21 174:9 175:15,18 176:5 177:7,21 178:18 179:6,14 179:18 181:10 181:18 183:15 183:23 185:7,14 185:15,18,18,20 186:11,15,17 188:14,15 189:3 189:21 190:14 191:22 192:25 197:12,25 198:20,22,25 199:9,21 200:6,8 200:19,22 201:5 201:15,24 202:4 202:12,18 203:6 203:9,17,25 204:11,16,24 205:6 206:12 207:6 209:22 210:10,22,25 211:12,15,22 212:5,18 213:3,5 214:12,23 216:17 219:11 219:14,15,25 220:17 221:15 221:20 222:16 223:3,14,25 224:3,7,16,22 225:5,18 228:8 228:11,12,21,25 229:4,6,8,13,18 229:18,24 230:2 230:21,23,25 231:4,17 234:13 236:12,15,24 237:2 239:25 240:19 241:3,15 241:17,23 242:8 242:21 244:15 246:5,6 247:11 247:16 248:3,20

249:15,23
252:15 253:23
253:23 254:19
254:23 255:10
255:12,15,18
256:5 257:6,8,12
257:18 258:3,15
259:3 261:9,10
262:13,14,22
263:25 264:12
264:14 266:3,6
267:3,7,8,15,16
267:17,21
268:20,22
269:21,22 270:3
270:19 274:3,15
275:2,4 276:24
279:17 280:2,8
285:3,21 286:22
286:23 287:18
288:14 289:14
289:21,22 290:9
290:10 291:9,14
292:18 293:2,21
293:22,23 294:6
294:14 295:16
295:24 296:10
296:14 297:5
298:9,16,23,23
300:9 301:11,21
302:13 305:3,15
306:25 307:6,10
309:24 310:17
314:4,17 315:11
316:25 317:20
322:12,19
324:10,17 325:3
329:23 331:7,11

332:19,24 333:3
333:7,14,25
334:2 335:11,24
336:9,18 341:10
341:18
**suicides** 31:20
31:22 33:15
50:8 86:10
162:16,16,25
163:11 178:16
178:17,19,23
179:9 180:15
181:23 185:2
197:4 199:25
200:2 206:9
240:24 241:20
247:2,2 260:6
261:7 265:16
268:19 283:20
317:12
**suicidology**
288:11
**suicidology's**
288:15
**suing** 63:21
**suitable** 249:20
**suite** 2:6
**suits** 63:21,25
**sum** 104:22
134:8 154:21
245:18
**summarize**
245:13
**summarized**
254:3
**summarizes**
273:15

**super** 178:12
**superficial**
338:21
**superior** 85:17
**supply** 36:6
**support** 27:8
57:19 58:20
61:8,13 63:8,15
64:11,24 65:5
78:22 108:2
143:21 148:17
148:24 149:13
153:18 156:13
175:6 187:2
196:13,15 214:8
247:16 248:10
250:25 264:15
272:7
**supported** 71:18
71:21 95:6
153:24 154:14
174:21
**supporting** 55:4
141:6 153:6
**supportive**
153:12
**suppose** 70:8
161:18
**supposed** 186:13
207:23 293:10
314:2
**suppressed**
324:11
**sure** 6:25 7:10
13:15 19:3
23:16 24:2,13,14
30:23 36:21
59:5 61:11,23

73:2 74:11 85:2
89:4 106:11
117:6 121:4
129:9,12 130:3
144:16 145:2
147:25 159:7
160:4,8 177:3
187:16 195:18
225:19 238:15
243:10 252:9
253:8 260:8
285:9,24 294:18
298:10 328:8
332:13
**surrounded**
204:23
**surveillance**
179:25 180:2
**survey** 166:23
179:19 317:17
319:17 330:14
330:19
**surveys** 318:17
**survival** 334:13
**surviving** 266:19
266:25
**survivor** 55:7
**survivors** 32:9
**suspect** 34:3
270:23
**sustained** 137:25
**swanson** 304:9
304:17,23
306:13 307:25
342:10
**swear** 58:23
64:19 74:8
162:8

**swearingen** 56:24 59:2,5 73:8
**switch** 159:13
**sworn** 5:14 340:14 343:12
**sympathetic** 195:4 338:18
**synonym** 157:13
**system** 63:3 178:22 179:10 179:25 180:4,11 180:13,14 181:5 181:9,22 182:16 182:22
**systematic** 107:3 107:4,11,12,17 112:19 326:8
**systemic** 107:16
**systems** 320:13

**t**

**t** 110:8 137:2 231:16 237:23 343:2,2 344:3,3
**tab** 34:13 38:11 38:16 94:14 109:8 110:3 192:7 226:5 287:21 303:24
**tabarrok** 237:21 237:24 248:23 327:20,21 328:25 341:23
**table** 110:8 123:2 159:7,7 160:7 201:13,14 218:16 249:10 249:11 273:15 273:20,20 274:16 283:25 285:13,15 298:3 299:2,5,7 300:17
**tables** 249:10
**take** 3:11 10:22 23:23 28:14 34:25 35:7 38:5 40:21 46:3 49:8 53:16 92:5 94:2 109:5 114:9 131:9 141:22 189:23 219:22 276:15 284:17 295:6 297:18 315:20
**taken** 3:16 12:20 53:23 101:24 136:24 190:5 273:8 316:2 332:5
**talk** 112:11 156:24 257:24
**talked** 28:19,22
**talking** 86:9 133:3 159:13 164:15 185:13 230:3 265:8 266:25 268:9 281:4
**tallahassee** 13:6
**tamal** 2:20 5:2
**targeting** 112:22 119:11 142:2
**tautology** 198:23
**tech** 81:23 120:22
**technical** 7:18 7:22 8:3 31:7 168:22
**technically** 85:16 259:18
**technology** 3:23
**tell** 14:17 15:11 23:24 56:22 57:14 82:19 144:3 188:21 190:18,24 192:5 218:12,15 226:16 251:16 257:19 285:15 302:4 313:18
**telling** 222:12
**temporal** 292:18
**temporary** 334:11
**ten** 245:23 246:2 246:7 248:5 315:21
**tend** 25:17 173:3 176:14 191:17 221:4 223:11 230:5 250:25
**tendency** 147:3 147:5
**tends** 139:24 175:17 228:21 248:10
**tentative** 76:25
**tentatively** 139:19
**term** 12:14 27:11 114:18 115:16 144:13 146:2 152:8 206:13 222:21 244:14 252:2 299:15 302:22
**terms** 11:5 119:16 121:25 136:11 154:18 211:25 302:12 310:14 311:2
**test** 78:13 79:5 85:14 96:4 125:25 147:23 147:24 150:7,10 277:5
**tested** 146:10 149:3,17
**testified** 5:15 54:7 55:16 56:10 64:24 65:4,7,14 87:5 89:25 137:7 230:10 336:2
**testify** 6:15 7:3 12:22 13:3 61:13 66:19 256:6
**testifying** 13:10 35:9 54:23 242:2
**testimony** 13:18 54:10 56:23 57:15,19 58:19 60:17 62:10,15 63:7,15 64:11 66:5 88:15 90:2 137:14 193:17 205:8 219:2 263:8 281:21 340:9 343:13

**testing** 149:25 150:11 152:24 306:20 315:13
**tests** 78:4,5 79:6 158:11 186:12 187:22
**text** 93:23 249:9
**textbook** 95:21
**thank** 9:24 121:13 250:10 315:17
**thanks** 10:3
**theoretical** 147:21 279:14
**thin** 262:17
**thing** 7:6 12:12 18:15,22 26:5 61:23 91:25 102:16 119:5 129:12 133:22 164:22 167:7 190:18 198:21 222:22 248:15 255:24 291:6 314:20
**things** 11:3 36:8 74:24 143:15 165:7 194:7 223:2,7 245:14 245:16 261:2,4 262:6 265:19 295:13 303:4 308:4 313:17 326:7
**think** 6:6 12:12 16:14 18:14 23:24 31:7 33:18 47:4 48:7 53:15 58:12 59:22,24 62:14 63:22,25 64:18 65:21,21 67:4,18 68:5 81:22 82:15 90:23 91:11 99:13 102:20 111:5 120:21 125:12 128:20 130:17 140:9 142:6 145:10 159:6 160:8 163:13,14 163:22 167:2 170:19 176:8 189:4,9,23 194:23 195:9,10 195:24 199:16 212:20 216:13 217:15 227:2 247:18,21 248:23 253:19 255:17 258:17 260:7 266:10 275:14 276:20 279:12,15,20 285:23 286:11 299:5,5 302:3 304:2 305:24 308:25 310:11 313:19 315:22 325:19 329:3 335:22 336:5
**thinking** 141:17 183:4 257:13
**thinks** 186:25
**third** 35:14 44:7 46:20 319:8,16 319:18
**thirds** 29:8
**thorough** 96:5 166:2
**thought** 34:3 51:9 171:20 238:17 272:21 295:9 331:13
**thoughts** 289:6 290:15 291:3 294:14
**thousand** 163:18 317:15
**threatening** 288:14
**three** 23:21,25 37:6 110:8 122:11 202:2 211:15 213:15 213:24 240:21 284:23 317:11 325:4 329:4
**threshold** 168:16 168:20 169:7,18
**time** 4:10 8:20 8:20 23:8 40:21 53:16,20,24 54:4 55:20 60:8 65:17 66:13 72:20 73:13 101:21,25 111:7 136:22 137:3,4 140:5 141:2,3,4 141:19 142:4,5 142:12 167:4 190:3,6 196:25 197:4,4,8,11,20 204:5 206:21 207:13,15 208:14 223:21 229:7,9,21 230:6 230:7,14 235:17 273:4,6,9 280:17 281:8 292:9 293:2,9,13,14,18 307:21 311:21 315:24 316:3 334:17,17 339:3 339:5
**times** 21:15 23:18 200:5,7 201:23 202:3 230:8 289:9 336:3
**timing** 228:19 229:11,14
**tiny** 176:17 303:16
**tirschwell** 2:16 4:22,23
**title** 26:13 93:19 161:8 271:12
**titled** 60:19 190:13 214:23 226:10 231:16 288:13 294:13
**titles** 41:21 329:7
**today** 7:4 9:12 12:22 13:3,10,18 14:4 35:7 83:8 104:7,23 105:17 126:18 128:17 129:3 167:7 170:21 171:15 336:22

**today's** 13:12
**tool** 29:2,6,11,25 30:3,14
**top** 41:14 238:14 245:3 265:4 311:24
**topic** 26:20 27:2 82:10 83:24,25 84:5,6,10 85:9 93:22 98:18 99:24 100:6,21 108:17 111:2 119:19 165:2 193:15 195:7 217:18 218:5 222:8 256:8 268:14 282:16
**topics** 100:10 193:10
**total** 164:23 170:16 172:5,16 178:18 181:13 181:24 183:8,12 184:25 199:25 241:17 242:7 247:2,11,16 248:19 249:15 320:10
**totally** 105:5 123:9 169:20
**towns** 173:12
**track** 207:18
**trade** 20:12 62:11,18 67:20 69:15
**traditional** 193:10
**transcript** 10:15 340:5,9
**transfer** 207:24
**transferred** 207:22
**transfers** 208:3
**transitory** 203:14,14 204:7 204:9,15 205:4,6 230:6,11
**translates** 186:14 222:14
**traumatic** 41:24
**treated** 332:7
**tricky** 208:11
**tried** 105:16 118:19 303:11 305:12 329:12
**trigger** 203:17
**trivial** 44:20 51:11 236:19 241:4 246:8 247:3 254:10
**true** 61:17,20 62:9,14 89:20 102:17,17 114:24 116:15 116:25 122:15 122:24 123:7 133:22 135:10 135:23 173:9 204:16 230:15 230:15 270:22 283:3 297:7 308:11 314:7 333:20 340:8 343:13
**truncated** 31:7
**trust** 263:6
**truthfully** 6:15 7:4 12:22 13:3
**truthfulness** 149:8
**try** 94:2 104:22 134:8 139:19 160:19 179:7 235:25 297:25
**trying** 60:3 61:3 100:4 137:13 158:7 164:22 169:12 283:16 323:7
**turn** 14:6 38:10 40:2,20 53:3 56:16 57:23 76:23 92:25 95:2 139:6 144:11 151:8 177:5 181:12 188:22 201:12 236:14 240:12 247:9 290:5 294:19 332:17
**turned** 329:9
**turning** 92:22 144:5 164:2 289:18 329:11
**turns** 247:7
**twice** 21:17
**two** 20:5 22:10 23:3,16,22 29:8 40:14 58:13 80:9,19 81:7 84:11 95:11 99:6,10 120:2,6 120:12 121:25 122:6 129:13 134:15 135:15 135:19 136:2,7 136:18 143:6 158:18 162:10 168:12 169:7,13 187:18 191:5 194:12,12,13 196:6,7 208:11 209:7 212:2 217:16 218:8 221:23 223:8,9 225:2 227:3 243:11 263:12 264:16 269:16 274:9 277:6 284:22 286:19 327:8 329:3 330:12
**tyler** 2:22 5:5,6
**type** 22:2,2 106:20 181:24 252:7
**types** 43:2 336:8
**typical** 216:5
**typically** 180:6 333:14
**typo** 114:7

**u**

**u.s.** 3:19 60:21 165:10 176:20 180:25 194:14 194:16 239:23
**unable** 7:20
**unambiguously** 94:3

**unauthorized** 138:21 139:5
**unavailable** 155:6 185:17 186:11 187:14 328:12
**uncertainty** 182:24 183:3,5
**uncompleted** 179:14,18
**unconnected** 67:13
**uncontaminated** 168:13
**uncontrolled** 122:19 298:7 309:16 311:4 321:20 322:4
**undercuts** 231:5 249:12 271:15
**underestimate** 133:20
**underestimates** 135:20
**underestimation** 136:4
**underlying** 47:9 47:22
**understand** 6:14 7:2,7,8,17,20 8:2 10:20 12:3 19:3 29:13,22 30:4,20 35:17 36:7 46:6 79:3 80:6 83:14 92:3 100:16 125:13,13 134:18 135:13 135:14 137:13 158:7 220:18 254:16 263:12 288:17 311:11
**understanding** 11:5 16:10 26:11 44:16 46:25 54:25 135:17 147:16 157:2 160:21 211:13
**understands** 201:9
**understate** 134:24
**understood** 8:10 10:15,25 46:8 86:22
**undertook** 304:18,24
**undeveloped** 319:7
**undisputed** 222:5
**unemployed** 254:18
**unemployment** 243:18 254:13 254:20,22 255:9 255:11,21 256:15 262:8
**unexposed** 219:22
**unfortunately** 44:17 78:9 117:5 165:6 192:19
**uniform** 167:7
**uniformly** 250:23
**unimportant** 287:5
**union** 317:17 319:15
**uniquely** 155:2 185:14 332:18
**unit** 3:14 157:4 173:19 175:10
**united** 1:2 157:9 175:24
**units** 164:10 172:25 176:15 176:18
**universally** 215:22 283:3
**universe** 160:21 160:23 303:12
**university** 70:18 71:6,9,9,14
**unlimited** 326:21
**unlocked** 137:20
**unmeasured** 309:3,7
**unnecessary** 228:2
**unpack** 265:22
**unpaid** 23:14 71:12
**unpredictable** 120:19
**unrelated** 163:9 221:23 280:2
**unreliable** 26:24 102:11 103:14 104:3 192:22 193:3 218:25 239:7 301:7 318:4,10
**unrepresentative** 303:16
**unseal** 9:17
**unstable** 6:5 176:11
**unusual** 124:12
**uphold** 65:5
**upper** 93:6
**urban** 225:11 243:20,23
**use** 21:5 32:4 52:13,17 88:23 89:3 107:11,23 108:6 114:17 128:5,14 132:22 144:13 152:8 153:25 154:4 163:20 184:13 185:10 187:6 188:9,12 189:20 189:22 214:12 245:20 269:20 274:19 282:19 290:9,10 292:17 300:4 318:9 333:24,24 334:6 338:7
**useless** 184:21
**users** 138:21
**uses** 95:16 165:17
**usual** 242:15 334:19
**usually** 44:23 87:15 180:9

197:6 266:13
301:3 307:12
325:16 330:21
**utilization** 185:5
**utterly** 166:9

**v**

**v** 64:5 231:16
340:1 344:1
**vaguely** 26:10
190:15 275:22
**valid** 98:24
149:7 163:5,25
168:24 171:9
200:17 206:18
248:17
**validity** 165:18
**value** 139:4
**valued** 210:19
**values** 283:25
**variabilities**
164:4
**variable** 92:5,6
112:13 113:2
121:21 122:6,13
123:19 129:22
131:24 132:19
132:22 133:23
134:6 164:6,12
164:13,17,21
258:25 297:15
300:18 301:9
310:23 311:24
322:11 323:23
323:25 324:12
**variables** 112:25
114:18 118:24
120:2,17 121:22

122:2,7,12,17
123:13 130:9
135:19 162:13
164:5,24 165:21
166:14 167:14
169:7,18 194:15
208:17 209:15
212:8 218:21
248:2 249:18
257:6,12,18,22
258:3,9,18
259:16 262:2,17
262:21,21
263:19 277:8
287:11 297:9,12
298:6 300:8,12
300:18,23,24
301:19,24
302:17 305:23
308:12,15,17
311:21 315:14
321:15,18
322:16 323:15
**variables's**
310:20
**variation** 244:21
**varies** 204:5
206:21 230:14
**variety** 163:3
187:8
**various** 41:22
67:7 111:19
168:22 177:7
273:16 297:8
298:4 301:22
302:10 311:13
320:9 321:5
337:6

**vary** 60:11
**varying** 119:16
**vast** 15:24 35:20
133:13 135:5
293:21
**verbatim** 114:4
**veritext** 3:25 4:3
**versions** 166:22
**versus** 3:18
22:19 56:24
57:24 58:24
59:2,3,5,6 60:20
62:3,22 64:4,4
73:7 90:4,6
203:2,6 219:23
265:16 276:25
280:23 292:4
302:14 307:10
**veteran** 60:19
**victim** 154:20
166:19 167:6
178:17
**victimization**
138:25 166:23
166:24,24
167:12
**victims** 269:22
286:22
**video** 1:20 3:11
3:15
**videoconference**
1:16,20
**videographer**
3:2 4:2 5:24
6:17 53:20,24
101:21,25
136:22 137:4
190:3,6 273:6,9

315:24 316:3
339:3
**view** 15:18 24:9
24:25 26:16
29:21 30:9
33:16,22 43:18
47:20 54:13
83:15 95:19
97:5 113:10
115:11,19 117:3
127:22 130:18
164:25 173:24
186:9 195:6
203:10 208:2
216:3 225:16
229:16 233:14
233:25 251:6
290:25 291:19
307:24 323:7
335:8 336:5,19
**views** 335:18
338:17
**violate** 166:25
**violence** 67:4
192:23 193:2,4
193:12 194:17
194:19 195:5,11
196:11 216:2
233:10 251:12
262:20 314:10
314:23 335:20
336:8,10,20
338:19,23
**violent** 166:19
**virtual** 3:23
**virtually** 3:6
128:20 142:23
169:10 170:2

172:24 198:23 207:2 281:25
**virtue** 7:18 225:12 338:14
**vis** 18:25,25
**vital** 178:21
**voice** 6:6
**volume** 35:20 80:11 95:13
**voluntarily** 35:11
**voss** 106:14
**vote** 181:2
**voters** 180:25
**vs** 214:24

**w**

**w** 2:8
**wait** 8:15,17
**walk** 38:7,21
**want** 11:4 14:6 14:10 33:20 38:7 55:14,19 56:17,19 63:4 84:22,24 85:2 91:5 94:13,14 98:12 100:16 110:3,7 125:12 135:14 137:10 139:6 144:11 145:11,16,19,25 148:5,11 151:8 154:2 156:24 177:5 189:6 201:12 203:12 205:16,17 210:18 214:17 226:2 228:25 231:10 237:18 259:22 273:12 284:17,20 286:9 286:12 287:20 299:4,4 304:5 308:24 316:11 333:9
**wanted** 33:11 63:5 67:5 124:21 188:7 292:3,5 316:7
**wanting** 267:15
**warn** 46:10
**warning** 29:14 30:5 49:8
**warnings** 87:22
**warranted** 46:4
**warren** 195:21
**wave** 142:18
**way** 8:25 9:3 25:24 28:10 31:22 48:13 52:7 55:11 65:17 71:18,21 74:3 76:6 79:4 85:12 90:19 106:23 118:13 123:23 124:4,8 124:16 126:12 126:19 127:12 127:13 128:22 130:4 131:3 133:25 134:8 139:13 140:3 141:25 147:11 149:5 152:24 154:11,22 157:20 160:14 165:12 168:8 180:18 182:11 202:24 207:9,25 208:6 218:18 271:14 276:3 277:5,21 278:14 278:15 279:6,7 282:2,16 283:5 311:17 313:20 313:24 323:17 324:20,22 325:16 331:25 332:14 343:18
**ways** 266:21 292:24 334:19
**we've** 109:22 125:25 142:18 155:10 185:13 213:15 223:4 313:9 336:22
**weak** 78:23 103:3,3 104:18 116:9 118:2,5 139:25 234:12 234:20 287:5
**weaker** 116:16 116:19,21 117:4
**weakness** 162:24
**wealth** 234:10
**weapon** 332:20
**weapons** 58:21
**website** 28:2 29:5,20 30:13 42:9,14 333:10 333:19 334:8,24 335:4
**webster** 259:24 260:4 263:17 341:25
**weeks** 292:19
**weight** 168:9
**weighted** 182:7
**went** 161:13 328:6
**whatsoever** 105:12 126:17 237:4 296:20
**whereof** 343:20
**white** 244:17
**whopping** 303:5
**wide** 316:25
**widely** 204:25 330:18
**widespread** 186:19
**wife** 221:22 223:11
**wild** 233:7
**wildly** 60:11
**willing** 73:24
**winston** 2:24 4:24
**wintemute** 195:22 196:6 216:25,25 225:24 226:9 341:21
**wisdom** 153:20
**wish** 269:5
**witness** 3:9 5:13 5:25 6:2,19 13:14,20 14:2 15:10,14,22 16:21 18:6 24:4 55:15 66:15 73:25 74:3

75:24 81:25
121:5,7,15 250:8
272:24 273:5
303:25 304:3
341:3 343:10,14
343:20
**wold** 107:25
**wolf** 64:4,8
**woman** 224:19
**women** 214:23
219:7,22,22
220:6,22 221:14
224:17 234:4
**wonder** 179:10
**wondering**
98:16
**word** 109:5
114:10 256:11
295:6
**words** 15:11
78:20 85:16
120:12 123:10
123:14 124:22
144:9 166:6
168:6 181:18
270:3 271:21
306:3
**work** 22:7,9
23:19,23 56:17
56:19 67:14,17
67:20 68:6
70:14,21 71:2,3
73:16 76:5
130:6 326:4,24
**workday** 23:7
**worked** 21:7,16
23:3,12 68:13
249:5

**working** 66:14
68:17 72:21
73:7,14,17
177:13
**works** 68:20
72:10,20 73:9
**world** 157:10
319:8 321:5
**world's** 319:5
**worldwide** 319:9
**worse** 142:20
257:10
**worst** 176:16
**worth** 37:7
136:13 141:20
171:19 263:11
**write** 56:11
141:9 177:17
260:10 289:19
325:18
**writes** 309:3
**writing** 247:24
249:6 325:21
**writings** 37:9,19
240:21
**written** 22:7
79:23 336:2
**wrong** 156:12
281:24 310:12
331:8 337:21
**wrote** 13:14,25
140:10 150:22
206:6 226:20
233:6 235:21
269:17 309:11
319:20 329:12
329:18

**x**

**x** 1:4,15 27:7
92:5,6,7,10,10
229:7,9,22 230:6
230:7 341:2

**y**

**y** 5:12 6:12 92:6
92:7,8,10,10
137:6
**yeah** 6:21 9:13
26:21 33:18
47:10 61:6 73:5
73:19 83:3,25
85:12 101:18
115:20 118:25
119:10,14 132:5
133:3 140:7,9,25
142:15 144:19
144:24 145:6,11
157:15 158:9
159:5,7,13 160:5
160:11 162:9
177:13 180:8
188:22 189:2,9
189:17 192:2
195:12 198:11
205:24 206:5
222:10,19
225:21 229:21
233:18 234:6,6
240:11 243:24
251:4 252:2
254:10,15 255:5
255:22 258:16
259:7,13 260:7
264:20 265:7,7,8
265:11 266:16

267:13 268:17
273:14 280:15
290:11 291:5
302:5 329:5
**year** 12:9 112:5
148:23 161:19
182:21,21,23
201:21 203:8
219:16 227:10
261:8 295:21
296:13 325:7
**years** 22:24 70:9
149:8,9,24
157:19 167:3
201:18 202:2
203:18,21
226:16 229:19
229:24 252:21
252:21 286:19
288:22 292:19
**york** 1:23 2:14
2:14 4:17,17
343:3,8
**younger** 57:9
280:14
**youth** 260:5,5
**yup** 64:15
208:25 243:19

**z**

**zero** 131:2 132:4
202:14 335:24
335:25
**zoom** 1:16 8:23
8:23