IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150,**

   *Plaintiffs,*     No.: 1:22-cv-00865-SAG

   v.

**ANNE ARUNDEL COUNTY,**
**MARYLAND**
**44 Calvert Street**
**Annapolis, MD 21401,**

   *Defendant.*

**MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE**

Plaintiffs respectfully submit this memorandum in opposition to the defendant, Anne Arundel County's ("the County"), motion in limine. The County seeks to exclude entirely the report of plaintiffs' expert, Dr. Gary Kleck. As detailed below, that motion is based on a false premise, *i.e.,* that the County's literature at issue here merely states that firearms and suicide are "associated," while in fact the literature expressly and implicitly effectively state that mere access to firearms is a causal factor in suicide. Dr. Kleck's testimony describes the error of any such conclusion and criticizes the methodology of the County's experts and that vast quantity of decidedly unscientific studies on which the County relies. His testimony and report are useful to the Court in understanding the issues before the Court. The County's objections to Dr. Kleck's report and testimony merely go to the weight of his testimony and conclusions, not its admissibility. The County's motion should thus be denied.

## I. DR. KLECK'S REPORT AND DEPOSITION TESTIMONY ARE RELEVANT

### A. The County's Message and Dr. Kleck's Report.

The County's multipage pamphlet, entitled "Firearms and Suicide Prevention" (Complaint Exh. B) flatly states that "Some People are More at Risk for Suicide than Others" and includes within that category people who have "Access to lethal means, including firearms and drugs." On its face, that is an assertion of causal effect, *i.e.,* that mere "access" to firearms makes a person "more at risk for suicide."  On the same page, the pamphlet states that "Risk factors are characteristics or conditions that increase the chance that a person may try to take their life." Plaintiffs' expert, Dr. Kleck, thus testified at his deposition that this pamphlet effectively states that "possession of a gun or ownership of a gun increases the likelihood one will commit suicide." Kleck Dep. Tr. at 15 (Def. SJ Exh. 3).  See also Kleck Dep. at 93-94 (Q. Okay. Where on this page is the statement that you evaluated for purposes of your report?  A. First of all, the title of the page as a whole, as you said, Some People Are More At Risk For Suicide Than Others, that introduces the topic of risk factors, which is reinforced in the lower right text, which reads, 'Risk factors are characteristics or conditions that increase the chance that a person may try to take their life.' That's unambiguously an assertion about causal effects."). As he further explained, "implicit in the notion that owning a gun is a risk factor for suicide, and any reader would think suicide is a bad thing, then the implication is – the recommendation implied is don't own a gun." Id. at 18.

That is the same reading shared by the plaintiff dealers and MSI members. See Response of plaintiff dealers to Interr. Nos. 1 (P. SJ Exhs A-D) ("Requiring firearms dealers to display the County's publications on suicide and conflict resolution sends the message that the purchase and possession of firearms and ammunition is causally related to increased risk of suicide and/or an illegal use of firearms and ammunition in conflict resolution."); id. at Interr. Nos. 2-3, 9 (same); MSI

Response to Interr. Nos. 1, 7, 14, 15 (P. SJ Exh. E) (same). See also Pasadena Arms Dep. Tr. at 42 ("I said putting them together and it tells me that this is all one package that firearms are causing the issue" and that "this message is against firearms"), Id. at 29 ("Firearms don't cause suicide. Suicide is the problem, not firearms."). (Pl. Exh. J); Cindy's Hot Shots Dep. Tr. at 79-80 ("Q. And so the message that firearms and ammunition are causally related to the illegal use of firearms and ammunition and conflict resolution is something you derive from these two pamphlets being together? A. Yes.) (Pl. Exh. I); Field Traders Dep. Tr. at 63 ("Q.  * * * Is it your understanding that the access to lethal means risk factor, inclusion on this list of risk factors means that having access to a firearm means you are more likely to use it to commit suicide than not? A. That is correct"). (P. SJ Exh. H). Those are common-sense readings of the pamphlets. And resort to everyday, common use of words is controlling here because the pamphlets are distributed *to the public*, not social scientists.

Remarkably, the County denies that the pamphlet says what it says, asserting that "no reasonable reader would understand the pamphlet to convey a message that guns cause suicides." (Def. SJ Mem. at 22).  Nonsense. Quite to the contrary, every "reasonable reader" cannot miss the pamphlet's assertion that a person with "access" to "firearms" "are more at risk of suicide."  Indeed, the County itself makes no attempt to parse the actual language of pamphlet. Instead, the County resorts to the assertion that the pamphlet merely states that firearms are "*correlated or associated* with suicide, *and in this sense* are a risk factor for suicide." (Def. SJ Mem. at 20) (emphasis added). Perhaps recognizing that these terms are not used in the pamphlet, the County argues that the term "risk factor" is a "designation commonly understood in the field of public health and epidemiology to *be associated with* an outcome, regardless of whether or not it actually *causes* the outcome." (Def. SJ Mem. at 22) (emphasis in original). The County repeats this mantra through its summary

judgment memorandum. See Def. SJ Mem. at 2, 7, 21, 22 n.26. In other words, according to the County, "any reasonable reader" would know how the term is used in "the field of public health and epidemiology." That argument is facially absurd.

The hard reality is that the pamphlet never states that access to firearms is merely "associated with" suicide." Quite to the contrary, as explained above, the pamphlet states that "[r]isk factors are characteristics or conditions that increase the chance that a person may try to take their life" and asserts that persons with mere "access" to firearms **"are** more at risk of suicide." As Dr. Kleck states, "[t]hat's unambiguously an assertion about causal effects." (KIeck Dep. Tr. at 94). In short, the term "risk factor" is used in the plain language of the pamphlet as a statement of causation, not merely as statement of "correlation," as the County now asserts. Certainly, the term "risk factor" is not defined *in the pamphlet* by reference to the "field of public health and epidemiology," the source which the County now claims must be consulted for the meaning of the term. The terms "correlation" or "associated with" are simply not found anywhere in the pamphlet.

Dr. Kleck explains this point, explaining that if the term "risk factor" is understood "to mean nothing more than a correlate" then it "is trivial" because "it could be cause, it could be consequence." Kleck Dep. Tr. at 44. He further notes that "[o]ften in the public health literature, an author will say it's a risk factor and imply that it's a causal factor, because they then draw a conclusion about how you might, in this case, prevent suicide. Well, of course, you can't prevent suicide by eliminating something that's merely coincidentally associated with suicide. It's got to be a factor that has some causal effect." Kleck Dep. at 45. In other words, the assertion that access to firearms is "associated" with suicide, "implies that risk factor is a causal factor. Otherwise, it wouldn't make any sense to say, well, you can affect people's likelihood of committing suicide by removing this risk factor." (Id.). See also Kleck Dep. Tr. at 78-79. In short, if access "has no causal

effect, then of course it's not public health concern" (Id. at 88). Studies that rely on such correlations or "associated with" assertions to imply a causal connection are, in Dr. Kleck's words, "junk science." Id. at 233-34, 237. In its summary judgment papers, County does not dispute that basic and self-evident proposition.

Indeed, such "junk science" has been rejected repeatedly by the courts. For example, in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 800 (2011), the Supreme Court rejected research by "psychologists whose studies purport to show a connection between exposure to violent video games and harmful effects on children," holding that the studies "do not prove that violent video games *cause* minors to act aggressively (which would at least be a beginning). (Emphasis the Court's). See also *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir.), *cert. denied,* 562 U.S. 893 (2010) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables."); *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 298 (4th Cir. 2017) (affirming district court's exclusion of expert testimony where the expert's data pointed "only to correlation not causation."). Under these principles, this Court should exclude the testimony of the County's experts, as nothing in their reports actually purports to support the pamphlet's claim that persons with access to firearms "are more at risk for suicide than others."

The County does not dispute that such a statement of causal connection "is not supported by the most credible available scientific evidence and is probably false." Kleck Rept. at 3 (P. SJ Exh. G). See also Kleck Dep. Tr. at 48 ("I think there is no convincing evidence that having a firearm has a causal effect on suicide rate. So it's a noncausal correlation or association with suicide."). See Def. SJ. Exh. 3. Indeed, as noted above, in its motion for summary judgment, the County actually *expressly disclaims* any causal connection. The alternative, that the County is now asserting, is that

access to a firearm is merely "correlated" or "associated with" or related to suicide. But, if so, then the pamphlet is scientifically "trivial" and is intentionally misleading the public in asserting, as fact, that people with such access "**are** more at risk of suicide than others." Kleck Dep. Tr. at 254. (Emphasis added).

In Dr. Kleck's view, the proper analysis is to control for confounding factors that have "an influence on both firearms acquisition and ownership and on suicide." Id. at 48. In other words, "both firearms ownership and suicide are consequences of other factors." Id. at 49. According to Dr. Kleck, the strongest such factor is suicidal intent, which can be measured by the "lethality of the methods" people used. Id. at 124. See also Id. at 185, 188, 202-06, 211-14. In short, people use firearms to commit suicide because they really intend to kill themselves. Firearms are thus not the cause of suicide but rather the consequence of a strong suicidal intention. Without access to firearms, "people will just substitute another method if they're really determined to kill themselves. And the evidence more recently has supported the proposition that the people who use guns in a suicide attempt really do want to kill themselves. That is to say, their suicidal intent is far higher than the people who use other methods of suicide." Id. at 153-54. Dr. Kleck expressly relies on earlier studies by other researchers in reaching this conclusion. See Kleck Dep. Tr. at 149-50, 202-203, 206. That reliance included studies by Brent and others. See Kleck Rept. at 6-7, Kleck Dep. Tr. at 265-270.

In ardently insisting that the pamphlet's language merely communicates an "association" or a "correlation," the County necessarily is conceding that any implication of a causal connection would be wrong and thus not "purely factual," much less "uncontroversial." See Kleck Rept. at 3-4 (stating any claim that "access to firearms causes an increased chance a person committing suicide" is not only contrary to "available scientific evidence," it is also "indisputably not purely factual and uncontroversial information"); id., at 5 ("Leaving aside scientific evidence for the moment, the

County's suicide claim is highly controversial in the sense that it is contrary to the views held by the vast majority of Americans."); Kleck Dep. Tr. at 50 (noting that the firearm storage parts of the County's pamphlet "implies that there would be a causal effect on the likelihood of somebody committing suicide through their manner of firearm storage"). As plaintiffs' motion for summary judgment makes clear, evidence of controversy and the absence of "pure statements of fact" are highly material to the proper resolution of this case under *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018), and *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

The County states that the plaintiffs oppose being commandeered by the County "on ideological grounds." (Def. SJ Mem. at 8). But, as Dr. Kleck explains, an ideological animus against firearms underlies much of the literature on which the County relies. Dr. Kleck explains that ideologically motivated and biased researchers transmogrify data showing a mere "association" into conclusions of causal connections, noting that "[o]ften in the public health literature, an author will say it's a risk factor and imply that it's a causal factor." Kleck Dep. at 45. Dr. Kleck testified this bias is particularly prevalent in medical journals addressing firearms, noting "there's a pronounced ideological bias among editors and contributors to the journal on that particular topic." Id. at 193. Such publications on this topic of firearms "regularly accept for publication research that simply doesn't meet minimal scientific standards." Id. at 194. Such evidence of bias is helpful to the Court. As stated in *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 879 F.3d 101, 111 (4th Cir.), *cert. denied*, 138 S.Ct. 2710 (2018), a "statement's factuality" "'does not divorce the speech from its moral or ideological implications.'" (879 F.3d at 110), quoting *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014). That principle applies *a fortiori* to literature implying an erroneous causal connection between suicide and firearms.

Such publications evidencing such flawed conclusions specifically include ones on which the County and its "experts" rely in this case. Id. at 195-200. These studies in particular jump from "correlation" to causation. See Kleck Dep. at 199-200 ("But when you read assertions about gun ownership as a risk factor in context, in medical journals like this one, what they're clearly hinting at, if not explicitly saying, is they think it's a causal factor."). In short, the studies will identify "risk factors" and then imply that these factors actually causally lead to suicide. The County's "expert," Dr. Nilesh Kalyanaraman, makes this flawed implication through his report. Yet, Dr. Kalyanaraman is not even an expert in this field, having "never published a single scholarly article on this issue." Kleck Rept. at 14. All his "report" does is regurgitate the contents of a few studies done by others. It is his testimony that ought to be excluded, not Dr. Kleck's. See, e.g., *Higginbotham v. KCS Int'l, Inc.,* 85 F. App'x 911 (4th Cir. 2004) (affirming the exclusion of expert testimony regarding the design of a ladder in a products liability case when the expert had "no training in metallurgy nor ... in ladder design"). See also Kleck Dep. Tr. at 338 ("Nobody really even quibbles with the notion that personal bias can result in distorted conclusions, use of inappropriate methods, drawing conclusions that didn't really follow from the evidence."). Dr. Kleck himself confessed that he was originally "sympathetic to the proposition that more guns leads to more violence," but was soon was forced to "set aside my personal biases in the face of credible evidence that indicated the opposite, including my own research." Id. at 195. The County's literature in this case is but another example of that bias. Evidence of bias among experts is indisputably relevant. See, e.g., *Davis v. Alaska,* 415 U.S. 308, 316–17 (1974).

## II.   THE COUNTY'S OBJECTIONS GO TO WEIGHT NOT ADMISSIBILITY

The County argues that even if the County's literature could be read to assert a causal relationship between access to firearms and suicide, Dr. Kleck's report and testimony must be

8

excluded because they are supposedly not based on facts or reliable principles and methods. Def. Mem. at 9. Nonsense. Dr. Kleck is a renowned expert and has testified repeatedly as an expert. His credentials and expertise are beyond question, as his report makes clear. Not even the County's "experts" actually deny Dr. Kleck's point that correlation is not causation. Instead, Dr. McCourt's expert report, on which the County relies, is full of assertions that firearms are "associated with" or has a "relationship" with suicide. See McCourt Rept. ¶¶ 2, 4, 5, 8, 10, 13, 16, 22. But, his report contains not a single assertion of causation. Dr. Kleck's point is simply that such studies showing "relationships" or "associations" between firearms and suicide simply do not support a finding that firearms access is a causal factor for suicide. And, again, the County's pamphlet asserts a causal relationship, not merely an association.

That correlation does not prove causation is indisputable. See *Valencia*, 600 F.3d at 425 (5th Cir.) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables."); *Verisign*, 848 F.3d at 298 (affirming district court's exclusion of expert testimony where the expert's data pointed "only to correlation not causation."). Dr. Kleck believes that suicide is more likely caused by suicidal intent and that conclusion is based on specific studies cited by Dr. Kleck in his testimony, a reliance conceded by the County in its motion in limine. Def. Mem. at 19 (referencing the Brent studies). While the County disputes Dr. Kleck's interpretation of those studies, the merits of such contentions are, as explained below, best resolved by the trier of fact, should such resolution even prove necessary. And whether Dr. Kleck's theory is correct or not is immaterial to the point made by Dr. Kleck that the studies on which the County relies overwhelming show nothing more than an "association" or a correlation, not causation. Again, a mere correlation

or an "association" does not support the causal assertion made in the County's literature that persons who have access to a firearm "**are** more at risk for suicide than others." (Emphasis added).

These points made by Dr. Kleck are helpful to the Court, which is no doubt why the County is trying so hard to exclude his testimony. Helpfulness to the trier of fact is "the 'touchstone'" under Rule 702. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Specifically, Rule 702 permits expert testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A review of the case law after *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

Indeed, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Because *Daubert* "did not work a 'sea-change over federal evidence law,' . . . 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Advisory Committee Notes to 2000 Amendments* (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (expert testimony need not be "'irrefutable or certainly correct [because it is] subject to testing by vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof"); *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("'questions regarding the factual underpinnings of the [expert's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'"); *Westberry*, 178 F.3d at 261 (same).

Dr. Kleck's criticism of the County's reliance on studies showing mere "associations" and "relationships" to imply causation is both well supported by the case law, cited above, and is obviously correct. At most, the County's arguments concerning Dr. Kleck's theory that suicidal intent is more likely to be a causal factor in suicide than any access to firearms "go only to the weight of [his] testimony, not its admissibility." *Heckman v. Ryder Truck Rental, Inc.,* No. CIV. CCB-12-664, 2014 WL 3405003, at *3 (D. Md. July 9, 2014).

Indeed, in another case in which Dr. Kleck was an expert witness, this Court recently rejected the defendant's attempt to exclude his testimony on essentially the same reasons the County seeks exclusion in this case, *viz.,* the assertion (Def. Mem. at 8-9) that Dr. Kleck relied on his own studies, which are allegedly "not widely accepted," and failed to rely on "peer reviewed" studies, which, in this case, are the very studies criticized by Dr. Kleck as fatally infected by bias and other flaws. See *Maryland Shall Issue, Inc., v. Hogan*, 2021 WL 3172273 at *9-*10 (D.Md. 2021). In essence, the County wishes to blind this Court to any criticism of its "peer reviewed" studies. That is not science, it is group-think. Dr. Kleck's critique of the County's studies effectively destroys the scientific basis for the County's assertion of causation in its literature. It is thus hardly surprising that the County so desperately seeks to exclude his testimony.

Like here, Dr. Kleck's testimony in that case focused on the flaws in the experts' reports submitted by the defendant. Id. at *9-*10. This Court, per Judge Hollander, held that Dr. Kleck's

testimony was fully admissible. Judge Hollander noted that "the Fourth Circuit has explained: 'The fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.'" Id. at *10, quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 594). Judge Hollander found that "Kleck's opinions" were "relevant" to the issues presented in the case no less than the opinions of the defendant's experts (id), and concluded that "Kleck's testimony is based on research that he was entitled to consider" and was thus admissible. Id. at *11. So too here.

## CONCLUSION

The County's motion in limine should be denied.

>Respectfully submitted,
>
>*/s/ Mark W. Pennak*
>
>MARK W. PENNAK
>MARYLAND SHALL ISSUE, INC.
>9613 Harford Rd., Ste C #1015
>Baltimore, MD 21234-21502
>mpennak@marylandshallissue.org
>Phone: (301) 873-3671
>MD Atty No. 1905150005
>District Court Bar No. 21033