## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150,**

|  |  |  |
|---|---|---|
| | *Plaintiffs,* | **No.:   1:22-cv-00865-SAG** |
| | **v.** | |

**ANNE ARUNDEL COUNTY,**
**MARYLAND**
**44 Calvert Street**
**Annapolis, MD 21401,**

         *Defendant.*

### MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT AND
### REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**MARK W. PENNAK**
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
District Court Bar No. 21033

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

I.  BILL 108-21 IS SUBJECT TO STRICT SCRUTINY ......................................... 2

  A.  The County's Message ........................................................................................ 2

  B.  *Zauderer* Is Inapposite ........................................................................................ 8

    1.  *Zauderer* is strictly limited.......................................................................... 8

    2.  Bill 108-21 is not "about the terms under which services will be available".................. 10

    3.  The County's literature is not "purely factual and uncontroversial" ............................... 13

  C.  The County's Other Arguments Are Meritless ................................................. 17

III. MSI MEMBERS HAVE STANDING ................................................................ 24

  A.  The Rights of MSI Members Are Adversely Affected By The Bill ................. 25

  B.  MSI Members Have Third-Party Standing to Protect The Rights of Dealers.................... 29

IV. RELIEF REQUESTED ....................................................................................... 31

CONCLUSION............................................................................................................ 33

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.,** *et al.,*
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150,**

                *Plaintiffs,*               **No.:   1:22-cv-00865-SAG**

                **v.**

**ANNE ARUNDEL COUNTY,**
**MARYLAND**
**44 Calvert Street**
**Annapolis, MD 21401,**

                *Defendant.*

### MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
### REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs respectfully submit this memorandum in opposition to the defendant, Anne Arundel County's ("the County"), motion for summary judgment and as a Reply in further support of plaintiffs' motion for summary judgment. For the reasons set forth below and in plaintiffs' Motion for Summary Judgment and supporting Memorandum (filed September 30, 2022), plaintiffs' motion for summary judgment should be granted and the County's motion denied.

### INTRODUCTION

The County does not deny that Bill 108-21 imposes content-based, compelled speech and is thus presumptively unconstitutional under the First Amendment. The County thus makes no attempt to justify its enactment of Bill 108-21 under the strict scrutiny standard of review articulated in *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018) ("*NIFLA*").

The County thus effectively concedes that if strict scrutiny applies, then Bill 108-21 must fail. Rather, the County has hinged its hopes of prevailing solely on the notion that Bill 108-21 regulates only "commercial speech" under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985), and is thus, according to the County, subject only to rational basis review. That argument is flawed in the multiple ways detailed below.

## I.      BILL 108-21 IS SUBJECT TO STRICT SCRUTINY

### A.      The County's Message

The County's multipage pamphlet, entitled "Firearms and Suicide Prevention" (Complaint Exh. B) flatly states that "Some People are More at Risk for Suicide than Others" and includes within that category people who have "Access to lethal means, including firearms and drugs." On its face, that is an assertion of causal effect, *i.e.,* that mere "access" to firearms makes a person "more at risk for suicide." On the same page, the pamphlet states that "Risk factors are characteristics or conditions that increase the chance that a person may try to take their life." Plaintiffs' expert, Dr. Kleck, thus testified at his deposition that this pamphlet effectively states that "possession of a gun or ownership of a gun increases the likelihood one will commit suicide." Kleck Dep. Tr. at 15 (Def. Exh. 3). See also Kleck Dep. at 93-94 (Q. Okay. Where on this page is the statement that you evaluated for purposes of your report? A. First of all, the title of the page as a whole, as you said, Some People Are More At Risk For Suicide Than Others, that introduces the topic of risk factors, which is reinforced in the lower right text, which reads, 'Risk factors are characteristics or conditions that increase the chance that a person may try to take their life.' That's unambiguously an assertion about causal effects."). As he further explained, "implicit in the notion that owning a gun is a risk factor for suicide, and any reader would think suicide is a bad thing, then the implication is – the recommendation implied is don't own a gun." Id. at 18.

That same reading is shared by the plaintiff dealers and MSI members. See Response of plaintiff dealers to Interr. Nos. 1 (P. SJ Exhs A-D) ("Requiring firearms dealers to display the County's publications on suicide and conflict resolution sends the message that the purchase and possession of firearms and ammunition is causally related to increased risk of suicide and/or an illegal use of firearms and ammunition in conflict resolution."); id. at Interr. Nos. 2-3, 9 (same); MSI Response to Interr. Nos. 1, 7, 14, 15 (P. SJ Exh. E) (same). See also Pasadena Arms Dep. Tr. at 42 ("I said putting them together and it tells me that this is all one package that firearms are causing the issue" and that "this message is against firearms"), Id. at 29 ("Firearms don't cause suicide. Suicide is the problem, not firearms."). (Pl. Exh. J); Cindy's Hot Shots Dep. Tr. at 79-80 ("Q. And so the message that firearms and ammunition are causally related to the illegal use of firearms and ammunition and conflict resolution is something you derive from these two pamphlets being together? A. Yes.) (Pl. Exh. I); Field Traders Dep. Tr. at 63 ("Q. * * * Is it your understanding that the access to lethal means risk factor, inclusion on this list of risk factors means that having access to a firearm means you are more likely to use it to commit suicide than not? A. That is correct"). (P. SJ Exh. H). These are common-sense readings of the pamphlets. Resort to everyday, common use of words is controlling here because the pamphlets are distributed *to the public*.

Remarkably, the County denies that the pamphlet says what it says, asserting that "no reasonable reader would understand the pamphlet to convey a message that guns cause suicides." (Def. Mem. at 22). Nonsense. Quite to the contrary, every "reasonable reader" cannot miss the pamphlet's express assertion that persons with "access" to "firearms" "are more at risk of suicide." Indeed, the County itself makes no attempt to parse the actual language of the pamphlet. Instead, the County resorts to the assertion that the pamphlet merely states that firearms are "*correlated or associated* with suicide, *and in this sense* are a risk factor for suicide." (Def. Mem. at 20) (emphasis

added). Perhaps recognizing that these terms are not used in the pamphlet, the County argues that the term "risk factor" is a "designation commonly understood in the field of public health and epidemiology to *be associated with* an outcome, regardless of whether or not it actually *causes* the outcome." (Def. Mem. at 22) (emphasis in original). The County repeats this mantra through its memorandum. See Def. Mem. at 2, 7, 21, 22 n.26. In other words, according to the County, "any reasonable reader" would know how the term is used in "the field of public health and epidemiology." That argument is facially absurd.

The hard reality is that the pamphlet never states that access to firearms is merely "associated with" suicide. Quite to the contrary, as explained above, the pamphlet states that "[r]isk factors are characteristics or conditions that increase the chance that a person may try to take their life" and asserts that persons with mere "access" to firearms **"are** more at risk of suicide." As Dr. Kleck states, "[t]hat's unambiguously an assertion about causal effects." (Kleck Dep. Tr. at 94). In short, the term "risk factor" is used in the plain language of the pamphlet as a statement of causation, not merely as a statement of "correlation," as the County now asserts. Certainly, the term "risk factor" is not defined *in the pamphlet* by reference to the "field of public health and epidemiology," the source which the County now claims must be consulted for the meaning of the term.

Dr. Kleck explains that if the term "risk factor" is understood "to mean nothing more than a correlate" then it "is trivial" because "it could be cause, it could be consequence." Kleck Dep. Tr. at 44. He further notes that "[o]ften in the public health literature, an author will say it's a risk factor and imply that it's a causal factor, because they then draw a conclusion about how you might, in this case, prevent suicide. Well, of course, you can't prevent suicide by eliminating something that's merely coincidentally associated with suicide. It's got to be a factor that has some causal effect." Kleck Dep. at 45. In other words, the assertion that access to firearms is "associated" with suicide,

4

"implies that risk factor is a causal factor. Otherwise, it wouldn't make any sense to say, well, you can affect people's likelihood of committing suicide by removing this risk factor." (Id.). See also Kleck Dep. Tr. at 78-79. In short, if access "has no causal effect, then of course it's not public health concern." (Id. at 88). Studies that rely on such correlations or "associated with" assertions to imply a causal connection are, in Dr. Kleck's words, "junk science." Id. at 233-34, 237. The County does not dispute that basic and self-evident proposition.

As written, the County's pamphlet is committing the classic logical fallacy of *Post Hoc Ergo Propter Hoc* and/or *Cum Hoc Ergo Propter Hoc*. Specifically, the County's assertion, in its brief, that access to firearms is "correlated" or "associated with" suicide and is thus a risk factor "***in this sense***" (Def. Mem. at 20) (emphasis added) is logical nonsense. Without a showing of causation, the County's assertion is akin to asserting that hospitals are a risk factor for sickness because hospitals are full of sick people (*Cum Hoc Ergo Propter Hoc*), or black cats are a "risk factor" for falls off ladders because a cat walked under the ladder right before the fall (*Post Hoc Ergo Propter Hoc*). See *McClain v. Metabolife Intern. Inc*., 401 F.3d 1233, 1243 (11th Cir. 2005) (discussing the *Post Hoc* fallacy); *Ohio v. U.S. Dept. of the Interior*, 880 F.2d 432, 473 (D.C. Cir. 1989) (same); *Florence v. Board of Chosen Freeholders of County of Burlington,* 621 F.3d 296, 311-12 (3d Cir. 2010) (Pollak, J. dissenting) (discussing the *Cum Hoc* fallacy); *Ortzian v. McNeilus Truck & Mrg., Inc.,* 2008 WL 5118608 at *4 (D. N.J. (2008) (same and directing entry of a directed verdict for failure of proof on that basis).

Indeed, such "junk science" has been rejected repeatedly by the courts. For example, in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 800 (2011), the Supreme Court struck down, on First Amendment grounds, a California statute that imposed restrictions and labeling

requirements on "violent video games." In so holding, the Court rejected California's reliance on research by "psychologists whose studies purport to show a connection between exposure to violent video games and harmful effects on children," holding that the studies "do not prove that violent video games *cause* minors to act aggressively (which would at least be a beginning). (564 U.S. at 800) (emphasis the Court's). The Court went on to note that "[n]early all of the research is based on correlation, not evidence of causation" and thus "have been rejected by every court to consider them." (Id.) (citation omitted). See also *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir.), *cert. denied,* 562 U.S. 893 (2010) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables."); *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 298 (4th Cir. 2017) (affirming district court's exclusion of expert testimony where the expert's data pointed "only to correlation not causation.").

As explained, the pamphlet's actual language flatly asserts that mere access to firearms is a causal risk factor for suicide. Yet, the County does not actually defend that language, thus conceding that such a statement of causal connection "is not supported by the most credible available scientific evidence and is probably false." Kleck Rept. at 3 (P. SJ Exh. G). See also Kleck Dep. Tr. at 48 ("I think there is no convincing evidence that having a firearm has a causal effect on suicide rate. So it's a non-causal correlation or association with suicide."). Indeed, as noted above, the County now *expressly disclaims* any causal connection. The alternative, that the County is now asserting, is that access to a firearm is merely "correlated" or "associated with" suicide. But, if so, then the pamphlet is scientifically "trivial" and is intentionally misleading the public in asserting, as fact, that people with such access "**are** more at risk of suicide." The County's argument fails either way. Cf. Hamill, et al., *Legal Firearm Sales at State Level and Rates of Violent Crime, Property Crime, and*

6

*Homicides,* Journal of Surgical Research, Volume 281, Pages 143-154 (January 2023) ("Robust analysis does not identify an association between increased lawful firearm sales and rates of crime or homicide.").

The proper analysis is to control for confounding factors that have "an influence on both firearms acquisition and ownership and on suicide." Id. at 48. In other words, "both firearms ownership and suicide are consequences of other factors." Id. at 49. According to Dr. Kleck, the strongest such factor is suicidal intent, which can be measured by the "lethality of the methods" people used. Id. at 124. See also Id. at 185, 188, 202-06, 211-14. In short, people use firearms to commit suicide because they really intend to kill themselves. Firearms are thus not the cause of suicide but rather of the consequence of a strong suicidal intention. Without access to firearms, "people will just substitute another method if they're really determined to kill themselves. And the evidence more recently has supported the proposition that the people who use guns in a suicide attempt really do want to kill themselves. That is to say, their suicidal intent is far higher than the people who use other methods of suicide." Id. at 153-54.

Substitution of method is easy. If a firearm is not present then a person could simply commit suicide by hanging and the County does not dispute "there's no significant difference in the fatality rates or case fatality rates of suicide attempts by hanging and suicide by firearms." Id. at 154. See also id. at 185. Rope suitable for hanging is, of course, readily available at any hardware store. And there are a multitude of other ways of committing suicide that are virtually guaranteed to cause

7

death, such as jumping in front of an oncoming train,[1] or leaping from tall buildings or bridges.[2] See also Kleck Dep. Tr. at 205. "There is no public health benefit to merely getting people to kill themselves with non-firearms methods but without reducing the total number of people who kill themselves." Kleck Rept. at 13-14. Limiting access to firearms simply does not cause a reduction in suicides. Id.

### B.   *Zauderer* Is Inapposite

#### 1.   *Zauderer* is strictly limited

As noted, the County makes no attempt to justify Bill 108-21 under strict scrutiny. Rather, the County's sole argument in this case is that compelled speech is "commercial speech" and, as such, is justified under *Zauderer*. That argument fails for the all reasons set forth in plaintiffs' opening brief which anticipated and addressed precisely this argument. See P. Mem. at 14-18. The County's attempt to rebut that discussion borders on the frivolous.

To recap. *Zauderer* assessed the constitutionality of restraints on advertising and solicitation by attorneys. The Court first held that "'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech,'" finding that the "speech at issue" in *Zauderer*, was commercial speech because it restricted "advertising pure and simple." (471 U.S. at 637). The Court stated that "[t]he States and the Federal

---

[1] https://www.wusa9.com/article/news/local/maryland/jessup-shooting-suspect-killed-in-apparent-suicide-struck-by-marc-train/65-105981624;
https://pubmed.ncbi.nlm.nih.gov/19696595/ ; https://www.cambridgeday.com/2022/01/31/red-line-was-shut-down-for-five-hours-sunday-after-a-suicide-by-train-and-buses-failed-riders//

[2] https://www.nbcnewyork.com/news/local/mans-death-marks-fifth-suicide-leap-in-five-weeks-at-george-washington-bridge/260732/ ; https://www.jstor.org/stable/10.1525/j.ctt1pn5tj ; https://www.washingtonpost.com/dc-md-va/2022/09/07/chesapeake-bay-bridge-suicide-son-prevention/.

8

Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, * * * or that proposes an illegal transaction." Id. at 638. Applying these principles in *Zauderer*, the Court sustained a requirement that "an attorney advertising his availability on a contingent fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful." 471 U.S. at 652. The Court reasoned that the State had not attempted to prescribe what was "orthodox" in "matters of opinion," but only what was "orthodox *in commercial advertising*" by a requirement that the attorney "include in his advertising purely factual and uncontroversial information about the terms under which his services will be available." 471 U.S. at 651 (emphasis added).

As noted in plaintiffs' opening brief (P. Mem. at 14), *NIFLA* sharply enforced these limits on the reach of *Zauderer*, holding the more deferential view permitted by *Zauderer* is "limited to 'purely factual and uncontroversial information about the terms under which ... services will be available.'" *NIFLA*, 138 S.Ct.. at 2172, quoting *Zauderer*, 471 U.S. at 651. The Court then reiterated its holding in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995), that "***Zauderer* does not apply outside of these circumstances**." *NIFLA*, 138 S.Ct. at 2172 (emphasis added). As explained in *Hurley*, while the State "may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' *outside that context it may not compel affirmance of a belief with which the speaker disagrees*." *Hurley*, 515 U.S. at 573 (citations omitted) (emphasis added).

These holdings could not be clearer. To be permissible under *Zauderer*, as limited by *NIFLA*, the compelled speech must be (1) "limited to purely factual and uncontroversial information," *and* (2) the compelled speech must be "about the terms under which services will be available." In addition, under *NIFLA*, governments may not "impose content-based restrictions on speech without

persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." *NIFLA*, 138 S.Ct. at 2372 (cleaned up). Thus, in *NIFLA*, the Court rejected the holding that professional speech was "a separate category of speech." Id. at 2371-72.

### 2.    Bill 108-21 is not "about the terms under which services will be available"

The County's literature fails both prongs of the *NIFLA* test. First, and perhaps most obvious, the literature compelled by Bill 108-21 is not remotely "about the terms under which services will be available" from the plaintiffs dealers. On their face, the pamphlets address suicide. Both pamphlets seek to convey information about suicide and services for suicide prevention. The back page of the suicide pamphlet is devoted to listing "resources" available for suicide prevention. The one-page "conflict resolution" pamphlet conveys specific information for accessing the County's suicide prevention "toolkit" and lists multiple County "resources" for conflict resolution and suicide prevention, such as the police, the County "Warmline," and "Veteran's Crisis Line." The plaintiff dealers sell firearms and ammunition; they do not provide suicide prevention or "conflict resolution" services.

Indeed, *Zauderer* presented a situation where the State was requiring additional information as part of speech (advertising) that the attorneys were otherwise voluntarily making in order to prevent consumer deception that could arise from the attorneys' speech. *Zauderer*, 471 U.S. at 651. Bill 108-21 is not so limited. Rather, the Bill requires the plaintiff dealers to "make visible and available" and distribute with each sale the County's literature regardless of whether the dealer conducts any advertising or undertakes any speech at all. The Bill's display requirement obtains regardless of whether the dealer makes any sales. And the distribution requirement for each sale is imposed without regard to the dealer's speech. Thus, unlike *Zauderer*, the compelled speech here cannot possibly be justified as necessary "to dissipate the possibility of consumer confusion or

deception" that could otherwise arise from the dealer's speech. *Zauderer*, 471 U.S. at 651. As *Zauderer* states, State regulation of speech in such circumstances is permissible "*as long as* disclosure requirements are reasonably related to the State's interest in *preventing deception of consumers*." Id. (emphasis added). Those concerns are entirely absent here.

Relatedly, the County utterly ignores the requirement imposed in *Zauderer* and reaffirmed in *NIFLA* that the compelled speech must be "'about the terms under which ... services will be available.'" *NIFLA*, 138 S.Ct.. at 2172, quoting *Zauderer*, 471 U.S. at 651. It likewise ignores the holding in *NIFLA* that "*Zauderer* does not apply" if that "circumstance" is not present. *NIFLA*, 138 S.Ct. at 2172. The absence of this circumstance is, of course, fatal to the County's reliance on *Zauderer*. Indeed, even prior to *NILFA*, the Fourth Circuit applied this limitation in *Zauderer*. In *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir.), *cert. denied,* 138 S.Ct. 2710 (2018), the Fourth Circuit rejected Baltimore's argument that compelled speech related to advertising, noting that nothing in the Baltimore's compelled speech ordinance "directly regulated misleading advertising itself." The court noted further that "the Baltimore ordinance applies to the pregnancy centers regardless of whether they advertise at all." Id. at 108-09. So too here.

Instead, the County attempts a sleight of hand, arguing that the literature regulates commercial speech under *Zauderer* because it is about firearms and ammunition which are "being sold" by the plaintiff dealers in commercial transactions. (Def. Mem. at 14). That argument is flawed for at least two reasons. First, as in *Greater Baltimore Center,* the display requirement imposed by the Bill is not dependent on *any* sale at all and thus the County's arguments fails in its premise. In *Zauderer*, the government was regulating speech (advertisements) that was otherwise being voluntarily undertaken by the regulated party. Here, in contrast, the Bill thus does not purport

11

regulate a dealer's speech for some sufficient regulatory purpose; it compels speech, *qua* speech, simply to promote a County ideological agenda, precisely the situation presented in *Greater Baltimore Center* and *NIFLA*.

Second, and relatedly, the County's reading of *Zauderer* would allow the government to compel speech about any product being sold in any commercial transactions without regard to whether the compelled speech is "*about* the terms of service" for such sales. *NIFLA*, 138 S.Ct. at 2372 (emphasis added). Here, the pamphlets are "about" suicide as well as "about" County services for conflict resolution. While the County asserts the pamphlets *also* relate to firearms (on the erroneous premise that access to firearms increases the risk of suicide), nothing in the pamphlets is "about" the dealers' "terms of service" for the firearms being sold. Nothing in *Zauderer* or *NIFLA* permits such compelled speech having **nothing** to do with the vendor's "services" or terms of sale, or speech otherwise being undertaken by the vendor in advertising or otherwise.

The County's approach would allow it to compel speech over any specific item of commerce being sold regardless of whether it is "about the terms of services" for such item. For example, the County could push an ideological global warming agenda by compelling an automobile dealer or manufacturer to distribute County literature extolling the merits of all-electric vehicles. Or the County could compel every service station dealer to distribute literature on the supposed evils of internal combustion engines because such engines contribute to air pollution. Allowing such compelled speech would divorce the compelled speech from the underlying purpose identified in *Zauderer*, which is to permit States to regulate "the terms" under which "services will be available." It would allow compelled speech without regard to whether it was for the prevention of consumer deception. *Zauderer*, 471 U.S. at 651. Such a reading of *Zauderer* and *NIFLA* would impermissibly allow the government to create "new categories of speech for diminished constitutional protection"

wherever the County could claim that it had a "substantial interest" in the matter at hand. *NIFLA*, 138 S.Ct. at 2372. The potential for abuse is endless. See *NIFLA*, 138 S.Ct. at 2372 (the Court "has been especially reluctant to 'exemp[t] a category of speech from the normal prohibition on content-based restrictions.'"). (Citation omitted).

### 3.      The County's literature is not "purely factual and uncontroversial"

There is nothing remotely "purely factual and uncontroversial" about the County's literature. As explained above, Bill 108-21 is limited to firearms dealers and sellers of ammunition and the literature is premised on the message that mere access to firearms and ammunition places people "more at risk of suicide." While the County argues vigorously that the literature merely says that access is merely "associated with" or "correlated" with suicide rather than being a causal factor for suicide (Def. Mem. at 21), that assertion is, as explained above, contradicted by the plain language of the pamphlet. At a minimum, the "implication" of causal effect is unmistakable from the language used in the pamphlet. After all, the pamphlet expressly states that people with access to firearms "**are** more at risk for suicide than others." That is an assertion of causation.

In ardently insisting that this language merely communicates an "association" or a "correlation," the County necessarily is conceding that any such implication of a causal connection would be wrong and thus not "purely factual," much less "uncontroversial." See Kleck Rept. at 3-4 (stating any claim that "access to firearms causes an increased chance a person committing suicide" is not only contrary to "available scientific evidence," it is also "indisputably not purely factual and uncontroversial information"); id., at 5 ("Leaving aside scientific evidence for the moment, the County's suicide claim is highly controversial in the sense that it is contrary to the views held by the vast majority of Americans."); Kleck Dep. Tr. at 50 (noting that the firearm storage parts of the

13

County's pamphlet "implies that there would be a causal effect on the likelihood of somebody committing suicide through their manner of firearm storage").

Given that the literature can be fairly read as making a claim of causation, that reality is fatal to the County's claim. The plaintiff dealers may no more be compelled to endorse such erroneous implications than they can be made to endorse a wrong statement of fact. See, e.g., *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) (invalidating compelled disclosure on video game packaging, noting that the disclosure would "*arguably* now convey a false statement that certain conduct is illegal when it is not, and the State has no legitimate reason to force retailers to affix false information on their products") (emphasis added). As stated in *Greater Baltimore Center,* 879 F.3d at 11, a "statement's factuality" "'does not divorce the speech from its moral or ideological implications.'" (879 F.3d at 110), quoting *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014). That principle applies *a fortiori* to statements and literature implying an erroneous causal connection between suicide and firearms.

The County argues that its belief that firearms are "associated with" or "correlated" to suicides is well-supported by the scientific literature. (Def. Mem. at 6). That argument is irrelevant here because, as noted, the County's compelled literature contends that access to firearms is a *causal* factor in suicide, not merely a factor "associated with" suicide. The County dismisses plaintiffs' objections, asserting the plaintiffs oppose being commandeered by the County merely "on ideological grounds." (Def. Mem. at 8). Just so. Plaintiffs certainly do not share the County's ideological animus against firearms and cannot be forced to parrot the County's line as if it were some sacred passage from Mao's Little Red Book. As the Fourth Circuit has stated, "[t]he dangers of compelled speech in an area as ideologically sensitive and spiritually fraught as this one require that the government not overplay its hand." *Greater Baltimore Center*, 879 F.3d at 113. The County

14

makes much of the fact that the NSSF, a firearms industry trade association, has bought into the County's line in co-authoring the suicide pamphlet. (Def. Mem. at 25). But the NSSF is a mere trade association with its own agenda to promote and does not speak for plaintiffs. See Kleck Dep. Tr. at 334-35 (addressing NSSF's views, noting that "there's no foundation in the scientific literature for those assertions"). The plaintiffs are no more bound by the NSSF's views than they are by the County's.

Firearms and suicide may or may not be seen as a "spiritual" issue, but people's beliefs concerning the merits of firearm possession are no less ideological than abortion at issue in *Greater Baltimore Center*. And, like abortion, the sale and possession of firearms is highly controversial in the United States. See, e.g, https://academicinfluence.com/inflection/controversial-topics/controversial-topic-gun-control. See also *Wooley v. Maynard*, 430 U.S. 705, 717, n. 15, 715 (1977) (observing that a vehicle "is readily associated with its operator" and that drivers displaying license plates "use their private property as a 'mobile billboard' for the State's ideological message"); *Johanns v. Livestock Marketing Ass'n.*, 544 U.S. 550 557 (2005) (same). Here, as in *Greater Baltimore Center*, the County has "[w]eaponiz[ed] the means of government against ideological foes." 879 F.3d at 113. "[I]t is not too much to ask" that the County "lay down the arms of compelled speech and wield only the tools of persuasion." Id. Ideological disagreement is a reason *to protect* the dealers in this case against the County's overreach. It is not a reason, as the County would have it, to run roughshod over the dealers with the imposition of compelled speech.

Indeed, the same ideological animus against firearms underlies much of the literature on which the County relies. Dr. Kleck explains that ideologically motivated and biased researchers transmogrify data showing a mere "association" into conclusions of causal connections, noting that "[o]ften in the public health literature, an author will say it's a risk factor and imply that it's a causal

15

factor." Kleck Dep. at 45. Dr. Kleck testified that this bias is particularly prevalent in medical journals addressing firearms, noting "there's a pronounced ideological bias among editors and contributors to the journal on that particular topic." Id. at 193. Such publications on this topic of firearms "regularly accept for publication research that simply doesn't meet minimal scientific standards." Id. at 194.

Such publications specifically include ones on which the County relies in this case. Id. at 195-200. These studies in particular jump from "correlation" to causation. See Kleck Dep. at 199-200 ("But when you read assertions about gun ownership as a risk factor in context, in medical journals like this one, what they're clearly hinting at, if not explicitly saying, is they think it's a causal factor."). See also Kleck Dep. Tr. at 338 ("Nobody really even quibbles with the notion that personal bias can result in distorted conclusions, use of inappropriate methods, drawing conclusions that didn't really follow from the evidence."). Indeed, Dr. Kleck himself confessed that he was originally "sympathetic to the proposition that more guns leads to more violence," but was soon forced to "set aside my personal biases in the face of credible evidence that indicated the opposite, including my own research." Id. at 195. The County's literature in this case is but another example of that bias.

Of course, this Court need not decide whether these journals and researchers are fatally infected with anti-gun bias in order to decide this case. Here, the County's bias is plain for all to see for the suicide pamphlet undeniably states that persons with access to firearms "are more at risk for suicide than others," thus making clear the County's belief that there is a causal connection. The County's naked denial that the literature says what it says (Def. Mem. at 22) simply confirms that the literature is indefensible as written. The County makes no attempt to defend that causal

connection belief in its brief in this Court. That reality is alone sufficient to make clear that the literature is not "purely factual and uncontroversial."

### C.      The County's Other Arguments Are Meritless

The County first insists that *Zauderer* is not limited to the "circumstances" at issue in *Zauderer* and identified in *NIFLA*, but extends as well to allow the County to regulate any commercial speech if the County has a "substantial interest in public safety" and the compelled speech "consists of purely factual and uncontroversial information and is not unduly burdensome." (Def. Mem. at 11). That argument ignores *NIFLA* which expressly held that compelled speech must *not only* be limited to "purely factual and controversial information," but that the compelled information must *also* be "about the terms under which ... services will be available." *NIFLA*, 138 S.Ct. at 2372. Indeed, the Court expressly ruled that the licensed notice there at issue was "not limited to purely factual and uncontroversial information about the terms under which ... services w[ould] be available," because the notice "in no way relate[d] to the services that licensed clinics provide." Id. In addition, *NIFLA* made clear that governments may not "impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." Id. (citation omitted). *NIFLA* holds that "***Zauderer* does not apply outside of these circumstances**." Id. (emphasis added). The County skips over these express limitations on *Zauderer*.

The County's attempt to distinguish *NIFLA* (Def. Mem. at 27-28) likewise fails. The County notes that the Court in *NIFLA* did not question "'the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products.'" Def. Mem. at 27, quoting *NIFLA*, 138 S.Ct. at 2376. That statement in *NIFLA* cannot be reasonably read as somehow limiting the Court's express holding, earlier in the opinion, that

*Zauderer* was limited to the "circumstances" identified by the Court. The Court did not explain what it meant in its reference to "health and safety warnings," but it is safe to conclude that the Court was referring to purely factual and uncontroversial health and safety warnings about the ordinary and expected *use* of the product being advertised and sold by the regulated entity. For example, *Zauderer*, as construed in *NIFLA*, would permit purely factual and uncontroversial "health warnings for sugary drinks" in advertising. *Tingley v. Ferguson*, 47 F.4th 1055, 1075 (9th Cir. 2022).

The County literature at issue here simply is not that type of "health and safety warning." *Nothing* in the County's literature actually contains such a "warning." The County's pamphlets do not even "warn" that firearms can be dangerous. As Dr. Kleck confirms, people with strong suicidal intent who use firearms to commit suicide choose that method knowing full well that actual suicide is likely to result. That's the whole point for that choice of method. The normal and expected use of firearms is for perfectly lawful reasons -- not to commit suicide. After all, suicide was a crime at common law. *Brown v. Harris*, 240 F.3d 383, 386 (4th Cir. 2001).

The County's literature is not a "warning," it is information about the County's services and policy concerns about suicide and conflict resolution. That sort of informational campaign simply may not be forced upon unwilling dealers, much less their customers, under *Zauderer*. See *Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1, 15 n.12 (1986) ("Nothing in *Zauderer* suggests, however, that the State is equally free to require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views."), cited with approval in *Hurley*, 515 U.S. at 575. Certainly, the County has not carried its burden of showing any "persuasive evidence of a long (if heretofore unrecognized) tradition" of forcing vendors to act as unwilling agents for a governmental informational campaign. *NIFLA*, 138 S.Ct. at 2372 (cleaned up). Indeed, as *NIFLA*, *Hurley* and

18

*Greater Baltimore Center* illustrate, *every* such attempt to coerce such participation has been struck down under the First Amendment.

The limited nature of the *NIFLA*'s reference to "health and safety warnings" is made clear by the rest of the Court's opinion. Specifically, that statement was rendered in the context of the Court's *rejection* of the underlying health rationale proffered by California as justification in that case. *NIFLA*, 138 S.Ct. at 2369 ("The stated purpose of the FACT Act, including its licensed notice requirement, is to 'ensure that California residents make their personal reproductive health care decisions knowing their rights and the health care services available to them.'") (citation omitted). The Court held that California could "inform low-income women about its services 'without burdening a speaker with unwanted speech.'" *NIFLA*, 138 S.Ct. at 2376, quoting *Riley v. National Federation of the Blind*, 487 U.S. 781, 800 (1988). The Court stressed that "California could even post the information on public property near crisis pregnancy centers," concluding that California failed to "prove that an advertising campaign is not a sufficient alternative." Id., citing *United States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

Here, the County justifies Bill 108-21 for the same, informational reasons proffered by California in *NIFLA*. Def. Mem. at 3-5. As in *NIFLA*, there is nothing stopping the County from providing all this information itself "without burdening a speaker with unwanted speech." Here, as in *NIFLA*, the County has not proved that a County advertising campaign "is not a sufficient alternative" to compelled speech. See also *Greater Baltimore Center*, 879 F.3d at 112 ("we are unpersuaded that the City could not pursue its goals through less restrictive means"). In short, *NIFLA* makes clear that where the government may not impose compelled speech simply to dragoon others

into publicizing the County's own (or third-party) services or ideological policy preferences. That result in *NIFLA* is fully consistent with the Court's narrow reading of *Zauderer* as limited to compelled speech concerning "the terms" under which "services" are rendered by the regulated party. 138 S.Ct. at 2372. In short, *NIFLA* is not only apposite, it is controlling.

The County concedes (as it must) that the pamphlets concern services rendered by the County or by third-parties, but lamely argues that the pamphlets contain other information as well. (Def. Mem. at 28). However, the "conflict resolution" pamphlet is *completely* about County services, so the County's point does not apply to that compelled speech at all. Similarly, the last page of the suicide pamphlet is likewise addressed solely to suicide "resources" provided by third parties. The rest of that pamphlet addresses suicide, including making the "likely false" statement that persons with mere "access" to firearms "are more at risk for suicide than others." But, the plaintiff dealers are not in the suicide prevention business, so nothing in the pamphlet can be said to regulate the terms of services provided by dealers. While this pamphlet identifies types of "safe storage" devices it does so in the context of its assertion that mere access to firearms is a causal factor for suicide. Nothing about the pamphlet relates to the "terms" for the sale of safe storage devices. The pamphlet does not provide any "health and safety warnings" about any issues arising from the actual intended **use** of these safe storage devices. The pamphlet was intended to *promote* the use of such devices, not "warn" about such use.

The County's extraordinarily heavy reliance (Def. Mem. at 11-12, 16-17, 19-22, 24, 26-27, 29-30) on *Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022), is particularly meritless. In fact, *Recht* actually supports plaintiffs. *Recht* involved a State statute that regulated legal advertisements soliciting clients for litigation involving medications or medical devices. The statute restricted the terms of such advertisements and required health and safety disclosures stating that discontinuing

medications "'can result in injury or death'" and that patients should "consult[] their doctors" in those circumstances. 32 F.4th at 416. The Fourth Circuit first sustained the restrictions imposed on speech by the statute, applying the intermediate scrutiny test of *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561(1980). See *Recht*, 32 F.4th at 410 ("Applying *Central Hudson*'s framework, we conclude that the Act's prohibitions survive constitutional scrutiny."). Here, in contrast, the County seeks summary judgment *solely* under *Zauderer*, and expressly *disclaims* any attempt to justify the Bill under the intermediate scrutiny, the test applied in *Central Hudson*. (Def. Mem. 11). The County does not even cite *Central Hudson* in its brief.

That omission can only be read as a concession that Bill 108-21 is indefensible under *Central Hudson*. And that conclusion would be correct. As explained in *Recht*, *Central Hudson* applies solely to commercial speech, which is defined as "'expression related *solely* to the economic interests of the speaker and its audience.'" *Recht*, 32 F.4th at 407, quoting *Central Hudson*, 447 U.S. at 561 (emphasis added). That commercial speech is still entitled to constitutional protection under intermediate scrutiny. Under that test, commercial speech may be regulated if it concerns lawful activity that was not misleading and where the asserted governmental interest is substantial and the regulation "directly advances the governmental interest asserted." 32 F.4th at 408, quoting *Central Hudson*, 447 U.S. at 566. The County does not attempt to apply that test here.

There was no dispute in *Recht* that the restrictions imposed by the statute at issue regulated commercial speech under *Central Hudson*. *Recht*, 32 F.4th at 409-10 (noting the "[b]egrudging" acknowledgement of plaintiffs in that case). The court of appeals thus proceeded to apply the *Central Hudson* factors to sustain the statute's restrictions on commercial speech. 32 F.4th at 410-16. Here, of course, the County's literature is not a *restriction* on speech, it is a mandatory *disclosure*

requirement and the County's mandated literature certainly does not relate "solely [or at all] to the economic interests of the speaker and its audience."

After sustaining, under *Central Hudson,* the constitutionality of the *restrictions* imposed on the commercial speech there at issue, the *Recht* court then turned to "the Act's disclosure requirements," holding these requirements were constitutional under *Zauderer.* 32 F.4th at 416. In so holding, the court sharply distinguished *NIFLA*, holding that the disclosure requirement at issue in *Recht* was "far from the boundary line staked out by *NIFLA*." 32 F.4th at 417. Specifically, the court of appeals ruled that the statute's disclosure requirement was, as in *Zauderer*, "directly targeted at promoting the State's interest 'in dissipat[ing] the possibility of consumer confusion or deception.'" Id., quoting *Zauderer*, 471 U.S. at 651. The court of appeals stressed as well that the disclosure requirements "do so by providing information *directly connected* to the subject of the advertisement, *rather than by compelling speech concerning unrelated or competing services.*" Id. (emphasis added). The only question, the court ruled, was whether the required disclosures "are 'factual and uncontroversial.'" Id., quoting *NIFLA*, 138 S.Ct. at 2376. The court found that these requirements were satisfied in that case because "the disclosure that patients should consult with their doctor before discontinuing medication simply communicates to the audience the factual and uncontroversial point that the advice of a physician mitigates this risk of injury or death." Id. at 417.

The County's mandatory disclosures at issue here plainly fail under *Recht.* Here, unlike in *Recht*, the County's literature is not justified by any need to dissipate "the possibility of consumer confusion or deception." *Recht*, 32 F.4th at 417. Here, unlike in *Recht*, the compelled speech is not "directly connected to the subject" of any "advertisement" by the dealers. Id. Here, unlike in *Recht*, the compelled speech concerns "unrelated or competing services" rendered by the County or third parties, not by the dealers. Id. And here, unlike in *Recht*, the compelled speech about suicide and

conflict resolution is not "factual and uncontroversial" because the County's message that persons with mere access to firearms "are" more likely to commit suicide is both wrong and controversial.

These differences are controlling here. The *Recht* court stressed that in *NIFLA*, "the Supreme Court cautioned against applying *Zauderer* to disclosures that 'in no way relate[]' to the services being offered or that compel speech on hotly contested topics." 32 F.4th at 416. The Fourth Circuit also recognized that *NIFLA* expressly held that *Zauderer* did not permit a regulation that "required private medical clinics to post information about entirely unrelated 'state-sponsored services." 32 F.4th at 417. In this case, **every one** of these boundaries are crossed by Bill 108-21. The County's compelled speech fails for all these reasons.

The County spills much ink on how Bill 108-21 is "reasonably related" to the County's interest in suicide prevention. (Def. Mem. at 16-20). That discussion is flawed in multiple ways. First, regardless of the County's interest in suicide prevention, the County has no legitimate interest in compelling controversial speech that erroneously asserts or implies that there is a causal connection between suicide and access to firearms. Second, and more fundamentally, the County's interests are irrelevant under *Zauderer* where, as here, the compelled speech crosses "the boundary line staked out by *NIFLA*." *Recht*, 32 F.4th at 417. Of course, such interests might be relevant under *Central Hudson* for "restrictions" on "commercial speech," but, for the reasons explained above, the County's compelled speech here cannot possibly be justified under *Central Hudson*. See *Recht*, 32 F.4th at 407. *Zauderer* is limited to the circumstances specified in *NIFLA,* and where, as here, those limitations are exceeded, that is the end of the analysis.

What is left are the principles applied in *NIFLA* and, under *NIFLA*, the County's compelled speech is presumptively unconstitutional and can be justified, if at all, only under strict scrutiny. See P. Mem. at 18-23. For good reasons, the County makes no attempt to justify Bill 108-21 under strict

23

scrutiny. Rather, the County is attempting to take considerations relevant for restrictions on commercial speech analyzed under *Central Hudson* and transplant those considerations to a compelled speech case that the County asserts is controlled by *Zauderer*. Yet, *Recht* holds that the analysis under *Central Hudson* for prohibitory restrictions on commercial speech is altogether separate from the approach applicable to compulsory disclosures. And under *Recht*, neither *Central Hudson* nor *Zauderer* permit the compelled speech imposed by the County in this case.

Finally, the asserted importance of the compelled speech is not controlling. The Supreme Court did not question the legitimacy or importance of California's interest in promoting State abortion services at issue in *NIFLA*. The Court nonetheless held that "California cannot co-opt the licensed facilities to deliver its message for it." 138 S.Ct. at 1276. Nor did the Court question the importance of Massachusetts' public accommodation law at issue in *Hurley*. And yet the Court had no difficulty in holding that the State "may not compel affirmance of a belief with which the speaker disagrees." 515 U.S. at 573. Likewise, the Fourth Circuit found Baltimore's asserted interests to be "plainly important" in *Greater Baltimore Center*, 879 F.3d at 111, but nonetheless sustained an injunction against the City's compelled speech, noting that "we are unpersuaded that the City could not pursue its goals through less restrictive means.'" Id. at 112. So too here.

III.   **MSI MEMBERS HAVE STANDING**

As explained in plaintiffs' opening brief, Bill 108-21 affects both the First Amendment and the Second Amendment rights of the purchaser to whom the plaintiff dealers are forced to distribute the County's literature. In response, the County asserts that purchasers, such as MSI members, do not have standing to complain about Bill 108-21 because "[t]he Bill requires nothing of the customers themselves, who are free to disregard the literature entirely, or discard

it even before reading it." (Def. Mem. at 31). That assertion is both factually wrong and legally irrelevant.

### A.      The Rights of MSI Members Are Adversely Affected By The Bill

The assertion is factually wrong because the County cannot seriously deny that restraints on dealers imposed by Bill 108-21 are aimed at and necessarily affect customers of dealers and thus are part and parcel of the same wrong. After all, the forced display and distribution requirements of Bill 108-21 make clear that the purchasers are the ultimate targets of the compelled speech the County imposes on the dealers. The display requirement is directed at customers and such customers are the actual recipients of the literature the dealers are forced to distribute. Customers are the very "objects" of Bill 108-21. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"). See also *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212-13 (4th Cir. 2020) (applying *Lujan* to sustain standing of a firearms dealer as well as the third-party rights of customers, including MSI members). Cf. *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 417 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied,* 142 S.Ct. 1447 (2022) (noting that the law there at issue was "a functional prohibition on buyers, not a mere condition or qualification on sellers").

Of course, the County is right that nothing in the Bill bars customers from throwing away the pamphlets that are foisted upon them by the dealers. But that action can take place only after forced receipt. And the customers are not free to walk away from the coerced display of the County's literature if they wish to exercise their Second Amendment rights. Customers must also still suffer the indignity of the "probably false" assertion that their purchase of a firearm (or

ammunition) will make them more likely to commit suicide. Likewise, customers are being told that they need to be informed of the County's conflict resolution services, lest they use the firearm or ammunition for illegal conflict resolution. The County does not deny that customers who wish to exercise their Second Amendment right to acquire a firearm are held captive to the County's compelled speech imposed on dealers. Purchasers in the County may only acquire a firearm through licensed dealers. That is particularly so in Maryland, which requires federally licensed dealers to conduct federal background checks on private sales of ordinary long guns. MD Code, Public Safety, § 5-204.1. A private sale of a handgun is likewise facilitated by a State licensed dealer. MD Code, Public Safety, § 5-124(a)(1). All other sales are also conducted through dealers.

Customers are thus truly held captive to dealers if they wish to exercise their Second Amendment rights. See *Hill v. Colorado*, 530 U.S. 703, 717-18 (2000) ("The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases" and this interest is especially placed at risk where "'the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure'"). The captive-audience doctrine applies where the listener cannot avoid being exposed to that speech and is based on a common law right "to be left alone." *Hill*, 530 U.S. at 716-17. That right is "the most comprehensive of rights and the right most valued by civilized men." Id. at 717 (citation omitted). See also *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210-11 (1975). "[N]o one has a right to press even 'good' ideas on an unwilling recipient," much less offensive speech. *Rowan v. United States, Post Office Dept.,* 397 U.S. 728, 738 (1970) (sustaining the right of a recipient to direct the Post Office to remove his or her name from mailing lists). That rule applies not only to forced receipt in one's

26

home, as in *Rowan*, but, as *Hill* holds, it applies wherever the recipient is otherwise held "captive" as a practical matter and thus is not free just to walk away from offensive speech.

The County asserts that this principle is limited to situations where it is "impractical for the unwilling viewer or auditor to avoid exposure." (Def. Mem. at 33). Just so. Here, it is "impractical" for the customer "to avoid" the County's forced display and distribution of its unwanted speech if the customer wishes to exercise her Second Amendment rights to acquire firearms and/or ammunition. See *Simmons v. United States*, 390 U.S. 377, 393-394 (1968) (it is "intolerable that one constitutional right should have to be surrendered in order to assert another"). Under the "unconstitutional conditions doctrine" the County may not condition the undisputed Second Amendment right to purchase a firearm or ammunition, or violate the right "to be left alone" while making such constitutionally protected purchases, on the forced receipt of the County's highly offensive speech. See *Kootz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604-05 (2013) (collecting cases).

This principle fully applies to the First Amendment context. See *Bethel Ministries, Inc. v. Salmon*, 2022 WL 111164 at *8-*11 (D. Md. 2022) (collecting cases). Likewise, the Second Amendment "is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2156 (2022) (citation omitted). Indeed, if the County may force the receipt of such messages in this context, there is no principled limit on the ability of a governmental unit to condition other constitutional rights on the forced receipt of the government's messages. The County's position is Orwellian in its implications. See, e.g., *Rushman v. City of Milwaukee*, 959 F.Supp. 1040, 1044 (E.D. Wisc. 1997) ("If the City could ban any statement or belief debunked by science, the First Amendment would

be a cruel hoax, more worthy of Orwell's double-thinking Oceania than the United States of America.").

The County's coerced display and distribution requirements will also objectively affect or chill the customer's own speech. These injuries to the customers own First Amendment rights are more than sufficient to accord standing. See, e.g., *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) ("plaintiffs need not show that the government action led them to stop speaking"); *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("[i]n First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising his right to free expression'") (citation omitted). The chilling effect need only be "objectively reasonable" and that element is satisfied here as customers will be objectively chilled where, as here, the dealers appear to be endorsing the County's literature by virtue of displaying and distributing that literature. See MSI Resp. to Interr. 10 (P. SJ Exh. E) ("MSI members highly value good relations with firearms dealers and reasonably can be expected to avoid expressing their own opinions regarding the County's messages and will reasonably seek to avoid potential disagreements with dealers and their employees over the County's messages while on the dealers' premises.").

Arguments on the merits may not be rejected on grounds of "standing." See *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) ("A plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case" because otherwise "'every unsuccessful plaintiff will have lacked standing in the first place.'") (quoting *White Tail Park, Inc. v. Stroube,* 413 F.3d 451, 461 (4th Cir. 2005)). See also *MSI*, 971 F.3d at 212 ("courts 'must not confuse standing with the merits'"), quoting *Covenant*, 493 F.3d at 429) (cleaned up). Plaintiffs have "standing" to make these arguments as there is no

dispute that customers (MSI members) are the target audience of the scheme created by Bill 108-21 and thus have the requisite "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The traceability and redressability elements of standing are plainly satisfied as well. *MSI*, 971 F.3d at 212-13.

**B.      MSI Members Have Third-Party Standing to Protect The Rights of Dealers**

Customers (MSI members) in this case also have third-party standing to assert the rights of the dealers. Such third-party standing is well-established in the First Amendment context because application of the usual standing rules "would have an intolerable, inhibitory effect on freedom of speech." *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940). Thus, as stated in *Secretary of State of Md. v. Joseph H. Munson Co., Inc.* 467 U.S. 947, 956-57 (1984), "'[l]itigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" (Quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973. Indeed, the Fourth Circuit has recognized that, in a Second Amendment context, "a vendor has third-party standing to pursue claims on behalf of its customers, *regardless* of whether a vendor's customers are hindered in bringing their own claims." *MSI*, 971 F.3d at 216 (emphasis added). For the same reasons, the customers have the requisite close relationship to pursue claims on behalf of vendors, "regardless" of whether the vendors "are hindered in bringing their own suits."

In any event, small dealers in the County *are* hindered from challenging lawless actions by the County. There are many dealers licensed to sell firearms in the County, and they are almost all

small businesses for whom litigation against the County would be prohibitively expensive.[3] Such dealers can also ill-afford to risk antagonizing the County by bringing suit, as the County has already illegally asserted the power to regulate the business operations of firearms dealers under MD Code, Criminal Law, § 4-209(b). See Anne Arundel Co. Bill 109-21, codified at Arundel County Code 12-6-101-12-6-301.[4] Customers are uniquely well-situated to protect the rights of these dealers, as the County has no such regulatory power over customers. See, e.g., *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 954–58 (1984) ("[t]he activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents."); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (standing requirements are relaxed where the challenged action "substantially abridges the First Amendment rights of other parties not before the court."). Such third-party standing is especially appropriate where, as here, the customers are the actual targets of the compelled speech inflicted on dealers.

---

[3] According to the ATF, there are roughly 36 Class 01 Federal Firearms Licensees ("FFLs") located within Anne Arundel County zip codes. Class 01 FFLs are entities licensed to sell firearms by the federal government and thus are presumptively covered by Bill 108-21. See https://www.atf.gov/firearms/listing-federal-firearms-licensees/state?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2022&ffl_date_month%5Bvalue%5D%5Bmonth%5D=1&field_state_value=MD. This Court may take judicial notice of this official source and we ask the Court to do so. Vendors making only ammunitions sales are not licensed and thus there is no reliable source for identifying vendors who sell only ammunition.

[4] The County's authority to enact Bill 109-21 was challenged by plaintiffs in State court. *MSI v. Anne Arundel Co.*, No. C-02-CV-22-000217 (Cir. Ct. for Anne Arundel Co.). That case was dismissed as moot in August 2022, when the County backed down with the enactment of County Bill 70-22, which amended County Code § 12-6-101 to eliminate the threat of enforcement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   RELIEF REQUESTED

On the merits, plaintiffs are entitled to prevail and thus are entitled to injunctive, declaratory relief and nominal damages. The County does not dispute that such relief is appropriate should plaintiffs prevail. The County does contend that plaintiffs' claims for nominal damages are "outlandish," asserting, *ipse dixit,* that those claims "require little response." (Def. Mem. at 35). But, the County does not dispute that, if plaintiffs prevail, an award of nominal damages is mandatory. See *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 800 (2021) ("the prevailing rule, 'well established' at common law, was 'that a party whose rights are invaded can always recover nominal damages without furnishing any evidence of actual damage'") (citation omitted); *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (a court is "obligate[d]" to award nominal damages under Section 1983); *Central Radio v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016) (same). That leaves the question of how to measure the nominal damages.

Apart from objecting to so-called "outlandish" nominal damages, the County does not dispute that each of the plaintiff dealers are entitled to nominal damages of at least one dollar. The County does not dispute that each day that the dealers were subjected to Bill 108-21 is a separate violation of the First Amendment for which nominal damages are appropriate and that this period is 25 days. The County does not even dispute that the better measure of nominal damages would be to peg such nominal damages to the forced display requirement as one daily violation, and each forced, daily distribution as separate violations, thus justifying a daily nominal damages award in excess of $1 per day, per dealer.

The only dispute thus appears to be on how to measure nominal damages for MSI members. The County does not dispute the numbers, *i.e.,* that MSI had precisely 1,606 members during the 25

days Bill 108-21 was in effect, including 235 members who were County residents. See Supp. Decl. of Daniel Carlin-Weber, ¶ 3 (P.S.J.Exh. F). Nor does the County dispute that the underlying purposes associated with nominal damages awards are furthered by a nominal damage award to MSI members. See *Uzuegbunam*, 141 S.Ct. at 801; *Hewitt v. Helms*, 482 U.S. 755, 761 (1987); *Farrar*, 506 U.S. at 112. The County does not dispute the point made in *Global Impact Ministries v. Mecklenburg County*, 2021 WL 982333 at *3 (W.D.N.C. 2021), which noted "while an organization ordinarily will not have representational standing to sue for damages on behalf of its injured members, that rule does not necessarily apply where the organization is suing for nominal damages on its members' behalf."

The rule is well established that a failure to respond to legal arguments may be treated as a concession. See *In re Bestwall LLC*, 47 F.4th 233, 245 (3d Cir. 2022) ("Claimants do not dispute that those two elements have been satisfied, so we are left to consider only the arguments made by the Trusts."). See also See *Griswold v. Coventry First LLC*, 762 F.3d 264, 274 n.8 (3d Cir. 2014) (noting that failure to brief an issue on appeal and a related concession at oral argument constitutes a forfeiture of the argument); *United States v. Osbosrne*, 807 Fed.Appx. 511, 526 (6th Cir. 2020) (We may treat [a party's] failure to respond to the Government's assertions as a concession of their validity."), citing *Hussam F. v. Sessions*, 897 F.3d 707, 720 (6th Cir. 2018); See also *In re Incident Aboard D/B Ocean King*, 758 F.2d 1063, 1071 n.9 (5th Cir. 1985) ("[w]e treat the failure to respond to Hydril's arguments as a concession"). Given these County concessions, there is nothing "outlandish" about applying the same nominal damages approach to MSI members, including performing the calculations in the same way.

While the County objects to $40,000 for MSI members, the County does not dispute that controlling precedent holds that nominal damages must be awarded to class members in class

actions. *Norwood v. Bain*, 143 F.3d 843, 856 (4th Cir. 1998) (reversing denial of nominal damages for class members), *reinstated in part*, 166 F.3d 243, 245 (4th Cir.) (en banc), *cert. denied*, 527 U.S. 1005 (1999). It is common knowledge that class members may number in the thousands. Such awards are not "outlandish." Association members in suits brought on their behalf by their association under *Hunt*, are similarly situated to class members whose rights are represented by a class representative. Accordingly, the Court should award nominal damages for MSI members in the amount of $40,150 (1,606 x 25 x $1), including $5,875 (235 x 25 x $1) for MSI members who actually were residents of the County during this time period. Plaintiffs are also entitled to attorneys' fees and costs, but those matters are collateral to the merits. *Budinich v. Becton Dickinson and Co.*, 486 U.S. 196 (1988).

## CONCLUSION

For all the forgoing reasons, plaintiffs' motion for summary judgment should be granted and the County's cross-motion for summary judgment should be denied.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005
District Court Bar No. 21033