**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.* | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-22-00865** |
| **v.** | * | |
| | * | |
| **ANNE ARUNDEL COUNTY** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

In 2022, Anne Arundel County, Maryland ("the County" or "Defendant") enacted an ordinance requiring gun shop owners to provide literature to firearms customers regarding suicide prevention and nonviolent conflict resolution. Plaintiffs—four gun retailers and a non-profit organization dedicated to preserving gun owners' rights—filed a single-count complaint challenging the ordinance as unlawful compelled speech under the First Amendment of the United States Constitution. ECF 1.

Three motions are pending before this Court. Plaintiffs filed a motion for summary judgment, ECF 39, and the County filed a cross-motion for summary judgment, ECF 45. Plaintiffs submitted their opposition, ECF 50, and the County filed its reply, ECF 53. The County also filed a motion to exclude the testimony of Plaintiffs' expert witness, ECF 44, which Plaintiffs opposed, ECF 46, and the County replied, ECF 49. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, Defendant's Motion to Exclude, ECF 44, will be GRANTED; Plaintiffs' Motion for Summary Judgment, ECF 39, will be DENIED; and Defendant's Cross-Motion for Summary Judgment, ECF 45, will be GRANTED.

## I.  BACKGROUND

*Anne Arundel County's Ordinance*

On April 5, 2019, Anne Arundel County Executive Steuart Pittman signed Executive Order No. 9, creating the Anne Arundel County Gun Violence Prevention Task Force. *See County Executive Orders*, ANNE ARUNDEL CNTY. MD. (2019).[1] The Order instructed the Task Force to investigate gun-related violence in the County and recommend mitigative actions. *Id.* On June 5, 2020, the Task Force released its final report, finding that 63% of firearm-related deaths in the County between 2014 and 2018 were suicides. ANNE ARUNDEL COUNTY, REPORT OF THE GUN VIOLENCE PREVENTION TASK FORCE 21 (2020).[2] The Task Force recommended promoting awareness of risk factors of gun-related violence throughout the community. *Id.* at 46.

On January 2, 2022, the County Council of Anne Arundel County passed Bill 108-21, entitled "An Ordinance concerning: Public Safety – Distribution of Literature to Purchasers of Guns or Ammunition." ECF 45-6 at 2 (hereinafter "the Ordinance"). The Ordinance directed the County's Health Department to prepare literature "relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution" and to distribute this literature to "all establishments that sell guns or ammunition." *Id.* The Ordinance further required all such retailers to "make the literature distributed by the health department visible and available at the point of sale" and to "distribute the literature to all purchasers of guns or ammunition." *Id.* at 3. The Ordinance granted enforcement authority to an Anne Arundel County Health Department

---

[1] *Available at* https://www.aacounty.org/departments/county-executive/executive-orders/index.html.

[2] *Available at* https://www.aacounty.org/boards-and-commissions/gun-violence-task-force/reports/fina-report-20200605.pdf.

representative to issue citations for failure to comply. *Id.* Initial violation of the Ordinance would result in a $500 civil fine, and subsequent violations would result in a $1,000 civil fine. *Id.*; *see also* ANNE ARUNDEL CNTY. CODE § 9-2-101(f)(3).

*Suicide Prevention Pamphlet*

The National Shooting Sports Foundation ("NSSF") is the firearm industry's trade association that "leads the way in advocating for the industry and its business and jobs, keeping guns out of the wrong hands, encouraging enjoyment of recreational shooting and hunting and helping people better understand the industry's lawful products." ECF 45-8 at 3. The American Foundation for Suicide Prevention ("AFSP") is a voluntary health organization that "supports strategic investments in suicide prevention, education, and research" to reduce the national rate of suicide. ECF 45-10 at 3; ECF 45-11 at 2. NSSF partnered with AFSP to develop educational materials for firearms retailers to provide to their customers. ECF 45-12 at 2. These materials included a 6"x6" pamphlet entitled "Firearms and Suicide Prevention." *Id.*; *see also* ECF 45-7 ("Suicide Prevention Pamphlet"). The County's Health Department selected this pamphlet as the primary source of literature for firearms retailers to distribute pursuant to the Ordinance.

The front cover of the Suicide Prevention Pamphlet depicts a smiling Caucasian middle-aged man in a jean jacket and baseball hat. ECF 45-7 at 2. The words "Firearms and Suicide Prevention" lay across his photo, as do the logos of NSSF and AFSP. *Id.* The first inside page of the pamphlet asks the reader "What Leads to Suicide?" and answers, "There's no single cause." *Id.* at 3. It explains that multiple stressors and health issues converge to create conditions that increase the risk of suicide. *Id.*

The next textual page of the pamphlet explains, "Some People are More at Risk for Suicide than Others." *Id.* at 5. Below this heading, there are three columns of risk factors—health,

environmental, and historical—with examples of each. *Id.* The "Health Factors" column lists mental health conditions, chronic health conditions, and traumatic brain injuries. *Id.* "Historical Factors" includes previous suicide attempts, family history of suicide, and childhood abuse. *Id.* Finally, "Environmental Factors" includes stressful life events, prolonged stress, exposure to another person's suicide, and, relevant to this case, "Access to lethal means[,] including firearms and drugs." *Id.* In the bottom right corner, the pamphlet explains, "Risk factors are characteristics or conditions that increase the chance that a person may try to take their life." *Id.*

The next two pages inform the reader how to recognize warning signs of suicide and how to take appropriate action. *Id.* at 6–7. On the page entitled "Reaching Out Can Help Save a Life," the pamphlet notes that firearms are used in 50% of all suicides in the United States and explains that "by keeping secure firearm storage in mind, you can help reduce the number of suicides involving firearms." *Id.* at 7. The penultimate page of the pamphlet provides options for safely storing and protecting firearms, including a cable lock (starting at $10), a gun case (starting at $20), a lock box (starting at $25), or a full size gun case (starting at $200). *Id.* at 8. The back page lists available resources, including a URL to find a mental health provider, the National Suicide Prevention Lifeline, and 911. *Id.* at 9. The logos of NSSF and AFSP adorn the back page.

*Conflict Resolution Pamphlet*

The County developed its own one-page 6"x6" pamphlet to inform firearm owners about available resources for conflict resolution. ECF 45-7 at 10 ("Conflict Resolution Pamphlet"). The flyer reads: "Do you have unresolved conflicts? Are you looking for peaceful solutions? Want to know what mediation can do for you? Conflict Resolution is a process to help you find the best way to resolve conflicts and disagreements peacefully." *Id.* It then lists resources, such as the Anne Arundel County Conflict Resolution Center, the Veteran's Crisis Line, and 911. *Id.* It includes the

logo of Anne Arundel County's Department of Health and a QR Code linking to the County's suicide prevention toolkit. *Id.*

*The Present Litigation*

The Ordinance went into effect on April 10, 2022. ECF 45-6 at 3. On or around that date, the County's Health Department distributed the pamphlets to firearms dealers in the County. ECF 1 ¶ 1. On April 11, 2022, four gun retailers (Pasadena Arms, LLC; Cindy's Hot Shots, Inc.; Field Traders, LLC; Worth-A-Shot, Inc.) (collectively "Gun Retailer Plaintiffs") and Maryland Shall Issue, Inc. ("MSI"), a non-profit "dedicated to the preservation and advancement of gun owners' rights in Maryland," filed suit in this Court. ECF 1. The Ordinance remained in effect for twenty-five days, during which the Gun Retailer Plaintiffs displayed and distributed the pamphlets. ECF 45-1 at 11.

On April 20, 2022, Plaintiffs moved for a preliminary injunction and temporary restraining order, and, in the alternative, summary judgment. ECF 6. The Parties conferred and the County agreed to not enforce the Ordinance against any gun retailer until this Court reached a decision on the merits. ECF 16 at 1–2; ECF 17 at 2; ECF 19. However, the Parties disputed whether discovery was appropriate prior to summary judgment. ECF 16 at 2. After reviewing the briefing and conferring with the Parties, this Court set a scheduling order for discovery. ECF 21. After an opportunity for discovery, the Parties' dispositive motions are now ripe.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of

showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B. Expert Admissibility**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance." 509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010). However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not be based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are

speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. 2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. 08-CV-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested

before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (citing *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

## III.   ARTICLE III STANDING ANALYSIS

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citations and quotation marks omitted). To prove Article III standing, a plaintiff must establish the three "irreducible" minimum requirements: (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). At issue here is the first element—injury-in-fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

No litigant disputes the justiciability of the Gun Retailer Plaintiffs' claims. *See* ECF 45-1 at 33 n.33. The Ordinance plainly imposes compelled speech on the retailers, providing them an

alleged constitutional injury-in-fact.[3] However, an issue of standing arises with MSI, which seeks

monetary damages on behalf of its members who purchase guns and will receive the pamphlets.[4]

An association can establish standing "on behalf of its members when: (a) its members

would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are

germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple*

*Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see Lujan*, 504 U.S. at 563. "The association must

allege that its members, or any one of them, are suffering immediate or threatened injury as a result

of the challenged action of the sort that would make out a justiciable case had the members

themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Evidence of concrete harm

by one of its members is "an Article III necessity for an association's representative suit." *United*

*Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). The United

States Supreme Court has repeatedly denied associational standing where an organization fails "to

make specific allegations establishing that at least one identified member had suffered or would

suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see, e.g.*, *Lujan*, (holding

that the organization lacked standing because it failed to "submit affidavits . . . showing, through

---

[3] The Gun Retailer Plaintiffs also alleged standing on behalf of their customers. ECF 1 ¶ 14. However, this Court need not analyze this alternative basis for standing since the Gun Retailer Plaintiffs plainly have standing on their own accord.

[4] In its Complaint, MSI also brings a First Amendment claim "on behalf of its members who are firearms dealers in Anne Arundel County, and who are required to display and distribute County literature by Bill 108-21, and who are thus directly regulated by Bill 108-21." ECF 1 ¶ 9. Four of these retailer members are named plaintiffs in the lawsuit. *See* ECF 39-6 at 2. Thus, MSI has viable associational standing through these retailer members. However, MSI also seeks nominal damages on behalf of its customer members. ECF 1 ¶ 25; ECF 39-12 at 36. Thus, this Court analyzes MSI's ability to assert standing on behalf of these customer members.

specific facts . . . that one or more of [its] members would . . . be 'directly' affected"); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990) (concluding the affidavit provided by the city was insufficient because it did not name individuals harmed by the challenged program).

MSI presents four theories of how its customer members have standing. First, MSI argues that receipt of information about suicide prevention and nonviolent conflict resolution infringes its customer members' Second Amendment rights. Specifically, it asserts that the Ordinance affects the "First Amendment rights of MSI members to exercise their Second Amendment rights to acquire firearms and ammunition without being held captive to the forced distribution of the County's offensive message." ECF 39-12 at 33; ECF 39-5 at 9.

To be clear, MSI and its members have not brought a Second Amendment challenge; they only allege this harm for the purpose of standing. MSI points to no case law suggesting the receipt of information can infringe a customer's Second Amendment right. Even if MSI customer members had such a right, the harm remains speculative. Not a single MSI member presents an affidavit or testimony suggesting their receipt of these pamphlets will affect their ability to purchase a firearm. The Gun Retailer Plaintiffs likewise do not present any such customer. ECF 45-20 at 103:3–11 ("Q: Have any customers told you that they will not be able to purchase firearms or ammunition from you because of the display and distribution of the pamphlet? A: No. Q: Have any customers or did any customers refuse to purchase firearms or ammunition from you because of the display of the pamphlets? A: No."); ECF 45-21 at 120:1–14 (same question-and-answer for Plaintiff Cindy's Hot Shots); ECF 45-22 at 96:10–13 (same for Plaintiff Field Traders). This lack of an impact is unsurprising given that the receipt of the information occurs after the customer decides to make the purchase.

At this motion for summary judgment stage, MSI asks this Court to confer associational standing based purely on MSI's allegation that its unidentified members will suffer harm. If speculation were the threshold for Article III standing, many more organizational plaintiffs could access federal court without an actual controversy. "This novel approach to the law of organizational standing would make a mockery of [] prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498. Without a single member actually alleging harm to their ability to purchase a firearm, MSI's alleged Second Amendment injury-in-fact remains conjectural and insufficient to confer standing.

Second, Plaintiff MSI alleges that the pamphlets have a "chilling effect" on its customer members' speech. ECF 1 ¶ 22. Specifically, MSI speculates that its members "will be inhibited or will refrain from arguing or contesting that County message in the dealer's store where the dealer is displaying and distributing the County's literature . . . [the customer members] reasonably can be expected to avoid expressing their own opinions regarding the County' [sic] messages and will reasonably seek to avoid potential disagreements with dealers and their employees over the County's messages while on the dealers' premises." ECF 39-5 at 8 (MSI's Response to Interrogatories).

In First Amendment cases alleging chilled speech, the Fourth Circuit has recognized that the constitutional standing requirements are "somewhat relaxed." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013). Consequently, "the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* (citing *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). The chilling effect must nonetheless be "objectively reasonable," and the government's

action must be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 236 (quoting *Benham*, 635 F.3d at 135) (internal quotation marks omitted).

Thus, MSI would have standing if it demonstrated that at least one of its customer members feared or experienced a chilling effect on his or her speech. However, MSI has presented no such evidence. Instead, MSI presents the name of a single member under seal, whom MSI claims "has personal knowledge of how [their[5]] constitutional rights have been infringed." ECF 41-2 at 3 (MSI's Response to Interrogatories). This one sentence is the extent of the description of this member's alleged First Amendment harm. MSI does not present any affidavit or testimony of this member directly and does not specify how exactly this member's speech would be chilled.

The only other evidence presented regarding this member's alleged First Amendment injury is the deposition of another MSI member, Katherine Novotny. In Ms. Novotny's deposition, she alleges that the first MSI member stated that they are now less willing to articulate their views as a result of the pamphlets' presence. ECF 41-1 at 78: 9–14. Again, the description of the alleged chilling effect goes into no greater detail. Ms. Novotny was unaware of what specific views the first member would restrain from stating, and was unaware when or how they informed MSI that they were less willing to articulate these views. *Id.* at 79:7–80:5; 82:19–83:1.

Although case law lowers the bar for what constitutes cognizable harm in chilled speech cases, it does not jettison the constitutional requirement of plaintiffs demonstrating how they are actually suffering (or will suffer) this harm. "Subjective or speculative accounts of such a chilling effect . . . are not sufficient." *Id.* In other words, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future

---

[5] The Court uses singular "they" in this portion of the analysis to protect the confidentiality of the MSI member who remains undisclosed.

harm[.]" *Laird v. Tatum*, 408 U.S. 1, 14 (1972). With no first-hand evidence, this Court must speculate how these pamphlets affect this member's speech.

Upon review of this evidence, MSI only hypothesizes that its customer members' speech would be chilled; it does not allege a specific existing or imminent example of such harm. It fails to present the affidavit or testimony of a single member whose speech will be chilled by the County's Ordinance. In cases where the Fourth Circuit has recognized chilled speech as providing injury-in-fact, individual plaintiffs have actually alleged such an impact. *E.g.*, *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 796, 142 S. Ct. 2737 (2022) (noting that "some plaintiffs alleged that they have decided not to write about certain topics because of the prepublication review policies"); *Cooksey*, 721 F.3d at 236 (noting that but-for the government's regulation, the plaintiff would have resumed his advice column). Here, even if accepted as true, Ms. Novotny's hearsay evidence presents only the conclusory statement that this member is now less willing to express their views. Without a specific example of the chilling impact experienced or threatened, or without any evidence from this member directly, the member's alleged harm remains speculative and not credible.

Third, Plaintiff MSI alleges the forced receipt of the pamphlets amounts to a concrete harm itself, citing the captive-audience doctrine. ECF 50 at 28 (citing *Hill v. Colorado*, 530 U.S. 703, 717–18 (2000)). In *Hill*, a state statute effectively limited how anti-abortion protestors could protest outside abortion clinics. *Id.* at 715. The U.S. Supreme Court ultimately upheld the state statute as a constitutional content-neutral time, place, and manner regulation. *Id.* at 730. Relevant to MSI's argument, the U.S. Supreme Court recognized in its First Amendment analysis that the right to free speech includes the right to persuade others, but it "does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." 530 U.S. at 716. MSI argues

that the County's pamphlets are likewise offensive and that its customers cannot avoid the message. However, the U.S. Supreme Court narrowed this exception to situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Id.* at 718; *see also Snyder v. Phelps*, 562 U.S. 443, 459 (2011) ("In most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting his eyes.'" (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 210–211 (1975))). Here, MSI's customer can simply ignore the County's speech. It would be extremely easy for customers to toss out the pamphlets and never read them. For this reason, the captive-audience doctrine does not apply, and receipt of the pamphlets does not amount to a concrete injury-in-fact.

Finally, Plaintiff MSI argues that its customer members have third-party standing on behalf of the affected gun retailers. "Courts have long adhered to the rule that a 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 214 (4th Cir. 2020), as amended (Aug. 31, 2020) (quoting *Warth*, 422 U.S. at 499); *see also Powers v. Ohio*, 499 U.S. 400, 410 (1991). "Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). The U.S. Supreme Court has "recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute . . . ; the litigant must have a close relation to the third party . . . ; and there must exist some hindrance to the third party's ability

to protect his or her own interests." *Powers*, 499 U.S. at 411 (citing *Wulff*, 428 U.S. at 115–16). Courts look for a close relationship to ensure the litigant is "as effective a proponent of the right" as the third party, and they look for "some genuine obstacle to such assertion," suggesting the third party would otherwise bring the lawsuit. *Wulff*, 428 U.S. at 114–16.

In its reply, Plaintiff MSI proffers that there are over thirty businesses licensed to sell firearms in Anne Arundel County.[6] ECF 50 at 32 n.3. In *MSI v. Hogan*, the Fourth Circuit considered the reverse scenario—whether a gun retailer, Atlantic Guns, had third-party standing to represent its firearm customers' rights to purchase firearms. 971 F.3d at 214. Of note, Atlantic Guns had standing on its own accord to challenge Maryland's handgun licensing law. *Id.* at 206, 214. The Fourth Circuit noted that courts have uniformly permitted vendors to "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market," regardless of the ability of customers to bring their own claims. *Id.* at 216 (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)) (internal quotation marks omitted). For this reason, the Fourth Circuit concluded Atlantic Guns had third-party standing on behalf of its customers, even though there was no hindrance to the customers bringing their own claim. *Id.*

A dispositive difference between *MSI v. Hogan* and the present case is that Atlantic Guns had suffered its own injury-in-fact. The Supreme Court requires a litigant to independently have a concrete injury-in-fact to bring third-party claims. *See Powers*, 499 U.S. at 411 (citing *Wulff*, 428 U.S. at 115–16). As discussed above, MSI's customer members have not alleged they will suffer a concrete harm, and so they cannot rely on the harm of others to procure standing.

---

[6] Third-party standing on behalf of the four Gun Retailer Plaintiffs would be inapposite given they are successfully asserting their own legal rights. *See Wulff*, 428 U.S. at 115–16. Thus, this Court assumes that MSI, through its customer members, seeks to assert third-party standing for the other gun retailers not represented in this litigation.

In short, MSI's customer members lack standing to challenge the County's Ordinance; therefore, MSI lacks associational standing on behalf of its customer members. The resolution of that issue is immaterial, however, in light of this Court's holding on the constitutional issue below.

## IV.   FIRST AMENDMENT ANALYSIS

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that "abridg[e] the freedom of speech." U.S. CONST. amend. I; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*"). This constitutional protection "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Its protection is broad, and the U.S. Supreme Court has "been reluctant to mark off new categories of speech for diminished constitutional protection." *NIFLA*, 138 S. Ct. at 2372 (quoting *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 804 (1996)) (internal quotation marks omitted).

Content-based laws—those that regulate speech based on its message—are presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (explaining that regulation of speech is content-based if it "'applies to particular speech because of the topic discussed or the idea or message expressed'") (quoting *Reed*, 576 U.S. at 163)). This includes laws that "compel[] individuals to speak a particular message," because "such notices 'alter the content of their speech.'" *NIFLA*, 138 S. Ct. at 2371 (alterations adopted) (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Generally, for content-based laws, the government must show the law is narrowly tailored to serve compelling state interests. *Id.* "This stringent standard reflects the fundamental principle that governments have 'no power to

restrict expression because of its message, its ideas, its subject matter, or its content.'" *NIFLA*, 138 S. Ct. at 2371 (internal quotation marks and citations omitted).

Nonetheless, the U.S. Supreme Court applies "a lower level of scrutiny to laws that compel disclosures in certain contexts," including cases analyzing the required disclosure of "factual, noncontroversial information in . . . 'commercial speech.'" [7] *NIFLA*, 138 S. Ct. at 2372. As the U.S. Supreme Court recently explained, "we do not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id.* at 2376. For this latter category—required disclosure of purely factual and uncontroversial information about a commercial product—the individual's First Amendment rights "are adequately protected as long as disclosure requirements are reasonably related to the State's interest." *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 628 (1985).

Thus, to qualify as permissible under *Zauderer*, as affirmed in *NIFLA*, the County's pamphlets must be (1) commercial speech, (2) purely factual and uncontroversial information, and (3) reasonably related to the County's interest.

---

[7] Until relatively recently, governments routinely regulated commercial speech without infringement upon the First Amendment. *See, e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942) (upholding as constitutional a New York City law that prohibited street distribution of commercial advertising). By 1975, the U.S. Supreme Court made clear that the First Amendment protects commercial speech, although to a lesser degree. *See Bigelow v. Virginia*, 421 U.S. 809, 821 (1975) (reaffirming the "principle that commercial advertising enjoys a degree of First Amendment protection"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (noting the settled proposition "that speech does not lose its First Amendment protection because money is spent to project it"). *See also Recht v. Morrisey*, 32 F.4th 398, 407 (4th Cir.), *cert. denied*, 143 S. Ct. 527 (2022) ("For almost two centuries, commercial speech . . . was understood to fall outside of the First Amendment's ambit.").

### A. Commercial Speech

The U.S. Supreme Court has recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 64 (1983) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–56 (1978)) (internal quotation marks omitted). "However, because 'application of this definition is not always a simple matter,' . . . some speech outside this 'core notion' may also be deemed commercial." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018) ("*Greater Baltimore II*") (quoting *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 440 (4th Cir. 1999); *Bolger*, 463 U.S. at 66). Beyond this "core notion" of commercial speech, courts have looked to other factors, including: "'(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech.'" *Id.* (quoting *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 285 (4th Cir. 2013) ("*Greater Baltimore I*") (in turn quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990))). "While 'the combination of all these characteristics . . . provides strong support for the . . . conclusion that speech is properly characterized as commercial speech,' . . . it is not necessary that each of the characteristics 'be present in order for speech to be commercial,'" *Greater Baltimore I*, 721 F.3d at 285 (quoting *Bolger*, 463 U.S. at 67 n.14) (internal quotation marks omitted). "Because of the 'difficulty of drawing bright lines that will clearly cabin commercial speech,' the inquiry is fact-intensive." *Greater Baltimore II*, 879 F.3d a 108 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)). "It is also one in which 'context matters.'" *Id.* (quoting *Greater Baltimore I*, 721 F.3d at 286).

Upon review of the Ordinance's terms and the proposed literature, this Court concludes that the Ordinance plainly encompasses commercial speech. First, the Ordinance regulates commercial retailers, *i.e.*, "establishments that sell guns or ammunition." ECF 45-6 at 3. Next, the literature is available at the "point of sale" and is provided to "all purchasers of guns or ammunition." *Id.* And finally, the speech relates to the safe handling of the purchased product, *i.e.*, information "relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution." *Id.* The Suicide Prevention Pamphlet informs firearm owners how to identify warning signs of suicide and how to safely store their firearms. The penultimate page offers firearm storage options with cost estimates. The Conflict Resolution Pamphlet provides information regarding mediation services available to the firearm owner, such as the Anne Arundel County Conflict Resolution Center and the Veteran's Crisis Line. All information provided in the proposed literature relates to the responsible and safe use of the product at the heart of the commercial transaction.

Providing information to promote the responsible use of a firearm is akin to commonplace laws requiring information regarding the safe use of other products, such as toys, cell phones, and pharmaceutical drugs. *See, e.g.*, 16 C.F.R. § 1500.19(b) (requiring "any article that is a toy or game intended for use by children" with small parts to include a choking hazard warning); 21 C.F.R. § 201.100(d) (requiring prescription labels to include adequate directions for the product's safe use, including "any relevant warnings, hazards, contraindications, side effects, and precautions"); *see also United States v. Gen. Nutrition, Inc.*, 638 F. Supp. 556, 562 (W.D.N.Y. 1986) (holding drug labeling requirements are "clearly commercial speech").

In such cases, courts assessing the constitutionality of labeling and disclosure requirements have applied *Zauderer*'s commercial speech analysis. *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*,

429 F.3d 294, 309–10 (1st Cir. 2005) (Maine's requirement that pharmacy benefit managers disclose conflicts of interest is commercial speech and analyzed under *Zauderer*); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001) (Vermont law requiring packages to disclose the presence of mercury and provide instructions about the product's safe disposal was subject to the rational basis test of *Zauderer*); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 23 (D.C. Cir. 2014) (applying *Zauderer* to the USDA's country-of-origin labeling requirements for meat packaging); *CTIA – The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 841 (9th Cir. 2019) (Berkeley's disclosure requirement—that all cell phone retailers provide cell phone customers with notice that cell phones carried "in a pants or shirt pocket or tucked into a bra" may exceed federal guidelines for radiation exposure—was agreed by all parties to be commercial speech). The County's Ordinance is no different than these disclosure laws—it likewise informs the consumer about the product's potential risks and how to mitigate them.

The County's Ordinance is distinguishable from laws that require disclosures outside the context of the commercial transaction, such as mandatory disclosures on a manufacturer's website, *cf. Nat'l Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 522 (D.C. Cir. 2015) (concluding the SEC's disclosure requirement of conflict minerals on manufacturers' websites was not a "point of sale disclosure" and therefore not commercial speech), or in the waiting rooms of pregnancy centers, *cf. NIFLA*, 138 S. Ct. at 2369. Here, the Ordinance requires the disclosure to take place during the economic transaction. Also, the County's Ordinance is distinguishable from disclosure laws that do not relate to an economic purchase or economic service. *Cf. id.* at 2372 (explaining *Zauderer* does not apply in part because the notice requirement "in no way relates to the services that licensed clinics provide"); *Greater Baltimore II*, 879 F.3d at 108 ("A morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction.'"). Here,

the County does not seek to reroute the customers to its own competing services. Rather, it informs

the customers of its own resources as a means to safely use the purchased firearm.

Nonetheless, Plaintiffs argue that the pamphlets are not commercial speech because they

do not "propose a commercial transaction." ECF 39-12 at 18. Plaintiffs' narrowed focus on this

specific language, derived from *Bolger*, overlooks the language's context. In *Bolger*, a

contraceptives company challenged a federal law prohibiting the mailing of unsolicited

advertisements for contraceptives. 436 U.S. at 61. The U.S. Supreme Court concluded that most

of the company's mailings, such as a pamphlet listing the company's various condoms and

contraceptive products, fell "within the core notion of commercial speech—'speech which does

no more than propose a commercial transaction.'" *Id.* at 66 (internal quotation omitted). However,

the U.S. Supreme Court noted that some pamphlets "present[ed] a closer question." *Id.* at 61. For

example, the "Plain Talk about Venereal Disease" pamphlet discussed the public health issue and

only generically referenced contraceptive products on the last page. *Id.* at 61 n.13. When

considering whether these venereal disease pamphlets constituted commercial speech, the U.S.

Supreme Court highlighted three relevant facts: (1) the parties conceded that these pamphlets were

advertisements, even if the company's name was not prevalent; (2) the pamphlets referred to

products, even if they did not mention the company's specific products; and (3) the company had

an economic motivation for producing and disbursing the pamphlets. *Id.* at 66–67. The

combination of all of these characteristics supported the conclusion that all of the pamphlets—

even the informational pamphlet about the risks of venereal disease—were commercial speech. *Id.*

at 68.

Even if the pamphlets fell outside the "core notion" of commercial speech, they would be

commercial under *Bolger*. There are striking similarities between the venereal disease prevention

pamphlet in *Bolger*—which the U.S. Supreme Court held to constitute commercial speech—and the suicide prevention pamphlet in the present case. The *Bolger* pamphlet was "an eight-page pamphlet discussing at length the problem of venereal disease and the use and advantages of condoms in aiding the prevention of venereal disease." *Id.* at 62 n.4. Similarly, the suicide prevention pamphlet is an eight-page pamphlet discussing the problem and signs of suicide and how proper storage of a firearm can help reduce risks of suicide by firearm. Both pamphlets discuss the relationship of the economic product to an important public health issue. *Compare id.* at 62 n.4 (discussing "the use and advantages of condoms in aiding the prevention of venereal disease")*, with* ECF 45-7 at 7, 8 (noting that "[b]y keeping secure firearm storage in mind, you can help reduce the number of suicides involving firearms," suggesting "options for safely storing and protecting your firearms when they're not in use," such as a lock box and gun case).

Plaintiffs highlight various differences between the County's pamphlets and traditional examples of commercial speech. ECF 39-12 at 18. But many of these differences are inherent in the distinction between laws that *prohibit* speech versus laws that *compel* speech. The County's pamphlets are not advertisements (the first *Bolger* factor), and the County has no economic motivation (the third *Bolger* factor). But "it is not necessary that each of the characteristics 'be present in order for speech to be commercial.'" *Greater Baltimore I*, 721 F.3d at 285. And these distinctions hold true for any instance where the government compels safety disclosures of products. The choking hazard labels on toys' packaging and the long list of drugs' side effects provided to a consumer at the pharmacy are not advertisements. The disclosures required by the FDA and the U.S. Consumer Product Safety Commission seek to promote public health and consumer awareness, not promote the products' sales. Nonetheless, these examples of compelled information plainly fall within the realm of commercial speech. The County's aim to reduce rates

of suicide by firearms and violent conflict resolution by providing information to gun owners about how to safely store their firearms is no different.

Plaintiffs argue the content of the pamphlets inappropriately focus on public health crises linked to firearms, rather than the firearms themselves. ECF 39-12 at 17; ECF 50 at 12. *Bolger* makes clear, however, that much of commercial speech "links a product to a current public debate." *Bolger*, 463 U.S. at 68 (quoting *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 563, n.5 (1980)) (internal quotation marks omitted); *see also Central Hudson Gas*, 447 U.S. at 563 (noting that a contrary conclusion "would grant broad constitutional protection to any advertising that links a product to a current public debate. But many, if not most, products may relate to public concerns with the environment, energy, economic policy, or individual health and safety."). From suicide to venereal disease, speech discussing public issues can still be commercial.

Finally, Plaintiffs argue that *Zauderer* does not apply because the speech does not limit consumer deception. ECF 50 at 13. However, multiple appellate courts have rejected this interpretation of *Zauderer*. *Am. Meat Inst.*, 760 F.3d at 22 ("To the extent that other cases in this circuit may be read as holding to the contrary and limiting *Zauderer* to cases in which the government points to an interest in correcting deception, we now overrule them."); *Sorrell*, 272 F.3d at 115 (concluding that *Zauderer*'s holding was broad enough to encompass non-misleading disclosure requirements); *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 556–58 (6th Cir. 2012) (upholding federally required health warnings on cigarette packaging, relying on *Sorrell*); *CTIA – The Wireless Ass'n*, 928 F.3d at 843–44. As discussed above, consumer deception is not the only recognized government interest in compelled disclosure laws. Many laws aim to ensure the product's proper and safe use, ranging from instructing consumers how to

properly dispose mercury-containing products to safely ingesting pharmaceutical drugs. The County's Ordinance achieves the same goal.

In short, these informational pamphlets are compelled disclosures related to a product purchased during an economic transaction. Such disclosures have been long understood as "commercial speech" and analyzed under such a standard. This Court does the same.

## B. Factual and Uncontroversial Information

This Court will next examine whether the pamphlets' content is factual and uncontroversial, after first considering the County's Motion to Exclude.

### i.   Defendant's Motion to Exclude

Plaintiffs' expert witness, Gary Kleck, opines on one specific statement in the pamphlets: that "[a]ccess to lethal means[,] including firearms" is a "risk factor[]" for suicide. *See* ECF 39-7 at 3; ECF 45-5 at 41:3–5 (identifying this statement as the only one for which he provides an expert opinion); *id.* at 39:13–16, 40:10–12, 41:10–12 49:11–13, 50:2–3, 51:20–25, 53:3–9 (confirming he does not provide an opinion on information anywhere else in the pamphlets). In his expert report, Mr. Kleck concludes that listing access to firearms as a "risk factor" infers that it is a *causal* factor. Specifically, he writes that "the County, via this pamphlet, is claiming that access to firearms causes an increased chance of a person committing suicide." ECF 39-7 at 3. He entitles this inference "the suicide claim" and concludes that it "is probably false." *Id.* He then uses the remainder of his report to dispute that "suicide claim," *i.e.*, that access to firearms *cause* suicide.

Mr. Kleck's report would be relevant, and therefore admissible, if the pamphlet indeed asserted a causal link between firearm access and suicide. However, it does no such thing. The pamphlet identifies access to firearms and other lethal means as a "risk factor," and nothing more. This distinction is supported by the fact that the pamphlet informs the firearm owner that "[b]y

keeping secure firearm storage in mind, you can help reduce the number of suicides *involving firearms*," not the number of suicides generally. ECF 45-7 at 7 (emphasis added). The pamphlet limits itself to identifying the risk that a firearm, like other items, could be used by a person contemplating suicide, and it focuses its message on informing gun owners how to safely store their firearms. By using the language of "risk factor" rather than "cause," the pamphlet specifically avoids making any causal accusation. By definition, "risk factors" need not have a causal connection. Like the pamphlet, Black's Law Dictionary defines "risk factor" as "[a]nything that increases the possibility of harm or any other undesirable result." *Risk Factor*, BLACK'S LAW DICTIONARY (11th ed. 2019). It does not require a causal relationship, and mere "correlation does not prove causation." *MSI v. Hogan*, 971 F.3d at 213. For Mr. Kleck's expert report to be relevant, this Court must read words into the pamphlet that are not there.[8] The pamphlet only identifies

---

[8] Aside from Mr. Kleck's proposed inference from the pamphlet, Plaintiffs argue a reasonable reader would interpret the pamphlet to propose a causal link. ECF 46 at 3. For evidence of this, Plaintiffs cite depositions and answers to interrogatories with statements made by themselves regarding their understanding of the pamphlet's message. *Id.* However, these statements do not address the statement at issue in Mr. Kleck's testimony. Some of these criticisms take issue with "feelings" the gun shop owners and other Plaintiffs get by distributing the pamphlets, they do not take issue with the actual messages or text written in the pamphlet. *E.g.*, ECF 39-10 at 29: 12–19 ("Q: Can you describe what you don't like about this pamphlet? A: Firearms don't cause suicide. Suicide is the problem, not the firearms. Q: Can you show me where in the pamphlet it says firearms cause suicide? A: That's what I was getting off the cover. That's what it means to me."); *Id.* at 42:6–21 ("Both pamphlets together give me that feeling. Q: What feeling? A: That this message is against firearms. Q: But the document itself doesn't mention firearms, correct? . . . A: I said I couldn't find it. I said putting them together and it tells me that this is all one package that firearms are causing the issue.").

Further, in Plaintiffs' answers to interrogatories, when asked to "identify with particularity each statement within [the pamphlets] that you contend" of which they disagree, Plaintiffs referenced

access to firearms as a risk factor, and Mr. Kleck's expert opinion does not dispute the correlation between access to firearms and risks of suicide. ECF 45-5 at 200:20–201:2. Consequently, Mr. Kleck's report is not "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

For this reason, Mr. Kleck's expert report is excluded.

### ii.    Factual

Given the pamphlet's restrictive scope, this Court need only assess whether access to firearms is a risk factor for an increased risk of suicide, *i.e.*, whether there is a correlation between access to firearms and risk of suicide. No party disputes this correlation; Plaintiffs only dispute research finding a causal link. ECF 50 at 4–10. In his deposition, Mr. Kleck agreed with the correlative relationship between access to firearms and an increased risk of suicide. ECF 45-5 at 200:20–201:11 ("Q: So you – you agree with the proposition that firearms ownership and firearms access is a risk factor for suicide if risk factor is used to mean a correlate? A: Yes. If it means nothing more than a correlate and not a causal assertion about causality, then yes.").

---

the message sent by the act of displaying and providing the pamphlets generally; they did not point to any particular statement in the pamphlet of which they disagreed. ECF 39-1 at 3–4 (Plaintiff Field Traders); 39-2 at 3–4 (Plaintiff Cindy's Hot Shots); ECF 39-1 at 3–4 (Plaintiff Pasadena Arms); ECF 39-4 at 3–4 (Plaintiff Worth-A-Shot); ECF 39-5 at 4 (Plaintiff MSI) (all repeating that "Requiring firearms deals to display the County's publications on suicide and conflict resolution sends the message that the purchase and possession of firearms and ammunition is causally related to increased risk of suicide and/or an illegal use of firearms and ammunition in conflict resolution"). Thus, Plaintiffs' answers to interrogatories take issue with the message displaying the pamphlets "sends"—not the message actually written in the pamphlets.

Mr. Kleck's opinion is limited to a line of text on page 4 of the Suicide Prevention Pamphlet. Thus, for the purposes of the motion to exclude, this Court limits its review to the statement for which Mr. Kleck provides expert testimony, not other statements or messages Plaintiffs assert can be inferred from the pamphlet as a whole.

The County provides expert reports and numerous studies demonstrating this well-documented correlation. ECF 45-3 at 7 (Expert Report of Alexander McCourt) (reporting that the description of access to firearms as an environmental risk factor for suicide "is consistent with a large body of research evidence"); ECF 45-4 at 5–6 (Expert Report of Nilesh Kalyanaraman) (summarizing sources documenting "a strong correlation" between firearm access and risk of suicide); ECF 45-15 (NIH FAQ webpage listing the "[p]resence of guns or other firearms in the home" as a risk factor for suicide, with the caveat that "[m]ost people who have risk factors for suicide will not attempt suicide"); ECF 45-18 (CDC webpage listing "[e]asy access to lethal means of suicide among people at risk" as a societal risk factor for suicide); ECF 45-33 at 2 (2010 American Journal of Public Health published study finding that laws requiring firearm licensing were "associated with fewer suicide attempts overall"); ECF 45-34 at 2–7 (2017 American Association of Suicidology published study summarizing the "extensive body of research" that has "demonstrated an association between gun ownership and suicide" and noting that that "[n]either theory nor data contend that gun ownership causes suicidal ideation," *id.* at 3); ECF 45-35 at 2 (2014 Annals Internal Medicine published study concluding "[a]ccess to firearms is associated with risk for completed suicide"); ECF 45-36 (1997 study concluding "keeping a gun in the home is associated with increased risk of both suicide and homicide of women"); ECF 45-37 (1988 study reporting access to firearms in the home as a risk factor for adolescent suicide); ECF 45-38 (1991 study reporting that "guns were twice as likely to be found in the homes of suicide victims as in the homes of attempters"). In short, the statement that access to firearms is a risk factor for suicide is factual.

The Conflict Resolution Pamphlet is likewise purely factual. Aside from listing available resources, it simply states that "Conflict Resolution is a process to help you find the best way to

resolve conflicts and disagreements peacefully." ECF 45-7 at 10. This statement is a straightforward definition of conflict resolution.

Thus, the County's pamphlets present purely factual information.

### iii.    Uncontroversial

This Court next addresses whether the information contained in the pamphlets "communicates a message that is controversial for some reason other than dispute about simple factual accuracy." *Am. Meat Inst.*, 760 F.3d at 27. Undoubtedly, firearm regulation in the United States is a highly controversial topic. However, the pamphlets themselves only speak to the uncontroversial topics of suicide prevention and nonviolent conflict resolution. The fact that the NSSF—the firearm industry's trade association—wrote and produced the "Firearms and Suicide Prevention" pamphlet strongly demonstrates the nonpartisan nature of the included information. *See* ECF 45-5 at 20:11–22. Plaintiffs do not, and plainly cannot, take issue with the County's goal of reducing the number of suicides and violent conflict resolutions. And Plaintiffs do not contest the correlational relationship between firearm access and suicide. Plaintiffs' arguments focus on the alleged controversial nature of the causal relationship. But as explained, the pamphlets do not suggest a causal relationship.

This contrasts with cases where the disclosed information was itself controversial. In past cases, courts have struck down laws requiring pregnancy centers to disclose the fact that they do not offer abortions and to provide information about state-sponsored abortion services—a controversial service in itself. For example, in *NIFLA*, the U.S. Supreme Court concluded that *Zauderer* did not apply in part because the mandatory disclosed information was about access to abortions, "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372. The same issue arose in *Greater Baltimore*, where the Fourth Circuit noted that "[t]he message conveyed is

antithetical to the very moral, religious, and ideological reasons the Center exists." *Greater Baltimore II*, 879 F.3d at 110. Here, information about how to safely store a firearm, information about the warning signs of suicide, and resources for individuals contemplating suicide or violent conflict resolution, are not antithetical to gun retailers' mission of selling firearms, nor are they controversial.

### C. Reasonably Related to the County's Interest and Not Unduly Burdensome

Finally, the pamphlets are "reasonably related to the State's interest" and are not "unduly burdensome." *Zauderer*, 471 U.S. at 628, 651. The physical ask of the Ordinance is minimal. The County prints and provides the pamphlets, which take up 6x6 inches of space each, at no cost to the gun retailers. The Ordinance simply requires gun retailers to display the pamphlets at the point of sale and to provide them to any purchaser of a firearm or ammunition. Similarly, the burden on gun shop owners' freedom of speech is minimal. Customers can easily recognize that gun retailers did not produce the pamphlets themselves because the pamphlets include the logos of the County, the NSSF, and AFSP. Further, the gun retailer could lawfully explain to the customer that the County requires distribution of the pamphlets.

The pamphlets are reasonably related to the County's interest in preventing suicide and violence. The proven correlation between gun access and suicide risk presents the County an opportunity to target its informational outreach more accurately. *See* ECF 45-4 at 8–9 (Expert Report of Nilesh Kalyanaraman) ("Since higher rates of gun ownership are associated with increased rates of gun suicide, it is sound public health practice to develop materials tailored to gun owners and deliver it in a setting with a high number of gun owners to best reach a high-risk population."). Similarly, the County's interest in reducing gun violence is reasonably related to its requirements that the Conflict Resolution pamphlet be distributed.

Ultimately, this case is not about limiting gun ownership or stigmatizing firearms. This case is about the correlative link between access to firearms and the risk of suicide or violent conflict resolution, and about the County's ability to take reasonable steps to mitigate that risk. Because the County's actions do not infringe Plaintiffs' First Amendment rights, summary judgment in the County's favor is warranted.

## V.   CONCLUSION

For the reasons stated above, Defendant's Motion to Exclude, ECF 44, is GRANTED; Plaintiffs' Motion for Summary Judgment, ECF 39, is DENIED; and Defendant's Cross-Motion for Summary Judgment, ECF 45, is GRANTED.

A separate Order follows.


Dated: March 21, 2023                                   _____/s/_____

Stephanie A. Gallagher
United States District Judge